JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

## BEFORE THE
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE SONY BMG CD )          MDL Docket No. _____
TECHNOLOGIES LITIGATION )

### MOTION TO TRANSFER UNDER 28 U.S.C. § 1407

Sony BMG Music Entertainment GP ("Sony BMG") has been sued in eleven related federal

class actions alleging that Sony BMG's use of content protection software on its audio compact discs

("CDs") violated federal and state law.  Sony BMG hereby moves under 28 U.S.C. § 1407 and Rule

7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation to transfer to the United

States District Court for the Southern District of New York all of these related federal cases.  A

supporting memorandum of law accompanies this motion, which is based on the following averments:

1.       Eleven putative class actions have been filed against Sony BMG alleging problems with

Sony BMG's use of "XCP" and/or "MediaMax" content protection software between August 2003

and the present.

OFFICIAL FILE COPY

IMAGED DEC 2 8 2005

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2005 DEC 23  A 11: 27

RECEIVED
CLERK'S OFFICE

2.    The eleven related cases are pending in United States District Courts in four judicial

districts: seven in the Southern District of New York, one in the Central District of California, two in the

Northern District of California, and one in the District of New Mexico.

3.    All eleven of the actions are in their earliest stages.  Although the actions pending in the

Southern District of New York have been consolidated and Interim Class Counsel has been appointed

for those consolidated actions, Sony BMG has not yet responded to any complaint and discovery has

not yet begun.

4.    All eleven of the lawsuits involve numerous common questions of fact.  Indeed, they are

nearly identical.  All of the cases allege that for approximately the past two years, Sony BMG has been

encoding some of its music CDs with "XCP" or "MediaMax" content protection software.  The cases

further allege that when the content protection software is installed onto a personal computer, the

software purportedly degrades the performance of the computer, makes the computer more vulnerable

to computer viruses, worms, and spyware, and permits Sony BMG to monitor the user's listening

habits.  The cases also allege that the content protection software is difficult to remove without causing

damage to the computer, that the End User Licensing Agreements ("EULAs") associated with the

content protection software do not adequately disclose relevant information, and that Sony BMG's use

of the content protection software caused harm.

5.    In addition, the pending actions raise common legal issues that could present a risk of

inconsistent pretrial rulings on substantive and procedural issues– including overlapping class-

certification requests– were such issues decided in multiple courts.

2

6.      Transfer of all actions to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407 would eliminate duplicative discovery, avoid potentially conflicting rulings and schedules, save time and expense for the parties, the attorneys, the witnesses, and the courts, and otherwise promote the just and efficient prosecution of all actions.

7.      The Southern District of New York is more convenient for the parties, witnesses, and the judicial system than is any other single district.  Sony BMG's principal offices are located in that District, the company's top executives and the employees responsible for the content protection software are located in that District, Sony BMG's Law Department, Department of Business and Legal Affairs and Global Digital Business Group are located in that District and most potentially relevant documents and witnesses are located in that District.

8.      Plaintiffs who initially filed cases in other judicial districts would not suffer any prejudice from transferring the actions to the Southern District of New York for pretrial coordination or consolidation.  Those plaintiffs could be deposed in their home states, if necessary, and all plaintiffs would enjoy numerous efficiencies from coordinating their cases with other similar actions.

WHEREFORE, the Movants respectfully ask the Panel to enter an Order transferring the

pending cases, as well as any related cases that might later be filed, to the United States District Court

for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28

U.S.C. § 1407.


Dated: New York, New York
       December 23 , 2005

                                        Respectfully submitted,



                                        Jeffrey S. Jacobson, Esq.

                                        Debevoise & Plimpton LLP
                                        919 Third Avenue
                                        New York, New York 10022
                                        (212) 909-6000

                                        Attorneys for Defendant Sony BMG Music
                                        Entertainment GP

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

BEFORE THE
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE SONY BMG CD | ) | MDL Docket No. _____ |
| TECHNOLOGIES LITIGATION | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO TRANSFER UNDER 28 U.S.C. § 1407

Sony BMG Music Entertainment GP ("Sony BMG") is the principal defendant in eleven related class actions that have been filed in or removed to federal court. Seven lawsuits are pending in the United States District Court for the Southern District of New York and have been consolidated before the Honorable Naomi Reice Buchwald; one is pending in the Central District of California; two are pending in the Northern District of California; and one has been removed to the District of New Mexico. Sony BMG now moves to transfer all of those cases currently pending in United States District Courts to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407.

All of the lawsuits arise from a common factual core and assert virtually identical claims against Sony BMG under the same or similar laws. Transfer and consolidation or coordination of these

actions, as well as any future related cases, will promote efficient handling of these cases, avoid

potentially duplicative discovery, prevent inconsistent pretrial rulings on class-certification requests and

other procedural and substantive issues and conserve resources. The Southern District of New York is

the most appropriate transferee forum because Sony BMG is headquartered there and because most of

the witnesses and documents are located there.

## FACTUAL BACKGROUND

Sony BMG is a Delaware General Partnership with its corporate headquarters at 550 Madison

Avenue, New York, New York. Declaration of Stephanie Yu, Esq., Dec. 22, 2005 [hereinafter "Yu

Decl."] ¶ 5. Sony BMG is one of the world's largest recorded music businesses, with labels including

Arista Records, BMG Classics, BMG Heritage, Columbia Records, Epic Records, J Records, Jive

Records, LaFace Records, Legacy Records, Provident Music Group, RCA Records, RCA Victor

Group, RLG – Nashville, Sony Classical, Sony Music Nashville, Sony Wonder, Sony Urban Music,

and Verity Records. *Id.* ¶ 4.

Presently and at all times relevant to the litigation, Sony BMG's principal offices have been

located within the Southern District of New York. Yu Decl. ¶ 6. Most of Sony BMG's top executives

and the employees responsible for content protection software work in those offices. *Id.* ¶ 7. Sony

BMG's corporate officers, its Global Digital Business Group and its law department all have been

based in New York since August 2004. *Id.* ¶ 8.

The factual allegations in the ten federal suits pending against SONY BMG in the United States

District Courts are substantially identical. All of the cases allege that for approximately the past two

2

years, Sony BMG has been including one of two types of content protection software on some of its

music CDs: "XCP," which was created by First 4 Internet Ltd. ("F4I"), a corporation located in and

organized under the laws of the United Kingdom, and MediaMax, which was created by SunnComm

International, Inc. ("SunnComm"), a Nevada corporation headquartered in Arizona.  Sony BMG was a

licensee of these technologies.

The complaints allege that, when and if an XCP CD is inserted into a computer, an End User

License Agreement ("EULA") appears automatically on the screen and, if the EULA is accepted, the

XCP Software installs itself on the user's computer.  The complaints allege that the XCP Software

contains a potentially harmful "rootkit" that renders the user's computer more vulnerable to "malware"

promulgated by third parties, including "viruses," "Trojan Horses" and "spyware," than the computers

would have been had the XCP software not been installed and that the XCP software interferes with

the user's ability to access the music via non-XCP software, consumes excess computer resources, and

causes system errors.

With respect to the MediaMax software, the complaints claim that when a MediaMax CD is

inserted into a computer, a EULA appears automatically on the screen, and that certain software files

are immediately loaded onto the computer even before the user of the MediaMax CD has an

opportunity to accept or reject the EULA.  The complaints allege that this software remains on the

computer even if the EULA is rejected.  The complaints also allege that the MediaMax software causes

a file folder to be installed on a user's computer that renders the user's computer more vulnerable to

3

security breaches by third parties by allowing these third parties to gain enhanced permissions over the user's computer running the Windows operating system.

With respect to both XCP and MediaMax, the complaints allege that the software permits Sony BMG to collect information over the Internet from CD users, including users' Internet Protocol (IP) addresses. According to the complaints, both types of software are difficult to locate and remove. The complaints allege that Sony BMG failed to provide a ready means to uninstall either type of content protection software and that, when Sony BMG did make an uninstall program available, this program also created security risks. Further, the complaints allege that both the XCP EULA and the MediaMax EULA misrepresented or failed to disclose the nature and presence of each respective type of content protection software and that the EULAs contained unconscionable or otherwise unenforceable provisions.

The following introductory paragraph, which appears in nearly identical form in a New York and two California complaints, is typical of the claims in all of the actions:

> By including a flawed and overreaching computer program in over 20 million music CDs sold to the general public, Sony BMG created serious security, privacy and consumer protection problems that damaged Plaintiffs and the members of the class. At issue are two software technologies—MediaMax and Extended Copy Protection, also known as XCP—which defendant Sony BMG claims to have placed on the music CDs for the purpose of copyright protection, but which in truth do much more, including monitoring customer listening of the CDs and installing undisclosed and in some cases hidden files on users' computers.

Declaration of Jeffrey S. Jacobson, Dec. 23, 2005 [hereinafter Jacobson Decl.], Ex. 10 (*Ricciuti v. Sony BMG Music Entm't*, No. 05 CV 10190 (BSJ) (S.D.N.Y. Dec. 5, 2005) (Compl. ¶ 1)); *see*

*also* Jacobson Decl., Ex. 3 (*Klemm v. Sony BMG Music Entm't*, No. C 05 5111 BZ (N.D. Cal.

Dec. 9, 2005) (Compl. ¶ 1) (same)); Jacobson Decl., Ex. 6 (*Melcon v. Sony BMG Music Entm't*,

No. C 05 5084 MHP (N.D. Cal. Dec. 8, 2005) (Compl. ¶ 1) (same)).  All other complaints are based

on nearly identical factual assertions.[1]

---

[1]   Jacobson Decl., Ex. 5 (*Maletta v. Sony BMG Music Entm't*, No. 05 CV 10637 (UA) (S.D.N.Y.
Dec. 19, 2005) (Compl. ¶ 15) ("SONY failed to disclose to the public that when downloaded,
XCP also installs a hidden 'rootkit' program . . . disguised as software designed to play music."));
Jacobson Decl., Ex. 1 (*Black v. Sony BMG Music Entm't*, No. CIV-05-1315 WDS/RLP (D.
N.M. Dec. 19, 2005) (Compl. ¶ 2) ("Defendant sells music discs to consumers as Compact Discs
'CDs' that, unbeknownst to consumers, do not meet the technical specifications of CDs and instead
contain a sneaky 'rootkit' program disguised as song playing software that installs on (and thereby
affirmatively harms) the 'root' of a user's computer system.")); Jacobson Decl., Ex. 8 (*Ponting v.
SonyBMG Music Entm't*, No. CV 05-08472-JFW(AJWx) (C.D. Cal. Dec. 2, 2005) (Compl. ¶
1) ("Defendant Sony BMG Music Entertainment, LLC sold CDs containing software, . . . which
purported to be an end-to-end solution to protect the rights of record labels and artists against the
unauthorized copying of CD content.  In reality, the software was spyware, which secretly
implanted a computer program on the user's computer sending personal information back to
Defendant Sony.")); Jacobson Decl., Ex. 2 (*DeMarco v. Sony BMG Music*, No. 2:05-cv-05485-
WHW-SDW (D.N.J. Nov. 17, 2005) (stipulated transfer to S.D.N.Y. pending) (Compl. ¶ 3)
("The MediaMax software, which was allegedly intended to prevent piracy made permanent and
irreversible alterations to the core windows operating system which could be later utilized by
Hackers or Sony to take control of the users' computer without the users' knowledge."));
Jacobson Decl., Ex. 4 (*Klewan v. Arista Holdings Inc. d/b/a Sony BMG Music Entm't*, No. 05
CV 9609, consolidated as *In re Sony BMG CD Techs. Litig.*, No. 05 CV 9575 (NRB)
(S.D.N.Y. Nov. 14, 2005) (Compl. ¶ 5) ("[XCP] was designed to prevent owners of the disc from
making unauthorized copies but has additional harmful effects on a user's computer.")); Jacobson
Decl., Ex. 7 (*Michaelson v. Sony BMG Music, Inc.*, No. 05 CV 9575 (NRB) (S.D.N.Y. Nov.
14, 2005) (Compl. ¶ 4) ("While Sony publicly touted [XCP] as a 'speed bump' for consumers
seeking to illegally share its music, in reality it was something far more sinister. . . . [T]his software is
'spyware' that is a 'trojan that opens securities vulnerabilities through rootkit functionality.'"));
Jacobson Decl., Ex. 9 (*Potter v. Sony BMG Music Entm't*, No. 05 CV 9607, consolidated as *In
re Sony BMG CD Techs. Litig.*, No. 05 CV 9575 (NRB) (S.D.N.Y. Nov. 14, 2005) (Compl. ¶
4) ("[T]he EULA fails to disclose that [Sony BMG]'s music CDs contain a hidden 'rootkit'
program disguised as song playing software which surreptitiously installs itself directly into the 'root'
of users' computer systems.")); Jacobson Decl., Ex. 11 (*Rivas v. Sony BMG Music Entm't*, No.
05 CV 9598, consolidated as *In re Sony BMG CD Techs. Litig.*, No. 05 CV 9575 (NRB)

## ARGUMENT

This panel should exercise its authority under 28 U.S.C. § 1407 to transfer all the related cases

to the United States District Court for the Southern District of New York for coordinated or

consolidated pretrial proceedings.  The related lawsuits all involve "one or more common questions of

fact."  *See* 28 U.S.C. § 1407.  Although the plaintiffs originally filed their actions in different

jurisdictions, all of the actions will involve the same factual discovery and will turn upon the same factual

questions, namely, the nature and function of Sony BMG's content protection software, whether Sony

BMG knew of the nature and function of its content protection software, whether Sony BMG

adequately disclosed the nature and function of its content protection software and whether the plaintiffs

sustained any damages as a result of Sony BMG's content protection software.

Transfer would also serve "the convenience of parties and witnesses" and "promote the just and

efficient conduct" of the cases.  *See* 28 U.S.C. § 1407.  Because all of these cases revolve around the

same complex and technical factual questions, pretrial coordination of the various cases would

significantly ease the burden of discovery for both Sony BMG and plaintiffs.  Pretrial coordination

would also promote the just and efficient resolution of motions by permitting only one judge to resolve

questions of class certification, sufficiency of pleadings, discovery disputes, and summary judgment.

The Southern District of New York is the most appropriate forum for coordination or

consolidation.  Sony BMG's headquarters is located within the Southern District of New York, Sony

_____

(S.D.N.Y. Nov. 14, 2005) (Compl. ¶ 1) ("Sony has concocted an elaborate scheme that conceals
from the user that DRM CDs contain the DRM software program, the installation of the software
program, and the presence of the software program on the user's computer.")).

6

BMG executives and technology developers work there, Sony BMG's documents pertaining to content protection software are located there, and seven of the eleven actions are already pending there before Judge Buchwald.  Transfer to the Southern District of New York also could facilitate an early resolution of these cases and foster judicial economy.  If the parties reach an amicable resolution to the matter and all of the cases are consolidated before Judge Buchwald, the parties will not have to present the settlement to courts in other Districts and seek the dismissal of each suit individually.

## I.

## THE CASES SHOULD BE TRANSFERRED.

### A.   The Cases Arise from a Common Factual Core.

As demonstrated above, all of the actions involve essentially the same questions of fact, as required by 28 U.S.C. § 1407.  Thus, the same issues of law and fact will be central to all of the cases against Sony BMG.  All cases will involve the questions of (*i*) the nature of the content protection software on some of Sony BMG's CDs, (*ii*) what Sony BMG knew of the alleged problems with the content protection software, (*iii*) whether Sony BMG adequately disclosed the nature and functions of the content protection software to consumers, and (*iv*) whether the content protection software on some Sony BMG CDs caused harm to consumers.

The cases should be transferred for coordinated or consolidated pretrial proceedings even though different cases may require application of different states' laws.  It is well settled that "divergent legal theories . . . arising out of the same substantive claims and allegations present[] no bar to a Section 1407 transfer."  *In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 611 (J.P.M.L. 1974).  *See also In*

7

*re AT&T Corp. Sec. Litig.*, No. 1399, 2001 U.S. Dist. LEXIS 5233, *3-*4 (J.P.M.L. Apr. 19,

2001) (stating that the presence of additional or differing legal theories is insignificant "when the

underlying actions still arise from a common factual core"); *In re Alliance Equip. Lease Program Sec.*

*Litig.*, No. 1296, 1999 U.S. Dist. LEXIS 17148, at *3 (J.P.M.L. Nov. 4, 1999) (same).  Although

plaintiffs, in addition to the common claims under federal law, asserted supplemental claims under

various state laws, all of the claims arise from a common factual core, and all of the plaintiffs will be

seeking the same discovery relating to the development, nature, function and implementation of the

XCP and MediaMax software.

### B.      Transfer Would be for the Convenience of Parties and Witnesses.

Pretrial coordination or consolidation is essential to prevent expensive and time-consuming

duplication of discovery, which would unnecessarily burden the parties and the courts.  *See, e.g.*, *In re*

*Reliance Acceptance Group, Inc. Sec. Litig.*, No. 1304, 1999 U.S. Dist. LEXIS 19205, at *2-*3

(J.P.M.L. Dec. 9, 1999) (ordering transfer "in order to eliminate duplicative discovery").  This case

involves complex and technical factual questions.  All plaintiffs will be seeking technical information

about the same content protection software and Sony BMG's use of it.  All parties likely will be using

experts to help analyze the technical facts.  Conducting separate discovery in each of the several cases

would collectively burden the plaintiffs by requiring each plaintiff to collect information separately and

retain a separate expert.  Separate discovery also would burden Sony BMG by repeatedly requiring it

to make available those employees who are familiar with the facts.  Thus, consolidating or coordinating

discovery would ease the burden on both sides of the dispute.  Further, each individual case is unlikely

to require significant discovery from the plaintiffs in different jurisdictions.

### C.     Transfer Would Promote Justice and Efficiency.

Transferring all cases to one court would permit that court to dispose of all pretrial motions in a

just and efficient manner.  The different cases against Sony assert claims on behalf of overlapping

purported classes of plaintiffs.  "It is in the field of class action determinations in related multidistrict civil

actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re*

*Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968).  All cases against Sony BMG are

still in the preliminary stages of litigation.  None of the potential transferor courts have yet certified any

of the purported classes.  Transferring all cases to one court would allow for a simple and consistent

definition of the class or classes.

Additionally, transfer would facilitate a coordinated and consistent disposition of the cases.  If

Sony BMG is unable to achieve a resolution of the matters at the pre-answer stage, it may move for

dismissal of many of the cases and, if necessary, may also move for summary judgment at a later stage

of the litigation.  "[T]he likelihood of motions for . . . dismissal [or] summary judgment in [multiple]

actions . . . makes Section 1407 treatment . . . necessary to prevent conflicting pretrial rulings and

conserve judicial effort." *In re TransOcean Tender Offer Sec. Litig.*, 415 F. Supp. 382, 384

(J.P.M.L. 1976); *see also, e.g., In re IKON Office Solutions, Inc. Sec. Litig.*, No. 1318, 1999 U.S.

Dist. LEXIS 19077, at *2 (J.P.M.L. Dec. 2, 1999) (ordering transfer to "prevent inconsistent pretrial

rulings").  Transfer would also enable Sony to engage all plaintiffs in any efforts to resolve the cases

amicably and efficiently. If Sony BMG is able to resolve the cases and the cases are coordinated

before one court for pretrial proceedings, only one court would need to approve any settlement. *See*

FED. R. CIV. P. 23(e) (requiring court approval for any settlement, voluntary dismissal, or compromise

in a class action).

## II.

### THE SOUTHERN DISTRICT OF NEW YORK IS THE MOST APPROPRIATE TRANSFEREE DISTRICT.

The Southern District of New York is the most appropriate forum for the pretrial coordination

or consolidation of all of the cases. Sony BMG's headquarters, where most of the key witnesses and

documents are located, is within the Southern District of New York. Of the eleven cases against Sony

BMG, seven are already pending in the Southern District of New York and are subject to Judge

Buchwald's Case Management Order Number 1, entered on December 1, 2005 in Case Number 05

CV 9575 (NRB). *See* Jacobson Decl., Ex. 12. Coordination or consolidation in the Southern District

of New York would cause the least disruption. Transfer of those cases that are currently pending

elsewhere would not prejudice the plaintiffs in those cases or inconvenience their counsel.

The location of witnesses and documents is one of the most important considerations in

selecting a transferee forum under § 1407. *See, e.g., In re Allegheny Energy, Inc. Sec. Litig.*, 259 F.

Supp. 2d 1368, 1369 (J.P.M.L. 2003) (transferring 13 cases to district where only one case was

pending, because defendant's headquarters and individual defendants were there); *In re Safety-Kleen*

*Corp. Sec. Litig.*, No. 1378, 2000 U.S. Dist. LEXIS 17845, at *2 (J.P.M.L. Dec. 1, 2000)

(consolidating cases in South Carolina, where defendant was headquartered and key documents

10

located); *In re Rite Aid Corp. Sec. Litig.*, No. 1360, 2000 U.S. Dist. LEXIS 14841, at *2 (J.P.M.L.

Oct. 6, 2000) (transferring cases to the Eastern District of Pennsylvania because "the presence of Rite

Aid headquarters within that district means that pertinent documents and witnesses should be found

there"); *In re IKON Office Solutions, Inc. Sec. Litig.*, No. 1318, 1999 U.S. Dist. LEXIS 19077, at

*5 (J.P.M.L. Dec. 2, 1999) (transferring cases to the Eastern District of Pennsylvania because

"Pennsylvania, where IKON's headquarters is located, is likely to be the location of a significant

number of documents and witnesses"); *In re Sunbeam Corp. Sec. Litig.*, No. 1297, 1999 U.S. Dist.

LEXIS 15870, at *2 (J.P.M.L. Oct. 13, 1999) (transferring cases to the Southern District of Florida

because "documents and witnesses will likely be found in that district at Sunbeam's Boca Raton

headquarters").

Transferring the cases to the Southern District of New York would neither prejudice plaintiffs

nor inconvenience their counsel. Those few plaintiffs who are geographically distant from the Southern

District of New York would not need to travel to there for depositions, which Sony BMG could take in

the plaintiffs' home states, if necessary. *See, e.g.*, *IKON*, 1999 U.S. Dist. LEXIS 19077, at *3 ("since

Section 1407 transfer is for pretrial proceedings only, there is usually no need for the parties and

witnesses to travel to the transferee district for depositions or otherwise"). Transfer to the Southern

District of New York will not inconvenience Plaintiffs' counsel because "the judicious use of liaison

counsel, lead counsel and committees of counsel will eliminate the need for most counsel ever to travel

to the transferee district." *In re Alliance Equip. Lease Program Sec. Litig.*, No. 1296, 1999 U.S.

Dist. LEXIS 17148, at *4 (J.P.M.L. Nov. 4, 1999). Counsel representing a plaintiff in one of the

11

actions pending in the Southern District of New York originally filed the action in the District of New

Jersey, but stipulated that transfer to the Southern District of New York would serve the convenience

of the parties and the administration of justice. Jacobson Decl., Ex. 5 (*DeMarco v. Sony BMG Music*,

2:05-cv-05485-WHW-SDW (D.N.J. Nov. 17, 2005) (Joint Stipulation for Change of Venue, Dec.

19, 2005)). Additionally, counsel representing plaintiffs in actions pending in the Northern Districts of

California have already filed a substantially identical action in the Southern District of New York.[2]

Far from generating inconvenience, transfer to the Southern District of New York would

collectively *benefit* Plaintiffs' counsel by eliminating the need to duplicate efforts that will be undertaken

in the Southern District of New York litigation regardless of transfer. *See In re MLR, LLC, Patent*

*Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003) ("it is most logical to assume that prudent counsel

will combine their forces and apportion their workload in order to streamline the efforts of the parties

and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a

minimum of inconvenience to all concerned"); *In re Reliance Acceptance Group, Inc. Sec. Litig.*, No.

1304, 1999 U.S. Dist. Lexis 19205, at *4 (J.P.M.L. Dec. 9, 1999) (same); *Alliance Equip. Lease*

---

[2]    The law firms of Green Welling LLP, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, the
Electronic Frontier Foundation, and Lawrence E. Feldman & Associates filed a complaint on
behalf of Tom Ricciuti, Yvonne Ricciuti, and Mary Schumacher in the Southern District of New
York on December 5, 2005. The same counsel also filed a complaint on behalf of Erin Melcon in
the Northern District of California on December 8, 2005. The two complaints filed in different
jurisdictions are substantially identical. *Compare* Jacobson Decl., Ex. 10 (*Ricciuti v. Sony BMG
Music Entm't*, No. 05 CV 10190 (S.D.N.Y. Dec. 5, 2005) (Compl.)) *with* Jacobson Decl., Ex.
6 (*Melcon v. Sony BMG Music Entm't*, No. C 05 5084 MHP (N.D. Cal. Dec. 8, 2005)
(Compl.)).

*Program*, 1999 U.S. Dist. LEXIS 17148, at *4-*5 (same); *In re Nissan Motor Corp. Antitrust Litig.*, 385 F. Supp. 1253, 1255 (J.P.M.L. 1974) (same).

## CONCLUSION

For all of the above reasons, the Panel should transfer the pending actions, as well as any related actions that might later be filed, to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407.

Dated: New York, New York
      December 23, 2005

                      Respectfully submitted,

                      Jeffrey S. Jacobson, Esq.

                      Debevoise & Plimpton LLP
                      919 Third Avenue
                      New York, New York 10022
                      (212) 909-6000

                      Attorneys for Defendant Sony BMG Music
                      Entertainment GP

☑003

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE SONY BMG CD        )    **MDL Docket No. 1750**
TECHNOLOGIES LITIGATION  )

## REVISED SCHEDULE OF ACTIONS

### CENTRAL DISTRICT OF CALIFORNIA

*Jeffrey T. Ponting, Daniel D. Linde, on behalf of themselves and all others similarly situated v. SonyBMG Music Entertainment, LLC, First4Internet, Ltd., and Does 1 through 20.*

Case Number: CV 05-08472-JFW(AJWx)

Plaintiffs:    Jeffrey T. Ponting
               Daniel D. Linde

Defendants:    SonyBMG Music Entertainment, LLC
               First4Internet, Ltd.

Judge:         The Honorable John F. Walter

## NORTHERN DISTRICT OF CALIFORNIA

*Laura Klemm, on behalf of herself and all others similarly situated v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

    Case Number: C 05 5111 BZ

    Plaintiff:    Laura Klemm

    Defendants:    Sony BMG Music Entertainment
                      Sony Corporation of America
                      Bertelsmann, Inc.

    Judge:    The Honorable Bernard Zimmerman

*Erin Melcon, on behalf of herself and all others similarly situated v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

    Case Number: C 05 5084 MHP

    Plaintiff:    Erin Melcon

    Defendants:    Sony BMG Music Entertainment
                      Sony Corporation of America
                      Bertelsmann, Inc.

    Judge:    The Honorable Marilyn Hall Patel

## DISTRICT OF NEW JERSEY

*Darren DeMarco, on behalf of himself and all others similarly situated v. Sony BMG Music, and SunnComm Technologies, Inc., and Does 1 - 300.*

    Case Number: 2:05-cv-05485-WHW-SDW (D. N.J.)

    Plaintiff:    Darren DeMarco

    Defendants:    Sony BMG Music
                      SunnComm Technologies, Inc.

Judge:      The Honorable William H. Walls

Note:       This case was transferred, under 28 U.S.C. § 1404 and pursuant to stipulation of
            the parties, to the Southern District of New York on December 22, 2005.  No
            civil action number has yet been assigned to this case.

## DISTRICT OF NEW MEXICO

*Chad Black, on behalf of himself and all other similarly situated v. Sony BMG Music Entertainment,
and Does 1 through 100.*

Case Number:  CIV-05-1315 WDS/RLP

Plaintiff:    Chad Black

Defendant:    Sony BMG Music Entertainment

Judge:        The Honorable W. Daniel Schneider

## SOUTHERN DISTRICT OF NEW YORK

*In re Sony BMG CD Technologies Litigation*

Consolidated Case Number:       1:05-cv-09575-NRB

Judge:                          The Honorable Naomi Reice Buchwald

*Andrew Klewan and James Springer, individuals, on their own behalf and on behalf of all others
similarly situated v. Arista Holdings Inc., doing business as Sony BMG Music Entertainment.*

Case Number:  05 CV 9609

Plaintiffs:    Andrew Klewan
               James Springer

Defendant:    Arista Holdings Inc., doing business as Sony BMG Music Entertainment

3

*John Maletta, Individually and as Representative for all others similarly situated and the General Public v. Sony BMG Music Entertainment Corp., Sony Corporation of America, and Bertelsmann, Inc., and Does 1 through 100, Inclusive.*

    Case Number: 05 CV 10637 (UA)

    Plaintiff:     John Maletta

    Defendants:    Sony BMG Music Entertainment Corp.
                  Sony Corporation of America
                  Bertelsmann, Inc.

*James Michaelson and Ori Edelstein v. Sony BMG Music, Inc. and First 4 Internet.*

    Case Number: 05 CV 9575

    Plaintiffs:    James Michaelson
                  Ori Edelstein

    Defendants:    Sony BMG Music, Inc.
                  First 4 Internet

*Jeffrey Potter, individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment, a Delaware General Partnership.*

    Case Number: 05 CV 9607

    Plaintiff:     Jeffrey Potter

    Defendant:    Sony BMG Music Entertainment

*Tom Ricciuti, Yvonne Ricciuti, and Mary Schumacher v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

    Case Number: 05 CV 10190

    Plaintiffs:    Tom Ricciuti
                  Yvonne Ricciuti
                  Mary Schumacher

4

Defendants:    Sony BMG Music Entertainment
               Sony Corporation of America
               Bertelsmann, Inc.

*Dora Rivas individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment.*

Case Number: 05 CV 9598

Plaintiff:    Dora Rivas

Defendant:    Sony BMG Music Entertainment

5

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE SONY BMG CD      )    **MDL Docket No. _____**
TECHNOLOGIES LITIGATION    )

**DECLARATION OF STEPHANIE YU, ESQ.**

I, STEPHANIE YU, declare and say:

1. I am Counsel for SONY BMG MUSIC ENTERTAINMENT GP ("SONY BMG"). I have worked for SONY BMG since September 6, 2005. I work at SONY BMG's headquarters in New York, New York.

2. I submit this declaration in connection with SONY BMG's motion to transfer eleven pending cases to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407.

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2005 DEC 23  A 11: 28

RECEIVED
CLERK'S OFFICE

3.  Except as otherwise stated, I make this declaration based on personal knowledge acquired in the ordinary performance of my duties at SONY BMG, and on business records made and maintained in the normal course of SONY BMG's business.

4.  SONY BMG is one of the world's largest recorded music businesses, with labels including Arista Records, BMG Classics, BMG Heritage, Columbia Records, Epic Records, J Records, Jive Records, LaFace Records, Legacy Records, Provident Music Group, RCA Records, RCA Victor Group, RLG – Nashville, Sony Classical,  Sony Music Nashville, Sony Wonder, Sony Urban Music, and Verity Records.

5.  SONY BMG is a Delaware General Partnership with its corporate headquarters at 550 Madison Avenue, New York, New York.

6.  Presently and at all times relevant to the litigation, SONY BMG's principal offices have been located within the Southern District of New York.

7.  Most of SONY BMG's top executives and employees responsible for content protection software work in those offices.

8. SONY BMG's corporate officers, its Global Digital Business Group, and its law department all have been based in New York since August 2004.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: New York, New York
      December 22, 2005

Stephanie Yu, Esq.

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

# BEFORE THE
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| **IN RE SONY BMG CD** | ) | **MDL Docket No. _____** |
| **TECHNOLOGIES LITIGATION** | ) | |

## DECLARATION OF JEFFREY S. JACOBSON, ESQ.
## IN SUPPORT OF MOTION TO TRANSFER UNDER 28 U.S.C. § 1407

I, JEFFREY S. JACOBSON, declare and say:

1. I am a member of the bar of the State of New York and am a partner in the law firm of

Debevoise & Plimpton LLP, attorneys for defendant Sony BMG Music Entertainment GP in the above

captioned matter. I submit this Declaration in support of defendants' Motion to Transfer under 28 U.S.C.

§ 1407. I am over the age of 18 and am competent to testify in this action.

2. I base this Declaration on personal knowledge, except as otherwise stated.

3. I am informed and believe that Exhibits 1-11, which accompany this Declaration, are the true

and correct copies of the Complaints in the following actions:

Exhibit 1:    *Chad Black, on behalf of himself and all other similarly situated v. Sony BMG Music Entertainment, and Does 1 through 100*, No. CIV-05-1315 WDS/RLP (D. N.M.);

Exhibit 2:    *Darren DeMarco, on behalf of himself and all others similarly situated v. Sony BMG Music, and SunnComm Technologies, Inc., and Does 1 - 300*, No. 2:05-cv-05485-WHW-SDW (D.N.J.);

Exhibit 3:    *Laura Klemm, on behalf of herself and all others similarly situated v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*, No. C 05 5111 BZ (N.D. Cal.);

Exhibit 4:    *Andrew Klewan and James Springer, individuals, on their own behalf and on behalf of all others similarly situated v. Arista Holdings Inc., doing business as Sony BMG Music Entertainment*, No. 05 CV 9609 (S.D.N.Y.);

Exhibit 5:    *John Maletta, Individually and as Representative for all others similarly situated and the General Public v. Sony BMG Music Entertainment Corp., Sony Corporation of America, and Bertelsmann, Inc., and Does 1 through 100, Inclusive*, No. 05 CV 10637 (S.D.N.Y.).

Exhibit 6:    *Erin Melcon, on behalf of herself and all others similarly situated v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*, No. C 05 5084 MHP (N.D. Cal.);

Exhibit 7:    *James Michaelson and Ori Edelstein v. Sony BMG Music, Inc. and First 4 Internet*, No. 05 CV 9575 (NRB) (S.D.N.Y.);

Exhibit 8:    *Jeffrey T. Ponting, Daniel D. Linde, on behalf of themselves and all others similarly situated v. SonyBMG Music Entertainment, LLC, First4Internet, Ltd., and Does 1 through 20*, No. CV 05-08472-JFW(AJWx) (C.D. Cal.);

Exhibit 9:    *Jeffrey Potter, individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment, a Delaware General Partnership*, No. 05 CV 9607 (S.D.N.Y.);

Exhibit 10:    *Tom Ricciuti, Yvonne Ricciuti, and Mary Schumacher v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*, No. 05 CV 10190 (S.D.N.Y.);

Exhibit 11:    *Dora Rivas individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment*, No. 05 CV 9598 (S.D.N.Y.).

4. I am informed and believe that Exhibit 12, which accompanies this Declaration, is a true and correct copy of the Stipulation and Case Management Order Number 1, entered on December 1, 2005, in *James Michaelson and Ori Edelstein v. Sony BMG Music, Inc. and First 4 Internet*, No. 05 CV 09575 (NRB) (S.D.N.Y.), which consolidates that action with *Andrew Klewan and James Springer, individuals, on their own behalf and on behalf of all others similarly situated v. Arista Holdings Inc., doing business as Sony BMG Music Entertainment*, No. 05 CV 9609 (S.D.N.Y.); *Dora Rivas individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment*, No. 05 CV 9598 (S.D.N.Y.); and *Jeffrey Potter, individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment, a Delaware General Partnership*, No. 05 CV 9607 (S.D.N.Y.).

5. I am informed and believe that Exhibit 13, which accompanies this Declaration, is a true and correct copy of the Joint Stipulation for Change of Venue, filed on December 19, 2005, in *Darren DeMarco, on behalf of himself and all others similarly situated v. Sony BMG Music, and SunnComm Technologies, Inc., and Does 1 - 300*, 2:05-cv-05485-WHW-SDW (D. N.J.).

6. I am informed and believe that Exhibit 14, which accompanies this Declaration, is a true and correct copy of the Notice of Removal, filed on December 19, 2005, in *Chad Black, on behalf of himself and all other similarly situated v. Sony BMG Music Entertainment, and Does 1 through 100*, No. CIV-05-1315 WDS/RLP (D. N.M.).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: New York, New York
       December 23, 2005

                                  Jeffrey S. Jacobson, Esq.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| **IN RE SONY BMG CD** | ) | **MDL Docket No. _____** |
| **TECHNOLOGIES LITIGATION** | ) | |

**NOTICE OF APPEARANCE**

       In compliance with J.P.M.L Rule 5.2(c), the following designated attorney is authorized to receive service of all pleadings, notices, orders, and other papers relating to practice before the Judicial Panel on Multidistrict Litigation on behalf of the defendants listed below.  I am aware that only one attorney can be designated for each party.

Name and address of designated attorney:

       Jeffrey S. Jacobson, Esq.
       Debevoise & Plimpton LLP
       919 Third Avenue
       New York, New York 10022

       Telephone: (212) 909-6000
       Facsimile: (212) 521-7479

Represented party:

     Sony BMG Music Entertainment GP

Dated: December 23, 2005

                                   Jeffrey S. Jacobson, Esq.

                                   Debevoise & Plimpton LLP
                                   919 Third Avenue
                                   New York, New York 10022
                                   (212) 909-6000

                                   Attorneys for Defendant Sony BMG Music
                                   Entertainment GP

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 8 2005

FILED
CLERK'S OFFICE

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE SONY BMG CD | ) | **MDL Docket No. 1750** |
| TECHNOLOGIES LITIGATION | ) | |

## REVISED PROOF OF SERVICE

I, Marissa M. Grimes, an attorney, hereby certify that, on December 23, 2005, I caused a copy

of the Moving Defendant's (*i*) Motion to Transfer Under 28 U.S.C. § 1407 (with an attached Schedule

of Actions), (*ii*) Memorandum of Law in Support of Motion to Transfer, (*iii*) Declaration of Stephanie Yu,

Esq., (*iv*) Declaration of Jeffrey S. Jacobson, Esq. (with exhibits), (*v*) Notice of Appearance, (*vi*)

Corporate Disclosure Statement, and (*vii*) Proof of Service to be served by first-class mail, postage

prepaid, upon counsel for each of the represented parties and, where not represented by counsel, directly

upon the parties involved in the litigations identified in the Schedule of Actions, as follows:

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2005 DEC 28  A 6: 48

RECEIVED
CLERK'S OFFICE

## CENTRAL DISTRICT OF CALIFORNIA

*Jeffrey T. Ponting, Daniel D. Linde, on behalf of themselves and all others similarly situated v. SonyBMG Music Entertainment, LLC, First4Internet, Ltd., and Does 1 through 20.*

Counsel for Plaintiffs:

Douglas A. Linde
Erica L. Allen
**THE LINDE LAW FIRM**
2029 Century Park East, #1360
Los Angeles, CA 90067
Telephone: (310) 203-9555
Facsimile: (310) 652-9555

Counsel for Defendant First4Internet, Ltd.:

Leonard T. Nuara
**THACHER, PROFFITT & WOOD**
25 DeForest Avenue
Summit, NJ 07901
Telephone: (908)598-5777
Facsimile: (866)805-3954

## NORTHERN DISTRICT OF CALIFORNIA

*Laura Klemm, on behalf of herself and all others similarly situated v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

Counsel for Plaintiffs:

Ira P. Rothken
**ROTHKEN LAW FIRM**
1050 Northgate Dr., Suite 520
San Rafael, CA 94903
Telephone: (415) 924-4250
Facsimile: (415) 924-2905

2

Stan S. Mallison
Hector R. Martinez
**LAW OFFICES OF MALLISON & MARTINEZ**
1042 Brown Avenue, Suite A
Lafayette, CA 94549
Telephone: (925) 283-3842
Facsimile: (925) 283-3426

*Erin Melcon, on behalf of herself and all others similarly situated v. Sony BMG Music
Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

Counsel for Plaintiffs:

Robert S. Green
Jenelle Welling
Avin P. Sharma
**GREEN WELLING LLP**
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Cindy Cohn
Fred von Lohmann
Kurt Opsahl
Corynne McSherry
**ELECTRONIC FRONTIER FOUNDATION**
454 Shotwell Street
San Francisco, CA 94105
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Reed R. Kathrein
Shana Scarlett
**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

3

Lawrence E. Feldman
**LAWRENCE E. FELDMAN & ASSOCIATES**
432 Tulpehocken Avenue
Elkins Park, PA 19027
Telephone: (215) 885-3302
Facsimile: (215) 885-3303

## DISTRICT OF NEW MEXICO

*Chad Black, on behalf of himself and all other similarly situated v. Sony BMG Music Entertainment, and Does 1 through 100.*

Counsel for Plaintiffs:

Nicholas Koluncich III
**LAW OFFICES OF NICHOLAS KOLUNCICH III**
6804 Fourth Street NW
Los Ranchos de Albuq., NM 87107
Telephone: (505) 345-0605
Facsimile: (505) 345-3925

## SOUTHERN DISTRICT OF NEW YORK

*Darren DeMarco, on behalf of himself and all others similarly situated v. Sony BMG Music, and SunnComm Technologies, Inc., and Does 1 - 300.* (Originally filed in the District of New Jersey; stipulated transfer to the Southern District of New York pending.)

Counsel for Plaintiffs:

Lynne M. Kizis
**WILENTZ, GOLDMAN & SPITZER**
A Professional Corporation
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000

4

Philip A. Tortoreti
**TORTORETI, TOMES & CALLAHAN**
A Professional Corporation
150 Tices Lane
East Brunswick, NJ 08816
Telephone: (732) 257-9100

Stephen Raff
Michael Raff
**RAFF & RAFF, LLP**
30 Church Street
Paterson, NJ 07505
Telephone: (973) 742-1917

Michael D. Halbfish
**LAW OFFICES OF MICHAEL D. HALBFISH**
245 Main Street
Woodbridge, NJ 07095
Telephone: (732) 636-4900

*Andrew Klewan and James Springer, individuals, on their own behalf and on behalf of all others*
*similarly situated v. Arista Holdings Inc., doing business as Sony BMG Music Entertainment.*

Counsel for Plaintiffs:

Jason L. Solotaroff
**GISKAN & SOLOTAROFF, LLP**
207 West 25th Street
New York, NY 10001
Telephone: (212) 847-8315
Facsimile: (212) 473-8096

Daniel Lynch
**CIRIGNANI HELLER HARMAN & LYNCH**
150 S. Wacker Drive #2600
Chicago, IL 60606
Telephone: (312) 346-8700
Facsimile: (312) 896-5883

Ethan Preston
150 S. Wacker Drive #2600
Chicago, IL 60606
Telephone: (312) 346-8700
Facsimile: (312) 896-5883

*James Michaelson and Ori Edelstein v. Sony BMG Music, Inc. and First 4 Internet.*

Counsel for Plaintiffs:

Scott A. Kamber
**KAMBER & ASSOCIATES, LLC**
19 Fulton Street, Suite 400
New York, NY 10038
Telephone: (212) 571-2000

*Jeffrey Potter, individually and on behalf of all others similarly situated v. Sony BMG Music
Entertainment, a Delaware General Partnership.*

Counsel for Plaintiffs:

Ira M. Press
Mark A. Strauss
**KIRBY McINERNEY & SQUIRE, LLP**
830 Third Avenue
New York, NY 10022
Telephone: (212) 317-2000
Facsimile: (212) 751-2540

6

*Tom Ricciuti, Yvonne Ricciuti, and Mary Schumacher v. Sony BMG Music Entertainment, Sony Corporation of America, and Bertelsmann, Inc.*

Counsel for Plaintiffs:

Robert M. Rothman
**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Robert S. Green
Jenelle Welling
Avin P. Sharma
**GREEN WELLING LLP**
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Cindy Cohn
Fred von Lohmann
Kurt Opsahl
Corynne McSherry
**ELECTRONIC FRONTIER FOUNDATION**
454 Shotwell Street
San Francisco, CA 94105
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Reed R. Kathrein
Jeffrey Friedman
Shana Scarlett
**LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

Lawrence E. Feldman
**LAWRENCE E. FELDMAN & ASSOCIATES**
432 Tulpehocken Avenue
Elkins Park, PA 19027
Telephone: (215) 885-3302
Facsimile: (215) 885-3303

*Dora Rivas individually and on behalf of all others similarly situated v. Sony BMG Music Entertainment.*

Counsel for Plaintiffs:

Sanford P. Dumain
Peter Safirstein
**MILBERG WEISS BERSHAD & SCHULMAN LLP**
One Pennsylvania Avenue
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Jonathan K. Levine
Eric H. Gibbs
Dylan Hughes
**GIRARD GIBBS & DeBARTOLOMEO LLP**
601 California Street, Suite 1400
San Francisco, CA 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David Nester
**NESTER & CONSTANCE, P.C.**
123 West Washington Street
Belleville, IL 62220-2021
Telephone: (618) 234-4440
Facsimile: (618) 234-6193

8

Robert I. Lax
**ROBERT L LAX & ASSOCIATES**
535 Fifth Avenue, 21ˢᵗ Floor
New York, NY 10017
Telephone: (212) 818-9150
Facsimile: (212) 818-1266

I also hereby certify that, on December 23, 2005, I caused a copy of the aforementioned

documents to be served upon the Clerk of each District Court in which the litigations identified in the

Schedule of Actions are pending, and upon the Clerk of the District Court to which the Moving Defendants

have moved to transfer the cases under 28 U.S.C. § 1407, as follows:

## CENTRAL DISTRICT OF CALIFORNIA

Clerk of the Court
United States District Court
Central District of California, Western Division
312 N. Spring Street
Los Angeles, CA 90012

## NORTHERN DISTRICT OF CALIFORNIA

Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102

## DISTRICT OF NEW MEXICO

Clerk of the Court
United States District Court
District of New Mexico
333 Lomas Blvd. N.W.
Albuquerque, NM 87102

9

## SOUTHERN DISTRICT OF NEW YORK

Clerk of the Court
United States District Court
Southern District of New York
U.S. Courthouse
500 Pearl Street
New York, NY 10007-1213

I also hereby certify that, on December 28, 2005, I caused a copy of the aforementioned

documents and the Moving Defendant's (*i*) Revised Schedule of Actions and (*ii*) Revised Proof of

Service to be served by Federal Express upon the following additional counsel and Clerk:

*John Maletta, Individually and as Representative for all others similarly situated and the General Public v. Sony BMG Music Entertainment Corp., Sony Corporation of America, and Bertelsmann, Inc., and Does 1 through 100, Inclusive.*

Counsel for Plaintiff John Maletta:

Robert I. Harwood
Jeffrey M. Norton
**WECHSLER HARWOOD LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

Counsel for Defendant Sony Corporation of America:

Jeffrey S. Jacobson
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Facsimile: (212) 521-7479

Counsel for Defendant Bertelsmann, Inc.:

Irving Scher
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8120
Facsimile: (212) 310-8007

11

Counsel for Defendant SunnComm Technologies, Inc.:

    Andrew C. DeVore
    **MANATT, PHELPS & PHILLIPS, LLP**
    7 Times Square
    New York, NY 10036
    Telephone: (212) 790-4500
    Facsimile: (212) 790-4545

## DISTRICT OF NEW JERSEY

    Clerk of the Court
    United States District Court
    District of New Jersey
    Martin Luther King Building & U.S. Courthouse
    50 Walnut Street, Room 4015
    Newark, NJ 07101

I also hereby certify that, on December 28, 2005, I caused a copy of the Moving Defendant's

(*i*) Revised Schedule of Actions and (*ii*) Revised Proof of Service to be served by first-class mail,

postage prepaid, upon each counsel and Clerk listed above not already being served by Federal

Express.

Dated:  New York, New York
      December 28, 2005

                        Marissa M. Grimes, Esq.

                        Debevoise & Plimpton LLP
                        919 Third Avenue
                        New York, New York 10022
                        (212) 909-6000

                        Attorneys for Defendant Sony BMG Music
                        Entertainment GP

# D E B E V O I S E   &   P L I M P T O N   L L P

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

Jeffrey S. Jacobson
Partner
Tel  212 909 6479
Fax  212 521 7479
jsjacobson@debevoise.com

December 28, 2005

BY FACSIMILE & FEDERAL EXPRESS

Teresa Bishop
Judicial Panel on Multidistrict Litigation
One Columbus Circle, NE
Thurgood Marshall Federal Judiciary Building
Room G-255
Washington, DC 20002-8004
Telephone: (202) 502-2800
Facsimile: (202) 502-2888

**In re Sony BMG Audio Compact Disc Litigation**

**MDL Docket No. 1750**

Dear Ms. Bishop:

In compliance with your facsimile transmission of December 27, 2005, enclosed please find a Revised Schedule of Actions and a Revised Proof of Service.

Sincerely,

Jeffrey S. Jacobson

cc:    All counsel

Enclosures

2005 DEC 28  A 6: 48
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
RECEIVED
CLERK'S OFFICE

22102039v1

JUDICIAL PANEL
MULTIDISTRICT LITIGATION

DEC 28 2005

FILED
CLERK'S OFFICE

Dec 12 2005 16:35    HP LASERJET FAX                                      P

STATE OF NEW MEXICO
BERNALILLO COUNTY
SECOND JUDICIAL DISTRICT COURT

FILED
SECOND JUDICIAL DISTRICT

2005 DEC -7 PM 3: 49

*Juanita M. Duran*

SUMMONS ISSUED

**CV** 2005 0 9 3 2 9

Chad Black, on behalf of himself
and all other similarly situated

          **Plaintiff**

vs.

          No.

SONY BMG MUSIC ENTERTAINMENT,
and DOES 1 through
100,

          **Defendants**

## CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL DAMAGES FOR VIOLATIONS OF THE NEW MEXICO COMPUTER CRIMES ACT, TRESPASS TO CHATTELS, PRIMA FACIE TORT AND VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT

COMES NOW, Plaintiff Chad Black, by and through his attorney, Nicholas Koluncich,

respectfully praying that this Honorable Court intercede to halt the further introduction to market of

Defendant's defective audio discs containing the illegally invasive and affirmatively destructive

copy-protection program.

### I. INTRODUCTION AND SUMMARY OF THE ACTION

1. This class action is brought by Chad Black on behalf of himself and all other persons who

have purchased or otherwise acquired any non-recordable audio disc disseminated by SONY BMG

MUSIC ENTERTAINMENT ("Defendant") that contains its invasive and materially harmful no-

copy technology.

2. Defendant sells music discs to consumers as Compact Discs "CDs" that, unbeknownst to consumers, do not meet the technical specifications of CDs and instead contain a sneaky "rootkit" program disguised as song playing software that installs on (and thereby affirmatively harms) the "root" of a user's computer system.  Once installed on the system, the rootkit (likely made by a British company called "First 4 Internet, Ltd." hides itself by cloaking all associated files and misleadingly mislabeling certain operation files. This supposed "player" then begins perpetually and continuous monitoring the computer system.  This is referred to as "Spyware" in the technology industry in general and by Computer Associates specifically.  No matter what name it is given, it opens the door to hackers (and Defendant itself) to take control of user's computers.

3. All of this computerized chicanery depletes the computer's computing power in an effort to prevent (and monitor) copying of Defendant's audio discs.   The rootkit cannot be uninstalled without damage to the system.  Defendant does not inform consumers of the harmfully invasive nature of this rootkit program and misleads consumers into believing that the rootkit program can be safely uninstalled.  In reality, even the "quick-fix" Defendant belatedly foists upon consumers affirmatively harms the consumer's computer.  To date, several viruses have been reported that exploit the breach in system security that defendant's actions created.

4. As a result of the Defendant's failure to disclose the harmful nature of it's no-copy technology, hundreds of thousands (if not millions) of computer users have unwittingly infected their computers, and other people's computers, with the surreptitious rootkit.  This rootkit has been responsible for time-wasting conflicts within computer systems, computer problems that are expensive or impossible to fix and crashes of said computer systems.

2

5.  Defendant's affirmative, willful and deliberate actions were made in spite of an overwhelming public outcry against both "no-copy" technology and intrusive computer programs. These actions constitute violations of New Mexico Computer Crimes Act, Trespass to Chattels, Prima Facie Tort and Violation of the New Mexico Unfair Trade Practices Act.

## II. PARTIES

6.  Plaintiff Chad Black is presently domiciled in Albuquerque, New Mexico.  Chad purchased a Sony audio disc.  His installation of the audio disc for purposes of playing the music on the disc Content/Copy Protection onto his computer, including the rootkit program, which operated in a hidden manner to monitor his use of the computer.

7.  Defendant SONY BMG MUSIC ENTERTAINMENT ("Defendant") is a Delaware Corporation with its principle place of business in New York. Defendant has no registered agent for service of process in New Mexico.

8.  Except as described herein, Chad Black is uninformed as to the true names of the defendants sued as Does 1 through 100, inclusive, and the precise nature of their wrongful conduct, and therefore sues these Doe defendant by such fictitious names.  Plaintiff will seek leave of the Court to amend this compliant to allege the true names, capacities and precise nature of their conduct as soon as practicable after ascertained.

9.  Defendants, and each of them, are individually sued as a participant and aider and abetter in the improper acts, plans, schemes, and transactions to induce Chad Black and the class he seeks to represent to purchase the tainted audio discs from Defendant.

10. At all relevant times, Defendants pursued a common course of conduct, acted in concert with one another, and conspired with one another to accomplish the offenses complained of herein,

3

and performed acts and made statements in furtherance thereof. In addition to the wrongful conduct alleged herein, which gives rise to Defendants' primary liability, Defendant further aided and abetted, and knowingly assisted one another, in perpetrating the illegal and wrongful conduct complained of herein.

### III. JURISDICTION AND VENUE

11. This action is brought to remedy violations of state consumer and computer protection statutes in connection with defendant's surreptitious installation of a rootkit or other no-copy technology onto user's computers.

12. The amount in controversy of each class representative is less than $75,000, exclusive of interest and costs. As a result, federal courts do not have either subject matter or diversity jurisdiction over this case and controversy, or any of the claims alleged herein, under Article III of the United States Constitution, or under 28 U.S.C. Section 1332 and 1441, because the federal courts do not have original federal jurisdiction over any of the claims alleged herein, and therefore the federal courts cannot exercise supplemental jurisdiction over Plaintiff's state law claims as required by 28 U.S.C. Section 1367.

13. The class on which this complaint is brought consists of persons and entities that are residents of the State of New Mexico.

14. As a result of the fact that the federal courts do not have original federal jurisdiction under 28 U.S.C. Section 1367, the District Courts of New Mexico, County of Bernalillo has jurisdiction over this action pursuant to relevant substantive and procedural law.

4

15. Venue is proper in this Court because defendant conducts substantial business activity, including advertising, disseminating, marketing, and sale of Defendant's audio discs, at locations throughout this county.

16. The amount in controversy meets the jurisdictional minimum of this Honorable Court.

## IV. CLASS ACTION ALLEGATIONS

17. Class Plaintiff, Chad Black, brings this Complaint against the defendant, pursuant to New Mexico Rule of Civil Procedure 1-023, on behalf of himself and all persons statewide who have purchased one or more of defendant's audio discs with the rootkit program. Excluded from the Class are all defendants, including its subsidiaries, parents, successors, predecessors, officers, and directors, and any entity in which any defendant has a controlling interest, and the legal representative, successors or assigns of any such excluded persons.

18. While the exact number of Class members in each class in unknown to Chad Black at this time, it is clear that the members of the Class are so numerous that joinder of all members is impracticable. Such audio discs sold by defendant number in the millions of copies and it is anticipated that the Class will number in excess of tens of thousands individuals. The information as to the identity of the Class members can be determined from purchase receipts and possession by Class members of the offending audio discs themselves. The presence of the rootkit program on the Class members' computers would be manifest to a computer expert.

19. Class plaintiff's claims are typical of the claims of the members of the Class, as the Class Plaintiff and other members of the Class sustained damages arising out of defendant's wrongful conduct based upon the same transactions, upon the same misrepresentations, and upon the same material omissions which were made uniformly to the Class Plaintiff and the public.

5

Dec 12 2005 16:35     HP LASERJET FAX                                    P ·

20. The Class Plaintiff will fairly and adequately represent and protect the interests of the members of each of the Class, and has retained counsel competent and experianced in class action litigation.

21. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members in impracticable. Furthermore, as the damages suffered by the individual actions makes it impossible for the Class members to individually redress the wrongs from which they have suffered. There will be no real difficulty in the management of this action as a class action.

22. Common questions of law and fact exist as to all members of the Class predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

   a) Whether defendant adequately disclosed the nature and purpose of its rootkit program on it's audio discs;

   b) Wether defendant made representations that the audio discs had characteristics, uses, benefits or qualities which it did not have;

   c) Whether defendant made false and/or misdealing statements of fact to Chad Black, class members and the consumer concerning the content of their audio discs;

   d) Whether defendant knew, or was reckless in not knowing, that its rootkit and XCP program would detrimentally affect the computers of users who installed its audio discs on their computers;

   e) Whether, by its misconduct as set forth herein, defendant gas engaged in unfair or unlawful business practices with respect to the sale of its audio discs;

6

f) Whether, by its misconduct as set forth herein, defendant has violated the New Mexico Computer Crimes Act § 30-45-1;

g) Whether plaintiff Chad Black and the class are entitled to relief, and the amount and nature of such relief.

23.  Plaintiff's claims are typical of the claims of the members of the Class.  Class Plaintiff has no interest antagonistic to those of the Class, and defendant has no defenses unique to Class Plaintiff;

24.  Class Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel well-experienced in class and complex litigation.

25.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

A.  It is economically impractical for members of the Class to prosecute individual actions;

B.  The class is readily definable; and

C.  Prosecution as a class action could reduce the possibility of repetitous litigation.

26.  A class action will cause an orderly and expeditious administration of the claims of the Class.  Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

27.  Neither Chad Black or his counsel anticipate any difficulty in the management of this litigation.

# V. FACTUAL ALLEGATIONS

28.  Sony is one if the largest distributors of pre-recorded audio discs in the world.  In addition to the Sony BMG Music Entertainment, Sony controls, in one way or another, such noted labels as Arista records, Columbia Records, Epic Records, J Records, RCA Victor, RCA Records and countless others.

29.  Defendant has experimented with a variety of different no-copy technologies in its audio discs and all of these technologies created playback and other problems.  These discs look like CDs, are packaged like CDs, are sold on the same shelves as CDs and are otherwise made to look as indistinguishable from CDs as possible in order to induce unsuspecting customers to purchase them as if they were CDs.  In reality, these audio discs do not meet the technical definition of a CD, as defined by the Sony/Phillips red book standard, and have sub-par and affirmatively destructive playback properties.

30.  Beginning on or about May of 2005, Sony began to issue certain music audio discs with no-copy technology called "Extended copy protection - XCP" from a British company called "First 4 Internet, Ltd."[1]  This protection scheme was specifically designed to prevent copying of the audio disc for any more than a certain number of times unilaterally decided upon by the defendant. Defendants do not disclose to the consumer that, pursuant to the the Digital Millennium Copyright Act, approximately $1.00 is added to the price of each audio disc to defray the alleged "costs" of

---

[1]Available information informs that First 4 Internet, Ltd. is one of the providers of the unwanted and affirmatively harmful computer code that is self-servingly referred to in the recording industry as "Digital Rights Management Software."  In all probability, this entity is one of the Doe Defendants and, upon confirmation of said information in discovery, may be added by name in any amended pleading.

unauthorized reproduction. Defendants themselves lobbied Congress for that extra fee and, thus, are

estopped from denying that they are aware of it.

    31. This time labeled "Content/Copy-Protected [Enhanced]," these audio discs suffered from

the same infirmities as every other no-copy scheme - and lots worse. The hidden "rootkit" program,

is disguised to look like just another "player" (a program that appears on the listener's computer to

play the music). This player, however, is not like just any of the dozens of players that are found pre-

installed on any computer. This "player" actually attaches to and attacks the root of the user's

computer system.

    32. The disc, once inserted into the user's computer, will automatically install itself. It is

not explained in any end-user agreement. Once installed on the system, this insidious rootkit

conceals itself and its constant activity by cloaking all associated files and innocuously labeling

certain operational files with misleading and friendly names. The reason for its being concealed is

simple: if defendants labeled the files accurately, consumers would know that their computer was

being monitored and impaired. In reality, the rootkit is a continuously running resource depleting,

copy preventing and function interrupting program that monitors the computer's functions in

perpetuity. This cloaking and mislabeling is difficult to accomplish by any computer programmer

and can not occur accidentally. Thus, defendants intended for this stealthy program to operate in this

manner.

    33. Defendant does not advise consumers of the existence or true nature of the rootkit

program and affirmatively misleads consumers into believing that it can be harmlessly removed. In

reality, the rootkit cannot be uninstalled without damage to the system. Not even the repair

technique defendant itself recommends is effective. Defendant's reported repair "patch" only reveals

the nature of the program in exchange for Defendant to obtain the user's personal information - which it then sells to undisclosed third parties. The no-copy program continues to work as badly as before. Resultantly, under any scenario, the consumer is left with either a damaged machine or a program that monitors their computer use.

34.  Unaware that the audio disc was installing an administrative level program on each system on which the disc was installed, millions of computer users have unknowingly infected their computers, and the computers of others, with this surreptitious rootkit.  This rootkit has been associated with conflicts within computer systems, performance slow-downs, loss of use of computer functionality, system crashes and other damage.

35.  Plaintiff Chad Black purchased one of defendant's audio discs encoded with the XCP and related root kit in question.  Upon playing the disc, and without his consent, the disc automatically installed the root kit on his system and was damaged thereby.

36.  Plaintiff and class members have been damaged though the defendant's unauthorized installation of software that has slowed computer function, compromised personal information and/or allowed their computers to be infected with damaging viruses.  Some class members are unwilling to risk using the disc on their computers.

37.  Analysis of the undeniable facts as alleged herein reveals the defendant's profound arrogance. *Sony itself sells the very same digital recording devices that the XCP program and rootkit seeks the thwart.*  Stated plainly, defendant acts to protect its intellectual property to the detriment of the consumer's personal property.

10

Dec 12 2005 16:37     HP LASERJET FAX                                    p  3

## VI. CLAIMS

## FIRST CAUSE OF ACTION

### Violation of the New Mexico Computer Crimes Act

38. Plaintiff repeats, realleges incorporates by reference each of the allegation set forth above as if fully set forth herein.

39. By selling or otherwise delivering the audio discs tainted with the invasive rootkit that attacks the computer hard-drives as alleged herein to members of the Class, defendant knowingly "alters, changes, damages and disrupts" the user's computer within the meaning of and in direct violation of the New Mexico Computer Crimes Act § 30-45-4, which prohibits "Computer Abuse."

40. By selling or otherwise disseminating the audio discs corrupted with the invasive no-copy technology that allows the defendant to direct communications back to defendant about the user's computer, defendant "directly or indirectly accesses, uses, takes, transfers . . . computer service" within the meaning of and in direct violation of the New Mexico Computer Crimes Act § 30-45-5, which prohibits "Unauthorized Computer Use."

## SECOND CAUSE OF ACTION

### Trespass to Chattels

42. Plaintiff repeats, realleges incorporates by reference each of the allegation set forth above as if fully set forth herein.

43. Defendant sold and continues to sell audio discs to customers embedded and encoded with XCP.

44. Such audio discs install a root kit and related no-copy software that negatively impacts the functionality of the computer operating system automatically upon playing the disc.

11

45. In addition to the loss of use of the computer functionality, the XCP and Rootkit scheme increases the risk that the computer can be infected with a virus. What is perhaps even worse, the software permits the tracking of the consumer's listening habits by defendant.

46. Defendant's actions, as evidenced by the result, were intentional and done without authorization.

47. Defendant's actions interfered with plaintiff and class member's possessory interest in their computer systems.

48. Defendant's action proximately caused damage to plaintiff Chad Black and class members.

## THIRD CAUSE OF ACTION

## Violations of the New Mexico Unfair Trade Practices Act

49. Plaintiff repeats, realleges incorporates by reference each of the allegation set forth above as if fully set forth herein.

50. Defendant's misrepresentations as to the true nature and invasive purpose of its rootkit violates the New Mexico Statute Annotated § 57-12-1 et seq..

51. Dependant's misrepresentations induced plaintiff and class members to purchase what appears to be a compact disc but is in fact a defective audio disc with spyware built into it.

52. Plaintiff and Class Members have been injured in that they were deceived by defendant's inaccurate sales practices. By reason of the foregoing, defendants have violated Section 57-12-2 (D) N.M. Stat Ann. (1999), defining "unfair or deceptive trade practices." Defendants' violations of the New Mexico Unfair Trade Practices Act include the following:

12

- Defendants represented, and continue to represent, that the purported compact discs are real compact discs, rather than some bizarre audio disc with a rootkit program that detrimentally affects the computers of users who installed it. This conduct is contemplated in §57-12-2 (D)(5), which prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;"

-Defendant knowingly misrepresented the most important and fundamental aspect of audio discs, that they were compact discs, rather than a device with an invasive program that allows for monitoring of the user's computer. This was accomplished by making the discs look like CDs, selling them in the same place as CDs and otherwise disseminating them as if they were CDs. This is precisely the sort of sneaky and self serving conduct contemplated by §57-12-2 (D)(14), which prohibits "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;" and

-Defendants knowingly misstated, and continue to misstate, the most important and fundamental aspect of the audio discs, specifically, their content. This is precisely the sort of improper trade practice that is contemplated by §57-12-2 (D)(17), which prohibits the "failure to deliver the quality of goods or services contracted for."

53. Section 57-12-2 (E) N.M. Stat Ann. (1999), defining "unconscionable trade practice(s)" accurately describes the elements of the defendant's deceptive sale of the audio discs containing the harmful rootkit and/or XCP system. These include:

-Defendant's continued refusal to provide any explanation of the nature of the program that these defective audio discs include. Unless the consumer is a sophisticated computer user, there is no way for them to discover that the apparently innocuous music player is actually an

13

invasive piece of spyware that has or will damage their machine. This is the sort of unconscionable

trade practice contemplated by § 57-12-2 (E) (1), which prohibits "take[ing] advantage of the lack

of knowledge, ability, experience or capacity of a person to a grossly unfair degree;" and

      - Defendants charged amounts for purported compact discs that the defendant never

intended to provide. This sort of unconscionable trade practice is contemplated by § 57-12-2 (E)(1),

which prohibits any sale of services which "results in a gross disparity of value between the value

received by a person and the price paid." Here, any price paid for an affirmatively harmful audio disc

could only result in a gross disparity in value.

    54. This conspiracy to violate this and the common laws alleged herein is ongoing and

continues to this day.

## VII. PRAYER FOR RELIEF

    WHEREFORE, Plaintiff, on behalf of himself and all members of the Class, pray for

judgment and relief as follows:

    1. With respect to the class claims, a declaring the action to be a proper class action and

designating Chad Black and his counsel of record as representative thereof;

    2. Awarding injunctive and equitable relief, including restitution, in an amount to be

determined at trial including, inter alia:

        (a) prohibiting defendant from engaging in further acts of unfair competition and

unfair practices;

        (b) requiring defendant to disgorge all of its ill-gotten gains to the class or to

whomever the Court deems appropriate;

(c) awarding plaintiff and members of the class full restitution of all monies wrongfully acquired by defendant by means of the wrongful conduct alleged herein; and

(d)  ordering such funds or assets to be impounded, or a trust imposed, to avoid dissipation, fraudulent transfers, and/or concealment of such monies or assets by defendant;

3. Awarding damages in an amount to be determined at trial;

4. Awarding Plaintiff's reasonable attorney's fees and costs;

5. Awarding pre- and post-judgment interest; and

6. Granting such other and further relief an the Court may deem just and proper.

DATED: December 7, 2005

Nicholas Koluncich III
Law Offices of Nicholas Koluncich III
6804 Fourth Street NW
Los Ranchos de Albuq., NM 87107
505-345-0605
FAX 505-345-3925
nkoluncich@newmexicoclassactions.com
**Attorney for Chad Black**

15



**2**

Lynne M. Kizis, Esq.
WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Tel: (732) 636-8000

Philip A. Tortoreti, Esq.
TORTORETI, TOMES & CALLAHAN
A Professional Corporation
150 Tices Lane
East Brunswick, NJ 08816
(732) 257-9100

Stephen Raff, Esq.
Michael Raff, Esq.
RAFF & RAFF, LLP
30 Church Street
Paterson, NJ 07505
(973) 742-1917

Michael D. Halbfish, Esq.
LAW OFFICES OF MICHAEL D. HALBFISH
245 Main Street
Woodbridge, NJ 07095
(732) 636-4900

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF NEW JERSEY

------------------------------------------------------X

| | |
|---|---|
| Darren DeMarco, on behalf of himself and all others similarly situated | : |
| | : |
| | : |
| Plaintiffs, | : 03 Civ. _____ |
| | : |
| v. | : CLASS ACTION COMPLAINT |
| | : |
| Sony BMG Music, and SunnComm Technologies, Inc., and Does 1 – 300. | : PLAINTIFF DEMANDS A |
| | : TRIAL BY JURY |
| | : |
| Defendants. | : |

------------------------------------------------------X

1

Plaintiff Darren DeMarco by counsel and on behalf of himself and all others similarly situated, for their complaint against Sony BMG Music Entertainment, SunnComm Technologies and Does 1 through 300 (collectively "Defendants"), hereby allege upon personal knowledge and belief as to their own acts, and upon information and belief (based on the investigation of their counsel) as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

## I. NATURE OF CLASS ACTION

1.  This is a class action brought on behalf of all owners, also referred to herein as ("consumers") of Sony BMG Music Compact Discs that have embedded MediaMax software (hereinafter "CDs"), sold in the United States by Defendants.  During the Class Period, Sony BMG Music Entertainment (hereinafter "Sony") has sold these products to consumers utilizing false and misleading advertising, deceptive practices, and false and fraudulent claims.

2.  SunnComm and Sony entered into an agreement under which SunnComm would produce a customized version of its MediaMax software for Sony's use on its CDs worldwide.

3.  Sony began encoding numerous music titles that it sold worldwide with the MediaMax software. The MediaMax software, which was allegedly intended to prevent piracy made permanent and irreversible alterations to the core windows operating system which could be later utilized by Hackers or Sony to take control of the users' computer without the users' knowledge.

2

4.      In encoding the CDs with MediaMax, Sony and SunnComm have decided that their intellectual property is more deserving of protection than the intellectual property, personal information and personal property of millions of consumers worldwide.

5.      Potentially millions of copies of MediaMax encoded CDs have been sold. It is probable that millions of consumers have played these CDs on their personal computers and thus compromised their systems without knowing it. As such, millions of users are at risk from viruses that destroy software and steal personal information.

6.      Sony and SunnComm have concealed these actions under the guise of trying to fix the problem.

## II.  JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Jurisdiction is proper because (1) the claims of all plaintiffs, aggregated together, exceed $5,000,000 and (2) the plaintiff and the defendant are citizens of different states.  (28 U.S.C. § 1332(d)(2) and (6).)

8.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts or omissions complained of herein have occurred or will occur in the District of New Jersey.

## III.  PARTIES

9.      Plaintiff Darren DeMarco, ("DeMarco") is a resident of Madison, New Jersey.  He purchased Anthony Hamilton's "Comin' From Where I'm From" on November 14, 2005 at FYE ("For Your Entertainment") in Short Hills.  This CD was embedded with the MediaMax software.

3

10.     Defendant Sony BMG Music ("Sony") is a general partnership organized

and existing under the laws of the State of Delaware with its principal place of business at

550 Madison Avenue, New York, New York. During the relevant time period, Sony has

distributed CDs in this jurisdiction under various labels including, but not limited to,

Columbia, Epic, Epic Associated, Sparrow, Delicious Vinyl, Sony Classical, Sony

Broadway, Masterworks Dinner Classics and Masterworks.

11.     Defendant SunnComm Technologies, Inc., is a corporation organized and

existing under the laws of Arizona with its principal place of business in Phoenix,

Arizona. SunnComm is a developer of digital rights management software including

MediaMax.

12.     Plaintiff DeMarco is informed and believes and thereon alleges that

Defendants including Does 1 through 300, inclusive, were the agents, servants,

employees, successors, assignees, transferees and/or joint venturers of their co-

Defendants, and each was, as such, acting within the course, scope and authority of

said agency, employment and/or joint venture and was acting with the consent,

permission and authorization of each of the remaining defendants, and that each and

every Defendant when acting as a principal, was negligent in the selection and hiring of

each and every other Defendant as an agent, employee and/or joint venturer.  All

actions of each Defendant as alleged herein were ratified and approved by every other

defendant or their officers or managing agents.

4

## IV. CLASS ALLEGATIONS

13.     Pursuant to Section of the Federal Rules of Civil Procedure, Plaintiff DeMarco brings this action individually on his own behalf and as a national class action, on behalf of all individuals who own compact CDs from Sony BMG encoded with digital rights management software ("Encoded CDs") any time since January 2005 (the "Class").

14.     This action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

15.     Plaintiff DeMarco believes that there are hundreds of thousand of members of the Class, though the exact number and the identities of the Class members are currently unknown to Plaintiff DeMarco.  The members of the Class are so numerous that joinder of all Class members is impracticable.

16.     Common questions of law and fact exist as to all member's of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are whether:

    (a)     Whether Sony adequately disclosed the nature and purpose of its Media Max program on its CDs;

    (b)     Whether Sony made representations that the Sony music CDs had characteristics, uses, benefits or qualities which it did not have;

    (c)     Whether Defendants made false and/or misleading statements of fact to the Class and the public concerning the content of the music CDs;

    (d)     Whether Defendants knew, or was reckless in not knowing, that the Media Max program would detrimentally affect the computers of users who installed its CDs on their computers;

    (e)     Whether Defendants engaged in deceptive and unfair practices;

    (f)     Whether Sony engaged in false advertising;

5

(g)     Whether Defendants engaged in an unlawful conspiracy to hide the true nature of the software encoded on Sony music CDs from the general public;

(h)     Whether the members of the Class have sustained damages, and if so what is the proper measure of damages;

(i)     Whether the end user license agreement complies with New Jersey law;

(j)     Whether Sony is liable for punitive damages, and if so, in what amount; and

(k)     Whether the Class is entitled to injunctive relief.

17.     Plaintiff DeMarco's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained monetary damages arising out of defendant's violations of common and statutory law as alleged herein.

18.     Plaintiff DeMarco is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent. Plaintiff DeMarco has retained counsel competent and experienced in complex class action litigation. Plaintiff DeMarco intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff DeMarco and his counsel.

19.     The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff DeMarco and the Class. The damages suffered by each individual Class member are of such magnitude that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by defendant's conduct. Furthermore, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for

6

inconsistent or contradictory judgments, and increases the delay and expense to all parties

and to the court system presented by the complex legal and factual issues raised by

defendant's conduct. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court.

## V.  SUBSTANTIVE ALLEGATIONS

SunnComm and Sony Create a Customized Version of the MediaMax Software

20.      In the last quarter of 2002, SunnComm introduced its MediaMax software.

21.      According to SunnComm, MediaMax is a "suite of products ... designed

in direct response to in put from the world's largest record companies ... no other

available content product or enhancement technology product [has] been accepted by

both the record industry and the CD consumer."  SunnComm touts its goal is to "achieve

the important balance between copyright protection for content providers, and added

value for consumers" by allowing "legitimate CD buyer[s] the ability to enjoy the

company's PLAY-MOVE-SHARE experience."

22.      Sometime thereafter SunnComm and Sony entered into an agreement

under which SunnComm would produce a customized version of its MediaMax software

for Sony's use on its compact CDs ("CDs") worldwide.

Sony Began Encoding Titles With Spyware

23.      Sony began encoding numerous music titles that it sold worldwide with

the MediaMax software same time in 2003 or 2004.  CDs containing MediaMax software

are referred to herein as "Encoded CDs".

24.      The moment someone attempts to play a CD on their Windows-based

machine, the software installs itself without the users' knowledge.  This occurs even if

#3768399 (144084.002)

the CD was simply copied to the computer for the users own personal use or for use on an

MP3 player. Since most users have "autorun" feature enabled on their PC, once a CD is

inserted and the CD tray is closed the CD plays and the software installs without

requiring any further action by the user.

25.     No disclosure of the MediaMax risks the user is exposed to is included in

the end user license agreement ("EULA") included with the Sony CDs. In addition, once

the software is installed Sony is able to compile a record of the music listening habits of

the user and have that information uploaded to a location of Sony's choosing. All this is

done without the users consent or knowledge.

26.     It is probable that millions of consumers have played these CDs on their

PC's and installed the MediaMax software without any knowledge of the installation or

its effect.

27.     By November 2005, several viruses have been reported that exploit the

weakness created by the playing of Encoded CDs. Millions of users are at risk from these

viruses that destroy software and steal personal information.

28.     In selling and distributing Encoded CDs, Sony and SunnComm have

decided that their intellectual property is more deserving of protection than the

intellectual property, personal information, and personal property on millions consumers.

29.     SunnComm's web site touts "Play it Loud Play it Legal." Yet apparently

its only legal concerns are for Sony and its other corporate clients.

30.     However, the SunnComm MediaMax Software not only embeds spyware

onto the users computer that makes the user vulnerable to viruses and Hackers, but also

8

does not allow the user to download the CD as an MP3 for legally permissible use on an MP3 player.

Plaintiff Purchased His Titles Unaware Of The MediaMax Encoding

31.    Unaware that the CD was installing an administrative level program on each system on which the CD was installed, thousands of computer users have unknowingly infected their computers, and the computers of others, with the MediaMax contained on the Encoded CDs.  This software has been responsible for conflicts within computer systems, crashes of systems, infection of viruses and other damage.

32.    Plaintiff DeMarco purchased two CDs encoded with MediaMax. Plaintiff DeMarco played the CDs on his computer which resulted in the installation of the MediaMax on his system.  Plaintiff DeMarco had not consented to the installation of the MediaMax, or for that matter any software that may have been bundled and the purchased CD. Plaintiff DeMarco's computer is connected to the internet and is used in interstate communication.

33.    Class members have been damaged through the unauthorized installation of software that has slowed computer function, compromised personal information and/or made allowed their computers to be infected with damaging viruses. Some class members are completely unable to use their computers others have diminished use. In other cases, class members purchased CDs to install on their computers but once they learned of the nature of the Encoded CDs determined that such a use would be reckless. Many of these users have been unable to return the purchased CDs and are stuck with a CD that, for all practical purposes, can not be used on a PC.

9

## VI  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Federal Computer Fraud and Abuse Act**

34.     Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 33 as if fully set forth herein.

35.     By selling and otherwise delivering the Encoded CDs to members of the Class, Defendant Sony knowingly caused the transmission of a program, information, code or command.

36.     Sony's encoded CDs intentionally installed software that either intentionally or recklessly caused damage.  The software directed communication back to Sony of certain information from the computer which was playing Sony's CD.

37.     The computers of the members of the class are "protected computers" as that term is defined 18 U.S.C. § 1030.

38.     The damage to the members of the class is, in the aggregate, greater than $5,000. In addition, Sony's act of producing its master encoded tape from which all Encoded CDs were made was a single act that proximately resulted in damages greater than $5,000.

39.     Sony did not have authorization to install damaging software to consumer computers, or exceeded the authorized access to consumer computers.

40.     Defendant SummComm conspired with, and acted in concert with, Defendant Sony to transmit the program, information, code or commands that comprise the MediaMax software.  As a result, Defendant SummComm is also liable.

41.     Plaintiff and Class members are entitled to all appropriate relief as set forth below.

10

## SECOND CAUSE OF ACTION
### Violation of Electronic Communications Privacy Act

42.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 41 as though fully set forth herein.

43.     Sony's CD's, including the encoded software on them, are electronic communications that affect interstate commerce as defined in 18 U.S.C. § 2510.

44.     Sony, by way of encoded software on CD's, intentionally intercepted, endeavored to intercept, or procured any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication.

45.     Pursuant to 18 U.S.C. § 2520, Plaintiff and each member of the Class is entitled to equitable and declaratory relief as may be appropriate, statutory damages of the greater of $10,000 or $100 a day for each violation, actual and punitive damages, reasonable attorney's fees and costs, plus any profits made by the defendants as a result of violations.

46.     Plaintiff and Class members are entitled to all appropriate relief as set forth below.

## THIRD CAUSE OF ACTION
### Common Law Trespass to Chattels

47.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 46 as though fully set forth herein.

48.     Sony sold discs to customers embedded with MediaMax.

49.     Sony's discs installed a MediaMax and other software, on the customers' computers. The root kit and software impacted the ability of the computer's operating

#3768399 (144084.002)

system to function properly.  This impact occurred automatically when a consumer played Sony's disk on a computer.

50.     The MediaMax programs increased the risk that the computer would be infected with a virus and decreased the speed and stability of the computer. In addition, the software permitted Sony to track user listening habits.

51.     Sony's acts were intentional and unauthorized.

52.     Sony's actions interfered with Plaintiffs' possessory interest in their computer systems.

53.     Sony's actions proximately resulted in damage to Plaintiffs and the Class.

54.     Defendant SummComm conspired with, and act in concert with, Defendant Sony to transmit the program, information, code or commands that comprise the MediaMax software.  As a result, Defendant SummComm is liable.

55.     Plaintiff and Class members are entitled to all appropriate relief as set forth below.


## FOURTH CAUSE OF ACTION
### Common Law Invasion of Privacy

56.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 55 as though fully set forth herein.

57.     Sony, on a widespread commercial basis, have knowingly, recklessly, or negligently misappropriated, exploited, or disclosed private and sensitive information concerning the personal affairs of Plaintiff and the Class members.

58.     Sony acted for its own benefit, without the knowledge or informed consent of Plaintiff and the Class members.

12

#3768399 (144084.002)

59.     Sony's actions constitute a highly offensive and dangerous invasion of

privacy to Plaintiff and the Class members.

60.     Plaintiff and Class members are entitled to all appropriate relief as set

forth below.

## FIFTH CAUSE OF ACTION
### Violation of New Jersey Plain Language Act
### (N.J.S.A. 56:12-1 et seq.)
### (Only alleged as to New Jersey Consumers)

61.     Plaintiff and Class members reallege and incorporate by reference each

allegation contained in Paragraphs 1 through 60.  Plaintiff and Class members further

allege as follows:

62.     The EULA is a consumer contract as defined in the New Jersey Plain

Language Act.

63.     Because Sony used a EULA that was not simple, was unclear, and was not

understandable and easily readable, they have violated the Plain Language Act.

64.     Plaintiff and Class members are entitled to all appropriate relief as set

forth below.

## SIXTH CAUSE OF ACTION
### Violation of New Jersey Consumer Fraud Act
### (N.J.S.A. 56:8-1 et seq.)
### (Only alleged as to New Jersey Consumers)

65.     Plaintiff DeMarco and Class members reallege and incorporate by

reference each allegation contained in Paragraphs 1 through 64 above and further allege

as follows:

66.     The above described conduct of Sony BMG and SunnComm constitutes

unconscionable commercial practices, deception, fraud, false pretense, false promise,

13

misrepresentations, and/or the knowing concealment, suppression, or omission of
material facts with the intent that others, including Plaintiff DeMarco and Class members,
rely upon such concealment, suppression, or omission in connection with the sale or
advertisement of Music CDs in violation of the New Jersey Consumer Fraud Act,
N.J.S.A. 56:8-1, et seq. (the "Consumer Fraud Act").

67.     Sony BMG and SunnComm knowingly misrepresented material facts
relating to the character of the Music CDs.

68.     Sony BMG and SunnComm's representations were made with the
intentions that the general public, including Plaintiff DeMarco and Class members, rely
upon them.  Specifically, Sony BMG and SunnComm concealed, suppressed and omitted
the fact that Sony BMG and SunnComm knew that its Music CDs contained the
MediaMax software which would make permanent and irreversible alterations to the core
windows operating system which could be later utilized by Hackers or Sony to take
control of the users' computer without the users' knowledge.

69.     Sony BMG and  SunnComm failed to disclose this information with the
intent that others, including Plaintiff DeMarco and Class members, rely upon such
concealment, suppression, or omission.  Sony BMG and SunnComm's unconscionable
commercial practice and suppression and concealment of material information continued
after SunnComm, when Sony BMG and SunnComm failed to institute a recall, or take
any other steps to warn the public or distributors, of the potentially defective Music CDs.

70.     Sony BMG and SunnComm's unconscionable commercial practice and
suppression and concealment of information continued even after Sony BMG and
SunnComm knew of the defect.

14

71.     Plaintiff DeMarco and Class members have suffered ascertainable losses of money, and property as a direct and proximate result of Sony BMG and SunnComm's unconscionable commercial practices.

72.     Furthermore, Defendants violation of the New Jersey Plain Language Act (Count Five above) constitutes a per se violation of the New Jersey Consumer Fraud Act.

73.     Plaintiff and Class members are entitled to all appropriate relief as set forth below.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiff DeMarco, individually and on behalf of all others similarly situated, pray for judgment against the defendants named herein, as follows:

1.     An order certifying the Plaintiff Class, determining that this action is a proper class action maintainable under Rule 4:32-1 et. seq., and appointing Plaintiff DeMarco and his respective counsel to represent the Class;

2.     Compensatory damages in an amount to be determined at trial and/or recessionary damages and relief;

3.     Statutory damages for violations of the applicable Consumer Fraud Acts.

4.     Pre-judgment and post-judgment interest at the maximum rate allowable at law;

5.     Punitive damages in an amount to be determined at trial;

6.     Equitable and injunctive relief enjoining Sony BMG from pursuing the policies, acts and practices described in this Complaint;

7.     Costs and fees incurred including attorneys' fees and experts fees and costs;

15

8.     Such further legal and equitable relief as this court may deem proper.


Dated:  November 17, 2005          TORTORETI  TOMES & CALLAHAN
                                   Attorneys for Plaintiffs

                                   By: _____
                                       PHILIP A. TORTORETI


Dated:  November 17, 2005          WILENTZ, GOLDMAN & SPITZER
                                   Attorneys for Plaintiffs

                                   By: _____
                                       LYNNE M. KIZIS


                                   Stephen Raff , Esq.
                                   Michael Raff , Esq.
                                   RAFF & RAFF, LLP
                                   Attorneys for Plaintiffs

                                   Michael D. Halbfish, Esq.
                                   LAW OFFICES OF MICHAEL D. HALBFISH
                                   Attorneys for Plaintiffs

16

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 17, 2005                    TORTORETI  TOMES & CALLAHAN
                                            Attorneys for Plaintiffs

                                            By: _____
                                                PHILIP A. TORTORETI

Dated:  November 17, 2005                    WILENTZ, GOLDMAN & SPITZER
                                            Attorneys for Plaintiffs

                                            By: _____
                                                LYNNE M. KIZIS


                                            Stephen Raff, Esq.
                                            Michael Raff, Esq.
                                            RAFF & RAFF, LLP
                                            Attorneys for Plaintiffs

                                            Michael D. Halbfish, Esq.
                                            LAW OFFICES OF MICHAEL D. HALBFISH
                                            Attorneys for Plaintiffs


## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, LYNNE M. KIZIS, PHILIP A. TORTORETI,

MICHAEL RAFF, STEPHEN RAFF AND MICHAEL D. HALBFISH are

hereby designated as Trial Counsel in the within matter.


17



**3**

Ira P. Rothken (SBN #160029)
ROTHKEN LAW FIRM
1050 Northgate Dr., Suite 520
San Rafael, CA  94903
Telephone:     (415) 924-4250
Facsimile:      (415) 924-2905

Stan S. Mallison, (SBN 184191)
Hector R. Martinez (SBN 206336)
LAW OFFICES OF MALLISON & MARTINEZ
1042 Brown Avenue, Suite A
Lafayette, CA 94549
Telephone:     (925) 283-3842
Facsimile:      (925) 283-3426

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA KLEMM, on behalf of herself and all others similarly situated | ) ) ) |
| Plaintiff, | ) Case No. ) **C 05  5111** ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| SONY BMG MUSIC ENTERTAINMENT, SONY CORPORATION OF AMERICA, and BERTELSMANN, INC. | ) ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) ) |

**BZ**

**BY FAX**

Plaintiff Laura Klemm, by and through her attorneys, brings this action on behalf of herself and all others similarly situated, and alleges against Defendants as follows:

### INTRODUCTION

1.      By including a flawed and overreaching computer program in over 20 million music CDs sold to the general public, Sony BMG created serious security, privacy and consumer protection problems that damaged Plaintiff and the members of the class.  At issue are two

1

COMPLAINT

1  software technologies – MediaMax and Extended Copy Protection, also known as XCP – which

2  defendant Sony BMG claims to have placed on the music CDs for the purpose of copyright

3  protection, but which in truth do much more, including monitoring customer listening of the CDs

4  and installing undisclosed and in some cases hidden files on users' computers.  These computer

5  programs expose users to malicious attacks by third parties and create a threat to public safety,

6  without appropriate notice and consent from purchasers.  The CDs also condition use of the

7  music on unconscionable licensing terms.  These, plus other problems caused by Sony BMG's

8  use of this software on its CDs, violate federal and California law and public policy.  After

9  public revelations about security risks associated with the XCP software, including warnings

10  issued by the United States Government, and demands made to address the problems by the

11  Electronic Frontier Foundation and its co-counsel, defendant Sony BMG began to take steps to

12  respond to the security risks created by the XCP technology.  It failed, however, to address

13  security concerns raised by the MediaMax software or the consumer privacy and consumer

14  fairness problems created by both technologies, or to provide adequate notice to the consuming

15  public of the XCP issues and the remedies for those problems.

16  **JURISDICTION AND VENUE**

17       2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

18  1332.

19       3.      Venue is proper in this District under 28 U.S.C. § 1391(b), because Defendants

20  transact business in this district, and a substantial part of the events giving rise to the claims

21  arose in this district.

22  **PARTIES**

23       4.      At all times mentioned herein, Plaintiff Laura Klemm ("Plaintiff") was and still is

24  an individual and resident of Martinez, California.

25       5.      At all times mentioned herein, Defendant Sony BMG Music Entertainment

26  ("Sony BMG"), is and at all relevant times was, a Delaware General Partnership, with its

27  principal place of business in New York, New York.

28

2

COMPLAINT

6.      Defendant Sony Corporation of America ("Sony Corp.") is the U.S. subsidiary of Sony Corporation, a multinational corporation based in Japan.  At all times mentioned herein, Defendant Sony Corporation of America, is and at all relevant times was, a New York corporation, with its principal place of business in New York, New York.

7.      Defendant Bertelsmann, Inc. ("Bertelsmann, Inc.") is the U.S. subsidiary of Bertelsmann AG, a multinational corporation based in Germany.  At all times mentioned herein, Defendant Bertelsmann, Inc., is a Delaware Corporation with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

8.      In August 2004, Sony Corp. merged its Sony Music Entertainment, Inc. with Bertelsmann AG's BMG to create a joint venture, Sony BMG.  Sony Corporation of America and Bertelsmann AG are the parent companies, respectively, of Sony Music Entertainment and BMG.

9.      Sony BMG is the world's second largest music company.  Its labels include Arista Records, Columbia Records, Epic Records, J Records, Jive Records, LaFace Records, Legacy Recordings, Provident Music Group, RCA Records, RCA Victor Group, RLG – Nashville, SONY BMG Masterworks, Sony Music Nashville, Sony Urban Music, Sony Wonder, So So Def Records, and Verity Records.  Sony BMG manufactures, distributes, markets, and sells audio compact discs ("CDs").

10.      In 2003, Sony BMG began to distribute to the public CDs that contain software that Sony BMG refers to as Digital Rights Management ("DRM").  This DRM software on Sony BMG CDs includes MediaMax software created by SunnComm ("MediaMax CDs") and Extended Copy Protection ("XCP") software created by First4Internet ("XCP CDs").  On information and belief, Sony BMG intended that most of its CDs sold in the United States would incorporate one of these technologies.

11.      Sony BMG is the first company to commercially deploy XCP.  Sony BMG has been using versions of XCP since 2002 on prerelease CDs sent to radio stations and internal

3
COMPLAINT

1    employees.

2        12.    Sony BMG and BMG have been using versions of MediaMax on some CDs since

3    at least 2003. Sony BMG currently uses MediaMax 5 on its recently issued MediaMax CDs.

4        13.    Since March 2005, Sony BMG has distributed at least 52 music titles with XCP

5    software. Sony BMG has shipped at least 4.7 million CD's containing the XCP software, of

6    which around 2 million were sold to consumers.

7        14.    Sony BMG also distributed many more music titles with MediaMax software—

8    including a CD this year by Alicia Keys, entitled *Alicia Keys Unplugged*. Sony BMG distributed

9    approximately 20 million CDs with MediaMax software. Sony BMG has distributed at least 27

10   titles with the MediaMax 5 software.

11       15.    In or about September, 2005, Plaintiff purchased the CD entitled *Alicia Keys*

12   *Unplugged* from Target store located at 560 Contra Costa Blvd., Pleasant Hill, California. On

13   the date of purchase, Plaintiff uploaded the contents of the *Alicia Keys Unplugged* CD onto her

14   Microsoft Windows XP based personal computer. Since uploading said contents onto her

15   computer, Plaintiff has experienced substantial problems with her personal computer such as, but

16   not limited to, slow software response and crashing which has rendered her computer and/or her

17   Windows XP operating system unstable.

18       16.    In a November 11, 2005, MSNBC.com article, by Bob Sullivan, SunnComm CEO

19   Peter Jacobs was quoted as stating that MediaMax is "now on about 20 million Sony BMG

20   music discs."

21                     **THE SUNNCOMM SOFTWARE IS UNDISCLOSED SPYWARE**
                         **AND COMPROMISES SECURITY**

22

23       17.    The Anti-Spyware Coalition ("ASC") describes spyware as technologies deployed

24   without appropriate user consent and/or implemented in ways that impair user control over:

25   (1) material changes that affect a user's experience, privacy, or system security; (2) use of the

26   user's system resources, including what programs are installed on the user's computer; and/or

27   (3) collection, use, and distribution of a user's personal or other sensitive information. Computer

28   Associates defines spyware as, "Any product that employs a user's Internet connection in the

background without their knowledge, and gathers/transmits info on the user or their behavior." As discussed below, the MediaMax software used by Sony BMG on many of its CDs meets the ASC's definition of spyware.

18.    The software on a Sony BMG MediaMax CD is designed to operate only on Windows-based computers that run Windows 98SE/ME/NT/2000/XP. MediaMax requires that the user have administrator privileges on the Windows operating system in order to listen to the CD.

19.    MediaMax installs without meaningful consent or notification. When a MediaMax CD is inserted into a computer running Windows, an installer program already starts and MediaMax installs, prior to the appearance of the End User License Agreement ("EULA"), approximately eighteen files that consume approximately 15 MB on the computer's hard drive. These files remain permanently installed even if the user declines the EULA presented later. One of them, a kernel-level driver with the cryptic name "sbcphid," is loaded into the memory and ready to run at all times, even when there is no disc in the CD drive and no music is being played. A "kernel" is the core of a computer operating system, which controls and secures access to the computer's basic operations.

20.    This kernel-level driver is the heart of the MediaMax copy protection system. When it is running, it attempts to block CD ripping and copying applications from reading the audio tracks on MediaMax CDs. The software refrains from making one final change until after users accept the EULA—it does not set the driver to automatically run again every time Windows starts. Even if the EULA is declined, the code remains on the hard disk indefinitely. Further, even if the EULA is declined, the code continues to run on the computer until the computer is shut down and restarted, which rarely occurs on many computers. In addition, when a subsequent CD with MediaMax is installed in the computer, the inactive software will reactivate, even if the EULA for the subsequent CD is declined.

21.    Only after these files are installed and at least one file has launched does the software display a EULA, which the user may accept or decline, making it a contract of

1  adhesion.

2      22.     The MediaMax CDs' EULA states: "As soon as you have agreed to be bound by

3  the terms and conditions of the EULA, this CD will automatically install a small proprietary

4  software program (the "SOFTWARE") onto YOUR COMPUTER. The SOFTWARE is

5  intended to protect the audio files embodied on the CD, and it may also facilitate your use of the

6  DIGITAL CONTENT. Once installed, the SOFTWARE will reside on YOUR COMPUTER

7  until removed or deleted." This statement is not true, as alleged above. Attached hereto as

8  Exhibit A and incorporated herein by reference is a true and correct copy of the MediaMax

9  EULA.

10     23.     Sony BMG's MediaMax EULA states that, "[T]he SOFTWARE will not be used

11  at any time to collect any personal information from you, whether stored on YOUR

12  COMPUTER or otherwise."

13     24.     If purchasers seek more information about the software that has been installed on

14  their computer, they are directed to the SunnComm Sony BMG customer care website, which

15  falsely tells users that "No information is ever collected about you or your computer without you

16  consenting" and also states: "Is any personal information collected from my computer during the

17  digital key delivery process? No, during the digital key delivery process, no information is ever

18  collected about you or your computer."

19     25.     In addition to the SunnComm Sony BMG customer care website, purchasers are

20  also directed to the "Readme.html". The "Readme.html" file is located on the MediaMax CD.

21  The Readme.html file falsely tells users that, "AT NO TIME DURING THESE PROCESSES

22  WILL DATA BE COLLECTED ABOUT YOU OR YOUR COMPUTER." (emphasis in the

23  original).

24     26.     Despite the representations to the contrary in the EULA and the SunnComm

25  website, and without notification or consent of the user, the MediaMax software "phones home"

26  to Sony BMG and/or SunnComm every time a user plays a protected CD. The software causes

27  the computer to connect to a Sony BMG and/or SunnComm server via the internet. The

28

MediaMax software conveys a unique code that identifies the album to which the user is listening. The request also contains standard HTTP headers which determine the operating system the computer is running and what version of Internet Explorer web browser the user has.

27.   Prior versions of the MediaMax software still used on some Sony BMG CDs contact Sony BMG and/or SunnComm to obtain "digital keys" that permitted the CDs to be copied.

28.   The SunnComm Sony BMG customer care website does not have a visible privacy policy.

29.   The Media Max software connects to an online service at http://license.sunncomm2.com/, which does not have a visible privacy policy.

30.   The MediaMax software opens a web page from a Sony BMG and/or SunnComm server and sends a 32-character identifier through an HTTP request. On information and belief, this is a unique code that tells Sony BMG and/or SunnComm to which album the user is listening. The request also contains standard HTTP headers that can be used to determine the user's operating system.

31.   The server to which the MediaMax software connects returns an HTTP response to the MediaMax software. According to SunnComm's public statements, this response is intended to facilitate the placement of dynamic, interactive advertisements that can be changed at any time by Sony BMG and/or SunnComm.

32.   The MediaMax software also transmits the computer's Internet Protocol or "IP" address to servers controlled by Sony BMG or its agents, without receiving permission from the computer user. No two IP addresses are alike and IP addresses provide the means to determine information about the person who used the particular IP address. Users are assigned an IP address by their Internet service provider or system administrator. Many users are issued frequently changing "dynamic" IP addresses that make it difficult to track them individually, but others have fixed, "static" addresses that can permit Sony BMG to ascertain their identities and associate listening habits with particular individuals across many different CDs containing the

1    SunnComm software.

2          33.    The MediaMax software contains a program referred to as "Perfect Placement."

3    In a July 13, 2005, press release, SunnComm states that Perfect Placement provides

4    "unparalleled targeted marketing opportunities. . . . This unique feature centrally serves up

5    dynamic promotional content controlled by the record label to reserved spaces located

6    throughout the MediaMax interface while a user is enjoying their CD on the computer." The

7    press release further states: "Imagine an artist's album is coming out and the record company has

8    the ability to announce this event to all those playing the artist's previously released album in

9    their computer."

10         34.    The SunnComm MediaMax support website

11   (http://tickets.sunncomm.com/selfhelp/), also misleadingly states, "Please note that MediaMax

12   was designed to manage and safeguard the copyrights of specified artists' CDs while giving you

13   an enhanced visual and listening experience.  It does not interfere with or impact <u>any</u> of the

14   normal operations and/or functions of your computer." (emphasis in the original).  As described

15   above, this statement is false.

16         35.    Sony BMG fails to disclose, prior to purchase, that users running the MediaMax

17   CDs on Windows-based computers could have files downloaded and stored on their computers

18   without their consent, and fails to disclose that the software would transmit information about

19   user, including monitoring whenever users listen to the CDs, without notification to or consent of

20   the users.

21          **SUNNCOMM'S MEDIAMAX'S FIRST UNINSTALLER CREATED A GREATER
            SECURITY RISK AND VIOLATED USER'S PRIVACY**

22         36.    Upon request, SunnComm will provide an internet-based uninstaller for the

23   MediaMax software.  Until approximately November 21, 2005, SunnComm provided this

24   uninstaller only after repeated requests that require the disclosure of personally identifying

25   information.

26         37.    The uninstaller provided by SunnComm until November 21, 2005, suffered from

27   a design flaw.  When a user visited the SunnComm uninstaller web page, the user was prompted

28

                                          8

to accept a small software component—an ActiveX control called "AxWebRemoveCtrl" created by SunnComm.

38.     This ActiveX control was designed so that any web page can ask it to download and execute code from an arbitrary website location or URL.

39.     If a user visits a malicious website, the site can use the flawed ActiveX control to download, install, and run malicious or dangerous software code on the user's computer without the user's knowledge or consent.  Such code could severely damage a user's computer, including but not limited to erasing a user's hard disk.

40.     The uninstaller available until November 21, 2005, failed to remove the vulnerable ActiveX control from the user's computer following completion of the uninstallation process.

41.     On or about November 21, 2005, SunnComm issued a patch to address the security flaw in the prior uninstallation.

42.     On or about November 21, 2005, the SunnComm Sony BMG customer care website provided a link to a web page that allows a user to access an internet-based uninstaller. The uninstaller uses an ActiveX control.

43.     On or about December 6, 2005, Sony BMG and EFF issued a joint press release announcing a software patch was available to address a security vulnerability with its Media Max version 5 content protection software.  The SunnComm Sony BMG customer care website provided a link that allows a user to download the software patch for the MediaMax version 5 software.  The patch does not remove MediaMax from a user's computer.  According to the SunnComm Sony BMG customer care site, the patch addresses a potential issue security issue with software.

44.     The software patch for Media Max version 5 also suffers from a design flaw. Independent researchers have discovered that the software patch does not completely address the security concerns of the MediaMax software and the patch itself is subject to the security concerns that it was designed to address.

45.     Sony BMG fails to disclose the security risks created by the MediaMax software and the potential harm to a user's computer.

## THE XCP SOFTWARE IS UNDISCLOSED SPYWARE
## AND COMPROMISES SECURITY

46.     Sony BMG's actions and omissions with respect to the MediaMax software are part of a pattern of corporate failure to investigate, address, and disclose the security and privacy risks associated with its inclusion of so-called DRM software on music CDs.

47.     Similar and, in some respects, more serious risks have been identified in CDs loaded with another Sony BMG technology, Extended Copy Protection, or XCP.  As with the MediaMax software independent researchers and consumer advocates disclosed these risks, not Sony BMG.

48.     The software on a Sony BMG XCP CD is designed to operate only on Windows-based computers that run Windows 98SE/NT/2000/XP.

49.     When a computer user places the Sony BMG XCP CD in a Windows based computer, the software is designed such that the user is first required to agree to a EULA. According to the EULA, a user cannot utilize the audio files or the digital content of the CD on the computer unless the user agrees to the EULA, making it a contract of adhesion.  Attached hereto as Exhibit B and incorporated herein by reference is a true and correct copy of the XCP EULA.

50.     The user is told that the XCP software automatically installs player software into the user's computer that will allow the user to play, save and copy the audio files on the CD.

51.     According to the EULA, the software automatically installed by the XCP CD is intended to protect the "digital content" embodied on the XCP CD.  Digital content appears to include audio files converted into digital music files as well as unspecified other "already existing digital content."

52.     While the user is led to believe that Sony BMG's XCP software is installing the player software into the user's computer, it is actually installing software as a "rootkit" into the user's hard drive.  The Sony BMG XCP software also installs a CD drive filter driver that

1    intercepts calls to the computer's CD drive.

2         53.    A rootkit is used to hide login, processes, files, and logs and may include software

3    to intercept data from terminals, network connections, CD drives, and keyboards. A rootkit is

4    invisible to the operating system and antivirus and security software, and is frequently used by

5    unauthorized third-parties, after gaining access to a computer system, to hide their activities.

6         54.    Specifically, the Sony BMG rootkit is a system filter driver which intercepts all

7    calls for process, directory or registry listings, and then modifies what information is visible to

8    the operating system in order to hide every file, process, or registry key beginning with the

9    characters "$sys$."

10        55.    Unbeknownst to users, once the rootkit is installed by the software on a Sony

11   BMG CD, the rootkit degrades the performance of the user's computer.

12        56.    In a November 1, 2005, eweck.com article by Paul Roberts, computer security

13   analyst Mark Russinovich states that the rootkit files interact with the Windows operating system

14   at a very low level and fail to account for certain conditions that could cause the files to

15   overwrite areas of memory, crashing applications that use that memory, or even crashing the

16   entire Windows operating system. On information and belief, this article correctly illustrates

17   some of the damage the rootkit could do.

18        57.    The rootkit causes significant and cumulative injury to a user's computer.

19   Specifically, the rootkit can interfere with the computer's CD drive, file copying software, and

20   media players. The rootkit also uses up system memory that would otherwise be available.

21        58.    On or around November 4, 2005, on National Public Radio's "Morning Edition"

22   program, Thomas Hesse, President of Sony BMG's global digital business division, when asked

23   about the XCP controversy, responded "Most people, I think, don't even know what a rootkit is,

24   so why should they care about it?" In the same program, Mr. Hesse also denied that Sony

25   BMG's software communicated with Sony BMG, saying "No information ever gets gathered

26   about the users' behavior, no information ever gets communicated back to the user, this is purely

27   about restricting the ability to burn MP3 files in an unprotected manner."

28

1    59.    In a November 29, 2005, Business Week article, by Steve Hamm, the article

2  states that F-Secure, a Finland-based antivirus company, notified Sony BMG on October 4,

3  2005, with problems associated the XCP rootkit. The article further states that F-Secure

4  informed Sony BMG that the rootkit "was a major security risk."

5    60.    Sony BMG failed to disclose that the XCP software, in the rootkit, automatically

6  connects the user's computer via the internet to a server owned or operated by Sony BMG or its

7  affiliates, without the user's consent. Once a user's computer is connected to the Sony BMG

8  website, the software sends an identification code associated with each XCP CD that is played on

9  that computer to the Sony BMG website. The Sony BMG server then automatically checks for

10  updates to the album art and lyrics for that album. This process uses the bandwidth that would

11  otherwise be available to the user's computer for other tasks.

12    61.    As with the MediaMax software, this network connection provides Sony BMG

13  with the ability to record each time a CD with XCP software is played and the IP address of the

14  computer playing it, without receiving permission from the computer user. As discussed above,

15  no two IP addresses are alike and IP addresses provide the means to determine information about

16  the person who used the particular IP address. Sony BMG does not disclose the possibility of

17  this use of DRM software in its packaging, the installation process, or its EULA. Instead the

18  EULA states, "the SOFTWARE will not be used at any time to collect any personal information

19  from you, whether stored on YOUR COMPUTER or otherwise."

20    62.    The Anti-Spyware Coalition and computer security firm Computer Associates

21  identify Sony BMG's XCP software as "Spyware."

22    63.    Sony BMG's XCP software meets the ASC standards for spyware because the

23  rootkit is placed on the computer without the user's consent and it changes the user's system

24  security because the rootkit makes the user's computer more vulnerable to other types of

25  malware.

26    64.    Computer Associates has classified the Sony BMG XCP rootkit as a form of

27  spyware known as a "Trojan," noting that the "XCP.Sony.Rootkit modifies you[r] operating

28

1   system at a low level, represents a large threat to both corporate and consumer users system

2   integrity." Computer Associates also has noted that "[t]he Rootkit functionality hides files and

3   enables hackers and other spyware to hide files with impunity."

4       65.    Computer Associates has categorized Sony BMG's "Media Player" as spyware,

5   noting that "When launched from the CD, Music Player sends information back to Sony BMG,

6   indicating which album is being played."

7       66.    Once the rootkit is on a user's computer, it creates an undisclosed risk of security

8   breach to that computer because other malicious software, such as computer viruses, worms, and

9   spyware that enter the computer could exploit the software concealed by the rootkit.

10      67.    Malicious software coders have discovered that they can effectively render their

11  programs invisible by using names for computer files similar to ones cloaked by the Sony BMG

12  technology.  On information and belief, several malicious programs that exploit the XCP

13  technology's ability to avoid detection have already been distributed over the internet.  Further,

14  as stated above, XCP software transmits information about the user's computer, IP address, and

15  listening habits.

16      68.    On or around November 12, 2005, Microsoft, Inc., the maker of the Windows

17  operating system stated that "Rootkits have a clearly negative impact on not only the security,

18  but also the reliability and performance of their systems" and Microsoft's Anti-Malware

19  Engineering Team informed consumers that "in order to help protect our customers we will add a

20  detection and removal signature for the rootkit component of the XCP software."

21      69.    The nature of a rootkit makes it extremely difficult for a computer user to remove,

22  often leaving reformatting the entire hard drive as the only solution.  Reformatting a hard drive

23  requires backing up all data on the hard drive, as reformatting a hard drive deletes all data on the

24  hard drive.  The user is then required to re-install the operating system and all applicable

25  programs and drivers.  This process can take many hours and is beyond the technical capabilities

26  of many users.  Sony BMG's XCP CD EULA and install process do not disclose nor does the

27  CDs' software prompt users with information about the rootkit or the need to reformat the hard

28

1    drive in order to remove it.

2        70.    In response to the public outcry about the deceptive nature of Sony BMG XCP

3    CDs, Sony BMG made available a software patch.  The patch was only available on the Sony

4    BMG support site (http://cp.sonybmg.com/xcp/english/home.html).  The patch does not remove

5    the software or allow the user to remove the software.  The software patch merely makes the

6    software visible to system tools and antivirus software while installing an additional 3.5 MB of

7    updated versions of the software into the user's computer.  Additionally, the patch contains a

8    design flaw that could cause a computer to crash as it is installed.

9        71.    Sony BMG failed to disclose that if a user attempts to disable the software it will

10   likely disable the audio CD driver on the computer, rendering the user's CD drive inoperable.  If

11   the rootkit is removed manually, the Sony BMG software's changes to the user's system will

12   render the user's CD drive non-functional.  According to computer security firm Computer

13   Associates, "[r]econfiguring the CD-ROM driver to a functioning state will be beyond the ability

14   of the average home user."

15       72.    Computer Associates categorized Sony BMG's patch as a "Trojan" and noted that

16   the Sony BMG software, even when patched with Sony BMG's update, continues to "represent a

17   threat to the user's control over their system . . . ."

18       73.    The United States Computer Emergency Readiness Team (US-CERT), part of the

19   Department of Homeland Security that is charged with the task of "protecting the nation's

20   Internet infrastructure" by coordinating "defense against and responses to cyber attacks across

21   the nation" has stated that the XCP rootkit "can pose a security threat" and that "one of the

22   uninstallation options provided by Sony BMG also introduces vulnerabilities to a system."

23       74.    Installation of a rootkit on a computer undermines the security of that computer.

24       75.    Installation of a rootkit on a computer causes impairment to the integrity or

25   availability of data, a program, a system or information.

26       76.    The software installed by Sony BMG includes a set of computer instructions that

27   are designed to modify, damage, destroy, record, and/or transmit information within a computer,

28

14
COMPLAINT

computer system, or computer network without the intent or permission of the owner of the information.

## SONY BMG'S FIRST XCP UNINSTALLER CREATED A GREATER SECURITY RISK AND VIOLATED USER'S PRIVACY

77.     The only known way for typical users to safely uninstall the XCP software is to obtain an uninstaller from Sony BMG.

78.     Until approximately November 15, 2005, in order to obtain an uninstaller from Sony BMG, a user was required to navigate an extensive request process and disclose personal information to Sony BMG. First, the user was required to go to the Sony BMG support website and fill out a form stating: a country where the CD was purchased; the artist's name; the album title; the store name; and the user's e-mail address. After submitting the form, the user was directed to a website which states that the user that the user will receive an e-mail with a "Case ID." Next, the user received an e-mail that directed the user to install the patch and then visit another website if the user still wanted to uninstall the DRM software.

79.     This further website, available until November 15, 2005, required the user to install ActiveX control software. The user was then required to enter the Case ID and fill in the reasons for the request. Once the user submitted this information, the user received an email that notified the user that a customer service representative would email the uninstall instructions to the user within a business day. The user then received an e-mail with a link to a confidentiality notice, which had to be accepted before software could be uninstalled.

80.     Sony BMG states that the information collected by Sony BMG before providing the uninstaller is subject to its Privacy Policy, http://www.sonybmg.com/privacypolicy.html. The Sony BMG Privacy Policy states, *inter alia*, that Sony BMG "may share the information we collect from you with our affiliates or send you e-mail promotions and special offers from reputable third parties in whose products and services we think you may have an interest. We may also share your information with reputable third-parties who may contact you directly."

81.     On information and belief, if the Sony BMG software was uninstalled using the uninstaller available until November 15, 2005, the user was no longer able to receive the full use

and value of the XCP CD on his or her computer.  Therefore, Sony BMG required the user to either accept the malicious software or lose the full use and value of the XCP CD.  Sony BMG did not disclose this fact to users prior to purchase.

82.     The Sony BMG  software could not be uninstalled if the user proceeded to the link from a different computer than the one on which the user installed the ActiveX control software.  If the user is not at that same computer he or she will receive an error message.  The uninstall link contains the Case ID in the address, so when the user proceeded to the uninstall link, the ActiveX control software sent a Sony BMG website an encrypted block of data.  This encrypted data was a signature that is tied to the hardware configuration of the user's computer.

83.     On information and belief, the ActiveX uninstaller left behind numerous software methods that can be exploited by others.

84.     The ActiveX uninstaller also exposed a user's computer to additional risks by enabling malicious third parties to download and install over the internet because the ActiveX uninstaller failed to restrict such access only to Sony BMG or First4Internet.  Such malicious code could severely damage a user's computer, including but not limited to erasing a user's hard disk.

85.     Sony BMG did not cause the ActiveX control to be removed from user's computers following completion of the installation process.

86.     On information and belief, the uninstallation could cause further damage to users' computers, including but not limited to, causing a user's Windows operating system to crash.

87.     On or around November 15, 2005, Sony BMG posted the following message on its website: "We currently are working on a new tool to uninstall First4Internet XCP software. In the meantime, we have temporarily suspended distribution of the existing uninstall tool for this software. We encourage you to return to this site over the next few days.  Thank you for your patience and understanding."  Sony BMG failed to disclose the problems associated with the old uninstaller.

88.     On or about November 28, 2005, Sony provided individuals who had requested

16<br/>COMPLAINT

1  the first uninstaller for the XCP software information on how to uninstall the first uninstaller.

2      89.     On or about December 5, 2005, the Sony BMG support site provided a link to an

3  uninstaller program for the XCP software.

4      90.     On information and belief, the software released by Sony BMG to resolve the

5  flaws in the XCP software can cause further damage to users' computers.

## SONY BMG HAS MADE MATERIAL
## MISREPRESENTATIONS AND OMISSIONS REGARDING
## THE SOFTWARE IT HAS INCLUDED ON MUSIC CDS

9      91.     In addition to the material misrepresentations and omissions set forth above, Sony

10  BMG has made numerous additional misrepresentations and omissions of material facts.

11      92.     On information and belief, the XCP and MediaMax CDs are disseminated to the

12  public with identical EULAs.

13      93.     Sony BMG's EULAs state that the MediaMax and XCP software installed on a

14  user's computer will not be used to collect any personal information.  As set forth above, this is

15  untrue.

16      94.     Sony BMG's EULAs state that the MediaMax and XCP software will remain on

17  the user's computer until it is removed or deleted.  Neither the MediaMax nor the XCP software

18  allows a user to use the standard "add/remove program" function on the Windows operating

19  system to remove the program.  Sony BMG's MediaMax and XCP CDs and its software fail to

20  provide information about how to remove the program or even how to contact Sony BMG to

21  resolve any problems with the program.

22      95.     The EULAs disclose that the MediaMax and XCP drivers try to "protect the audio

23  files embodied on the CD."  However, the drivers also attempt to restrict access to any other CD

24  that uses MediaMax or XCP technology.  Therefore, users need only agree to installation on one

25  album for the software to affect users' ability to use many other titles.

26      96.     Sony BMG uses its website to advertise and promote the sale of its CDs to the

27  public.  On its website, until November 15, 2005, Sony BMG falsely denied that its software is

28  spyware and that it posed a security risk.  Sony BMG also made the false claim that the software

17

COMPLAINT

1 does not collect any personal information nor is it designed to be intrusive to the user's computer

2 system.

3      97.    On or around November 8, 2005, Sony BMG publicly and falsely stated, on the

4 http://cp.sonybmg.com/xcp website, that the XCP software's rootkit "component is not malicious

5 and does not compromise security."

6      98.    The above website directs users to another site, http://updates.xcp-aurora.com/,

7 where users can obtain a software update to remove the rootkit component of the XCP

8 technology.  As of the filing of this complaint, the website states that the cloaking component "is

9 not malicious and does not compromise security."

10      99.    On its support website (http://cp.sonybmg.com/xcp/english/home.html), Sony

11 BMG stated, until approximately November 16, 2005, that its XCP software simply acts to

12 prevent unlimited copying and ripping from discs featuring the technology.  Sony BMG created

13 the false impression that the only effect of software included on CDs would be to restrict the

14 ability to create copies of CDs or the quantity of CDs that a user can copy.

15      100.    On or around November 16, 2005, Sony BMG announced, on the

16 http://cp.sonybmg.com/xcp website, that it shared the security concerns of consumers regarding

17 the XCP discs, and offered to exchange new CDs for CDs with XCP software.  Sony BMG did

18 not indicate the nature or extent of the security risks associated with the XCP software.  Sony

19 BMG also affirmed that the XCP software was not a "monitoring technology."

20      101.    Sony BMG uses its website to advertise and promote the sale of its CDs to the

21 public.  On its website, until November 15, 2005, Sony BMG falsely denied that its software is

22 spyware and that it posed a security risk.  Sony BMG also made the false claim that the software

23 does not collect any personal information nor is it designed to be intrusive to the user's computer

24 system.  Sony BMG has failed to make efforts to publicize the flaws in its XCP software and

25 uninstaller, apart from statements on its websites and statements to the press.  Therefore, many

26 XCP CD purchasers are unaware of the security and other risks caused by the software.

27      102.    Sony BMG has failed to publicly disclose or address the risks associated with

28

1  MediaMax software and its uninstaller.  Therefore, many MediaMax CD purchasers are unaware

2  of the security and other risks caused by the software.

3      103.    As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG

4  support website misleadingly represent that the software will not be used to collect personal

5  information about the user without his or her permission.

6      104.    As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG

7  support website falsely represent that MediaMax software will not be installed if the user

8  declines the EULA.

9      105.    The MediaMax EULA fails to disclose other important details about what the

10  uninstaller does, including but not limited to the security risks it poses to users' computers.

11      106.    According to Sony BMG, the purpose of the software is to restrict the ability to

12  create copies of CDs or the quantity of CDs that a user can copy.  The MediaMax and XCP

13  software goes far beyond copyright protection, however.  For example, the software makes it

14  extremely difficult for a consumer with a PC to transfer their music to an Apple Corporation-

15  manufactured iPod but easy to transfer to other portable digital music players, such as those sold

16  by Sony.  Sony BMG asks iPod owners who have XCP CDs to complain to Apple about the

17  inability to play Sony BMG protected music on an iPod.  The MediaMax support website also

18  asks iPod owners who have MediaMax CDs to complain to Apple about the inability to play

19  Sony BMG protected music on an iPod.  To the extent that this is intended to advantage Sony

20  BMG or its partners in the portable digital music player market, this advantage comes at the

21  expense of consumers.

22          **SONY BMG'S EULAS CONTAIN NUMEROUS UNCONSCIONABLE AND**
           **UNREASONABLE PROVISIONS**
23

24      107.    The XCP and MediaMax CDs are disseminated with identical EULAs.

25      108.    Sony BMG utilized unconscionable provisions in the EULA that accompanies the

26  XCP and MediaMax CDs.  These provisions include:

27          a.  Restrictions on the user's ability to use the digital content on the CD in the

28              event that that consumer chose to leave the United States;

19

COMPLAINT

b. Restrictions on resale and transfer of the digital content on the CDs;

c. Restrictions on user's ability to use the digital content on the CDs at work;

d. Restrictions on user's ability to use and retain lawfully-made copies of the digital content on the CDs in the event that the original CD is stolen or lost;

e. Restrictions on user's ability to use the digital content on the CDs following a bankruptcy;

f. Conditioning the user's continued use of the digital content on the CDs on acceptance of all Sony BMG software updates;

g. A purported $5.00 limit on Sony BMG's entire liability to the purchaser of the CDs;

h. Restrictions on user's ability to examine and test his or her computer to understand and attempt to prevent the damage cause by the rootkit;

i. A reservation of rights by Sony BMG to use technological "self-help" measures against the computers of users who desire to make use of the digital content on the CDs "at any time, without notice to [the user];" and

j. A disclaimer of all warranties, including implied warranties of merchantability, satisfactory quality, noninfringement, and fitness for any particular purpose.

## SONY BMG'S SOFTWARE IS A COMPUTER CONTAMINANT

109.    Sony BMG has introduced a computer contaminant, in violation of California Penal Code Section 502, into the Plaintiffs' and the Class' computers, computer systems or computer networks.

110.    Sony BMG software includes a set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network.

111.    Sony BMG software transmits information about which CDs the user is playing through the Internet.

112.   By engaging in the above-described acts, Sony BMG caused damage.

113.   By engaging the above described acts, Sony BMG has caused or attempted to cause a threat to public health or safety,

114.   It is important to public safety not to defeat or undermine the security measures on computers.

115.   Keeping the Internet infrastructure functioning is important to public safety.

**SONY BMG HAS CAUSED DAMAGE TO CONSUMERS AND THE PUBLIC**

116.   On or around November 16, 2005, Sony BMG issued a public statement announcing that it would recall XCP CDs and allow customers to exchange the XCP CDs for CDs that would not contain any DRM.

117.   A November 30, 2005, press release by the Office of the Massachusetts Attorney General states that some of the XCP CDs are still available in stores.

118.   As of the filing of this Complaint, Sony BMG has not offered to refund the purchase price of the XCP CDs.

119.   As of the filing of this complaint, Sony BMG has not offered to recall, replace, or refund the purchase price of MediaMax CDs.

120.   As of the filing of this complaint, Sony BMG has not compensated or offered to compensate consumers for the damage it has caused to their computers.

121.   Through the actions set forth above, Sony BMG damaged its customers, including Plaintiff and Class members, to an extent to be determined at trial, caused them actual injury, and caused them to lose money and property.

122.   Investigation into the scope and extent of the effects and damage caused by Sony BMG's software is ongoing.  Plaintiff, on behalf of herself and the Class, reserves the right to amend these allegations as new information is discovered.

<u>**CLASS ACTION ALLEGATIONS**</u>

123. Pursuant to Federal Rules of Civil Procedure 23 (a) and (b), Plaintiff Laura Klemm brings this action on behalf of herself and a Class of similarly situated persons defined as:

> All persons or entities who purchased an audio compact disc distributed by Sony BMG that XCP or SunnComm software and every person or entity who suffered damage or loss as a result of Defendants' violation of the Computer Fraud and Abuse Act ("CFAA").

Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, the officers, directors, and employees of Defendants, and the legal representatives, heirs, successors, and assigns of Defendants.

124. This action is brought as a class action and may properly be so maintained; pursuant to the provisions of the Federal Rules of Civil Procedure 23.

**Numerosity**

125. Members of the Class are so numerous that their individual joinder is impracticable. The precise numbers of members of the Class and their addresses are unknown to the Plaintiff. Plaintiff estimates that the Class consists of millions of members. The precise number of persons in the Class and their identities and addresses may be ascertained from Defendants' records. Members of the Class may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

**Commonality**

126. Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. These common legal and factual questions include:

> a. Whether Sony BMG engaged in deceptive business practices in connection with the sale and advertising of the XCP and MediaMax CDs;
>
> b. Whether some or all of the terms of the EULA are unconscionable;

    c.  Whether the MediaMax software installs on consumers' computers without authorization;

    d.  Whether the MediaMax and XCP software exceed the authorizations given by consumers;

    e.  Whether the MediaMax and XCP software are in violation of the Consumer Fraud Abuse Act, 18 U.S.C. § 1030; and

    f.  Whether the communications by the MediaMax and XCP software over the internet are disclosed and necessary uses of the copy protection software.

## Typicality

127.  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased a CD distributed by Defendants, and Plaintiff was required to agree to the EULA, which did not notify Plaintiff of the true nature of the software that the CD was to install on Plaintiff's computer.

## Adequacy

128.  Plaintiff is an adequate representatives of the Class because her interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to prosecute this action vigorously.  The interests of the member of the Class will be fairly and adequately protected by Plaintiff and her counsel.

129.  This suit may also be maintained as a class action because Plaintiff and the Class seek declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 23(b)(2) as Defendants acted on grounds generally applicable to Plaintiff and the Class, thereby making declaratory and/or injunctive relief proper.

130.  This suit may also be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual Class member may be relatively small, especially given the burden and expense of individual prosecution of the

1   complex and extensive litigation necessitated by Defendants' conduct.  Furthermore, it would be

2   virtually impossible for the Class members, on an individual basis, to obtain effective redress for

3   the wrongs done to them.  Moreover, even if Class members themselves could afford such

4   individual litigation, the court system could not.  Individual litigation presents a potential for

5   inconsistent or contradictory judgments.  Individualized litigation increases the delay and

6   expense to all parties and the court system presented by the complex legal issue of the case.  By

7   contrast, the class action device presents far fewer management difficulties, and provides the

8   benefits of a single adjudication, economy of scale and comprehensive supervision by a single

9   court.

10        131.    In addition, this suit may be maintained as a class action under Federal Rule of

11   Civil Procedure 23(b)(3), because:

12              a.    The prosecution of separate actions by individual Class members would

13                    create a risk of inconsistent or varying adjudication with respect to

14                    individual Class members that would establish incompatible standards of

15                    conduct for Defendants; or

16              b.    The prosecution of separate actions by individual Class members would

17                    create a risk of adjudications with respect to them that would, as a

18                    practical matter, be dispositive of the interests of other Class members not

19                    parties to the adjudications or substantially impair or impede their ability

20                    to protect their interests; or

21              c.    Defendants have acted or refused to act on grounds generally applicable to

22                    the Class, thereby making appropriate final injunctive or corresponding

23                    declaratory relief with respect to the Class as a whole.

1          **FIRST CLAIM FOR RELIEF**

2    **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

3    132. Plaintiff incorporates by reference the allegations in all proceeding paragraphs of

4 this complaint.

5    133. As defined by 18 U.S.C. § 1030, the Computer Fraud and Abuse Act ("CFAA"),

6 the computers used by Plaintiff and Class members are "protected computers."

7    134. By engaging in the above-described acts and practices, Sony BMG (i) knowingly

8 causes the transmission of a program, information, code, or command, and as a result of such

9 conduct, intentionally causes damage without authorization, to a protected computer; (ii)

10 intentionally accesses a protected computer without authorization, and as a result of such

11 conduct, recklessly causes damage; and/or (iii) intentionally accesses protected computers, and

12 as a result of such conduct, causes damage, without authorization, in violation of the Computer

13 Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A).

14    135. By engaging in the above-described acts and practices, Sony BMG "intentionally

15 accesse[d] a computer without authorization or exceeds authorized access, and thereby

16 obtain[ed] . . . information from any protected computer if the conduct involved an interstate or

17 foreign communication" in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §

18 1030(a)(2)(C).

19    136. By engaging in the above-described acts and practices, Sony BMG "knowingly

20 and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed]

21 authorized access, and by means of such conduct further[ed] the intended fraud" and obtained

22 information "of value," in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §

23 1030(a)(4).

24    137. By engaging in the above-described acts and practices, Sony BMG caused and

25 causes (i) loss to 1 or more persons during any 1-year period aggregating at least $5,000 in

26 value; (ii) the modification or impairment, or potential modification or impairment, of the

27 medical examination, diagnosis, treatment, or care of 1 or more individuals; (iv) a threat to

28

1   public health or safety; or (v) damage affecting a computer system used by or for a government

2   entity in furtherance of the administration of justice, national defense, or national security; in

3   violation of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(5)(B).

4        138.   Plaintiff and the Class suffered and will continue to suffer damages, and there

5   continues to be a threat to public health or safety; or damage affecting a computer system used

6   by or for a government entity in furtherance of the administration of justice, national defense, or

7   national security, as a result of Sony BMG's computer fraud and abuse.  Plaintiff, on behalf of

8   herself and on behalf of the Class seek compensatory damages, injunctive relief and other

9   equitable relief as specified below in an amount to be determined at trial.

10                          **SECOND  CLAIM FOR RELIEF**

11       **(Violation of Consumer Legal Remedies Act, CA Civil Code § 1750, et seq.)**

12       139.   Plaintiffs incorporate the allegations set forth above by references, as if set forth

13   fully herein.

14       140.   The Consumer Legal Remedies Act (CLRA), California Civil Code sections 1750

15   *et seq*, applies to Sony BMG's actions and conduct because such actions and conduct pertain to

16   transactions that were intended to result and/or resulted in the sale or lease of goods or services

17   to consumers.

18       141.   Plaintiffs and each member of the class are "consumers" within the meaning of

19   Civil Code Section 1761(d).

20       142.   The Sony BMG products that are the subject of this litigation are "goods" within

21   the meaning of Civil Code section 1761(a).

22       143.   Sony BMG has engaged in deceptive practices, unlawful methods of competition

23   and/or unfair acts as defined by Civ. Code §1770, to the detriment of Plaintiffs and the Class.

24   Plaintiffs and members of the Class have suffered harm as a proximate result of the violations of

25   law and wrongful conduct of Defendant alleged herein.

26       144.   Sony BMG intentionally and unlawfully perpetrated harm upon Plaintiffs and the

27   Class by the above described acts.

28

145.    In violation of Civil Code section 1770(5), Sony BMG has represented that its CDs have characteristics, uses or benefits which they do not have.

146.    In violation of Civil Code section 1770(a)(9), Sony BMG has advertised its CDs with intent not to sell them as advertised.

147.    In violation of Civil Code section 1770(a)(14), Sony BMG has represented that the purchase and/or use of its XCP and MediaMax CDs confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

148.    In violation of Civil Code section 1770(a)(19), Sony BMG has inserted several unconscionable provisions into the end-user license agreement (EULA) that accompanies the XCP and MediaMax CDs.

149.    Sony BMG concealed material information regarding the XCP and MediaMax CDs from Plaintiffs and other class members, including but not limited to the existence of the rootkit program and its effects on users' computers and the lack of a reasonable way to uninstall the software in the event of security or privacy violations.

150.    Users, including Plaintiffs and class members, routinely rely on this type of information in making music purchase decisions.  Had Sony BMG disclosed this material information, Plaintiffs and other class members would not have purchased the XCP and MediaMax CDs.

151.    Plaintiffs and other class members relied on this material information to their detriment.

152.    Sony BMG's deceptive acts and omissions and unfair business practices occurred in the course of selling a consumer product and violate Civil Code section 1770(a).

153.    As a direct and proximate result of Sony BMG's violations of the CLRA, Plaintiffs and other class members have suffered harm.

154.    Sony BMG's policies and practices are unlawful, unethical, oppressive, fraudulent and malicious.  The gravity of the harm to all consumers from Sony BMG's policies and practices far outweighs any purported utility those policies and practices have.

155.    Pursuant to Civil Code section 1780(a), Plaintiffs seek an order enjoining Defendant from engaging in the methods, acts or practices alleged herein, including an order enjoining the defendant from continuing to sell and market XCP and MediaMax CDs and continuing to disclaim the risks of using such CDs.

156.    Plaintiffs will amend their complaint after 30 days of filing and serving this complaint to add additional relief as permitted under the CLRA.

## THIRD CLAIM FOR RELIEF

### (Violation of California Business and Professions Code Section 17200)

157.    Plaintiffs incorporate the allegations set forth above by references, as if set forth fully herein.

158.    Plaintiffs and the Class have suffered injury in fact and lost money or property as a result of such unfair competition.  Such injuries and losses include, but are not limited to, computer damage, time and effort spent identifying and attempting to remove the damaging software, loss of use of the ability to listen to the music on the CDs, and the purchase price of the CDs.

159.    Sony BMG has engaged in unfair, unlawful and fraudulent business practices as set forth above.

160.    By engaging in the above-described acts and practices, Sony BMG has committed one or more unfair business practices within the meaning of Bus. & Prof. Code §17200, et seq. Specifically, Sony BMG's business practices offend the public policies set forth in California Constitution Art. 1, section 1; Civil Code sections 1750 et seq (Consumer Legal Remedies Act); Business and Professions Code section 22947 (Consumer Protection Against Computer Spyware Act);  Business and Professions Code section 17500 et seq.; Business and Professions Code sections 22575-579 (Online Privacy Protection Act);  and California Penal Code section 502.

161.    Sony BMG's above-described deceptive and misleading acts and practices have and/or are likely to deceive Plaintiffs and other Class members.

162.    Sony BMG's acts and practices are also unlawful because they violate Civil Code

1  sections 1750 et seq (Consumer Legal Remedies Act); Business and Professions Code section

2  22947 (Consumer Protection Against Computer Spyware Act); and California Penal Code

3  section 502.

4       163.   Specifically, Sony BMG marketed and sold the XCP and MediaMax CDs in

5  defective condition and deceptively failed to disclose their defects as described above; advertised

6  its XCP and MediaMax CDs with intent not to sell them as advertised; represented that the

7  purchase and/or use of its XCP and MediaMax CDs confers or involves rights, remedies, or

8  obligations which it does not have or involve, or which are prohibited by law; inserted several

9  unconscionable provisions into the EULA that accompanies the XCP and MediaMax CDs

10  infected with the XCP and MediaMax software; took control and modified the settings of user's

11  computers, collected personally identifiable information about users, tracked users as they listen

12  to the CDs and attempted to prevent users from blocking or disabling the XCP and MediaMax

13  software; violated the implied covenant of good faith and fair dealing; and failed to comply with

14  the implied warranty of merchantability.

15       164.   Plaintiffs and the Class have suffered injury in fact and have lost money or

16  property as a result of such unfair competition.

17       165.   Plaintiffs, on behalf of themselves and on behalf of the Class, seek an order of this

18  Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under

19  §17200, et seq.

20                    **FOURTH CLAIM FOR RELIEF**

21          **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

22       166.   Plaintiffs incorporate the allegations set forth above by references, as if set forth

23  fully herein.

24       167.   California law implies a covenant of good faith and fair dealing in all contracts

25  between parties entered into in the State of California.

26       168.   By engaging in above-described acts and practices, Sony BMG has violated the

27  implied covenant of good faith and fair dealing in the consumer's purchase of the XCP and

28

1 MediaMax CDs.

2   169.   By engaging in the above-described acts and practices, Sony BMG has caused

3 Plaintiffs and the Class to suffer damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

### (False or Misleading Statements)

6   170.   Plaintiffs incorporate the allegations set forth above by references, as if set forth

7 fully herein.

8   171.   Through its advertising practices, promotional materials, packaging, EULA,

9 public statements, and other acts and practices described herein, Sony BMG has made untrue and

10 misleading statements and omitted material facts in violation of California Business and

11 Professions Code §§17500, et seq.

12   172.   The misrepresentations, omissions and other misleading conduct described herein

13 concerning the XCP and MediaMax CDs were "likely to deceive." These misrepresentations and

14 omissions continue to this date.

15   173.   Sony BMG knows or should know that these misrepresentations and omissions

16 concerning the XCP and MediaMax CDs are false and misleading.

17   174.   Plaintiffs and the Class were actually deceived by the misrepresentations and

18 omissions.

19   175.   Plaintiffs and the Class relied on these misrepresentations and omissions to their

20 detriment.

21   176.   Plaintiffs and the Class have been harmed.  Plaintiffs, on behalf of themselves and

22 on behalf of the Class seek restitution, disgorgement, injunctive relief and all other relief

23 allowable under §17500, et seq.

### PRAYER FOR RELIEF

25   WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

26   A.   For compensatory damages in an amount to be proven at trial.

27   B.   For restitution and disgorgement of profits realized as a result of the unlawful

28

1    conduct of defendants.

2       C.      For any treble and/or punitive damages to the extent permitted by law.

3       D.      For declaratory relief, including but not limited to, i) declaring the distribution of

4    CDs with MediaMax and XCP software to be illegal under CFAA, ii) declaring the EULAs to be

5    unconscionable, misleading and void and iii) declaring the waiver of jury trial provision in the

6    EULAs be declared null, void, and unenforceable as a violation of law and/or public policy.

7       E.      For further equitable relief, including but not limited to, requiring Sony BMG to:

8              (i)      Notify consumers, through widespread publicity, of the potential security

9                       and other risks associated with the XCP and MediaMax technology, to

10                      allow consumers to make informed decisions regarding their use of those

11                      CDs.  The notification process should include issuing a public statement

12                      describing the risks associated with *both* XCP and MediaMax software

13                      and listing every Sony BMG CD, DVD or other product that contains

14                      MediaMax software.  In addition, Sony BMG must use the banner

15                      communication system incorporated in its software to advise consumers

16                      that refunds and uninstall software is available.  The notifications must be

17                      reasonably calculated to reach all consumers who have purchased the

18                      products.

19             (ii)     Cooperate fully with any interested manufacturer of anti-virus, anti-

20                      spyware, or similar computer security tools, and with security researchers,

21                      to facilitate the identification and complete removal of both XCP and

22                      MediaMax software from the computers of those infected.  Among other

23                      actions, Sony BMG should publicly waive any claims it may have against

24                      such vendors or researchers under the EULA, the Digital Millennium

25                      Copyright Act (DMCA), and any similar laws.

26             (iii)    Refund the purchase price of the CDs containing XCP technology for

27                      those consumers who prefer a refund to a replacement CD.

28

COMPLAINT

      (iv)    Refund the purchase price of the CDs containing MediaMax technology or, *at the consumer's election*, provide a replacement CD that does not contain the MediaMax technology.  For those consumers who choose to retain CDs containing the MediaMax technology, develop and make widely available a software update that will allow consumers to easily uninstall the technology without losing the ability to play the CD on their computers, without causing further damage to their computers, and without revealing any personally identifying information.

      (v)    To avoid future abuses, prior to releasing any future product containing technology with similar functions, thoroughly test the software to determine the existence of any security risks or other possible damages the technology might cause to any user's computer and certify in a statement included in the packaging of every CD containing the technology that the product does not contain any concealed software such as the XCP rootkit, does not electronically communicate with Sony BMG or any other party nor initiate the download of any software update or other data without informed consent of the consumer immediately prior to each communication, can be uninstalled without any need to contact and/or disclose personal information to Sony BMG or its affiliates and agents, does not present any security risks to any consumer's computer, and will not damage or reduce the functionality of the consumer's computer in any way.

F.     For the award to Plaintiff of their attorneys' fees and other costs of suit.

G.     For such other and further relief as the Court deems just and equitable.

JURY TRIAL DEMAND:

Plaintiff, pursuant to Federal Rules of Civil Procedure, Rule 38(b), hereby demands a Jury Trial as to all matters triable by Jury.

1  DATED: December 8, 2005       **ROTHKEN LAW FIRM**

2

3

4       By: _____
                IRA P. ROTHKEN

5

6       Ira P. Rothken (SBN #160029)
        ROTHKEN LAW FIRM

7       1050 Northgate Dr., Suite 520
        San Rafael, CA  94903

8       Telephone:    (415) 924-4250
        Facsimile:    (415) 924-2905

9

10      Stan S. Mallison, (SBN #184191)
        Hector R. Martinez (SBN #206336)

11      LAW OFFICES OF MALLISON & MARTINEZ
        1042 Brown Avenue, Suite A

12      Lafayette, CA 94549
        Telephone:    (925) 283-3842

13      Facsimile:    (925) 283-3426

14

15      Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28
                                33

IMPORTANT-READ CAREFULLY:  This compact disc ("CD") product contains
standard so-called "Red Book" compliant audio files that can be played
on any standard CD player, including those contained in many personal
home computer systems.  As an added feature, this compact disc ("CD")
product also enables you to convert these audio files into digital
music files and/or may also contain other already existing digital
content (such files and content, collectively, the "DIGITAL CONTENT"),
any of which may be stored on the hard drive of a personal home
computer system owned by you ("YOUR COMPUTER") and accessed via YOUR
COMPUTER or certain approved, compatible portable devices owned by you
(each, an "APPROVED PORTABLE DEVICE").

Before you can play the audio files on YOUR COMPUTER or create and/or
transfer the DIGITAL CONTENT to YOUR COMPUTER, you will need to review
and agree to be bound by an end user license agreement or "EULA", the
terms and conditions of which are set forth below.  Once you have read
these terms and conditions, you will be asked whether or not you agree
to be bound by them.  Click "AGREE" if you agree to be bound.  Click
"DISAGREE" if you do not agree to be bound.  Please keep in mind,
however, that if you do not agree to be bound by these terms and
conditions, you will not be able to utilize the audio files or the
DIGITAL CONTENT on YOUR COMPUTER.

As soon as you have agreed to be bound by the terms and conditions of
the EULA, this CD will automatically install a small proprietary
software program (the "SOFTWARE") onto YOUR COMPUTER.  The SOFTWARE is
intended to protect the audio files embodied on the CD, and it may also
facilitate your use of the DIGITAL CONTENT.  Once installed, the
SOFTWARE will reside on YOUR COMPUTER until removed or deleted.
However, the SOFTWARE will not be used at any time to collect any
personal information from you, whether stored on YOUR COMPUTER or
otherwise.

Once the SOFTWARE has been installed on YOUR COMPUTER, a menu will then
appear on the screen of YOUR COMPUTER, giving you the option of playing
the audio files on YOUR COMPUTER, creating a copy of the DIGITAL
CONTENT directly onto the hard drive of YOUR COMPUTER, or making a
limited number of back-up copies of the CD onto other, recordable CDs.
If you choose to create a copy of the DIGITAL CONTENT, the menu will
then prompt you to select a file format for the DIGITAL CONTENT.  Once
you have selected a file format, a copy of the DIGITAL CONTENT will
automatically be created in that file format and transferred onto the
hard drive of YOUR COMPUTER, where you will be able to access it using
an APPROVED MEDIA PLAYE (see below) or, at you election, transfer it
from YOUR COMPUTER onto an APPROVED PORTABLE DEVICE.

In order to access the DIGITAL CONTENT on YOUR COMPUTER, you will need
to have a copy of an approved media player software program that is
capable of playing the DIGITAL CONTENT in the file format you selected
(each such approved media player, an "APPROVED MEDIA PLAYER) on YOUR
COMPUTER.  You may already have a copy of an APPROVED MEDIA PLAYER on
YOUR COMPUTER.  If you do, you will be able to play the DIGITAL CONTENT
on YOUR COMPUTER without doing anything further.  This CD may also
contain an APPROVED MEDIA PLAYER for the file format you selected.  If
it does, the menu that appears on the screen of YOUR COMPUTER will
prompt you on how to transfer a copy of that APPROVED MEDIA PLAYER onto
YOUR COMPUTER.  To the extent you utilize an APPROVED MEDIA PLAYER

contained on this CD, your use of such APPROVED MEDIA PLAYER may be subject, in each instance, to separate terms and conditions provided by the owner of the APPROVED MEDIA PLAYER concerned.  If you do not already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER, and if this CD does not contain a compatible APPROVED MEDIA PLAYER, then you will then need to secure a compatible APPROVED MEDIA PLAYER elsewhere (e.g., on an Internet website, where you can download one).

END-USER LICENSE AGREEMENT

This End-User License Agreement ("EULA") is a legal agreement between you and SONY BMG MUSIC ENTERTAINMENT ("SONY BMG"), a general partnership established under Delaware law. By clicking on the "AGREE" button below, you will indicate your acceptance of these terms and conditions, at which point this EULA will become a legally binding agreement between you and SONY BMG.

Article 1.  GRANT OF LICENSE
1.    Subject to your agreement to the terms and conditions set forth in this EULA, SONY BMG grants to you a personal, non-exclusive and non-transferable license, with no right to grant sublicenses, to:
(a)    install one (1) copy of SOFTWARE onto the hard drive of YOUR COMPUTER, solely in machine-executable form;
(b)    install one (1) copy of any APPROVED MEDIA PLAYER(S) contained on this CD onto the hard drive of YOUR COMPUTER, solely in machine-executable form;
(c)    use the SOFTWARE and any APPROVED MEDIA PLAYER(S) contained on this CD to access the DIGITAL CONTENT on YOUR COMPUTER or on an APPROVED PORTABLE DEVICE;
in each instance, solely for your own personal and private use and not for any other purpose(including, without limitation, any act of electronic or physical distribution, making available, performance or broadcast, or any act for profit or other commercial purpose) and in accordance with the terms and conditions set forth in this EULA.
2.    The DIGITAL CONTENT and the SOFTWARE contained on this CD are sometimes referred to herein, collectively, as the "LICENSED MATERIALS".

Article 2.  PRODUCT FEATURES
1.    This CD contains technology that is designed to prevent users from making certain, unauthorized uses of the DIGITAL CONTENT, including, without limitation, the following:
(1)    making and storing more than one (1) copy of the DIGITAL CONTENT in each available file format on the hard drive of YOUR COMPUTER;
(2)    accessing the DIGITAL CONTENT on YOUR COMPUTER (once you have installed a copy of it on the hard drive of YOUR COMPUTER) using a media player that is not an APPROVED MEDIA PLAYER;
(3)    transferring copies of the DIGITAL CONTENT that reside on the hard drive of YOUR COMPUTER on to portable devices that are not APPROVED PORTABLE DEVICES;
(4)    burning more than three (3) copies of the DIGITAL CONTENT stored on YOUR COMPUTER (ATRAC OpenMG file format only) onto AtracCDs;
(5)    burning more than three (3) copies of the DIGITAL CONTENT onto recordable compact discs in the so-called "Red Book"-compliant audio file format; and
(6)    burning more than three (3) backup copies of this CD (using the

burning application provided on the CD) onto recordable CDs and burning
or otherwise making additional copies from the resulting backup copies.
2.    PLEASE NOTE:  Your use of the DIGITAL CONTENT and the other
LICENSED MATERIALS may be subject to additional restrictions, under
applicable copyright and other laws, that are not enforced or
prescribed by any technology contained on this CD.  The absence of any
such technology designed to enforce these additional restrictions
should in no way be viewed or interpreted as a waiver, on the part of
SONY BMG or any other person or entity owning any rights in any of the
LICENSED MATERIALS, of their respective rights to enforce any such
additional restrictions regarding your use of the LICENSED MATERIALS.
Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS shall,
at all times, remain subject to any and all applicable laws governing
the use of such materials, including, without limitation, any
restrictions on your use prescribed therein.
3.    All of your rights to enjoy the DIGITAL CONTENT, as described
herein, shall be subject to your continued ownership of all rights in
and to the physical CD on which such DIGITAL CONTENT is embodied;
should you transfer your ownership rights in the physical CD on which
such DIGITAL CONTENT is embodied (in whole or in part) to any other
person (whether by sale, gift or otherwise), your rights in both the
physical CD and such DIGITAL CONTENT shall terminate.

Article 3.  RESTRICTIONS ON USE OF LICENSED MATERIALS
1.    Except to the extent otherwise expressly permitted hereunder or
otherwise by the owner of the relevant rights in or to the LICENSED
MATERIALS concerned, and without limitation, the following restrictions
shall apply to your use of the LICENSED MATERIALS:
(a)    You may not copy or reproduce any portion of the LICENSED
MATERIALS.
(b)    You may not distribute, share through any information network,
transfer, sell, lease or rent any of the LICENSED MATERIALS to any
other person, in whole or in part.
(c)    You may not change, alter, modify or create derivative works,
enhancements, extensions or add-ons to any of the LICENSED MATERIALS.
(d)    You may not decompile, reverse engineer or disassemble any of the
LICENSED MATERIALS, in whole or in part.
(e)    You may not export the LICENSED MATERIALS outside of the country
where you reside.  (This clause 1(e) of Article 3 shall not be
applicable within the European Economic Area (EEA).)
(f)    You will at all times comply with, and will not circumvent or
attempt to circumvent, any of the restrictions on use set forth in this
Article 3 or elsewhere in this EULA.
2.    In the event that the owner of the LICENSED MATERIALS is a party
other than SONY BMG (each, a "LICENSOR"), you agree that such LICENSOR
shall be a third party beneficiary under this EULA and, as such, shall
have the right to enforce the terms and conditions of this EULA that
pertain directly to such LICENSOR'S rights in and to the LICENSED
MATERIALS concerned as if such LICENSOR was a party to this EULA.  The
rights granted to a Licensor under this Article shall not be revoked.
3.    SONY BMG and each LICENSOR reserve the right to use the SOFTWARE
and/or any APPROVED MEDIA PLAYER to enforce their respective rights in
and to the DIGITAL CONTENT, including any and all of the restrictions
on use set forth in this Article 3, at any time, without notice to you.

Article 4.  INTELLECTUAL PROPERTY RIGHTS
All title to, and intellectual property rights in, the LICENSED

MATERIALS and any related documents are and shall remain owned and/or controlled solely and exclusively by SONY BMG and/or its LICENSORS. SONY BMG and/or all respective LICENSORS reserve all rights in the LICENSED MATERIALS not specifically granted to you under this EULA.

Article 5.   EXCLUSION OF WARRANTIES
YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT YOU ARE INSTALLING AND USING THE LICENSED MATERIALS AT YOUR OWN SOLE RISK.   THE LICENSED MATERIALS ARE PROVIDED "AS IS" AND WITHOUT WARRANTY, TERM OR CONDITION OF ANY KIND, AND SONY BMG, ITS LICENSORS AND EACH OF THEIR LICENSEES, AFFILIATES AND AUTHORIZED REPRESENTATIVES (EACH, A "SONY BMG PARTY") EXPRESSLY DISCLAIM ALL WARRANTIES, TERMS OR CONDITIONS. EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, NON-INFRINGEMENT AND FITNESS FOR A GENERAL OR PARTICULAR PURPOSE.   NO ORAL, WRITTEN OR ELECTRONIC INFORMATION OR ADVICE GIVEN BY ANY SONY BMG PARTY SHALL CREATE ANY WARRANTY, TERM OR CONDITION WITH RESPECT TO THE LICENSED MATERIALS OR OTHERWISE.   SHOULD THE LICENSED MATERIALS PROVE TO BE DEFECTIVE, YOU (AND NOT THE SONY BMG PARTY CONCERNED) AGREE TO ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIRS OR CORRECTIONS.   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, TERMS OR CONDITIONS IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY MANDATES LIABILITY, DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

Article 6.   LIMITATION OF LIABILITY
NO SONY BMG PARTY SHALL BE LIABLE FOR ANY LOSS OR DAMAGE, EITHER DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHERWISE, ARISING OUT OF THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, TERM OR CONDITION, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY MISREPRESENTATION, FAILURE OF ANY REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE OR ANY OTHER LEGAL THEORY ARISING OUT OF, OR RELATED TO, THIS EULA OR YOUR USE OF ANY OF THE LICENSED MATERIALS (SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF DATA, LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED EQUIPMENT, DOWN TIME AND USER'S TIME), EVEN IF THE SONY BMG PARTY CONCERNED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.   IN ANY CASE, THE ENTIRE LIABILITY OF THE SONY BMG PARTIES, COLLECTIVELY, UNDER THE PROVISIONS OF THIS EULA SHALL BE LIMITED TO FIVE US DOLLARS (US $5.00).   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY REQUIRES LIABILITY DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

Article 7.   DAMAGES ARISING OUT OF YOUR ACTIONS
You shall defend and hold the SONY BMG PARTIES harmless from and against any and all liabilities, damages, costs, expenses or losses arising out of your use of the LICENSED MATERIALS, your negligent or wrongful acts, your violation of any applicable laws or regulations, and/or your breach of any provision of this EULA.

Article 8.   UPDATES TO THE LICENSED MATERIALS
The SONY BMG PARTIES may from time to time provide you with updates of the SOFTWARE in a manner that the SONY BMG PARTIES deem to be appropriate.   All such updates shall be deemed to be part of the

SOFTWARE for all purposes hereunder.  In the event that you fail to install an update, the SONY BMG PARTIES reserve the right to terminate the term of this EULA, along with your rights to use the LICENSED MATERIALS, immediately, without additional notice to you.  The SONY BMG PARTIES shall not be liable for any loss or damage caused by reason of your failure to install any such update or your failure to do so in the manner instructed.

Article 9.  EXPIRATION AND TERMINATION
1.      The rights granted to you hereunder to use the DIGITAL CONTENT are conditioned upon your continued possession of, and your continued right under a license from SONY BMG to use, the original CD product that you purchased.  In the event that you no longer possess or have the right under such license to use the original CD product, your rights hereunder to use the DIGITAL CONTENT shall expire immediately, without notice from SONY BMG.
2.      Without prejudice to any other rights SONY BMG or any SONY BMG PARTY may have hereunder, the term of this EULA shall terminate immediately, without notice from SONY BMG, and all rights you may have hereunder to use the LICENSED MATERIALS shall be immediately revoked, in the event that you: (i) fail to comply with any provision of this EULA(ii) fail to install an update of the SOFTWARE that was previously provided to you by the SONY BMG PARTIES within the time specified, or (iii) file a voluntary petition or are subject to an involuntary petition under applicable bankruptcy laws, are declared insolvent, make an assignment for the benefit of creditors, or are served with a writ of attachment, writ of execution, garnishment or other legal process pertaining to any of your assets or property.
3.      Upon the expiration or termination of this EULA, you shall immediately remove all of the LICENSED MATERIALS from your personal computer system and delete or destroy them, along with any related documentation (and any copies thereof) that you may have received or otherwise may possess.
4.      Articles 4 (Intellectual Property Rights), 6 (Limitation of Liability), 7 (Damages Arising Out Of Your Actions), 9 (Expiration and Termination), 10 (Governing Law and Waiver of Trial By Jury), and 11 (General) shall survive and remain in full force and effect following the expiration or termination of this EULA.
5.      To the extent relevant under applicable law, you and SONY BMG each agree, for the effectiveness of the termination clauses under this EULA, to waive any provisions, procedures and operation of any applicable law that might otherwise require judicial approval or a court order in order to effect the termination of this EULA.

Article 10. GOVERNING LAW AND WAIVER OF TRIAL BY JURY
1.      THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS EULA SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW).   THE NEW YORK COURTS (STATE AND FEDERAL), SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN NEW YORK COUNTY AND NOT ELSEWHERE.  THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS.
2.      YOU HEREBY WAIVE ALL RIGHTS AND/OR ENTITLEMENT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE THAT ARISES OUT OF OR RELATES IN ANY WAY

TO THIS EULA OR THE SOFTWARE.

Article 11. GENERAL

If any provision of this EULA is subsequently held to be invalid or
unenforceable by any court or other authority, such invalidity or
unenforceability shall in no way affect the validity or enforceability
of any other provision of this EULA.  This EULA shall be binding upon
the parties' authorized successors and assignees.  Neither party's
waiver of any breach or failure to enforce any of the provision of this
EULA at any time shall in any way affect, limit or waive such party's
right there after to enforce and compel strict compliance with every
other provision.  No modification of this EULA shall be effective
unless it is set forth in a writing signed by SONY BMG.

**IMPORTANT-READ CAREFULLY:** This compact disc ("CD") product contains standard so-called "Red Book"-compliant audio files that can be played on any standard CD player, including those contained in many personal home computer systems. As an added feature, this compact disc ("CD") product also enables you to convert these audio files into digital music files and/or may also contain other already existing digital content (such files and content, collectively, the "DIGITAL CONTENT"), any of which may be stored on the hard drive of a personal home computer system owned by you ("YOUR COMPUTER") and accessed via YOUR COMPUTER or certain approved, compatible portable devices owned by you (each, an "APPROVED PORTABLE DEVICE").

Before you can play the audio files on YOUR COMPUTER or create and/or transfer the DIGITAL CONTENT to YOUR COMPUTER, you will need to review and agree to be bound by an end user license agreement or "EULA", the terms and conditions of which are set forth below. Once you have read these terms and conditions, you will be asked whether or not you agree to be bound by them. Click "AGREE" if you agree to be bound. Click "DISAGREE" if you do not agree to be bound. Please keep in mind, however, that if you do not agree to be bound by these terms and conditions, you will not be able to utilize the audio files or the DIGITAL CONTENT on YOUR COMPUTER.

**As soon as you have agreed to be bound by the terms and conditions of the EULA, this CD will automatically install** a small proprietary software program (the "SOFTWARE") onto YOUR COMPUTER. The SOFTWARE is intended to protect the audio files embodied on the CD, and it may also facilitate your use of the DIGITAL CONTENT. Once installed, the SOFTWARE will reside on YOUR COMPUTER until removed or deleted. However, the SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise.

Once the SOFTWARE has been installed on YOUR COMPUTER, a menu will then appear on the screen of YOUR COMPUTER, giving you the option of playing the audio files on YOUR COMPUTER, creating a copy of the DIGITAL CONTENT directly onto the hard drive of YOUR COMPUTER, or making a limited number of back-up copies of the CD onto other, recordable CDs. If you choose to create a copy of the DIGITAL CONTENT, the menu will then prompt you to select a file format for the DIGITAL CONTENT. Once you have selected a file format, a copy of the DIGITAL CONTENT will automatically be created in that file format and transferred onto the hard drive of YOUR COMPUTER, where you will be able to access it using an APPROVED MEDIA PLAYER (see below) or, at you election, transfer it from YOUR COMPUTER onto an APPROVED PORTABLE DEVICE.

In order to access the DIGITAL CONTENT on YOUR COMPUTER, you will need to have a copy of an approved media player software program that is capable of playing the DIGITAL CONTENT in the file format you selected (each such approved media player, an "APPROVED MEDIA PLAYER") on YOUR COMPUTER. You may already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER. If you do, you will be able to play the DIGITAL CONTENT on YOUR COMPUTER without doing anything further. This CD may also contain an APPROVED MEDIA PLAYER for the file format you selected. If it does, the menu that appears on the screen of YOUR COMPUTER will prompt you on how to transfer a copy of that APPROVED MEDIA PLAYER onto YOUR COMPUTER. To the extent you utilize an APPROVED MEDIA PLAYER contained on this CD, your use of such APPROVED MEDIA PLAYER may be subject, in each instance, to separate terms and conditions provided by the owner of the APPROVED MEDIA PLAYER concerned. If you do not already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER, and if this CD does not contain a compatible APPROVED MEDIA PLAYER, then you will then need to secure a compatible APPROVED MEDIA PLAYER elsewhere (e.g., on an Internet website, where you can download one).

## END-USER LICENSE AGREEMENT

This End-User License Agreement ("EULA") is a legal agreement between you and SONY BMG MUSIC ENTERTAINMENT ("SONY BMG"), a general partnership established under Delaware law. By clicking on the "AGREE" button below, you will indicate your acceptance of these terms and conditions, at which point this EULA will become a legally binding agreement between you and SONY BMG.

Article 1. GRANT OF LICENSE
1.    Subject to your agreement to the terms and conditions set forth in this EULA, SONY BMG grants to you a personal, non-exclusive and non-transferable license, with no right to grant sublicenses, to:
      (a)    install one (1) copy of SOFTWARE onto the hard drive of YOUR COMPUTER, solely in machine-executable form;
      (b)    install one (1) copy of any APPROVED MEDIA PLAYER(S) contained on this CD onto the hard drive of YOUR COMPUTER, solely in machine-executable form;
      (c)    use the SOFTWARE and any APPROVED MEDIA PLAYER(S) contained on this CD to access the DIGITAL CONTENT on YOUR COMPUTER or on an APPROVED PORTABLE DEVICE;

in each instance, solely for your own personal and private use and not for any other purpose (including, without limitation, any act of electronic or physical distribution, making available, performance or broadcast, or any act for profit or other commercial purpose) and in accordance with the terms and conditions set forth in this EULA.

2.     The DIGITAL CONTENT and the SOFTWARE contained on this CD are sometimes referred to herein, collectively, as the "LICENSED MATERIALS".

## Article 2.  PRODUCT FEATURES

1.     This CD contains technology that is designed to prevent users from making certain, unauthorized uses of the DIGITAL CONTENT, including, without limitation, the following:

    (1)     making and storing more than one (1) copy of the DIGITAL CONTENT in each available file format on the hard drive of YOUR COMPUTER;

    (2)     accessing the DIGITAL CONTENT on YOUR COMPUTER (once you have installed a copy of it on the hard drive of YOUR COMPUTER) using a media player that is not an APPROVED MEDIA PLAYER;

    (3)     transferring copies of the DIGITAL CONTENT that reside on the hard drive of YOUR COMPUTER on to portable devices that are not APPROVED PORTABLE DEVICES;

    (4)     burning more than three (3) copies of the DIGITAL CONTENT stored on YOUR COMPUTER (ATRAC OpenMG file format only) onto AtracCDs;

    (5)     burning more than three (3) copies of the DIGITAL CONTENT onto recordable compact discs in the so-called "Red Book"-compliant audio file format; and

    (6)     burning more than three (3) backup copies of this CD (using the burning application provided on the CD) onto recordable CDs and burning or otherwise making additional copies from the resulting backup copies.

2.     <u>PLEASE NOTE</u>:  Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS may be subject to additional restrictions, under applicable copyright and other laws, that are not enforced or prescribed by any technology contained on this CD.  The absence of any such technology designed to enforce these additional restrictions should in no way be viewed or interpreted as a waiver, on the part of SONY BMG or any other person or entity owning any rights in any of the LICENSED MATERIALS, of their respective rights to enforce any such additional restrictions regarding your use of the LICENSED MATERIALS.  Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS shall, at all times, remain subject to any and all applicable laws governing the use of such materials, including, without limitation, any restrictions on your use prescribed therein.

3.     All of your rights to enjoy the DIGITAL CONTENT, as described herein, shall be subject to your continued ownership of all rights in and to the physical CD on which such DIGITAL CONTENT is embodied; should you transfer your ownership rights in the physical CD on which such DIGITAL CONTENT is embodied (in whole or in part) to any other person (whether by sale, gift or otherwise), your rights in both the physical CD and such DIGITAL CONTENT shall terminate.

## Article 3.  RESTRICTIONS ON USE OF LICENSED MATERIALS

1.     Except to the extent otherwise expressly permitted hereunder or otherwise by the owner of the relevant rights in or to the LICENSED MATERIALS concerned, and without limitation, the following restrictions shall apply to your use of the LICENSED MATERIALS:

    (a)     You may not copy or reproduce any portion of the LICENSED MATERIALS.

    (b)     You may not distribute, share through any information network, transfer, sell, lease or rent any of the LICENSED MATERIALS to any other person, in whole or in part.

    (c)     You may not change, alter, modify or create derivative works, enhancements, extensions or add-ons to any of the LICENSED MATERIALS.

    (d)     You may not decompile, reverse engineer or disassemble any of the LICENSED MATERIALS, in whole or in part.

    (e)     You may not export the LICENSED MATERIALS outside of the country where you reside.  (This clause 1(e) of Article 3 shall not be applicable within the European Economic Area (EEA).)

    (f)     You will at all times comply with, and will not circumvent or attempt to circumvent, any of the restrictions on use set forth in this Article 3 or elsewhere in this EULA.

2.     In the event that the owner of the LICENSED MATERIALS is a party other than SONY BMG (each, a "LICENSOR"), you agree that such LICENSOR shall be a third party beneficiary under this EULA and, as such, shall have the right to enforce the terms and conditions of this EULA that pertain directly to such LICENSOR'S rights in and to the LICENSED MATERIALS concerned as if such LICENSOR was a party to this EULA.  The rights granted to a Licensor under this Article shall not be revoked.

3.     SONY BMG and each LICENSOR reserve the right to use the SOFTWARE and/or any APPROVED MEDIA PLAYER to enforce their respective rights in and to the DIGITAL CONTENT, including any and all of the restrictions on use set forth in this Article 3, at any time, without notice to you.

**Article 4. INTELLECTUAL PROPERTY RIGHTS**
All title to, and intellectual property rights in, the LICENSED MATERIALS and any related documents are and shall remain owned and/or controlled solely and exclusively by SONY BMG and/or its LICENSORS. SONY BMG and/or all respective LICENSORS reserve all rights in the LICENSED MATERIALS not specifically granted to you under this EULA.

**Article 5. EXCLUSION OF WARRANTIES**
YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT YOU ARE INSTALLING AND USING THE LICENSED MATERIALS AT YOUR OWN SOLE RISK. THE LICENSED MATERIALS ARE PROVIDED "AS IS" AND WITHOUT WARRANTY, TERM OR CONDITION OF ANY KIND, AND SONY BMG, ITS LICENSORS AND EACH OF THEIR LICENSEES, AFFILIATES AND AUTHORIZED REPRESENTATIVES (EACH, A "SONY BMG PARTY") EXPRESSLY DISCLAIM ALL WARRANTIES, TERMS OR CONDITIONS. EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, NON-INFRINGEMENT AND FITNESS FOR A GENERAL OR PARTICULAR PURPOSE. NO ORAL, WRITTEN OR ELECTRONIC INFORMATION OR ADVICE GIVEN BY ANY SONY BMG PARTY SHALL CREATE ANY WARRANTY, TERM OR CONDITION WITH RESPECT TO THE LICENSED MATERIALS OR OTHERWISE. SHOULD THE LICENSED MATERIALS PROVE TO BE DEFECTIVE, YOU (AND NOT THE SONY BMG PARTY CONCERNED) AGREE TO ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIRS OR CORRECTIONS. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, TERMS OR CONDITIONS IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY MANDATES LIABILITY, DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 6. LIMITATION OF LIABILITY**
NO SONY BMG PARTY SHALL BE LIABLE FOR ANY LOSS OR DAMAGE, EITHER DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHERWISE, ARISING OUT OF THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, TERM OR CONDITION, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY MISREPRESENTATION, FAILURE OF ANY REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE OR ANY OTHER LEGAL THEORY ARISING OUT OF, OR RELATED TO, THIS EULA OR YOUR USE OF ANY OF THE LICENSED MATERIALS (SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF DATA, LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED EQUIPMENT, DOWN TIME AND USER'S TIME), EVEN IF THE SONY BMG PARTY CONCERNED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN ANY CASE, THE ENTIRE LIABILITY OF THE SONY BMG PARTIES, COLLECTIVELY, UNDER THE PROVISIONS OF THIS EULA SHALL BE LIMITED TO FIVE US DOLLARS (US $5.00). SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY REQUIRES LIABILITY DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 7. DAMAGES ARISING OUT OF YOUR ACTIONS**
You shall defend and hold the SONY BMG PARTIES harmless from and against any and all liabilities, damages, costs, expenses or losses arising out of your use of the LICENSED MATERIALS, your negligent or wrongful acts, your violation of any applicable laws or regulations, and/or your breach of any provision of this EULA.

**Article 8. UPDATES TO THE LICENSED MATERIALS**
The SONY BMG PARTIES may from time to time provide you with updates of the SOFTWARE in a manner that the SONY BMG PARTIES deem to be appropriate. All such updates shall be deemed to be part of the SOFTWARE for all purposes hereunder. In the event that you fail to install an update, the SONY BMG PARTIES reserve the right to terminate the term of this EULA, along with your rights to use the LICENSED MATERIALS, immediately, without additional notice to you. The SONY BMG PARTIES shall not be liable for any loss or damage caused by reason of your failure to install any such update or your failure to do so in the manner instructed.

Article 9. EXPIRATION AND TERMINATION

1. The rights granted to you hereunder to use the DIGITAL CONTENT are conditioned upon your continued possession of, and your continued right under a license from SONY BMG to use, the original CD product that you purchased. In the event that you no longer possess or have the right under such license to use the original CD product, your rights hereunder to use the DIGITAL CONTENT shall expire immediately, without notice from SONY BMG.

2. Without prejudice to any other rights SONY BMG or any SONY BMG PARTY may have hereunder, the term of this EULA shall terminate immediately, without notice from SONY BMG, and all rights you may have hereunder to use the LICENSED MATERIALS shall be immediately revoked, in the event that you: (i) fail to comply with any provision of this EULA, (ii) fail to install an update of the SOFTWARE that was previously provided to you by the SONY BMG PARTIES within the time specified, or (iii) file a voluntary petition or are subject to an involuntary petition under applicable bankruptcy laws, are declared insolvent, make an assignment for the benefit of creditors, or are served with a writ of attachment , writ of execution, garnishment or other legal process pertaining to any of your assets or property.

3. Upon the expiration or termination of this EULA, you shall immediately remove all of the LICENSED MATERIALS from your personal computer system and delete or destroy them, along with any related documentation (and any copies thereof) that you may have received or otherwise may possess.

4. Articles 4 (Intellectual Property Rights), 6 (Limitation of Liability), 7 (Damages Arising Out Of Your Actions), 9 (Expiration and Termination), 10 (Governing Law and Waiver of Trial By Jury), and 11 (General) shall survive and remain in full force and effect following the expiration or termination of this EULA.

5. To the extent relevant under applicable law, you and SONY BMG each agree, for the effectiveness of the termination clauses under this EULA, to waive any provisions, procedures and operation of any applicable law that might otherwise require judicial approval or a court order in order to effect the termination of this EULA.

Article 10. GOVERNING LAW AND WAIVER OF TRIAL BY JURY

1. THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS EULA SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW). THE NEW YORK COURTS (STATE AND FEDERAL), SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN NEW YORK COUNTY AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS.

2. YOU HEREBY WAIVE ALL RIGHTS AND/OR ENTITLEMENT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE THAT ARISES OUT OF OR RELATES IN ANY WAY TO THIS EULA OR THE SOFTWARE.

Article 11. GENERAL

If any provision of this EULA is subsequently held to be invalid or unenforceable by any court or other authority, such invalidity or unenforceability shall in no way affect the validity or enforceability of any other provision of this EULA. This EULA shall be binding upon the parties' authorized successors and assignees. Neither party's waiver of any breach or failure to enforce any of the provision of this EULA at any time shall in any way affect, limit or waive such party's right thereafter to enforce and compel strict compliance with every other provision. No modification of this EULA shall be effective unless it is set forth in a writing signed by SONY BMG.

(ID:239675.18 – 1/7/2005)



FILED

05 DEC -9 PM 3:42

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAURA KLEMM

        Plaintiff(s)

   -v-

SONY BMG MUSIC ENTERTAINM
        Defendant(s)

E-Filing

C 05-05111 BZ

ORDER SETTING INITIAL CASE MANAGEMENT
CONFERENCE

IT IS HEREBY ORDERED that this action is assigned to the
Honorable Bernard Zimmerman.  When serving the complaint or
notice of removal, the plaintiff or removing defendant must
serve on all other parties a copy of this order, the handbook
entitled "Dispute Resolution Procedures in the Northern District
of California," the Notice of Assignment to United States Magistrate
Judge for Trial, and all other documents specified in Civil Local Rule 4-2.
Counsel must comply with the case schedule listed below unless the
Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the
Alternative Dispute Resolution (ADR) Multi-Option Program governed
by ADR Local Rule 3.  Counsel and clients must familiarize themselves
with that rule and with the handbook entitled "Dispute Resolution
Procedures in the Northern District of California."

CASE SCHEDULE   [ADR MULTI-OPTION PROGRAM]

| Date | Event | Governing Rule |
|------|-------|----------------|
| 12/09/2005 | Complaint filed | |
| 03/27/2006 | Last day to meet and confer re initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR LR 3-5 |
| 03/27/2006 | Last day to file Joint ADR Certification with Stipulation to ADR process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 04/10/2006 | Last day to complete initial disclosures or state objection in Rule 26(f) Report, file/serve Case Management Statement, and file/serve Rule 26(f) Report | FRCivP 26(a)(1) Civil L.R.16-9 |
| 04/17/2006 | Case Management Conference in Ctrm G, 15th Floor, SF at 4:00 PM | Civil L.R. 16-10 |



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ANDREW KLEWAN and JAMES
SPRINGER, individuals, on their own behalf
and on behalf of all others similarly situated,

DOC # ____

05 CV 9609

             Plaintiffs,                         CLASS ACTION COMPLAINT

        v.

ARISTA HOLDINGS INC., doing business as
SONY BMG MUSIC ENTERTAINMENT

             Defendant.

------------------------------------------------------------x

       Plaintiffs, by their attorneys, bring this civil action for injunctive relief and damages on

behalf of themselves and all others similarly situated against the above-named Defendant,

and, demanding trial by jury, complain and allege as follows:

I.

JURISDICTION AND VENUE

       1.     This Complaint, which alleges a breach of express and implied warranties is

brought in federal court pursuant to the Class Action Fairness Act, codified at 28 U.S.C. §

1

1332(d). The Class Action Fairness Act provides jurisdiction over this action because the members of the class are citizens of New York, the Defendant is a citizen of other states and the damages suffered by members of the class exceed $5 million. In addition, the Complaint states a claim for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and this Court therefore has federal subject matter jurisdiction under 28 U.S.C. 1331.

2.      Venue as to the Defendant is laid in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391 (b) and (c) in that Defendant reside, are licensed to do business, and transact business in the Southern District of New York and/or the claims arose in this District.

II.

## PLAINTIFFS

3.      Plaintiff Andrew Klewan ("Klewan") is an individual who resides in Montclair, New Jersey. Plaintiff James Springer ("Springer") is an individual who resides in Lisle, Illinois.

III.

## DEFENDANT

4.      Defendant Arista Holdings Inc., ("Sony") does business as Sony BMG Music

2

Entertainment, and is a Delaware corporation with its principal place of business in New York, New York.

IV.

GENERAL ALLEGATIONS

5.      Sony produces and markets musical recordings on media which it represents to be compact discs ("CDs"). Earlier this year, Sony began to include a new type of software on its music discs. First 4 Internet ("F4I"), a private limited company based in the United Kingdom, created the software, known as XCP2. XCP2 is known as digital right management ("DRM") software. It was designed to prevent owners of the disc from making unauthorized copies but has additional harmful effects on a user's computer.

6.      XCP2's harmful effects include:

   a)      XCP2 supplants the users' own CD software, and interferes with users' ability to access the music the users' purchased from Sony;

   b)      XCP2 alters the users' Windows operating system to conceal certain XCP2 components. As a result, XCP2 has been classified both as spyware by Computer Associates, Inc. and as a security risk by Symantec Inc. Additionally, a new Trojan has recently been found that exploits XCP's alterations of the Windows operating system to conceal itself;

3

c)   XCP2 consumes far more resources on a user's computer than a genuine compact disc would; and

d)   XCP2 is difficult to remove and unless all the concealed components of XCP2 are removed completely, XCP2 may leave users' computer and CD drives inoperable.

7.   The CD technology was first developed by Koninklijke Philips Electronics N.V. ("Philips"), and Phillips still licenses the CD trademark. Phillips has promulgated standards which CDs must meet. These standards are known as "Red Book" standards. Music discs containing XCP2 deviate from these standards and cannot be considered CDs. Phillips has advised music companies that it should not use the CD trademark for discs containing XCP2 and other types of DRM software.

8.   Sony does not provide adequate disclosures in connection with its use of XCP2 software. Sony has taken deliberate steps to prevent the public from learning which of its music discs contain XCP2.

9.   Sony does not disclose on the packaging of its music discs that the discs contain XCP2. The only way a disc purchaser may discover whether a particular disc contains XCP2 is to load the disc on the purchaser's computer.

4

10.     If, as is typical, the purchaser's computer has its autorun function activated,

loading the XCP2 disc onto the computer will result in an installation and/or initiation of some

components of XCP2 *prior to the purchaser accepting XCP2's end user licensing agreement* (

"EULA").

11.     The EULA itself does not provide adequate disclosure of XCP2's harmful effects

set forth in Paragraph 7 above. To the contrary, the EULA represents that XCP2 is simple to

remove without damage to a user's computer. Further, Sony has publicly represented (to the

press and on its website) that the software is not spyware and is not a security risk.

12.     To completely remove XCP2 from a user's computer, a user must access an

inconspicuous portion of Sony's website. The user must then provide personal information,

including an email address, which Sony may use for marketing purposes or sell the third

parties.

**V.**

**INDIVIDUAL PLAINTIFF ALLEGATIONS**

13.     Plaintiff Klewan purchased  Bob Dylan's "No Direction Home" a music disc

manufactured by Sony in August 2005 from CD World in Totowa, New Jersey, believing that

5

he would be able to play "No Direction Home" on his Windows computer.

14.     However, Klewan learned that some Sony music discs contain XCP2 prior to

loading  "No Direction Home" on his Windows computer. Since Sony has not disclosed which

of its music discs contain XCP2, Klewan cannot be certain that "No Direction Home" does not

have XCP2. For fear of damaging his computer and compromising its security, Klewan will not

load "No Direction Home" onto his computer. As a result, Sony has effectively deprived

Klewan of the ability to play "No Direction Home" on his Windows computer.

15.     Klewan has been damaged because "No Direction Home" lacks a functionality

which Sony represented it would have and which Klewan believed it would have.

16.     Springer purchased the Sony music disc Chris Botti's "To Love Again" from

Tower Records in downtown Chicago, believing that his Windows computer would be able to

play "To Love Again."

17.     Springer installed the Sony music disc on his Windows computer. XCP2

corrupted his computer, as alleged above. When Springer attempted to remove XCP2, XCP2

deprived him of the use of his CD and DVD player. Springer was able to restore functionality

only after working on his computer for a great deal of time. He has not been able to remove

6

the XCP2 installed on his computer entirely on the date of this Complaint.

18.    Springer has been damaged because his music disc lacks a functionality which

Sony represented and which Springer believed his purchase would have.

19.    Sony has also damaged Springer by harming and interfering with Springer's

use of his computer.

20.    Defendant has also harmed Springer by misrepresenting the harm XCP2

causes and the prospective security risks which XCP2 poses, and by Defendant's failure to

provide a reasonable, fair and conscionable process for uninstalling XCP2.

20.    Springer has purchased other Sony discs since Further, since Sony has not

disclosed which of its music discs contain XCP2, Springer cannot be certain that his other

Sony music discs do not have XCP2. For fear of damaging his computer and compromising

its security, Springer will not play these discs on his computer. As a result, XCP2 has

effectively deprived Springer of the ability to play the other Sony music discs he purchased on

his Windows computer.

7

VI.

PLAINTIFFS' CLASS ALLEGATIONS

21.     Plaintiffs bring this action on their own behalf and on behalf of all other

members of the Class ("Class"), defined as:

> All persons who purchased any music disc from Sony after February 1, 2005.

22.     Within the Class is a subclass ("XCP2 Purchaser Subclass") defined as follows:

> All persons who purchased any music disc from Sony which contains XCP2.

23.     Within the Class is a subclass ("Computer Fraud Subclass") defined as follows:

> All persons whose computers were damaged by XCP2 after inserting a Sony
> product into their computer CD drive

24.     Within the Class is a subclass ("the New Jersey Subclass") defined as follows:

> All persons resident in the State of New Jersey who purchased any music disc
> from Sony after February 1, 2005.

25.     Within the Class is a subclass ('the Illinois Subclass") defined as follows:

> All persons resident in the State of Illinois who purchased any music disc from
> Sony after February 1, 2005.

26.     Notwithstanding the allegations of the Class and Subclasses in Paragraphs 22-

8

25, the Class and Subclasses exclude:

> Sony and F4I and any of their parents, subsidiaries, affiliates, employees, officers, or directors, legal representatives, successors, and assigns.

27.     Plaintiffs do not know the exact size of the Class or Subclasses, as such information is in Sony's exclusive control. Based on Sony's distribution of more than two million copies encoded with XCP2, Plaintiffs believe that Class and Subclass members number in the millions. Therefore, individual joinder of all members of the Class or the Subclass is likely to be impracticable.

28.     Common questions of fact and law exist as to all members of the Class and the New Jersey and Illinois subclasses. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include:

> a)      Whether Defendant adequately disclosed which of its music discs contain XCP2;
>
> b)      Whether Class members have a reasonable apprehension of playing Defendant's music discs in their Windows computers;

29.     Springer and Klewan's claims are typical of the Class; they purchased a music disc from Sony believing it would play on their Windows computers without corrupting the

computers, and now have a reasonable apprehension that if they play any Sony music discs

on their Windows computers, the music discs may corrupt their computers.

30.    Common questions of fact and law exist as to all members of the XCP2

Purchaser Subclass. These questions predominate over the questions affecting only

individual Computer Fraud Subclass members. In addition to the legal and factual questions

common with the Class, the legal or factual questions common to the XCP2 Purchaser

Subclass include:

a)    Whether Sony represents that its discs containing XCP2 comply with the
Red Book standards;

b)    Whether Sony represents that its discs containing XCP2 are genuine
CDs;

c)    Whether Sony's discs containing XCP2 in fact comply with the Red Book
standards;

d)    Whether Sony's discs containing XCP2 can be considered CDs; and

e)    Whether members of the class necessarily relies on Sony's
representation that its XCP2 discs were Red Book compliant CDs.

31.    Springer's claims are typical of the XCP2 Subclass; he purchased a product

from Sony encoded with XCP2 believing it would play on his Windows computers without

10

corrupting the computer, and cannot play the music disc on his Windows computer without

XCP2 corrupting his computer. Springer is no different in any relevant way from any other

Computer Fraud Subclass member, and the relief he seeks is common to the Class.

32.    Common questions of fact and law exist as to all members of the Computer

Fraud Subclass. These questions predominate over the questions affecting only individual

Computer Fraud Subclass members. In addition to the legal and factual questions common

with the Class and XCP2 Subclass, the legal or factual questions common to the XCP2

Purchaser Subclass include:

a)    Whether XCP2's autorun operations interfere with and supplant the
ordinary software components that operate CDs on Subclass members'
Windows systems;

b)    Whether XCP2's autorun operations initiate prior to any assent to XCP2's
EULA;

c)    Whether XCP2 conceals its components from users;

d)    Whether XCP2 constitute spyware;

e)    Whether XCP2 creates a computer security vulnerability on users'
computers;

f)    Whether XCP2 consumes significantly more resources of users'

11

computers than an ordinary CD player;

g)   Whether XCP2 render users' CD drives or even their entire Windows systems inoperable if users eliminate some (but not all) of XCP2's concealed components;

h)   Whether Sony misrepresented the effects of XCP2 on Windows computers, including the ease of removal;

i)   Whether Sony misrepresented the security risks that XCP2 poses;

j)   Whether Sony failed to provide a reasonable and conscionable uninstallation procedure for users whose computers were infected with XCP2.

33.   Springer's claims are typical of the Computer Fraud Subclass; he purchased a product from Sony encoded with XCP2 believing it would play on his Windows computers without corrupting the computer, he installed XCP2 on his computer, and XCP2 has harmed his computer. Springer is no different in any relevant way from any other Computer Fraud Subclass member, and the relief he seeks is common to the Class.

Klewan is an adequate representative for the Class because his interests do not conflict with the interests of the Class members he seeks to represent, and he has retained counsel competent and experienced in conducting class action litigation. Springer is an

12

adequate representative for the Class and the XCP2 and Computer Fraud Subclasses

because his interests do not conflict with the interests of the Class and Subclass members he

seeks to represent, and he has retained counsel competent and experienced in conducting

class action litigation. Plaintiffs and their counsel will adequately protect the interests of the

Class and Subclass members.

34.    A class action is superior to other available means for the fair and efficient

adjudication of this dispute. The damages suffered by each individual Class and Computer

Fraud Subclass member will likely be relatively small, especially given the burden and

expense of individual prosecution of the complex arbitration necessitated by Defendant's

actions. It would be virtually impossible for the Class and Subclass members individually to

obtain effective relief from Defendant's misconduct. Even if the Class and Subclass members

themselves could afford such individual litigation, it would still not be preferable to a class

action, because individual arbitration would increase the delay and expense to all parties due

to the complex legal and factual controversies presented in this Complaint. By contrast, a

class action presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single Court.

AND FOR A FIRST CLAIM ALLEGING BREACH OF THE NEW JERSEY CONSUMER
FRAUD ACT
(New Jersey Subclass)

35.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 34.

36.    Klewan and the other Class members are consumers who purchased Sony's music discs.

37.    Sony is a "person" for purposes of the New Jersey Consumer Fraud Act.

38.    Sony engaged in deceptive practices in the advertising, marketing and packaging of its music discs in connection with the purchase of the discs by Klewan and the other Class members.

39.    Specifically, despite Sony's knowledge that the presence of absence of XCP2 is a material factor in whether Klewan and the other Class members would purchase their music discs, Sony did not explicitly label music discs containing XCP2 as such, and took deliberate steps to prevent Klewan and the other Class members from learning which music discs contained XCP2.

40.    Sony's unfair and deceptive acts and practices, constitute acts, uses or

14

employment by defendant of unconscionable commercial practices in connection with the sale

of a product or service.

41.     Sony's actions constitute false advertising and deceptive and misleading

practices within the meaning of N.J.S.A. 56:8-2. Such actions and failures to act have directly,

foreseeably, and proximately caused damages to Klewan and the other members of the New

Jersey Subclass in amounts yet to be determined.

42.     As a result of the foregoing, Klewan and the other members of the New Jersey

subclass Class are entitled to treble damages and attorney fees.

### AND FOR A FIRST CLAIM ALLEGING VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### ACT, 815 ILCS 505/2
### (Illinois Subclass)

43.     Sony made misrepresentations and material omissions regarding its music discs

which contain XCP2.

44.     Specifically, Sony misrepresented that the XCP2 music discs function like

genuine CDs, about the function and nature of XCP2, and the ease or routine nature of

removing XCP2, as alleged above. These representations and omissions were false.

45.     Sony intended that Plaintiffs and other Class members rely on these specific

15

representations and material omissions.

46.     Sony made the misrepresentations and omissions alleged above in the course

of its business.

47.     By the misrepresentations and omissions alleged above, Defendant violated

815 ILCS 505/2.

48.     Through their violations of 815 ILCS 505/2, Defendants damaged Plaintiffs and

other Class members by 1) depriving Plaintiffs and other Class members of the bargained-for

value and functionality of a genuine CD, and 2) damaging and interfering with Plaintiffs and

Computer Fraud Subclass members' computers and their use thereof.

49.     Plaintiffs and other Class members seek damages under 815 ILCS 505/10a(a),

and attorneys' fees and costs under 815 ILCS 505/10a(c).

### AND FOR A THIRD CLAIM ALLEGING BREACH OF EXPRESS WARRANTY

50.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

49.

51.     Sony warrants that its music discs containing XCP2 are compact discs meeting

the Red Book compact disc standards.

16

52.     Springer and the Computer Fraud and XCP2 Purchaser Subclass members

relied on Sony's representation that its music discs were compact discs.

53.     By virtue of the fact that Sony's XCP2 music discs contain XCP2, they do not

comply with the Red Book standards and are not compact discs.

54.     As a result of Sony's breach of warranty, Springer and the XCP2 Purchaser

Subclass members suffered damages in the form of the purchase price they paid for XCP2

music discs and Springer and the Computer Fraud Subclass members suffered damages

attributable to the damage caused their computers by XCP2.

### AND FOR A SECOND CLAIM ALLEGING BREACH OF IMPLIED WARRANTY

55.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

54.

56.     Implicit in the sale of Sony's XCP2 music discs is the warranty that the discs are

merchantable – that is – fit for the ordinary purposes for which compact discs are used,

including the ability to play the discs on a Windows computer.

57.     By virtue of the fact that Sony's XCP2 music discs contain XCP2, and the

harmful effects XCP2 may have on a users computer, Sony's XCP2 music discs are not fit for

ordinary purposes.

58.     As a result of Sony's breach of the implied warranty of merchantability, Plaintiffs

and the members of the Class suffered damages in the form of the purchase price they paid

for XCP2 music discs and Plaintiffs and members of the Subclass suffered damages

attributable to the damage caused their computers by XCP2.

### AND FOR A THIRD CLAIM ALLEGING VIOLATION OF THE
### COMPUTER FRAUD AND ABUSE ACT

59.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

58.

60.     Sony's placement of the XCP2 program on its music discs with the intent that

disc purchasers would load the programs onto their computers constituted the knowing

transmission of a program, information, code, or command to the computers of Plaintiffs and

members of the Computer Fraud Subclass, which were used in interstate commerce and as a

result, Sony caused damages to those computers which aggregated more than $5,000 in one

year.

WHEREFORE, Plaintiffs pray for the following:

18

A.   That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   That the Court adjudge and decree that the Defendant breached express warranties and the implied warranty of merchantability and violated the Computer Fraud and Abuse Act, the New Jersey Consumer Fraud Act, the Illinois Consumer Fraud Act and ;

C.   That Plaintiff and the other Members of the Class and Subclasses receive actual and statutory damages, including treble damages for members of the New Jersey Subclass;

E.   That plaintiff and the other Members of the Class recover the costs of the suit, including reasonable attorneys' fees and experts' fees; and

F.   That the Court grant such other, further or different relief as it may deem just.

Dated:New York, New York
         November 14, 2005

GISKAN & SOLOTAROFF, LLP

By: _____

Jason L. Solotaroff (JS-5739)
207 West 25th Street
New York, N.Y. 10001
Tel.   212-847-8315
Fax.   212-473-8096

Daniel Lynch
CIRIGNANI HELLER HARMAN & LYNCH

19

150 S Wacker Drive #2600

Chicago, Illinois  60606

Tel.    312-346-8700

Fax.   312-896-5883

Ethan Preston

150 S Wacker Drive #2600

Chicago, Illinois  60606

Tel.    312-346-8700

Fax.   312-896-5883

ATTORNEYS FOR PLAINTIFF

20

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ANDREW KLEWAN and JAMES

SPRINGER, individuals, on their own behalf

and on behalf of all others similarly situated,

       Plaintiffs,

    v.

ARISTA HOLDINGS INC., doing business as

SONY BMG MUSIC ENTERTAINMENT

       Defendant.

-----------------------------------------------------------

## JURY DEMAND

Plaintiffs demands trial by jury of all issues as of right by a jury.

Dated: New York, New York

    November 14, 2005

                  GISKAN & SOLOTAROFF

                  Attorneys for Plaintiff

      By:_____

                  Jason L. Solotaroff (JS-5739)

                  207 West 25th Street

                  New York, N.Y. 10001

21



**5**



**WECHSLER HARWOOD LLP**
Robert I. Harwood (RH-3286)
Jeffrey M. Norton (JN-4827)
488 Madison Avenue, 8th Floor
New York, New York 10022
Tel. (212) 935-7400
Fax (212) 753-3630

05 CV 10637

*[Additional Counsel on Signature Page]*



RECEIVED
DEC 1 9 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN MALETTA, Individually and as Representative for all others similarly situated and the General Public, | Case No._____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| SONY BMG MUSIC ENTERTAINMENT CORP., SONY CORPORATION OF AMERICA, and BERTELSMANN, INC., and DOES 1 through 100, Inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, individually and on behalf of a similarly situated class of consumers, as defined below, alleges, upon personal knowledge as to himself and his own acts and, as to all other matters, upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows.

## NATURE OF THE ACTION

1.     This is a consumer fraud action brought under Section 349 of the New York General Business Law ("N.Y. Gen. Bus. L."), Article 22-A Consumer Protection from Deceptive Acts and Practices (N.Y. Gen. Bus. L. § 349) and the common law, on behalf of a class of natural persons,

businesses and entities who purchased one or more Sony music CDs containing software technology called Extended Copy Protection (also known as "XCP") (the "Class").

2.      Unbeknownst to Class members, the XCP protection, which allows SONY to manage the digital rights of the CD contents and prevent copying of the CD beyond a certain number of times, also contains a self executing "rootkit" program that installs hidden files on the consumer's computer hard drive. The rootkit, although manifesting itself as a music player, is intended to be used surreptitiously as a marketing tool. The rootkit program can and does cause numerous problems, including an increased risk of third-party attacks, privacy invasions, and significantly degraded computer performance.  The nature of the rootkit program makes it extremely difficult to remove without causing significant damage to one's computer system.

3.      As a result of this Defendants deceptive conduct, Plaintiff and other members of the Class suffered harm.

## THE PARTIES

4.      Plaintiff John Maletta is a resident of Los Angeles, California, and a member of the Class injured by Defendants' conduct.

5.      Defendant SONY BMG MUSIC ENTERTAINMENT CORP. (hereinafter referred to as "SONY") is a corporation existing under the laws of the State of Delaware, which is headquartered in New York, New York and does extensive business in the State of New York.

6.      Defendant  SONY CORPORATION OF AMERICA (hereinafter referred to as "SONY CORP.") is a corporation which is headquartered in New York, New York and does extensive business in the State of New York.

-2-

7.      Defendant BERTELSMANN, INC. (hereinafter referred to as "BERTELSMANN")
is the U.S. subsidiary of Bertelsmann AG, a multinational corporation based in Germany. Defendant
BERTELSMANN, is a Delaware corporation, headquartered in New York, New York and does
extensive business within the State of New York.

8.      DOES 1 through 100 are persons and/or business entities whose identities are
unknown to Plaintiff at this time, and are controlled by, and/or agents of, and/or employees of, and/or
affiliated with Defendants.  Plaintiff is ignorant of the true names and capacities of the DOE
Defendants sued herein under fictitious names DOES 1 through 100. When Plaintiff becomes aware
of the true names and capacities of the DOE Defendants, Plaintiff will amend this Complaint to state
their true names and capacities.

9.      At all times herein mentioned, Defendants, and each of them, were the agents,
principals, servants, employees and subsidiaries of each of the remaining Defendants and were at all
times acting within the purpose and scope of such agency, service and employment and directed,
consented, ratified, permitted, encouraged and approved the acts of each remaining Defendant.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C.
Section 1332(d).  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of
interests and costs, and fewer than one-third of the Class members are from the same state as
Defendants.

11.     Venue is proper in this district under 28 U.S.C. Section 1391 and the Court has
personal jurisdiction over the Defendants who are headquartered in this District and conduct
substantial business in this District.

## FACTUAL ALLEGATIONS

12.     In this class action lawsuit, Plaintiff and the Class seek a remedy against Defendants and DOES 1 through 100, inclusive, for unfair business practices, fraud and deceit and violations of the California statutory law.

13.     SONY is one of the world's largest music companies.  SONY manufactures, distributes, markets, and sells music CDs.

14.     In 2003, SONY began to distribute certain CDs to the public which contained a software technology called Extended Copy Protection (also known as "XCP").  The protection allowed SONY to manage the digital rights of the CD contents and prevent copying of the CD beyond a certain amount of times.

15.     SONY failed to disclose to the public that when downloaded, XCP also installs a hidden "rootkit" program.  The "rootkit" program is disguised as software designed to play music.  Once installed, the "rootkit" program hides itself within the computer and can cause numerous problems, such as an increased risk of third-party attacks and significantly degraded performance of one's computer.  The nature of the "rootkit" program makes it extremely difficult to remove without causing significant damage to one's computer system.

16.     Defendants are extremely sophisticated merchants and are aware of the unlawful, unfair and deceptive practices challenged in this action.

17.     Plaintiff is informed and believes that Defendants have enjoyed financial gains by ensuring the public that the music CDs would not compromise computer security, when in fact the music CDs installed a "rootkit" program that creates significant security risks and damage to one's computer system.

-4-

18.    Plaintiff seeks to remedy the harm caused by Defendants.  As set forth below,

Plaintiff, and all those similarly situated, should be awarded compensatory damages.  Additionally,

because Defendants knowingly defrauded their customers, Defendants' conduct constitutes willful,

deceptive and oppressive conduct, entitling Plaintiff and the Class to an award of punitive damages.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action on his own behalf and on behalf of all others in California

similarly situated as members of the proposed Plaintiff Class.  The proposed Plaintiff Class that

Plaintiff represents is defined as follows:

> All natural persons, businesses and entities who purchased one or
> more SONY music CDs with the "rootkit" program.  Excluded from
> the Class are all Defendants, including SONY, SONY CORP.,
> BERTELSMANN, its subsidiaries, parents, successors, predecessors,
> officers and directors, and any entity in which any Defendant has a
> controlling interest, and the legal representatives, successors or
> assigns of any such excluded persons.

20.    There is a well-defined community of interest in the central questions of law and fact

involved affecting the members of the Class.  All members of the Class have an equal interest in

establishing Defendant's liability to the members of the Class and obtaining the remedies prayed for

herein.  The questions of law and fact that affect the Class predominate over questions that affect

only individual members of the Class.  Proof of a common, single state of facts will establish the

right of each member of the Class to recover.  Defendant has acted and refused to act on grounds

generally applicable to the Class, making equitable and declaratory relief with respect to the Class

appropriate.

21.    The claims of the Plaintiffs are typical of those of each of the other members of the

Class. Plaintiffs will fairly and adequately represent the interests of the Class, and plaintiffs have no

interests adverse to the interests of the Class.  Plaintiffs have retained competent counsel skilled and experienced in the prosecution of class actions and other complex litigation.

22.     There is no plain, speedy or adequate remedy other than by maintenance of this class action because the damage to each individual plaintiff is relatively small, making it economically unfeasible to pursue remedies other than by way of a class action.  Consequently, there would be a failure of justice if this Court were to refuse to allow this case to proceed as a class action.

23.     The prosecution of separate actions by individual Class members seeking injunctive or declaratory relief would create the risk of inconsistent adjudications and would establish incompatible standards of conduct for the Defendant.  As a practical matter, such separate adjudications would either be dispositive of the interests of non-party Class members or would substantially impair or impede their ability to protect and assert those interests.

24.     Plaintiffs are not currently aware of unusual difficulties or complications that would or would be likely to be encountered in connection with the management of this action as a class action.

## FIRST CAUSE OF ACTION

(Violation of Section 349 of N. Y. Gen. Bus. L.)

25.     Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

26.     Article 22-A Consumer Protection from Deceptive Acts and Practices (N.Y. Gen. Bus. L. Section 349), was enacted to protect consumers against unfair and deceptive acts and business practices.

27.     Section 349(h) provides, in relevant part, that:

> . . . any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, [and] an action to recover his actual damages . . .

28.     As a result of Defendants' untrue and misleading advertising practices, Plaintiff and the Class have suffered actual monetary damages, including, but not limited to, the money they spent to purchase the music CDs and the money they spent to make necessary repairs and/or to prevent harmful attacks on their computers.

29.     SONY's failure to disclose the "rootkit" program on the music CDs constitutes unfair, deceptive, and misleading business practices in violation of Section 349.

30.     Further, Plaintiff and the Class will suffer irreparable harm if Defendants' conduct is not enjoined.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

31.     Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

32.     Defendants would be unjustly enriched if they were permitted to retain the earnings from the sales of the subject CDs to the Plaintiff and the Class.

33.     Defendants should be required to disgorge the monies which it has unjustly obtained.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, request the Court to enter an order granting the following relief:

A.      Declaring this action to be a proper class action with Plaintiff certified as the representative of the Class;

B.      Entering judgment against Defendants and awarding Plaintiff and the Class compensatory and punitive damages, together with the appropriate amounts of the prejudgment interest to which Plaintiff and the Class may be entitled;

C.      Enjoining the unlawful conduct of Defendants by requiring Defendants to cease and desist marketing and selling CDs containing the offending rootkit and notifying and informing all Class members, in a manner to be approved by the Court, of the foregoing relief;

D.      Ordering and directing Defendants to disgorge all profits which it unjustly obtained as a result of improper and deceptive practices;

E.      Awarding Plaintiff the costs and expenses incurred in this action, including reasonable attorneys' and experts' fees; and

F.      Granting any other appropriate relief deemed by the Court to be necessary and appropriate.

DATED:      New York, New York
            December 19, 2005

                        WECHSLER HARWOOD LLP


                  By:_____
                        Robert I. Harwood (RH-3286)
                        Jeffrey M. Norton (JN-4827)
                        488 Madison Avenue
                        New York, New York 10022
                        Telephone:  (212) 935-7400
                        Facsimile: (212) 753-3630


                              -8-

**KIRTLAND & PACKARD LLP**
Michael L. Kelly, Esq.
2361 Rosecrans Avenue, Fourth Floor
El Segundo, California 90245
Telephone: (310) 536-1000

*Attorneys for Plaintiff*



**6**



1  Robert S. Green (State Bar No. 136183)
   Jenelle Welling (State Bar No. 209480)
2  Avin P. Sharma (State Bar No. 233328)
   **GREEN WELLING LLP**
3  595 Market Street, Suite 2750
   San Francisco, CA 94105
4  Telephone: (415) 477-6700
   Facsimile: (415) 477-6710
5
   Cindy Cohn (State Bar No. 145997)
6  Fred von Lohmann (State Bar No. 192657)
   Kurt Opsahl (State Bar No. 191303)
7  Corynne McSherry (State Bar No. 221504)
   **ELECTRONIC FRONTIER FOUNDATION**
8  454 Shotwell Street
   San Francisco, CA 94110
9  Telephone: (415) 436-9333
   Facsimile: (415) 436-9993
10
   Reed R. Kathrein (State Bar No. 139304)
11 Shana Scarlett (State Bar No. 217895)
   **LERACH COUGHLIN STOIA GELLER**
12 **RUDMAN & ROBBINS LLP**
   100 Pine Street, 26th Floor
13 San Francisco, CA 94111
   Telephone:  (415) 288-4545
14 Facsimile:  (415) 288-4534

15 Lawrence E. Feldman
   **LAWRENCE E. FELDMAN & ASSOCIATES**
16 432 Tulpehocken Avenue
   Elkins Park, PA 19027
17 Telephone:  (215) 885-3302
   Facsimile: (215) 885-3303

18 Attorneys for Plaintiff

19             **UNITED STATES DISTRICT COURT**

20           **NORTHERN DISTRICT OF CALIFORNIA**

21 ERIN MELCON, on behalf of herself and all     )  Case No.
   others similarly situated                     )
22                                                )
                                                  )
23                 Plaintiff,                     )
                                                  )  **CLASS ACTION COMPLAINT**
24 v.                                             )
                                                  )
25 SONY BMG MUSIC ENTERTAINMENT,                  )
   SONY CORPORATION OF AMERICA,                   )  **JURY TRIAL DEMANDED**
26 and BERTELSMANN, INC.                          )
                                                  )
27                 Defendants.                    )
                                                  )
28 _____              )

                        1
                    COMPLAINT

1    Plaintiff Erin Melcon, by and through her attorneys, brings this action on behalf of herself

2  and all others similarly situated, and alleges against Defendants as follows:

3                                      **INTRODUCTION**

4    1.    By including a flawed and overreaching computer program in over 20 million

5  music CDs sold to the general public, Sony BMG created serious security, privacy and consumer

6  protection problems that damaged Plaintiff and the members of the class.  At issue are two

7  software technologies – MediaMax and Extended Copy Protection, also known as XCP – which

8  defendant Sony BMG claims to have placed on the music CDs for the purpose of copyright

9  protection, but which in truth do much more, including monitoring customer listening of the CDs

10  and installing undisclosed and in some cases hidden files on users' computers.  These computer

11  programs expose users to malicious attacks by third parties and create a threat to public safety,

12  without appropriate notice and consent from purchasers.  The CDs also condition use of the

13  music on unconscionable licensing terms.  These, plus other problems caused by Sony BMG's

14  use of this software on its CDs, violate federal and California law and public policy.  After

15  public revelations about security risks associated with the XCP software, including warnings

16  issued by the United States Government, and demands made to address the problems by the

17  Electronic Frontier Foundation and its co-counsel, defendant Sony BMG began to take steps to

18  respond to the security risks created by the XCP technology.  It failed, however, to address

19  security concerns raised by the MediaMax software or the consumer privacy and consumer

20  fairness problems created by both technologies, or to provide adequate notice to the consuming

21  public of the XCP issues and the remedies for those problems.

22                              **JURISDICTION AND VENUE**

23    2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

24  1332.

25    3.    Venue is proper in this District under 28 U.S.C. § 1391(b), because Defendants

26  transact business in this district, and a substantial part of the events giving rise to the claims

27  arose in this district.

28

                                             2

**PARTIES**

4.     At all times mentioned herein, Plaintiff Erin Melcon ("Plaintiff") was and still is an individual and resident of Petaluma, California.

5.     At all times mentioned herein, Defendant Sony BMG Music Entertainment ("Sony BMG"), is and at all relevant times was, a Delaware General Partnership, with its principal place of business in New York, New York.

6.     Defendant Sony Corporation of America ("Sony Corp.") is the U.S. subsidiary of Sony Corporation, a multinational corporation based in Japan.  At all times mentioned herein, Defendant Sony Corporation of America, is and at all relevant times was, a New York corporation, with its principal place of business in New York, New York.

7.     Defendant Bertelsmann, Inc. ("Bertelsmann, Inc.") is the U.S. subsidiary of Bertelsmann AG, a multinational corporation based in Germany.  At all times mentioned herein, Defendant Bertelsmann, Inc., is a Delaware Corporation with its principal place of business in New York, New York.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

8.     In August 2004, Sony Corp. merged its Sony Music Entertainment, Inc. with Bertelsmann AG's BMG to create a joint venture, Sony BMG.  Sony Corporation of America and Bertelsmann AG are the parent companies, respectively, of Sony Music Entertainment and BMG.

9.     Sony BMG is the world's second largest music company.  Its labels include Arista Records, Columbia Records, Epic Records, J Records, Jive Records, LaFace Records, Legacy Recordings, Provident Music Group, RCA Records, RCA Victor Group, RLG – Nashville, SONY BMG Masterworks, Sony Music Nashville, Sony Urban Music, Sony Wonder, So So Def Records, and Verity Records.  Sony BMG manufactures, distributes, markets, and sells audio compact discs ("CDs").

10.     In 2003, Sony BMG began to distribute to the public CDs that contain software that Sony BMG refers to as Digital Rights Management ("DRM").  This DRM software on Sony

1   BMG CDs includes MediaMax software created by SunnComm ("MediaMax CDs") and

2   Extended Copy Protection ("XCP") software created by First4Internet ("XCP CDs").  On

3   information and belief, Sony BMG intended that most of its CDs sold in the United States would

4   incorporate one of these technologies.

5          11.     Sony BMG is the first company to commercially deploy XCP.  Sony BMG has

6   been using versions of XCP since 2002 on prerelease CDs sent to radio stations and internal

7   employees.

8          12.     Sony BMG and BMG have been using versions of MediaMax on some CDs since

9   at least 2003.  Sony BMG currently uses MediaMax 5 on its recently issued MediaMax CDs.

10          13.     Since March 2005, Sony BMG has distributed at least 52 music titles with XCP

11   software.  Sony BMG has shipped at least 4.7 million CD's containing the XCP software, of

12   which around 2 million were sold to consumers.

13          14.     Sony BMG also distributed many more music titles with MediaMax software—

14   including a number one hit CD last year by Velvet Revolver, entitled *Contraband.*  Sony BMG

15   distributed approximately 20 million CDs with MediaMax software.  Sony BMG has distributed

16   at least 27 titles with the MediaMax 5 software.

17          15.     In a November 11, 2005, MSNBC.com article, by Bob Sullivan, SunnComm CEO

18   Peter Jacobs was quoted as stating that MediaMax is "now on about 20 million Sony BMG

19   music discs."

20   **THE SUNNCOMM SOFTWARE IS UNDISCLOSED SPYWARE**
     **AND COMPROMISES SECURITY**

21

22          16.     The Anti-Spyware Coalition ("ASC") describes spyware as technologies deployed

23   without appropriate user consent and/or implemented in ways that impair user control over:

24   (1) material changes that affect a user's experience, privacy, or system security; (2) use of the

25   user's system resources, including what programs are installed on the user's computer; and/or

26   (3) collection, use, and distribution of a user's personal or other sensitive information.  Computer

27   Associates defines spyware as, "Any product that employs a user's Internet connection in the

28   background without their knowledge, and gathers/transmits info on the user or their behavior."

1    As discussed below, the MediaMax software used by Sony BMG on many of its CDs meets the

2    ASC's definition of spyware.

3              17.    The software on a Sony BMG MediaMax CD is designed to operate only on

4    Windows-based computers that run Windows 98SE/ME/NT/2000/XP.  MediaMax requires that

5    the user have administrator privileges on the Windows operating system in order to listen to the

6    CD.

7              18.    MediaMax installs without meaningful consent or notification.  When a

8    MediaMax CD is inserted into a computer running Windows, an installer program already starts

9    and MediaMax installs, prior to the appearance of the End User License Agreement ("EULA"),

10   approximately eighteen files that consume approximately 15 MB on the computer's hard drive.

11   These files remain permanently installed even if the user declines the EULA presented later.

12   One of them, a kernel-level driver with the cryptic name "sbcphid," is loaded into the memory

13   and ready to run at all times, even when there is no disc in the CD drive and no music is being

14   played.  A "kernel" is the core of a computer operating system, which controls and secures

15   access to the computer's basic operations.

16             19.    This kernel-level driver is the heart of the MediaMax copy protection system.

17   When it is running, it attempts to block CD ripping and copying applications from reading the

18   audio tracks on MediaMax CDs.  The software refrains from making one final change until after

19   users accept the EULA—it does not set the driver to automatically run again every time

20   Windows starts.  Even if the EULA is declined, the code remains on the hard disk indefinitely.

21   Further, even if the EULA is declined, the code continues to run on the computer until the

22   computer is shut down and restarted, which rarely occurs on many computers.  In addition, when

23   a subsequent CD with MediaMax is installed in the computer, the inactive software will

24   reactivate, even if the EULA for the subsequent CD is declined.

25             20.    Only after these files are installed and at least one file has launched does the

26   software display a EULA, which the user may accept or decline, making it a contract of

27   adhesion.

28

21.     The MediaMax CDs' EULA states: "As soon as you have agreed to be bound by the terms and conditions of the EULA, this CD will automatically install a small proprietary software program (the "SOFTWARE") onto YOUR COMPUTER. The SOFTWARE is intended to protect the audio files embodied on the CD, and it may also facilitate your use of the DIGITAL CONTENT. Once installed, the SOFTWARE will reside on YOUR COMPUTER until removed or deleted." This statement is not true, as alleged above. Attached hereto as Exhibit A and incorporated herein by reference is a true and correct copy of the MediaMax EULA.

22.     Sony BMG's MediaMax EULA states that, "[T]he SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise."

23.     If purchasers seek more information about the software that has been installed on their computer, they are directed to the SunnComm Sony BMG customer care website, which falsely tells users that "No information is ever collected about you or your computer without you consenting" and also states: "Is any personal information collected from my computer during the digital key delivery process? No, during the digital key delivery process, no information is ever collected about you or your computer."

24.     In addition to the SunnComm Sony BMG customer care website, purchasers are also directed to the "Readme.html". The "Readme.html" file is located on the MediaMax CD. The Readme.html file falsely tells users that, "AT NO TIME DURING THESE PROCESSES WILL DATA BE COLLECTED ABOUT YOU OR YOUR COMPUTER." (emphasis in the original).

25.     Despite the representations to the contrary in the EULA and the SunnComm website, and without notification or consent of the user, the MediaMax software "phones home" to Sony BMG and/or SunnComm every time a user plays a protected CD. The software causes the computer to connect to a Sony BMG and/or SunnComm server via the internet. The MediaMax software conveys a unique code that identifies the album to which the user is

1   listening.  The request also contains standard HTTP headers which determine the operating

2   system the computer is running and what version of Internet Explorer web browser the user has.

3      26.  Prior versions of the MediaMax software still used on some Sony BMG CDs

4   contact Sony BMG and/or SunnComm to obtain "digital keys" that permitted the CDs to be

5   copied.

6      27.  The SunnComm Sony BMG customer care website does not have a visible

7   privacy policy.

8      28.  The Media Max software connects to an online service at

9   http://license.sunncomm2.com/, which does not have a visible privacy policy.

10      29.  The MediaMax software opens a web page from a Sony BMG and/or SunnComm

11   server and sends a 32-character identifier through an HTTP request.  On information and belief,

12   this is a unique code that tells Sony BMG and/or SunnComm to which album the user is

13   listening.  The request also contains standard HTTP headers that can be used to determine the

14   user's operating system.

15      30.  The server to which the MediaMax software connects returns an HTTP response

16   to the MediaMax software.  According to SunnComm's public statements, this response is

17   intended to facilitate the placement of dynamic, interactive advertisements that can be changed at

18   any time by Sony BMG and/or SunnComm.

19      31.  The MediaMax software also transmits the computer's Internet Protocol or "IP"

20   address to servers controlled by Sony BMG or its agents, without receiving permission from the

21   computer user.  No two IP addresses are alike and IP addresses provide the means to determine

22   information about the person who used the particular IP address.  Users are assigned an IP

23   address by their Internet service provider or system administrator.  Many users are issued

24   frequently changing "dynamic" IP addresses that make it difficult to track them individually, but

25   others have fixed, "static" addresses that can permit Sony BMG to ascertain their identities and

26   associate listening habits with particular individuals across many different CDs containing the

27   SunnComm software.

28

1    32.    The MediaMax software contains a program referred to as "Perfect Placement."

2  In a July 13, 2005, press release, SunnComm states that Perfect Placement provides

3  "unparalleled targeted marketing opportunities. . . . This unique feature centrally serves up

4  dynamic promotional content controlled by the record label to reserved spaces located

5  throughout the MediaMax interface while a user is enjoying their CD on the computer."  The

6  press release further states:  "Imagine an artist's album is coming out and the record company has

7  the ability to announce this event to all those playing the artist's previously released album in

8  their computer."

9    33.    The SunnComm MediaMax support website

10  (http://tickets.sunncomm.com/selfhelp/), also misleadingly states, "Please note that MediaMax

11  was designed to manage and safeguard the copyrights of specified artists' CDs while giving you

12  an enhanced visual and listening experience.  It does not interfere with or impact any of the

13  normal operations and/or functions of your computer." (emphasis in the original).  As described

14  above, this statement is false.

15    34.    Sony BMG fails to disclose, prior to purchase, that users running the MediaMax

16  CDs on Windows-based computers could have files downloaded and stored on their computers

17  without their consent, and fails to disclose that the software would transmit information about

18  user, including monitoring whenever users listen to the CDs, without notification to or consent of

19  the users.

20  **SUNNCOMM'S MEDIAMAX'S FIRST UNINSTALLER CREATED A GREATER
SECURITY RISK AND VIOLATED USER'S PRIVACY**

21    35.    Upon request, SunnComm will provide an internet-based uninstaller for the

22  MediaMax software.  Until approximately November 21, 2005, SunnComm provided this

23  uninstaller only after repeated requests that require the disclosure of personally identifying

24  information.

25    36.    The uninstaller provided by SunnComm until November 21, 2005, suffered from

26  a design flaw.  When a user visited the SunnComm uninstaller web page, the user was prompted

27  to accept a small software component—an ActiveX control called "AxWebRemoveCtrl" created

28

1    by SunnComm.

2          37.    This ActiveX control was designed so that any web page can ask it to download

3    and execute code from an arbitrary website location or URL.

4          38.    If a user visits a malicious website, the site can use the flawed ActiveX control to

5    download, install, and run malicious or dangerous software code on the user's computer without

6    the user's knowledge or consent.  Such code could severely damage a user's computer, including

7    but not limited to erasing a user's hard disk.

8          39.    The uninstaller available until November 21, 2005, failed to remove the

9    vulnerable ActiveX control from the user's computer following completion of the uninstallation

10   process.

11         40.    On or about November 21, 2005, SunnComm issued a patch to address the

12   security flaw in the prior uninstallation.

13         41.    On or about November 21, 2005, the SunnComm Sony BMG customer care

14   website provided a link to a web page that allows a user to access an internet-based uninstaller.

15   The uninstaller uses an ActiveX control.

16         42.    On or about December 6, 2005, Sony BMG and EFF issued a joint press release

17   announcing a software patch was available to address a security vulnerability with its Media Max

18   version 5 content protection software.  The SunnComm Sony BMG customer care website

19   provided a link that allows a user to download the software patch for the MediaMax version 5

20   software.  The patch does not remove MediaMax from a user's computer.  According to the

21   SunnComm Sony BMG customer care site, the patch addresses a potential issue security issue

22   with software.

23         43.    The software patch for Media Max version 5 also suffers from a design flaw.

24   Independent researchers have discovered that the software patch does not completely address the

25   security concerns of the MediaMax software and the patch itself is subject to the security

26   concerns that it was designed to address.

27

28

44.     Sony BMG fails to disclose the security risks created by the MediaMax software and the potential harm to a user's computer.

### THE XCP SOFTWARE IS UNDISCLOSED SPYWARE
### AND COMPROMISES SECURITY

45.     Sony BMG's actions and omissions with respect to the MediaMax software are part of a pattern of corporate failure to investigate, address, and disclose the security and privacy risks associated with its inclusion of so-called DRM software on music CDs.

46.     Similar and, in some respects, more serious risks have been identified in CDs loaded with another Sony BMG technology, Extended Copy Protection, or XCP.  As with the MediaMax software independent researchers and consumer advocates disclosed these risks, not Sony BMG.

47.     The software on a Sony BMG XCP CD is designed to operate only on Windows-based computers that run Windows 98SE/NT/2000/XP.

48.     When a computer user places the Sony BMG XCP CD in a Windows based computer, the software is designed such that the user is first required to agree to a EULA. According to the EULA, a user cannot utilize the audio files or the digital content of the CD on the computer unless the user agrees to the EULA, making it a contract of adhesion.  Attached hereto as Exhibit B and incorporated herein by reference is a true and correct copy of the XCP EULA.

49.     The user is told that the XCP software automatically installs player software into the user's computer that will allow the user to play, save and copy the audio files on the CD.

50.     According to the EULA, the software automatically installed by the XCP CD is intended to protect the "digital content" embodied on the XCP CD.  Digital content appears to include audio files converted into digital music files as well as unspecified other "already existing digital content."

51.     While the user is led to believe that Sony BMG's XCP software is installing the player software into the user's computer, it is actually installing software as a "rootkit" into the user's hard drive.  The Sony BMG XCP software also installs a CD drive filter driver that

10

COMPLAINT

1    intercepts calls to the computer's CD drive.

2         52.    A rootkit is used to hide login, processes, files, and logs and may include software

3    to intercept data from terminals, network connections, CD drives, and keyboards.  A rootkit is

4    invisible to the operating system and antivirus and security software, and is frequently used by

5    unauthorized third-parties, after gaining access to a computer system, to hide their activities.

6         53.    Specifically, the Sony BMG rootkit is a system filter driver which intercepts all

7    calls for process, directory or registry listings, and then modifies what information is visible to

8    the operating system in order to hide every file, process, or registry key beginning with the

9    characters "$sys$."

10        54.    Unbeknownst to users, once the rootkit is installed by the software on a Sony

11   BMG CD, the rootkit degrades the performance of the user's computer.

12        55.    In a November 1, 2005, eweek.com article by Paul Roberts, computer security

13   analyst Mark Russinovich states that the rootkit files interact with the Windows operating system

14   at a very low level and fail to account for certain conditions that could cause the files to

15   overwrite areas of memory, crashing applications that use that memory, or even crashing the

16   entire Windows operating system.  On information and belief, this article correctly illustrates

17   some of the damage the rootkit could do.

18        56.    The rootkit causes significant and cumulative injury to a user's computer.

19   Specifically, the rootkit can interfere with the computer's CD drive, file copying software, and

20   media players.  The rootkit also uses up system memory that would otherwise be available.

21        57.    On or around November 4, 2005, on National Public Radio's "Morning Edition"

22   program, Thomas Hesse, President of Sony BMG's global digital business division, when asked

23   about the XCP controversy, responded "Most people, I think, don't even know what a rootkit is,

24   so why should they care about it?"  In the same program, Mr. Hesse also denied that Sony

25   BMG's software communicated with Sony BMG, saying "No information ever gets gathered

26   about the users' behavior, no information ever gets communicated back to the user, this is purely

27   about restricting the ability to burn MP3 files in an unprotected manner."

28

58.     In a November 29, 2005, Business Week article, by Steve Hamm, the article states that F-Secure, a Finland-based antivirus company, notified Sony BMG on October 4, 2005, with problems associated the XCP rootkit.  The article further states that F-Secure informed Sony BMG that the rootkit "was a major security risk."

59.     Sony BMG failed to disclose that the XCP software, in the rootkit, automatically connects the user's computer via the internet to a server owned or operated by Sony BMG or its affiliates, without the user's consent.  Once a user's computer is connected to the Sony BMG website, the software sends an identification code associated with each XCP CD that is played on that computer to the Sony BMG website.  The Sony BMG server then automatically checks for updates to the album art and lyrics for that album.  This process uses the bandwidth that would otherwise be available to the user's computer for other tasks.

60.     As with the MediaMax software, this network connection provides Sony BMG with the ability to record each time a CD with XCP software is played and the IP address of the computer playing it, without receiving permission from the computer user.  As discussed above, no two IP addresses are alike and IP addresses provide the means to determine information about the person who used the particular IP address.  Sony BMG does not disclose the possibility of this use of DRM software in its packaging, the installation process, or its EULA.  Instead the EULA states, "the SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise."

61.     The Anti-Spyware Coalition and computer security firm Computer Associates identify Sony BMG's XCP software as "Spyware."

62.     Sony BMG's XCP software meets the ASC standards for spyware because the rootkit is placed on the computer without the user's consent and it changes the user's system security because the rootkit makes the user's computer more vulnerable to other types of malware.

63.     Computer Associates has classified the Sony BMG XCP rootkit as a form of spyware known as a "Trojan," noting that the "XCP.Sony.Rootkit modifies you[r] operating

1 system at a low level, represents a large threat to both corporate and consumer users system

2 integrity." Computer Associates also has noted that "[t]he Rootkit functionality hides files and

3 enables hackers and other spyware to hide files with impunity."

4       64.    Computer Associates has categorized Sony BMG's "Media Player" as spyware,

5 noting that "When launched from the CD, Music Player sends information back to Sony BMG,

6 indicating which album is being played."

7       65.    Once the rootkit is on a user's computer, it creates an undisclosed risk of security

8 breach to that computer because other malicious software, such as computer viruses, worms, and

9 spyware that enter the computer could exploit the software concealed by the rootkit.

10       66.    Malicious software coders have discovered that they can effectively render their

11 programs invisible by using names for computer files similar to ones cloaked by the Sony BMG

12 technology.  On information and belief, several malicious programs that exploit the XCP

13 technology's ability to avoid detection have already been distributed over the internet.  Further,

14 as stated above, XCP software transmits information about the user's computer, IP address, and

15 listening habits.

16       67.    On or around November 12, 2005, Microsoft, Inc., the maker of the Windows

17 operating system stated that "Rootkits have a clearly negative impact on not only the security,

18 but also the reliability and performance of their systems" and Microsoft's Anti-Malware

19 Engineering Team informed consumers that "in order to help protect our customers we will add a

20 detection and removal signature for the rootkit component of the XCP software."

21       68.    The nature of a rootkit makes it extremely difficult for a computer user to remove,

22 often leaving reformatting the entire hard drive as the only solution.  Reformatting a hard drive

23 requires backing up all data on the hard drive, as reformatting a hard drive deletes all data on the

24 hard drive.  The user is then required to re-install the operating system and all applicable

25 programs and drivers.  This process can take many hours and is beyond the technical capabilities

26 of many users.  Sony BMG's XCP CD EULA and install process do not disclose nor does the

27 CDs' software prompt users with information about the rootkit or the need to reformat the hard

28

1    drive in order to remove it.

2        69.    In response to the public outcry about the deceptive nature of Sony BMG XCP

3    CDs, Sony BMG made available a software patch.  The patch was only available on the Sony

4    BMG support site (http://cp.sonybmg.com/xcp/english/home.html).  The patch does not remove

5    the software or allow the user to remove the software.  The software patch merely makes the

6    software visible to system tools and antivirus software while installing an additional 3.5 MB of

7    updated versions of the software into the user's computer.  Additionally, the patch contains a

8    design flaw that could cause a computer to crash as it is installed.

9        70.    Sony BMG failed to disclose that if a user attempts to disable the software it will

10    likely disable the audio CD driver on the computer, rendering the user's CD drive inoperable.  If

11    the rootkit is removed manually, the Sony BMG software's changes to the user's system will

12    render the user's CD drive non-functional.  According to computer security firm Computer

13    Associates, "[r]econfiguring the CD-ROM driver to a functioning state will be beyond the ability

14    of the average home user."

15        71.    Computer Associates categorized Sony BMG's patch as a "Trojan" and noted that

16    the Sony BMG software, even when patched with Sony BMG's update, continues to "represent a

17    threat to the user's control over their system . . . ."

18        72.    The United States Computer Emergency Readiness Team (US-CERT), part of the

19    Department of Homeland Security that is charged with the task of "protecting the nation's

20    Internet infrastructure" by coordinating "defense against and responses to cyber attacks across

21    the nation" has stated that the XCP rootkit "can pose a security threat" and that "one of the

22    uninstallation options provided by Sony BMG also introduces vulnerabilities to a system."

23        73.    Installation of a rootkit on a computer undermines the security of that computer.

24        74.    Installation of a rootkit on a computer causes impairment to the integrity or

25    availability of data, a program, a system or information.

26        75.    The software installed by Sony BMG includes a set of computer instructions that

27    are designed to modify, damage, destroy, record, and/or transmit information within a computer,

28

---

1 computer system, or computer network without the intent or permission of the owner of the

2 information.

**SONY BMG'S FIRST XCP UNINSTALLER CREATED A GREATER SECURITY RISK AND VIOLATED USER'S PRIVACY**

76.     The only known way for typical users to safely uninstall the XCP software is to obtain an uninstaller from Sony BMG.

77.     Until approximately November 15, 2005, in order to obtain an uninstaller from Sony BMG, a user was required to navigate an extensive request process and disclose personal information to Sony BMG.  First, the user was required to go to the Sony BMG support website and fill out a form stating: a country where the CD was purchased; the artist's name; the album title; the store name; and the user's e-mail address.  After submitting the form, the user was directed to a website which states that the user that the user will receive an e-mail with a "Case ID."  Next, the user received an e-mail that directed the user to install the patch and then visit another website if the user still wanted to uninstall the DRM software.

78.     This further website, available until November 15, 2005, required the user to install ActiveX control software.  The user was then required to enter the Case ID and fill in the reasons for the request.  Once the user submitted this information, the user received an email that notified the user that a customer service representative would email the uninstall instructions to the user within a business day.  The user then received an e-mail with a link to a confidentiality notice, which had to be accepted before software could be uninstalled.

79.     Sony BMG states that the information collected by Sony BMG before providing the uninstaller is subject to its Privacy Policy, http://www.sonybmg.com/privacypolicy.html. The Sony BMG Privacy Policy states, *inter alia*, that Sony BMG "may share the information we collect from you with our affiliates or send you e-mail promotions and special offers from reputable third parties in whose products and services we think you may have an interest. We may also share your information with reputable third-parties who may contact you directly."

80.     On information and belief, if the Sony BMG software was uninstalled using the uninstaller available until November 15, 2005, the user was no longer able to receive the full use

15

1   and value of the XCP CD on his or her computer.  Therefore, Sony BMG required the user to

2   either accept the malicious software or lose the full use and value of the XCP CD.  Sony BMG

3   did not disclose this fact to users prior to purchase.

4         81.    The Sony BMG  software could not be uninstalled if the user proceeded to the

5   link from a different computer than the one on which the user installed the ActiveX control

6   software.  If the user is not at that same computer he or she will receive an error message.  The

7   uninstall link contains the Case ID in the address, so when the user proceeded to the uninstall

8   link, the ActiveX control software sent a Sony BMG website an encrypted block of data.  This

9   encrypted data was a signature that is tied to the hardware configuration of the user's computer.

10         82.    On information and belief, the ActiveX uninstaller left behind numerous software

11   methods that can be exploited by others.

12         83.    The ActiveX uninstaller also exposed a user's computer to additional risks by

13   enabling malicious third parties to download and install over the internet because the ActiveX

14   uninstaller failed to restrict such access only to Sony BMG or First4Internet.  Such malicious

15   code could severely damage a user's computer, including but not limited to erasing a user's hard

16   disk.

17         84.    Sony BMG did not cause the ActiveX control to be removed from user's

18   computers following completion of the installation process.

19         85.    On information and belief, the uninstallation could cause further damage to users'

20   computers, including but not limited to, causing a user's Windows operating system to crash.

21         86.    On or around November 15, 2005, Sony BMG posted the following message on

22   its website: "We currently are working on a new tool to uninstall First4Internet XCP software.

23   In the meantime, we have temporarily suspended distribution of the existing uninstall tool for

24   this software.  We encourage you to return to this site over the next few days.  Thank you for

25   your patience and understanding."  Sony BMG failed to disclose the problems associated with

26   the old uninstaller.

27

28

87.     On or about November 28, 2005, Sony provided individuals who had requested the first uninstaller for the XCP software information on how to uninstall the first uninstaller.

88.     On or about December 5, 2005, the Sony BMG support site provided a link to an uninstaller program for the XCP software.

89.     On information and belief, the software released by Sony BMG to resolve the flaws in the XCP software can cause further damage to users' computers.

## SONY BMG HAS MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS REGARDING THE SOFTWARE IT HAS INCLUDED ON MUSIC CDS

90.     In addition to the material misrepresentations and omissions set forth above, Sony BMG has made numerous additional misrepresentations and omissions of material facts.

91.     On information and belief, the XCP and MediaMax CDs are disseminated to the public with identical EULAs.

92.     Sony BMG's EULAs state that the MediaMax and XCP software installed on a user's computer will not be used to collect any personal information.  As set forth above, this is untrue.

93.     Sony BMG's EULAs state that the MediaMax and XCP software will remain on the user's computer until it is removed or deleted.  Neither the MediaMax nor the XCP software allows a user to use the standard "add/remove program" function on the Windows operating system to remove the program.  Sony BMG's MediaMax and XCP CDs and its software fail to provide information about how to remove the program or even how to contact Sony BMG to resolve any problems with the program.

94.     The EULAs disclose that the MediaMax and XCP drivers try to "protect the audio files embodied on the CD."  However, the drivers also attempt to restrict access to any other CD that uses MediaMax or XCP technology.  Therefore, users need only agree to installation on one album for the software to affect users' ability to use many other titles.

95.     Sony BMG uses its website to advertise and promote the sale of its CDs to the public.  On its website, until November 15, 2005, Sony BMG falsely denied that its software is

17

1  spyware and that it posed a security risk.  Sony BMG also made the false claim that the software

2  does not collect any personal information nor is it designed to be intrusive to the user's computer

3  system.

4       96.     On or around November 8, 2005, Sony BMG publicly and falsely stated, on the

5  http://cp.sonybmg.com/xcp website, that the XCP software's rootkit "component is not malicious

6  and does not compromise security."

7       97.     The above website directs users to another site, http://updates.xcp-aurora.com/,

8  where users can obtain a software update to remove the rootkit component of the XCP

9  technology.  As of the filing of this complaint, the website states that the cloaking component "is

10  not malicious and does not compromise security."

11       98.     On its support website (http://cp.sonybmg.com/xcp/english/home.html), Sony

12  BMG stated, until approximately November 16, 2005, that its XCP software simply acts to

13  prevent unlimited copying and ripping from discs featuring the technology.  Sony BMG created

14  the false impression that the only effect of software included on CDs would be to restrict the

15  ability to create copies of CDs or the quantity of CDs that a user can copy.

16       99.     On or around November 16, 2005, Sony BMG announced, on the

17  http://cp.sonybmg.com/xcp website, that it shared the security concerns of consumers regarding

18  the XCP discs, and offered to exchange new CDs for CDs with XCP software.  Sony BMG did

19  not indicate the nature or extent of the security risks associated with the XCP software.  Sony

20  BMG also affirmed that the XCP software was not a "monitoring technology."

21       100.    Sony BMG uses its website to advertise and promote the sale of its CDs to the

22  public. On its website, until November 15, 2005, Sony BMG falsely denied that its software is

23  spyware and that it posed a security risk.  Sony BMG also made the false claim that the software

24  does not collect any personal information nor is it designed to be intrusive to the user's computer

25  system.  Sony BMG has failed to make efforts to publicize the flaws in its XCP software and

26  uninstaller, apart from statements on its websites and statements to the press.  Therefore, many

27  XCP CD purchasers are unaware of the security and other risks caused by the software.

28

101.   Sony BMG has failed to publicly disclose or address the risks associated with MediaMax software and its uninstaller.  Therefore, many MediaMax CD purchasers are unaware of the security and other risks caused by the software.

102.   As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG support website misleadingly represent that the software will not be used to collect personal information about the user without his or her permission.

103.   As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG support website falsely represent that MediaMax software will not be installed if the user declines the EULA.

104.   The MediaMax EULA fails to disclose other important details about what the uninstaller does, including but not limited to the security risks it poses to users' computers.

105.   According to Sony BMG, the purpose of the software is to restrict the ability to create copies of CDs or the quantity of CDs that a user can copy.  The MediaMax and XCP software goes far beyond copyright protection, however.  For example, the software makes it extremely difficult for a consumer with a PC to transfer their music to an Apple Corporation-manufactured iPod but easy to transfer to other portable digital music players, such as those sold by Sony.  Sony BMG asks iPod owners who have XCP CDs to complain to Apple about the inability to play Sony BMG protected music on an iPod.  The MediaMax support website also asks iPod owners who have MediaMax CDs to complain to Apple about the inability to play Sony BMG protected music on an iPod.  To the extent that this is intended to advantage Sony BMG or its partners in the portable digital music player market, this advantage comes at the expense of consumers.

**SONY BMG'S EULAS CONTAIN NUMEROUS UNCONSCIONABLE AND UNREASONABLE PROVISIONS**

106.   The XCP and MediaMax CDs are disseminated with identical EULAs.

107.   Sony BMG utilized unconscionable provisions in the EULA that accompanies the XCP and MediaMax CDs.  These provisions include:

a. Restrictions on the user's ability to use the digital content on the CD in the event that that consumer chose to leave the United States;

b. Restrictions on resale and transfer of the digital content on the CDs;

c. Restrictions on user's ability to use the digital content on the CDs at work;

d. Restrictions on user's ability to use and retain lawfully-made copies of the digital content on the CDs in the event that the original CD is stolen or lost;

e. Restrictions on user's ability to use the digital content on the CDs following a bankruptcy;

f. Conditioning the user's continued use of the digital content on the CDs on acceptance of all Sony BMG software updates;

g. A purported $5.00 limit on Sony BMG's entire liability to the purchaser of the CDs;

h. Restrictions on user's ability to examine and test his or her computer to understand and attempt to prevent the damage cause by the rootkit;

i. A reservation of rights by Sony BMG to use technological "self-help" measures against the computers of users who desire to make use of the digital content on the CDs "at any time, without notice to [the user];" and

j. A disclaimer of all warranties, including implied warranties of merchantability, satisfactory quality, noninfringement, and fitness for any particular purpose.

**SONY BMG'S SOFTWARE IS A COMPUTER CONTAMINANT**

108. Sony BMG has introduced a computer contaminant, in violation of California Penal Code Section 502, into the Plaintiffs' and the Class' computers, computer systems or computer networks.

109. Sony BMG software includes a set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network.

110.   Sony BMG software transmits information about which CDs the user is playing through the Internet.

111.   By engaging in the above-described acts, Sony BMG caused damage.

112.   By engaging the above described acts, Sony BMG has caused or attempted to cause a threat to public health or safety,

113.   It is important to public safety not to defeat or undermine the security measures on computers.

114.   Keeping the Internet infrastructure functioning is important to public safety.

**SONY BMG HAS CAUSED DAMAGE TO CONSUMERS AND THE PUBLIC**

115.   On or around November 16, 2005, Sony BMG issued a public statement announcing that it would recall XCP CDs and allow customers to exchange the XCP CDs for CDs that would not contain any DRM.

116.   A November 30, 2005, press release by the Office of the Massachusetts Attorney General states that some of the XCP CDs are still available in stores.

117.   As of the filing of this Complaint, Sony BMG has not offered to refund the purchase price of the XCP CDs.

118.   As of the filing of this complaint, Sony BMG has not offered to recall, replace, or refund the purchase price of MediaMax CDs.

119.   As of the filing of this complaint, Sony BMG has not compensated or offered to compensate consumers for the damage it has caused to their computers.

120.   Through the actions set forth above, Sony BMG damaged its customers, including Plaintiff and Class members, to an extent to be determined at trial, caused them actual injury, and caused them to lose money and property.

121.   Investigation into the scope and extent of the effects and damage caused by Sony BMG's software is ongoing.  Plaintiff, on behalf of herself and the Class, reserves the right to amend these allegations as new information is discovered.

COMPLAINT

## CLASS ACTION ALLEGATIONS

122.    Pursuant to Federal Rules of Civil Procedure 23 (a) and (b), Plaintiff Erin Melcon brings this action on behalf of herself and a Class of similarly situated persons defined as:

> All persons or entities who purchased an audio compact disc distributed by Sony BMG that XCP or SunnComm software and every person or entity who suffered damage or loss as a result of Defendants' violation of the Computer Fraud and Abuse Act ("CFAA").

Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, the officers, directors, and employees of Defendants, and the legal representatives, heirs, successors, and assigns of Defendants.

123.    This action is brought as a class action and may properly be so maintained; pursuant to the provisions of the Federal Rules of Civil Procedure 23.

### Numerosity

124.    Members of the Class are so numerous that their individual joinder is impracticable. The precise numbers of members of the Class and their addresses are unknown to the Plaintiff. Plaintiff estimates that the Class consists of millions of members. The precise number of persons in the Class and their identities and addresses may be ascertained from Defendants' records. Members of the Class may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

### Commonality

125.    Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting only individual members of the Class. These common legal and factual questions include:

COMPLAINT

a. Whether Sony BMG engaged in deceptive business practices in connection with the sale and advertising of the XCP and MediaMax CDs;

b. Whether some or all of the terms of the EULA are unconscionable;

c. Whether the MediaMax software installs on consumers' computers without authorization;

d. Whether the MediaMax and XCP software exceed the authorizations given by consumers;

e. Whether the MediaMax and XCP software are in violation of the Consumer Fraud Abuse Act, 18 U.S.C. § 1030; and

f. Whether the communications by the MediaMax and XCP software over the internet are disclosed and necessary uses of the copy protection software.

## Typicality

126. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased a CD distributed by Defendants, and Plaintiff was required to agree to the EULA, which did not notify Plaintiff of the true nature of the software that the CD was to install on Plaintiff's computer.

## Adequacy

127. Plaintiff is an adequate representatives of the Class because her interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to prosecute this action vigorously. The interests of the member of the Class will be fairly and adequately protected by Plaintiff and her counsel.

128. This suit may also be maintained as a class action because Plaintiff and the Class seek declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 23(b)(2) as

1   Defendants acted on grounds generally applicable to Plaintiff and the Class, thereby making

2   declaratory and/or injunctive relief proper.

3      129.    This suit may also be maintained as a class action under Federal Rules of Civil

4   Procedure 23(b)(3) because a class action is superior to other available means for the fair and

5   efficient adjudication of this dispute.  The damages suffered by each individual Class member

6

7   may be relatively small, especially given the burden and expense of individual prosecution of the

8   complex and extensive litigation necessitated by Defendants' conduct.  Furthermore, it would be

9   virtually impossible for the Class members, on an individual basis, to obtain effective redress for

10  the wrongs done to them.  Moreover, even if Class members themselves could afford such

11  individual litigation, the court system could not.  Individual litigation presents a potential for

12  inconsistent or contradictory judgments.  Individualized litigation increases the delay and

13  expense to all parties and the court system presented by the complex legal issue of the case.  By

14

15  contrast, the class action device presents far fewer management difficulties, and provides the

16  benefits of a single adjudication, economy of scale and comprehensive supervision by a single

17  court.

18     130.    In addition, this suit may be maintained as a class action under Federal Rule of

19  Civil Procedure 23(b)(3), because:

20      a.    The prosecution of separate actions by individual Class members would

21          create a risk of inconsistent or varying adjudication with respect to

22          individual Class members that would establish incompatible standards of

23

24          conduct for Defendants; or

25      b.    The prosecution of separate actions by individual Class members would

26          create a risk of adjudications with respect to them that would, as a

27          practical matter, be dispositive of the interests of other Class members not

28

1           parties to the adjudications or substantially impair or impede their ability

2           to protect their interests; or

3       c.    Defendants have acted or refused to act on grounds generally applicable to

4           the Class, thereby making appropriate final injunctive or corresponding

5           declaratory relief with respect to the Class as a whole.

6

7                         **FIRST CLAIM FOR RELIEF**

8        **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

9       131.   Plaintiff incorporates by reference the allegations in all proceeding paragraphs of

10 this complaint.

11       132.   As defined by 18 U.S.C. § 1030, the Computer Fraud and Abuse Act ("CFAA"),

12 the computers used by Plaintiff and Class members are "protected computers."

13       133.   By engaging in the above-described acts and practices, Sony BMG (i) knowingly

14 causes the transmission of a program, information, code, or command, and as a result of such

15 conduct, intentionally causes damage without authorization, to a protected computer; (ii)

16 intentionally accesses a protected computer without authorization, and as a result of such

17 conduct, recklessly causes damage; and/or (iii) intentionally accesses protected computers, and

18 as a result of such conduct, causes damage, without authorization, in violation of the Computer

19 Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A).

20

21       134.   By engaging in the above-described acts and practices, Sony BMG "intentionally

22 accesse[d] a computer without authorization or exceeds authorized access, and thereby

23 obtain[ed] . . . information from any protected computer if the conduct involved an interstate or

24 foreign communication" in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §

25 1030(a)(2)(C).

26

27

28

135.    By engaging in the above-described acts and practices, Sony BMG "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud" and obtained information "of value," in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

136.    By engaging in the above-described acts and practices, Sony BMG caused and causes (i) loss to 1 or more persons during any 1-year period  aggregating at least $5,000 in value; (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;  (iv) a threat to public health or safety; or (v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security; in violation of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(5)(B).

137.    Plaintiff and the Class suffered and will continue to suffer damages, and there continues to be a threat to public health or safety; or damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security, as a result of Sony BMG's computer fraud and abuse.  Plaintiff, on behalf of herself and on behalf of the Class seek compensatory damages, injunctive relief and other equitable relief as specified below in an amount to be determined at trial.

## SECOND  CLAIM FOR RELIEF

### (Violation of Consumer Legal Remedies Act, CA Civil Code § 1750, et seq.)

138.    Plaintiffs incorporate the allegations set forth above by references, as if set forth fully herein.

139.    The Consumer Legal Remedies Act (CLRA), California Civil Code sections 1750 *et seq*, applies to Sony BMG's actions and conduct because such actions and conduct pertain to transactions that were intended to result and/or resulted in the sale or lease of goods or services

26

1  to consumers.

2      140.   Plaintiffs and each member of the class are "consumers" within the meaning of

3  Civil Code Section 1761(d).

4      141.   The Sony BMG products that are the subject of this litigation are "goods" within

5  the meaning of Civil Code section 1761(a).

6      142.   Sony BMG has engaged in deceptive practices, unlawful methods of competition

7  and/or unfair acts as defined by Civ. Code §1770, to the detriment of Plaintiffs and the Class.

8  Plaintiffs and members of the Class have suffered harm as a proximate result of the violations of

9  law and wrongful conduct of Defendant alleged herein.

10     143.   Sony BMG intentionally and unlawfully perpetrated harm upon Plaintiffs and the

11  Class by the above described acts.

12     144.   In violation of Civil Code section 1770(5), Sony BMG has represented that its

13  CDs have characteristics, uses or benefits which they do not have.

14     145.   In violation of Civil Code section 1770(a)(9), Sony BMG has advertised its CDs

15  with intent not to sell them as advertised.

16     146.   In violation of Civil Code section 1770(a)(14), Sony BMG has represented that

17  the purchase and/or use of its XCP and MediaMax CDs confers or involves rights, remedies, or

18  obligations which it does not have or involve, or which are prohibited by law.

19     147.   In violation of Civil Code section 1770(a)(19), Sony BMG has inserted several

20  unconscionable provisions into the end-user license agreement (EULA) that accompanies the

21  XCP and MediaMax CDs.

22     148.   Sony BMG concealed material information regarding the XCP and MediaMax

23  CDs from Plaintiffs and other class members, including but not limited to the existence of the

24  rootkit program and its effects on users' computers and the lack of a reasonable way to uninstall

25  the software in the event of security or privacy violations.

26     149.   Users, including Plaintiffs and class members, routinely rely on this type of

27  information in making music purchase decisions.  Had Sony BMG disclosed this material

28

1    information, Plaintiffs and other class members would not have purchased the XCP and

2    MediaMax CDs.

3         150.    Plaintiffs and other class members relied on this material information to their

4    detriment.

5         151.    Sony BMG's deceptive acts and omissions and unfair business practices occurred

6    in the course of selling a consumer product and violate Civil Code section 1770(a).

7         152.    As a direct and proximate result of Sony BMG's violations of the CLRA,

8    Plaintiffs and other class members have suffered harm.

9         153.    Sony BMG's policies and practices are unlawful, unethical, oppressive, fraudulent

10   and malicious.  The gravity of the harm to all consumers from Sony BMG's policies and

11   practices far outweighs any purported utility those policies and practices have.

12        154.    Pursuant to Civil Code section 1780(a), Plaintiffs seek an order enjoining

13   Defendant from engaging in the methods, acts or practices alleged herein, including an order

14   enjoining the defendant from continuing to sell and market XCP and MediaMax CDs and

15   continuing to disclaim the risks of using such CDs.

16        155.    Pursuant to Civil Code section 1782, on November 14, 2005, Plaintiffs notified

17   Sony BMG of its commission of unlawful acts under Civil Code section 1770, specifying the

18   particular violations, and demanded that Sony BMG rectify its illegal acts within 30 days.  The

19   demand letter requested that Sony BMG compensate consumers for computer problems related

20   to the XCP and MediaMax software.

21        156.    On November 18, 2005, Sony BMG responded.  In its response, Sony BMG did

22   not agree to provide compensation or to discuss a process for assessing claims.  Therefore,

23   Plaintiffs and the Class also request (a) actual damages; (b) restitution of money to Plaintiffs and

24   Class members; (c) punitive damages; (d) attorneys' fees and costs; and (e) other relief that this

25   Court deems proper.

26

27

28

**THIRD CLAIM FOR RELIEF**

**(Violation of California Business and Professions Code Section 17200)**

157.   Plaintiffs incorporate the allegations set forth above by references, as if set forth fully herein.

158.   Plaintiffs and the Class have suffered injury in fact and lost money or property as a result of such unfair competition.  Such injuries and losses include, but are not limited to, computer damage, time and effort spent identifying and attempting to remove the damaging software, loss of use of the ability to listen to the music on the CDs, and the purchase price of the CDs.

159.   Sony BMG has engaged in unfair, unlawful and fraudulent business practices as set forth above.

160.   By engaging in the above-described acts and practices, Sony BMG has committed one or more unfair business practices within the meaning of Bus. & Prof. Code §17200, et seq. Specifically, Sony BMG's business practices offend the public policies set forth in California Constitution Art. 1, section 1; Civil Code sections 1750 et seq (Consumer Legal Remedies Act); Business and Professions Code section 22947 (Consumer Protection Against Computer Spyware Act);  Business and Professions Code section 17500 et seq.; Business and Professions Code sections 22575-579 (Online Privacy Protection Act);  and California Penal Code section 502.

161.   Sony BMG's above-described deceptive and misleading acts and practices have and/or are likely to deceive Plaintiffs and other Class members.

162.   Sony BMG's acts and practices are also unlawful because they violate Civil Code sections 1750 et seq (Consumer Legal Remedies Act); Business and Professions Code section 22947 (Consumer Protection Against Computer Spyware Act); and California Penal Code section 502.

163.   Specifically, Sony BMG marketed and sold the XCP and MediaMax CDs in defective condition and deceptively failed to disclose their defects as described above; advertised

COMPLAINT

its XCP and MediaMax CDs with intent not to sell them as advertised; represented that the purchase and/or use of its XCP and MediaMax CDs confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; inserted several unconscionable provisions into the EULA that accompanies the XCP and MediaMax CDs infected with the XCP and MediaMax software; took control and modified the settings of user's computers, collected personally identifiable information about users, tracked users as they listen to the CDs and attempted to prevent users from blocking or disabling the XCP and MediaMax software; violated the implied covenant of good faith and fair dealing; and failed to comply with the implied warranty of merchantability.

164.    Plaintiffs and the Class have suffered injury in fact and have lost money or property as a result of such unfair competition.

165.    Plaintiffs, on behalf of themselves and on behalf of the Class, seek an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under §17200, et seq.

## FOURTH CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

166.    Plaintiffs incorporate the allegations set forth above by references, as if set forth fully herein.

167.    California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

168.    By engaging in above-described acts and practices, Sony BMG has violated the implied covenant of good faith and fair dealing in the consumer's purchase of the XCP and MediaMax CDs.

169.    By engaging in the above-described acts and practices, Sony BMG has caused Plaintiffs and the Class to suffer damages in an amount to be determined at trial.

COMPLAINT

# FIFTH CLAIM FOR RELIEF

## (False or Misleading Statements)

170.    Plaintiffs incorporate the allegations set forth above by references, as if set forth fully herein.

171.    Through its advertising practices, promotional materials, packaging, EULA, public statements, and other acts and practices described herein, Sony BMG has made untrue and misleading statements and omitted material facts in violation of California Business and Professions Code §§17500, et seq.

172.    The misrepresentations, omissions and other misleading conduct described herein concerning the XCP and MediaMax CDs were "likely to deceive."  These misrepresentations and omissions continue to this date.

173.    Sony BMG knows or should know that these misrepresentations and omissions concerning the XCP and MediaMax CDs are false and misleading.

174.    Plaintiffs and the Class were actually deceived by the misrepresentations and omissions.

175.    Plaintiffs and the Class relied on these misrepresentations and omissions to their detriment.

176.    Plaintiffs and the Class have been harmed.  Plaintiffs, on behalf of themselves and on behalf of the Class seek restitution, disgorgement, injunctive relief and all other relief allowable under §17500, et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For compensatory damages in an amount to be proven at trial.

B.    For restitution and disgorgement of profits realized as a result of the unlawful conduct of defendants.

C.    For any treble and/or punitive damages to the extent permitted by law.

D.    For declaratory relief, including but not limited to, i) declaring the distribution of

1 | CDs with MediaMax and XCP software to be illegal under CFAA and ii) declaring the EULAs

2 | to be unconscionable, misleading and void.

3 |   E.   For further equitable relief, including but not limited to, requiring Sony BMG to:

4 |       (i)   Notify consumers, through widespread publicity, of the potential security

5 |             and other risks associated with the XCP and MediaMax technology, to

6 |             allow consumers to make informed decisions regarding their use of those

7 |             CDs. The notification process should include issuing a public statement

8 |             describing the risks associated with *both* XCP and MediaMax software

9 |             and listing every Sony BMG CD, DVD or other product that contains

10 |            MediaMax software. In addition, Sony BMG must use the banner

11 |            communication system incorporated in its software to advise consumers

12 |            that refunds and uninstall software is available. The notifications must be

13 |            reasonably calculated to reach all consumers who have purchased the

14 |            products.

15 |       (ii)  Cooperate fully with any interested manufacturer of anti-virus, anti-

16 |             spyware, or similar computer security tools, and with security researchers,

17 |             to facilitate the identification and complete removal of both XCP and

18 |             MediaMax software from the computers of those infected. Among other

19 |             actions, Sony BMG should publicly waive any claims it may have against

20 |             such vendors or researchers under the EULA, the Digital Millennium

21 |             Copyright Act (DMCA), and any similar laws.

22 |       (iii) Refund the purchase price of the CDs containing XCP technology for

23 |             those consumers who prefer a refund to a replacement CD.

24 |       (iv)  Refund the purchase price of the CDs containing MediaMax technology

25 |             or, *at the consumer's election*, provide a replacement CD that does not

26 |             contain the MediaMax technology. For those consumers who choose to

27 |             retain CDs containing the MediaMax technology, develop and make

28 |

1         widely available a software update that will allow consumers to easily

2         uninstall the technology without losing the ability to play the CD on their

3         computers, without causing further damage to their computers, and

4         without revealing any personally identifying information.

5     (v)    To avoid future abuses, prior to releasing any future product containing

6         technology with similar functions, thoroughly test the software to

7         determine the existence of any security risks or other possible damages

8         the technology might cause to any user's computer and certify in a

9         statement included in the packaging of every CD containing the

10        technology that the product does not contain any concealed software such

11        as the XCP rootkit, does not electronically communicate with Sony BMG

12        or any other party nor initiate the download of any software update or

13        other data without informed consent of the consumer immediately prior to

14        each communication, can be uninstalled without any need to contact

15        and/or disclose personal information to Sony BMG or its affiliates and

16        agents, does not present any security risks to any consumer's computer,

17        and will not damage or reduce the functionality of the consumer's

18        computer in any way.

19   F.    For the award to Plaintiff of their attorneys' fees and other costs of suit.

20   G.    For such other and further relief as the Court deems just and equitable.

21

22   DATED: 12/8/05         **GREEN WELLING LLP**

23

24           By: _Robert S. Green_

25                Robert S. Green

              Jenelle Welling

26               Avin P. Sharma

27               595 Market Street, Suite 2750

              San Francisco, CA 94105

              Telephone: (415) 477-6700

28               Facsimile: (415) 477-6710

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cindy Cohn
Fred von Lohmann
Kurt Opsahl
Corynne McSherry
**ELECTRONIC FRONTIER FOUNDATION**
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Reed R. Kathrein
Shanna Scarlett
**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone:  (415) 288-4545
Facsimile:  (415) 288-4534

Lawrence E. Feldman
**LAWRENCE E. FELDMAN & ASSOCIATES**
432 Tulpehocken Avenue
Elkins Park, PA 19027
Telephone:  (215) 885-3302
Facsimile: (215) 885-3303

Attorneys for Plaintiff

COMPLAINT



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| ERIN MELCON | ) ) ) | |
| Plaintiff(s) | ) ) | No. C-05-05084 MHP |
| -v- | ) ) | ORDER SETTING INITIAL CASE MANAGEMENT |
| SONY BMG ENTERTAINMENT | ) | CONFERENCE |
| Defendant(s) | ) ) | |

IT IS HEREBY ORDERED that this action is assigned to the Honorable Marilyn Hall Patel.  When serving the complaint or notice of removal, the plaintiff or removing defendant must serve on all other parties a copy of this order, the handbook entitled "Dispute Resolution Procedures in the Northern District of California" and all other documents specified in Civil Local Rule 4-2. Counsel must comply with the case schedule listed below unless the Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the Alternative Dispute Resolution (ADR) Multi-Option Program governed by ADR Local Rule 3.  Counsel and clients must familiarize themselves with that rule and with the handbook entitled "Dispute Resolution Procedures in the Northern District of California."

CASE SCHEDULE   [ADR MULTI-OPTION PROGRAM]

| Date | Event | Governing Rule |
|---|---|---|
| 12/08/2005 | Complaint filed | |
| 03/20/2006 | Last day to meet and confer re initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR LR 3-5 |
| 03/20/2006 | Last day to file Joint ADR Certification with Stipulation to ADR process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 04/03/2006 | Last day to complete initial disclosures or state objection in Rule 26(f) Report, file/serve Case Management Statement, and file/serve Rule 26(f) Report | FRCivP 26(a)(1) Civil L.R.16-9 |
| 04/10/2006 | Case Management Conference in Ctrm 15, 18th Floor at 4:00 PM | Civil L.R. 16-10 |



**7**



Scott A. Kamber (SK-5794)
KAMBER & ASSOCIATES, LLC
19 Fulton Street, Suite 400
New York, N.Y. 10038
Tel: (212) 571-2000

Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

James Michaelson and Ori Edelstein,

            Plaintiffs,

    v.

Sony BMG Music, Inc.
and First 4 Internet,
            Defendants.

# JUDGE BUCHWALD

# 05 Civ. CV 9575

CIVIL COMPLAINT

PLAINTIFF DEMANDS A TRIAL
BY JURY

      Plaintiffs James Michaelson and Ori Edelstein ("plaintiffs"), by their undersigned attorneys, bring this complaint (the "Complaint") against the defendants named herein and alleges as follows:

## SUMMARY OF ACTION

      1.    This is a complaint for damages and injunctive relief.

      2.    In March 2003, First 4 Internet, Ltd. ("F4i") introduced its XCP software. According to F4I, XCP stands for "extended copy protection" and was an end-to-end solution to protect the rights of record labels and artists against the unauthorized copying of CD content."

      3.    Sometime thereafter F4i and Sony BMG Music, Inc. ("Sony") entered into an agreement under which F4i would produce a customized version of its XCP

software for Sony's use on its compact discs ("CDs") worldwide. Sony was the first major record label to agree to use the XCP software. Sony is one of the world's largest purveyors of music, video and games.

4.      In March 2005, Sony began encoding numerous music titles that it sold worldwide with the XCP software. While Sony publicly touted this development as a "speed bump" for consumers seeking to illegally share its music, in reality it was something far more sinister. For reasons not yet disclosed, Sony and F4i crafted an anti-burning scheme that would make permanent and irreversible alterations to the core windows operating system which could be later utilized by Hackers or Sony to take control of the users' computer without the users' knowledge. According to Computer Associates, this software is "spyware" that is a "trojan that opens securities vulnerabilities through rootkit functionality".

5.      In encoding the disks XCP, Sony and F4i have decided that their intellectual property is more deserving of protection than the intellectual property and personal information on millions of personal computers worldwide.

6.      Unfortunately, the risk is not just theoretical or a subject merely of relevance to technology bloggers. To date, over 3 million copies of XCP encoded disks have been sold. It is probable that millions of consumers have played these discs on their PC's and thus compromised their systems without knowing it. Today, several viruses have been reported that exploit the weakness that defendants created. Millions of users are at risk from these viruses that destroy software and steal personal information.

7.    Sony and F4i have taken concerted action to cover up their actions under the guise of trying to fix the problem. Sony has even refused to disclose which titles it sold that were encoded with the XCP technology.

8.    The plans Sony and F4i may have for future usage of this sinister technology in the game or video sector is currently unknown. 4Fi Managing Director was upbeat about the market potential of XCP and was quoted as saying, "Right now we're focusing on the music sector, where there's a real burning desire for this technology, excuse the pun! But there are other types of data that need to be protected, and our technology can be applied to video, for example, and to games. We've got lots of plans for the future. So it's all exciting times really."

### JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

10.    Personal jurisdiction over the defendants exists and venue is proper pursuant to 28 U.S.C. § 1391 (b)(3). Defendant Sony has a regular and established place of business in this judicial district.

11.    In addition, Plaintiff invokes the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over claims based upon state or common law.

### PARTIES

12.    Plaintiff Michaelson is a resident of Illinois. Plaintiff Michaelson purchased a Neil Diamond CD encoded with XCP and the root kit in question.

13.    Plaintiff Edelstein is a resident of New Jersey. Plaintiff Edelstein purchased a disk by Switchfoot encoded with XCP and the root kit in question.

14.    Defendant Sony BMG music, Inc. ("Sony") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 550 Madison Avenue, New York, New York. Sony is a subsidiary of the Sony Corporation. During the relevant time period, Sony has distributed CDs in this jurisdiction under various labels including, but not limited to, Columbia, Epic, Epic Associated, Sparrow, Delicious Vinyl, Sony Classical, Sony Broadway, Masterworks Dinner Classics and Masterworks.

15.    Defendant First 4 Internet, Ltd., is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Wales, United Kingdom. First 4 Internet is a developer of digital rights management software including the XCP1 Burn Protect. First 4 Internet. A customized version of this software was produced by First 4 Internet for Sony for worldwide use on Sony's Compact Discs, including discs sold in the United States.

CLASS ALLEGATIONS

16.    Pursuant to Section of the Federal Rules of Civil Procedure, plaintiffs bring this action individually on their own behalf and as a national class action, on behalf of all individuals who either: (i)purchased compact discs from Sony BMG encoded with digital rights management software ("Encoded CDs") any time since January 2005; or (ii) played any Encoded CDs on their personal computer resulting in the installation of software on a computer that has a modem or other internet

connection. (Collectively, the "Class"). Specifically excluded from the Class are the defendant and any person, firm, trust, corporation, or other entity related to or affiliated with it.

17.     This action is properly maintainable as a class action pursuant to Rule 23 of the federal Rules of Civil Procedure.

18.     Plaintiffs believe that there are hundreds of thousand of members of the Class, though the exact number and the identities of the Class members are currently unknown to plaintiffs. The members of the Class are so numerous that joinder of all Class members is impracticable.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are whether:

(a)     Whether Sony adequately disclosed the nature and purpose of its rootkit program on its CDs;

(b)     Whether Sony made representations that the Sony music CDs had characteristics, uses, benefits or qualities which it did not have;

(c)     Whether Defendants made false and/or misleading statements of fact to the Class and the public concerning the content of the music CDs;

(d)     Whether Defendants knew, or was reckless in not knowing, that its rootkit program would detrimentally affect the computers of users who installed its CDs on their computers;

(e)     Whether Defendants engaged in deceptive and unfair trade practices;

(f)     Whether Sony engaged in false advertising;

(g)    Whether Defendants engaged in an unlawful conspiracy to hide the true nature of the software encoded on Sony music CDs from the general public;

(h)    Whether the members of the Class have sustained damages, and if so what is the proper measure of damages;

(i)    Whether Sony is liable for punitive damages, and if so, in what amount; and

(j)    whether the Class is entitled to injunctive relief.

20.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained monetary damages arising out of defendant's violations of common and statutory law as alleged herein.

21.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Plaintiffs intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

22.    The class action is superior to other available means for the fair and efficient adjudication of the claims of plaintiff and the Class. The damages suffered by each individual Class member are of such magnitude that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by defendant's conduct. Furthermore, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential

for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by defendant's conduct. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## SUBSTANTIVE ALLEGATIONS

<u>F4i and Sony Create a Customized Version of the XCP Software</u>

23.     In March 2003, F4i introduced its XCP software.

24.     According to F4I, XCP stands for "extended copy protection" and was an end-to-end solution to protect the rights of record labels and artists against the unauthorized copying of CD content."

25.     Sometime thereafter F4i and Sony entered into an agreement under which F4i would produce a customized version of its XCP software for Sony's use on its compact discs ("CDs") worldwide. Sony was the first major record label to agree to use the XCP software.

<u>Sony Began Encoding Titles In Early 2005 With Spyware</u>

26.     In March 2005, Sony began encoding numerous music titles that it sold worldwide with the XCP software. CDs containing XCP software are referred to herein as "Encoded CDs".

27.     While Sony publicly touted this development as a "speed bump" for consumers seeking to illegally share its music, in reality it was something far more

sinister. For reasons not yet disclosed, Sony and F4i crafted an anti-burning scheme that would make permanent and irreversible alterations to the core windows operating system which could be later utilized by hackers or Sony to take control of the users' computer without the users' knowledge.

28.     According to Computer Associates, the Encoded CDs are "spyware" meaning that the software is a "trojan that opens securities vulnerabilities through rootkit functionality".

29.     The moment someone attempts to play a CD on their Windows-based machine, the malicious software installs itself without the users' knowledge. This occurs even if the CD was simply copied to the computer for the users own personal use or for use on an MP3 player. Since most users have "autorun" feature enabled on their PC, once a CD is inserted and the disc tray is closed the disc plays and the software installs without requiring any further action by the user.

30.     No disclosure of the root kit or the risk the user is exposed to is included in the end user license agreement ("EULA") included with the Sony CD's. In addition, once the software is installed Sony is able to compile a record of the music listening habits of the user and have that information uploaded to a location of Sony's choosing. All this is done without the users consent or knowledge.

31.     To date, over 3 million copies of Encoded CDs have been sold.

32.     It is probable that millions of consumers have played these discs on their PC's and installed the XCP software without any knowledge of the installation or its effect.

33.   By November 2005, several viruses have been reported that exploit the weakness created by the playing of Encoded CDs. Millions of users are at risk from these viruses that destroy software and steal personal information.

34.   In selling and distributing Encoded CDs, Sony and F4i have decided that their intellectual property is more deserving of protection than the intellectual property and personal information on millions of personal computers worldwide.

Plaintiffs Purchased Their Titles Unaware Of The XCP Encoding

35.   Unaware that the CD was installing an administrative level program on each system on which the CD was installed, thousands of computer users have unknowingly infected their computers, and the computers of others, with the surreptitious rootkit contained on the Encoded CDs.   This rootkit has been responsible for conflicts within computer systems, crashes of systems, infection of viruses and other damage.

36.   Plaintiff Michaelson purchased the Neil Diamond CD, *12 Songs*, encoded with XCP and the root kit in question.  Plaintiff Michaleson played the CD on his computer which resulted in the installation of a root kit on his system. Plaintiff Michaleson had not consented to the installation of the root kit, or for that matter any software that may have been bundled on the purchased CD.  Plaintiff Michelson's computer is connected to the internet and is used in interstate communication.

37.   Plaintiff Edelstein is a resident of New Jersey.  Plaintiff Edelstein purchased a disk by Switchfoot encoded with XCP and the root kit in question.

After Mr. Edelstein purchased the disk but before he played it on his computer he learned that certain Sony CDs, including the Switchfoot disk *Nothing is Sound* by Sparrow records, could compromise a computer by playing.   Thus, Plaintiff Edelstein has not played the CD on his computer even though that was the purpose for which Mr. Edelstein bought the CD. Since Mr. Edelstein has opened the CD, the store from which he purchased the CD will not give him a refund.

38.   Class members have been damaged through the unauthorized installation of software that has slowed computer function, compromised personal information and/or made  allowed their computers to be infected with damaging viruses. Some class members are completely unable to use their computers others have diminished use.  In other cases, class members purchased CDs to install on their computers but once they learned of the nature of the Encoded CDs determined that such a use would be reckless.  Many of these users have been unable to return the purchased CDs and are stuck with a CD that, for all practical purposes, can not be used on a PC.

Defendants' Have Covered Up The Problem And Exposed Their Customers To Serious Risks

39.   Sony and F4i have taken concerted action to cover up their actions under the guise of trying to fix the problem. Sony and F4i have repeatedly made changes to their EULA and FAQ sections of their websites, seeming to disclose whatever information had thus far become public, but no more. They have worked together to make posts on certain websites that downplay the risks and thus increase the vulnerability of consumers.

40.    Sony refuses to disclose which titles it sold that were encoded with the XCP technology.

41.    Under mounting pressure, Sony and F4i have made a corrective patch available that is not corrective at all. The only way for a consumer to get the patch is via internet and requires everyone who wishes to receive the uninstaller to do so through Sony BMG's official process, which involves releasing personally identifiable information for marketing use by Sony BMG and undisclosed third parties. The patch that they have made available does not uninstall the software but simply uncloaks the software and updates Sony's protections. It does nothing to disable the part of the software that compiles a record of user listening habits for Sony.

42.    The plans Sony and F4i may have for future usage of this sinister technology in the game or video sector is currently unknown. The 4Fi Managing Director was upbeat about the market potential of XCP and was quoted as saying, "Right now we're focusing on the music sector, where there's a real burning desire for this technology, excuse the pun! But there are other types of data that need to be protected, and our technology can be applied to video, for example, and to games. We've got lots of plans for the future. So it's all exciting times really."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Federal Computer Fraud Law

43.   Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 42 as if fully set forth herein.

44.   By selling and otherwise delivering the Encoded CDs to members of the Class, Defendant Sony knowingly caused the transmission of a program, code or command.

45.   The Encoded CDs were intended by Sony to install software that would cause damage and such software also directed communication back to Sony certain information from the customers' computer.   Such communication is an interstate communication as that term is defined under 18 U.S.C. § 1080.

46.   The computers of the members of the class are "protected computers" as that term is defined 18 U.S.C. § 1030.

47.   The damage to the members of the class is, in the aggregate, greater than $5,000.   In addition, Sony's act of producing its master encoded tape from which all Encoded CDs were made was a single act that proximately resulted in damages greater than $5,000.

48.   Defendant F4i did conspire with and act in concert with Defendant Sony to transmit the program, code or commands that comprise the XCP software and is liable as a result thereof..

## SECOND CAUSE OF ACTION
### Common Law Trespass

49.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through _42 as though fully set forth herein.

50.    Defendant Sony sold discs to customers embedded with XCP.

51.    Such discs installed a root kit and certain other software on the customers' computers that impacted the functionality of the computer operating system automatically upon playing on the computer.

52.    The XCP programs increased the risk that the computer would be infected with a virus. It also decreased the speed and stability of the computer. In addition, the software permitting the tracking of user listening habits by Sony.

53.    The acts by Defendant Sony were intentional and done without authorization.

54.    The actions of Defendant Sony interfered with plaintiffs' possessory interest in the computer systems.

55.    The actions of Defendant Sony proximately resulted in damage to plaintiffs and the class.

56.    Defendant F4i did conspire with and act in concert with Defendant Sony to interfere with plaintiffs' possessory interest in the computer systems and is liable as a result thereof.

## THIRD CAUSE OF ACTION
### Common Law Fraud

57.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 42 as though fully set forth herein.

58.    Defendants made false statements and omissions to the members of the Class regarding the XCP software and intended the Class to rely on such statements.

59.    Defendants knew such statements were false.

60.    Plaintiffs and the members of the Class relied on Defendants statements and, as a result were damaged.

### PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs, on behalf of themselves and members of the Class, pray for judgment and relief as follows:

1.    With respect to the class claims, declaring the action to be a proper class action and designating Plaintiffs and their counsel as representatives thereof;

2.    Awarding injunctive and equitable relief, including restitution, in an amount to be determined at trial including, inter alia: (a) prohibiting defendant from engaging in the acts of unfair competition; (b) requiring defendant to disgorge all of its ill-gotten gains to Plaintiff and members of the Class or to whomever the Court deems appropriate; (c) awarding Plaintiff and members of the Class full restitution of all monies wrongfully acquired by defendant by means of the wrongful conduct alleged herein; and (d) ordering such funds or assets to be impounded, or a

trust imposed, to avoid dissipation, fraudulent transfers, and/or concealment of such monies or assets by defendant;

     3.    Awarding damages in an amount to be determined at trial;

     4.    Awarding Plaintiffs reasonable attorney's fees and costs;

     5.    Awarding pre- and post-judgment interest; and

     6.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:   November 14, 2005
          New York, New York

                          Respectfully submitted,

                          By
                             Scott A. Kamber (SK-5794)
                          KAMBER & ASSOCIATES, LLC
                          19 Fulton Street, Suite 400
                          New York, NY 10038
                          Tel: (212) 571-2000
                          Fax: (212) 202-6364



8

1  DOUGLAS A. LINDE, State Bar No. 217584 (dal@lindelaw.net)   (SPACE BELOW FOR FILING STAMP ONLY)
2  ERICA L. ALLEN, State Bar. No. 234922 (ela@lindelaw.net)
   The Linde Law Firm
3  2029 Century Park East, #1360
   Los Angeles, CA 90067
4  (310) 203-9555
   (310) 652-9555 FAX
5
   Attorneys for Plaintiff
6
7
8                       UNITED STATES DISTRICT COURT
9                      CENTRAL DISTRICT OF CALIFORNIA
10
11                                    CV 05-08472-JFW(AJWx
12  JEFFREY T. PONTING, DANIEL D. LINDE, )   CASE NO.
    on behalf of themselves and all others )
13  similarly situated.                   )   **CLASS ACTION COMPLAINT FOR**
                                          )   **DAMAGES**
14                            Plaintiff,  )
                                          )   **1. Federal Computer Fraud And Abuse**
15            vs.                         )   **Act**
                                          )   **2. California Business and Professions**
16  SONYBMG MUSIC ENTERTAINMENT,          )   **Code 22947.3**
    LLC,  FIRST4INTERNET, LTD, and DOES 1 )   **3. Invasion of Privacy**
17  through 20.                           )   **4. California Business and Professions**
                                          )   **Code Section 17200**
18                            Defendants. )   **5. Negligent Misrepresentation**
                                          )   **6. Fraud**
19  _____
                                              JURY TRIAL DEMANDED
20
21
22
23        Plaintiffs, by and through their attorneys, bring this action on behalf of themselves and all others
24  similarly situated, and allege against Defendants as follows:
25
26                           **SUMMARY OF CASE**
27  1.  This is a large scale corporate fraud/invasion of privacy case effecting untold consumers
28  nationwide.  Defendant Sony BMG Music Entertainment, LLC sold CDs containing software,

Complaint.wpd

developed by Defendant First 4 Internet, Ltd. (Hereinafter "F4I") called XCP, or extended copy protection, software, which purported to be an end-to-end solution to protect the rights of record labels and artists against the unauthorized copying of CD content. In reality, the software was spyware, which secretly implanted a computer program on the user's computer sending personal information back to Defendant Sony.

## JURISDICTION AND VENUE

2. This Court has Original Jurisdiction over this case pursuant to 28 U.S.C. § 1331, and 28 USC § 1332, as members of Plaintiffs class are citizens of different states as some Defendant(s) and the amount in controversy exceeds $5 million. In addition, Plaintiffs invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, over state law claims asserted herein.

3. Venue in this judicial district is proper under 28 U.S.C. § 1391(c) and 1400(a) in that this is the judicial district in which a substantial part of the acts and omissions giving rise to the claims occurred.

## PARTIES

4. At all times mentioned herein, Plaintiff Jeffrey T. Ponting was, and still is, a citizen of California, residing in the County of Los Angeles.

5. At all times mentioned herein, Plaintiff Daniel D. Linde was, and still is, a citizen of California, residing in the County of Los Angeles.

6. At all times mentioned herein, Defendant Sony BMG Music Entertainment, LLP ("Sony"), is and was, a General Partnership existing under the laws of Delaware, with its principal place of business in New York.

Complaint.wpd

7. At all times mentioned herein, Defendant F4I, is and was corporation organized and existing under the laws of the United Kingdom, with its principal place of business in Oxfordshire, United Kingdom.

8. The true names and capacities of any defendants designated herein as DOES 1 through 20, inclusive, whether an individual, a business, a public entity, or otherwise, are presently unknown to plaintiff, who therefore sues said defendants by such fictitious names, pursuant to Code of Civil Procedure Section 474. Plaintiffs are informed and believe and on such information and belief allege that each Doe defendant is responsible in some manner for the events alleged herein, and plaintiffs will amend the complaint to state the true names and capacities of said defendants when the same have been ascertained.

9. Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the Defendants sued herein, including DOES 1 through 20, were the agent and employee of each of the remaining Defendants and were at all times acting in concert within the course and scope of such agency and employment with the full knowledge, consent, authority, ratification and/or permission of each of the remaining defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

10. Defendants market, distribute and sell audio compact discs ("CDs") throughout the United States. As part of recent CD releases, Defendants have included on these CDs their own proprietary media player designed to play audio tracks on a personal computer. These audio CDs utilize XCP Technology which Defendants represent is designed to "protect the audio files contained on the CD." Audio CDs distributed by Defendants that utilize XCP are marked "Content Protected" on the spine of the CD packages, however the Defendants make no disclosure on the packaging that anything will be installed on the user's computer. Once a user places a copy-protected CD in their computer for play, the CD creates and installs (I) its XCP technology,

-3-

Complaint.wpd

1  and (ii) a program which conceals the SCP files and the folder in which they are installed from the

2  user.

3

4  11.  Defendants do not disclose the fact that their technology include this spyware and cloaking

5  component to consumers and/or users.  In fact, on its website, located at http://cp.sonybmg.com,

6  Defendant Sony specifically represented to users that the software is not spyware, through a

7  Frequently Asked Questions section stating the following:

8

9      "I have heard that the protection software is really malware/spyware.  Could this be true?

10     Of course not.  The protection simply acts to prevent unlimited copying and ripping from
       discs featuring the protection solution.  It is otherwise inactive.  The software does not
11     collect any personal information nor is it designed to be intrusive to your computer system. "

12

13  12.  These representations were not true and Sony knew it.  They were made for the purpose of

14  inducing reliance among consumers and users and therefore boosting sales of this product.

15

16                                    **CLASS ALLEGATIONS**

17

18  13.  Plaintiffs bring this action individually on and on behalf of all individuals who (1) purchased

19  any CD manufactured and/or sold by BMG containing XCP Technology, (2) played any CD

20  manufactured and/or sold by BMG containing XCP Technology on their computer, and (3) both

21  purchased and played on their computer any CD manufactured and/or sold by BMG containing

22  XCP Technology.

23

24  14.  This action is properly maintained as a class action pursuant to Rule 23 of the Federal Rules of

25  Civil Procedure.  The members of the above class are currentrlty unknown, but are so numerous

26  that joinder of all Class members is impracticable.

27

28  15.  Common questions of law and fact include, but are not limited to:

a. Whether Defendants knew of the information gathering purpose of their product.

b. Whether Defendants adequately disclosed to consumers and/or users the information gathering purpose of their product.

c. Whether Defendants fraudulently concealed the information gathering purpose of their product.

d. Whether Defendants engaged in deceptive and unfair trade practices.

e. Whether Defendants engaged in false advertising

f. Whether Defendants invaded the privacy of purchasers and/or users of their product.

g. Whether members of the Class have sustained damages, and if so, in what amount.

h. Whether Defendants are liable for punitive damages, and if so, in what amount.

16. Plaintiffs claims are typical of all members of the class.  Whereas the Class includes any person who either purchased OR used the CDs in question, both named Plaintiffs purchased AND used the CDs in questions.

17. Plaintiffs are adequate representatives of the Class as their interests do not conflict with the interests of the Class members they seek to represent.  Plaintiffs have retained competent counsel and intend to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

18. The Class Action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class.  The damages suffered by each individual Class member are of such magnitude that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.  Furthermore, it would be virtually impossible for the members of the class individually to redress effectively the wrongs done to them.  In short, even of the members of the Class themselves could afford such individual litigation, the court system could not.

-5-

Complaint.wpd

1

2                           **FIRST CAUSE OF ACTION**

3                  **Violation of Federal Computer Fraud And Abuse Act**

4                               **18 U.S.C. § 1030**

5                       **(By all Plaintiffs Against All Defendants)**

6

7    19.  Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained

8    in the complaint.

9

10   20.  By engaging in the conduct described above, Defendants intentionally accessed a computer

11   without authorization or exceeded the authorized access, and thereby obtained private, confidential

12   information.

13

14   21.  By engaging in the conduct described above, Defendants knowingly caused the transmission

15   of a program, information, code, or command, and as a result of such conduct, intentionally caused

16   damage without authorization, to a protected computer

17

18   22.  As a result of Defendants conduct, Plaintiffs were harmed in an amount to be determined at

19   trial, but which aggregated at least $5,000 in value.

20

21                           **SECOND CAUSE OF ACTION**

22          **Violation of California Business and Professions Code 22947.3**

23                       **(By all Plaintiffs Against All Defendants)**

24

25   23.  Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained

26   in the complaint.

27

28

Complaint.wpd

1   24.  Defendants and each of them were under a duty not to take control of Plaintiffs' computers,

2   modify computer settings, or prevent Plaintiffs from blocking and/or disabling software.

3

4   25.  Defendants took control of Plaintiffs' computers, modifying computer settings, and prevented

5   Plaintiffs from blocking and/or disabling software.

6

7   26.  As a result of Defendants conduct, Plaintiffs were harmed in an amount to be determined at

8   trial.

9

10                              **THIRD CAUSE OF ACTION**

11                              **INVASION OF PRIVACY**

12                         **(By All Plaintiffs Against All Defendants)**

13

14   27.  Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained

15   in the complaint.

16

17   28.  Plaintiffs had a reasonable expectation of privacy in their computers.

18

19   29.  Defendants intentionally intruded in their privacy interests by installing onto their computers a

20   spyware program which transmitted Plaintiff's personal private information back to Defendants

21   without Plaintiffs' consent.

22

23   30.  Defendants  intrusion would be highly offensive to a reasonable person;

24

25   31.  Plaintiffs were harmed (in an amount to be proven at trial) by Defendant's conduct, which was

26   a substantial factor in bringing about Plaintiffs' harm.

27

28

-7-

Complaint.wpd

**FOURTH CAUSE OF ACTION**

**Violation of California Business and Professions Code Section 17200**

**(By All Plaintiffs Against All Defendants)**

32.  Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained in the complaint.

33.  Plaintiffs bring this cause of action on behalf of themselves, the Class, and in their capacity as private attorney generals.

34.  By engaging in the above described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of California Business and Professions Code section 17200, et.seq.

35.  Defendants acts and practices have and/or are likely to deceive members of the consuming public.

36.  Defendants acts and practices are unlawful because they violate California Civil Code sections 1770(a)(5), 1770(a)(9), and California Business and Professions Code section 22947, et.seq.

37.  Plaintiffs on behalf of themselves and each memember of the Class, seek individual restitution, injunctive relief and other relief as allowed under Section 17200, et.seq.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(By All PLAINTIFFS Against All DEFENDANTS)**

-8-

38. Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained in the Complaint.

39.  Defendants represented to Plaintiffs, and each of them, that the XCP software was not spyware.

40.  Defendants had no reasonable ground for believing these statements to be true. Defendants made these false statements with the intent to induce Plaintiffs to rely upon them.

41.  Plaintiffs, and each of them, were unaware of the falsity of the representation.  Plantiffs, and each of them, acted and justifiably acted in reliance upon the truth of the representation by allowing Defendants, and each of them, to represent them.

42.  The violation alleged above caused severe damage to Plaintiffs in amounts to be proven at the time of trial.

### SIXTH CAUSE OF ACTION

### FRAUD

### (By All PLAINTIFFS Against All DEFENDANTS)

43.  Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained in the Complaint.

44.  Defendants represented to Plaintiffs, and each of them, that the XCP software was not spyware.

-9-

Complaint.wpd

45. These were false representations, as Defendants knew at the time they made those statements that the software was indeed spyware.

46. Defendants made these false statements with the intent to induce Plaintiffs to rely upon them. Plaintiffs, and each of them, were unaware of the falsity of the representation. Plantiffs, and each of them, acted and justifiably acted in reliance upon the truth of the representation by allowing Defendants, and each of them, to represent them.

47. The violation alleged above caused severe damage to Plaintiffs in amounts to be proven at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS pray of judgment against DEFENDANTS as follows:

1. For compensatory damages, including restitution of all mones wrongfully taken from Plaintiffs and compensation for all damages caused to Plaintiffs' computers

2. For general damages for invasion of privacy

3. For disgorgement of all ill-gotten gains to Plaintiffs and the memebers of the Class.

4. For punitive damages as allowed by law;

5. For the legal interest on the judgment.

6. For costs of suit incurred herein, including attorneys fees; and,

7. For such other and further relief as the court deems just and proper.

DATED: December  2  , 2005          THE LINDE LAW FIRM


Douglas A. Linde
Erica L. Allen
Attorneys for Plaintiffs

-10-

1

## DEMAND FOR JURY TRIAL

2

3    PLAINTIFFS hereby demand a jury trial.

4

DATED: December ___2___, 2005          THE LINDE LAW FIRM

5

6

7                                                   _____
                                                    Douglas A. Linde
8                                                   Erica L. Allen
                                                    Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-



**9**

UNITED STATES DISTRICT COURT JUDGE DANIELS
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY POTTER, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>  vs.<br><br>SONY  BMG MUSIC ENTERTAINMENT, a Delaware General Partnership,<br><br>                 Defendant. | Civil Action No.<br><br>**05 CV 9607**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT AND PENDENT STATE LAW CLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Potter ("Plaintiff"), residing at Bouck Hall 195, 107 Schenectady Ave., Cobleskill, NY 12043-1704, by his undersigned attorneys, as and for his class action complaint, alleges upon personal knowledge and belief as to his own acts and upon information and belief as to all other matters, based upon investigation of counsel, as follows:

## NATURE OF ACTION

1.  This is a class action lawsuit brought by Plaintiff on behalf of himself and all persons in the United States who, at any time from January 1, 2005 to the present (the "Class Period"), purchased anti-piracy protected audio CDs manufactured and distributed by Sony BMG Music Entertainment (the "Class"). Claims are asserted under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, the New York Consumer Protection Act, NYGBL §349 *et seq.*, and for common law fraud, negligent misrepresentation, trespass to chattels, and breach of contract.

2.      This case arises out of an attempt by Sony BMG Music Entertainment ("Sony BMG" or "Defendant") to protect its intellectual property from perceived threats of piracy.  In or about January 2005, Defendant began including in new CD releases anti-piracy software developed by a company called First 4 Internet, of Great Britain, UK.  The software is included on every Sony BMG audio CD marked "content enhanced and protected" and is designed to install itself on the computers of every end-user who attempts to play the CD. The ostensible purpose of the software is to monitor the computer's program activity and prevent users from infringing on the claimed copyrights of the audio content.

3.      Whenever an audio CD is played on a computer for the first time, an End User License Agreement ("EULA") automatically appears on the end-user's computer screen requiring the end-user to agree to the installation of "a small proprietary software program" which "will reside on ... [the user's] computer until removed or deleted."  The EULA also states that the software "will not be used at any time to collect any personal information from you, whether stored on your computer or otherwise." However, as alleged in detail below, the EULA fails to disclose the true nature and implications of the software in question.

4.      In particular, the EULA fails to disclose that Defendant's music CDs contain a hidden "rootkit" program disguised as song playing software which surreptitiously installs itself directly into the "root" of users' computer systems. Rootkits commonly are used by hackers and computer virus writers to hide their software's activities from end-users.  A

2

rootkit takes partial control of a computer's operating system at a very deep level in order to hide the presence of files or ongoing processes, and to remain "cloaked" from the user's view.

5.     Computer security experts view rootkits with deep suspicion because they let virus writers who piggyback on the file-cloaking functions to hide malicious software on computers.

6.     Once installed on the end-users' systems, Defendant's rootkit hides itself by cloaking all associated files, labeling certain operational files with misleading names, and assumes a continuous resource-depleting (and copy prevention) monitoring of the system in perpetuity. The rootkit cannot be uninstalled without expert assistance and the aid of Sony BMG technical support, or without downloading and installing additional software programs. Without following these procedures, attempts to uninstall the rootkit result in damage to or destruction of end-users' computer systems.

7.     The threat to a user's computer security is, therefore, very significant and is not disclosed by the EULA.

8.     Indeed, on November 10, 2005, the computer security firm Symantec Corporation announced that it had discovered the first virus that uses Sony BMG's CD copy-protection software to hide on computers and wreak havoc. According to Symantec, the virus, called the Stinx-E trojan virus, tears down firewalls and gives hackers access to PCs, and uses Sony BMG's software in order to hide.

3

9.      In addition, contrary to claims made in the EULA, defendant's rootkit software engages in "phone home" activity -- that is, undisclosed internet communications between the end-user's computer and defendant by means of which it is believed that Sony BMG collects personal information on end-users.

10.      Unaware that the CDs are installing an administrative level program on each system on which the CD is played, plaintiff and the members of the class have unknowingly infected their computers, and the computers of others, with this surreptitious rootkit.

## THE PARTIES

11.      Plaintiff Jeffrey Potter ("Plaintiff") purchased a Sony BMG copy-protected audio CD and was damaged thereby.

12.      Defendant Sony BMG Music Entertainment ("Sony BMG" or "Defendant") is a Delaware General Partnership with its principal place of business located at 460 West 54th Street, New York, New York.  Sony BMG is one of the world's largest recorded music enterprises comprising over 17 record labels and representing a large array of contemporary music artists, both local and international.  Sony BMG's music catalog is among the world's largest and contains some of the most important recordings in history. Sony BMG is owned 50% by Bertelsmann A.G. and 50% by Sony Corporation of America.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to the Class Action Fairness Act

of 2005, 28 U.S.C.A. § 1453, as well as pursuant to the Computer Fraud and Abuse Act, 18

U.S.C. §1030, and 28 U.S.C. §1331.  This Court also has supplemental jurisdiction pursuant

to 28 U.S.C. §1367(a).

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because

Defendant Sony BMG maintains its principal place of business in this District and/or at all

times conducted substantial business in this District.

15.     In connection with the acts, transactions and conduct alleged herein,

Defendants used the means and instrumentalities of interstate commerce, including the

United States' mails and interstate telephone communication.

## CLASS ACTION ALLEGATIONS

16.     Plaintiffs bring this action as a class action, pursuant to Fed R. Civ. P.

23, individually and on behalf of a Class as defined above.  Excluded from the Class are the

Court and its staff, Defendant, any parent, subsidiary or affiliate of Defendant and all officers

and directors and employees who are or have been employed by Defendant during the Class

Period.

17.     The Class is so numerous and geographically dispersed that joinder of

all members is impracticable.  While the exact number and identity of Class members cannot

be ascertained by Plaintiffs at this time, it is believed that it consists of millions of consumers nationwide who purchased Sony BMG anti-piracy protected audio CDs.

18.     The number of potential members of the Class is not precisely determined at the present time, but can be established through notice and discovery. The disposition of the Class' claims in this action will substantially benefit both the parties and the Court. The numerosity requirement of Rule 23(a)(1) is therefore satisfied.

19.     Rule 23(a) and Rule 23(b) are satisfied because there are questions of law and fact common to Plaintiffs and the Class, which common questions predominate over any individual questions affecting only individual members. Among these common questions of law and fact are:

> a.     Whether Defendants participated in and/or committed or are responsible for the conduct complained of;
>
> b.     Whether Defendants' conduct constitutes the violations of law alleged herein;
>
> c.     whether Defendant has engaged and is engaging in the unlawful, deceptive, fraudulent, and/or misleading conduct alleged herein;
>
> d.     whether Defendant has engaged in conduct in violation of 18 U.S.C. §1030;
>
> e.     whether Defendant has engaged in conduct in violation of New York General Business Law §349 *et seq.*;

6

f.   whether injunctive relief is appropriate and, if so, what form of injunctive relief is most appropriate;

g.   whether plaintiff and the members of the class have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damages;

h.   Whether the laws of the State of New York, and to the extent applicable, substantially similar laws of other states, were violated by Defendant, by engaging in the wrongful and deceptive practices alleged herein;

i.   Whether Defendants' conduct was willful and/or intentional;

j.   Whether Plaintiff and members of the Class have sustained and/or are entitled to damages and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

k.   Whether Plaintiff and the Class are entitled to declaratory, injunctive, and/or other equitable relief.

20.   In satisfaction of Rule 23(a)(3), Plaintiff's claims are typical of the Class members' claims and do not conflict with the interests of any other members of the Class in that Plaintiffs and the Class have all suffered from the same wrongful acts of the Defendant, namely, having purchased a Sony BMG audio CD containing the rootkit software which has

infected his computer. Plaintiff asserts claims that are typical of the claims of the entire Class, all Class members have been subjected to this same wrongful conduct, and the relief Plaintiff seeks is common to the Class.

21.    In satisfaction of Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the other Class members and has no interests that are antagonistic to or which irreconcilably conflict with those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent him and the Class.

22.    A class action is the superior method for the fair and efficient adjudication of this controversy, since joinder of all Class members is impracticable. Plaintiffs are not aware of any potential difficulties in the management of this action as a class action.   Furthermore, the expense and burden of individual litigation make it prohibitively expensive for Class members to individually redress the wrongs done to them. Thus, because of the nature of the individual Class members' claims in this litigation, few, if any, could otherwise afford to seek legal redress against Defendant for the wrongs complained of herein, and a representative class action is therefore both the appropriate vehicle by which to adjudicate these claims and is essential to the interests of justice.

23.    Absent a representative class action, the potential resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications which might as a practical

8

matter be dispositive of the interests of the other Class members who are not parties to the adjudications, may substantially impede their ability to protect their interests and/or which would establish incompatible standards of conduct for defendants, making certification appropriate under Fed. R. Civ. P. 23(b)(1).

24.    Pursuant to Fed. R. Civ. P. 23(b)(2), Defendant has acted and/or refused to act on grounds generally applicable to Plaintiff and the Class, thereby rendering Class certification and injunctive and/or declaratory relief with respect to the Class as a whole pursuant to this sub-section appropriate as well.

25.    A class action regarding the issues in this case creates no problems of manageability.  In particular, notice of pendency of this action can be given in a variety of ways, including publication through the Internet and other media.  In addition, in that it is evident that defendant Sony BMG has surreptitiously communicated with end-users' computers by means of the "phone home" function of its rootkit software, it should be feasible to identify the members of the class and provide them with notice of pendency.

## SUBSTANTIVE ALLEGATIONS

26.    This case arises out of an attempt by Sony BMG Music Entertainment ("Sony BMG" or "Defendant") to protect its intellectual property from perceived threats of piracy.  In or about January 2005, Defendant began including in new CD releases anti-piracy software developed by a company called First 4 Internet, of Great Britain, UK. The software is included on every Sony BMG audio CD marked "content enhanced and protected" and is

9

designed to install itself on the computers of every end-user who attempts to play the CD. The ostensible purpose of the software is to monitor the computer's program activity and prevent users from infringing on the claimed copyrights of the audio content. It does this through a process called "sterile burning," which allows consumers to make several copies of purchased CDs for their own purposes but prevents them from making multiple copies of already burned discs or CD-Rs, *i.e.*, from making copies of copies.

27.     Whenever an audio CD is played on a computer for the first time, an End User License Agreement ("EULA") automatically appears on the end-user's computer screen requiring the end-user to agree to the installation of a "a small proprietary software program" which "will reside on ... [the user's] computer until removed or deleted." The EULA also states that the software "will not be used at any time to collect any personal information from you, whether stored on your computer or otherwise." However, the EULA fails to disclose the true nature and implications of the software in question.

28.     In particular, the EULA fails to disclose that the Defendant's music CDs contain a hidden "rootkit" program disguised as song playing software which surreptitiously installs itself directly into the "root" of users' computer systems. Rootkits commonly are used by hackers and computer virus writers to hide their software's activities from end-users. A rootkit takes partial control of a computer's operating system at a very deep level in order to hide the presence of files or ongoing precesses, and to remain "cloaked" from the user's view.

10

29.     Computer security experts view rootkits with deep suspicion because they let virus writers who piggyback on the file-cloaking functions to hide malicious software on computers.

30.     Once installed on end-users' systems, Defendant's rootkit hides itself by cloaking all associated files, labeling certain operational files with misleading names, and assumes a continuous resource-depleting (and copy prevention) monitoring of the system in perpetuity.

31.     The EULA misleadingly states that the software will remain there "until removed or deleted" - - suggesting that end-users can uninstall the program themselves. This is untrue.  Contrary to the EULA, the rootkit cannot be uninstalled without expert assistance and the aid of Sony BMG technical support, and downloading and installing additional software programs.  Without following these procedures, attempts to uninstall the rootkit result in damage to or destruction of end-users' computer systems.  Instances have been reported whereby significant damage to computer operating systems and CD-ROM driver software has been caused by users' attempts to remove Defendant's rootkit.  For example, computer expert and blogger Mark Russovich, who first discovered and reported about the Sony BMG rootkit software on his internet weblog, reported that even if end-users manage to locate the hidden files on their computers, "most users ... will cripple their computer if they attempt the obvious step of deleting the [hidden] files."  Indeed, Russovich's own attempt to remove the offending files "disabled the CD [player]" on his computer.

11

32.     The threat to a user's computer security posed by the rootkit is, therefore, very significant and is not disclosed by the EULA.

33.     Indeed, on November 10, 2005, computer security firm Symantec Corporation announced that it had discovered the first virus that uses Sony BMG's CD copy-protection software to hide on computers and wreak havoc.  According to Symantec, the virus, called the Stinx-E trojan virus, tears down firewalls and gives hackers access to PCs, and uses Sony BMG's software in order to hide.

34.     In addition, contrary to the claims made in the EULA, defendant's rootkit software engages in "phone home" activity -- that is, undisclosed internet communications between the end-user's computer and defendant by means of which it is believed by computer experts that Sony BMG collects personal information on end-users. This "phone home" and personal information collection activity has been specifically denied by Defendant in response to direct inquiries from users.  Therefore, in addition to misleading consumers with the deceptive EULA, it is believed that Sony BMG has engaged in affirmative deception with regard to the content of its anti-piracy software.

35.     In or about November, 2005, First 4 Internet released a downloadable "patch" for the cloaking technology of the rootkit, which makes the software viewable on the user's computer.  However, the patch does not remove the rootkit itself.  Therefore, it fails to alleviate the other injuries associated with the software.

12

36.     The EULA also fails to disclose other demonstrated drawbacks from installing the anti-piracy software. Among them, the incompatibility of audio files copied from the relevant Sony BMG CDs to popular portable MP3 player devices, such as the Apple Ipod. In reality, the software is a very sophisticated form of computer "spyware," which consumes enormous portions of the end-users' computer processing capacity in the ongoing conduct of its anti-piracy monitoring functions, one of which is the regular retrieval and relaying of personal information from end-users' computers to internet servers identified as those of Defendant Sony BMG. Meanwhile, the "rootkit" software remains cloaked and virtually undetectable to but all but the most professionally trained eyes and impervious to removal or uninstallation without causing damage to the host-computer's operating system. Defendant's software also demonstrably increases susceptibility of computers running Windows operating systems to system damage and/or so-called "blue-screen" crashes.

37.     Unaware that the CDs are installing an administrative level program on each system on which the CD is played, Plaintiff and the members of the Class have unknowingly infected their computers, and the computers of others, with this surreptitious rootkit. Therefore, Plaintiff and the members of the Class have been damaged in that they have been charged for flawed audio CDs and have exposed their computers to potentially costly and damaging software.

13

**FIRST CAUSE OF ACTION**
**Violations of the Computer Fraud and Abuse Act, 18 U.S.C. §1030**

38.    Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs as if fully set forth herein.

39.    Pursuant to 18 U.S.C. §1030(e), the computers that have been used by Plaintiff and the members of the Class to play Sony BMG anti-piracy protected audio CDs during the Class Period are "protected computers" in that they are connected to the internet and are used in interstate commerce and in a manner which affects interstate commerce or foreign commerce or communication of the United States.

40.    By virtue of the foregoing, defendant Sony BMG has knowingly caused the transmission of a program, information, code or command and, as a result of such conduct, intentionally caused damage without authorization to the protected computers of Plaintiff and the members of the Class in violation of 18 U.S.C. §1030(a)(5)(A)(i).

41.    In addition, by virtue of the foregoing, defendant Sony BMG intentionally has accessed the protected computers of the plaintiffs and the members of the Class without authorization and/or in excess of authorization and recklessly and/or intentionally caused damage thereby in violation of 18 U.S.C. §1030(a)(5)(A)(ii) & (iii).

42.    On information and belief, defendant Sony BMG's conduct as alleged herein has caused loss or damage to 1 or more persons including Plaintiff and the members of the Class aggregating at least $5,000 in value.

14

43.    Based on the foregoing, Plaintiff and the members of the Class are entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### For Injunctive Relief Pursuant to the
### Computer Fraud and Abuse Act, 18 U.S.C. §1030(g)

44.    Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs as if fully set forth herein.

45.    Defendant's conduct is continuing and will continue to cause damage to the protected computers of Plaintiff and the members of the Class.

46.    By virtue of the foregoing, pursuant to 18 U.S.C. §1030(g), Plaintiff and the members of the Class are entitled to an injunction prohibiting defendants from engaging in the conduct complained of herein; in particular, from distributing anti-piracy protected audio CDs containing the rootkit software; requiring consumers to agree to the installation of it or any other similarly damaging type of software as a condition of playing its audio CDs; and prohibiting defendants from using misleading EULAs or any other type of fraudulent means for obtaining unauthorized access to protected computers.

## THIRD CAUSE OF ACTION
### Violation of the New York Consumer Fraud Act, NYGBL §349

47.    Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs as if fully set forth herein.

15

48.     Defendant Sony BMG's conduct as complained of herein constitutes acts or practices which are fraudulent and deceptive in violation of NYGBL §349.

49.     Defendant Sony BMG's conduct as complained of herein occurred and is occurring in the conduct of a business, trade or commerce or in the furnishing of a service within the meaning of NYGBL §349.

50.     Defendant Sony BMG's conduct as complained of herein is directed at consumers.

51.     Defendant Sony BMG's conduct as complained of herein is misleading in a material respect, as alleged above. In particular, Defendant's EULA describes the anti-piracy software as simply "a small proprietary software program" which "will reside on ... [the user's] computer until removed or deleted." It also states that the software "will not be used at any time to collect any personal information from you, whether stored on your computer or otherwise."  However, as alleged above, these statements contain material misrepresentations and omissions in that the EULA fails to disclose the true nature and implications of the software in question.

52.     By virtue of the foregoing, Plaintiff and the members of the Class have been injured.

53.     Defendant Sony BMG's conduct as complained of herein renders it liable for treble damages for the consequences of such conduct, in which Defendant willfully and knowingly engaged.

## FOURTH CAUSE OF ACTION
### Common Law Fraud

54.    Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs as if fully set forth herein.

55.    Defendant Sony BMG has knowingly and/or recklessly engaged in the deceptive practices, uniform misrepresentations, and material omissions complained of herein in order to induce plaintiff and the members of the class unknowingly to pay for audio CDs that automatically install damaging software on their computers.

56.    Plaintiff and the class had no knowledge of the falsity and/or incompleteness of Sony BMG's misrepresentations when they installed Sony BMG's anti-piracy software. Plaintiff and the class relied upon Sony BMG's deceptive practices, uniform misrepresentations, and omissions to their detriment.

57.    Plaintiff and the members of the class have been damaged as a result of the conduct complained of herein, and the harm or risk of harm is ongoing.

58.    Sony BMG's conduct as complained of herein renders it liable in damages for the consequences of such conduct as well as appropriate injunctive relief enjoining Sony BMG's unlawful conduct.

59.    Sony BMG's conduct in perpetrating the fraud and deceptive practices described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of plaintiff and the class, directed to the general public, thereby warranting the imposition of punitive damages against Sony BMG.

## FIFTH CAUSE OF ACTION
### Negligent Misrepresentation and Omissions

60.    Plaintiff repeats and realleges each of the allegations of foregoing paragraphs as if fully set forth herein.

61.    Defendant Sony BMG had a duty to inform plaintiff and the class truthfully, accurately, and fully about the nature of the Sony BMG anti-piracy software contained on its audio CDs. Sony BMG has negligently engaged in the deceptive practices, uniform misrepresentations, and material omissions complained of herein in order to induce plaintiff and the members of the class unknowingly to purchase Sony BMG audio CDs and to install Sony BMG's antipiracy software.

62.    Plaintiff and the class were ignorant of the falsity of Sony BMG's misrepresentations, misleading statements, and omissions of material fact. Plaintiff and the class were also unaware of the computer problems that Sony BMG's software could cause. Plaintiff and the class relied upon the superior knowledge and expertise of Sony BMG to their detriment.

63.    Plaintiff and the members of the class have been damaged as a result of the conduct complained of herein, and the harm or risk of harm is ongoing.

64.    Sony BMG's conduct complained of herein renders it liable in damages for the consequences of such conduct as well as appropriate injunctive relief enjoining Sony BMG's unlawful conduct.

## SIXTH CAUSE OF ACTION
### Product Liability/Negligence

65.     Plaintiff repeats and realleges each of the allegations of foregoing paragraphs as if fully set forth herein.

66.     Defendant Sony BMG had a duty to its customers who installed Sony BMG's antipiracy software to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing and packaging of Sony BMG audio CDs and associated software.

67.     By virtue of the foregoing, Defendant breached that duty, as a result of which the product performed defectively, as described above, and Sony BMG's customers who installed the product were unaware of its defects.

68.     As a result of defendant's negligence plaintiff and the other class members suffered damages.

## SEVENTH CAUSE OF ACTION
### Breach of Contract

69.     Plaintiff repeats and realleges each of the allegations of foregoing paragraphs as if fully set forth herein.

70.     As alleged above, under the terms of the EULA included in each audio CD, Sony BMG contractually agreed with Plaintiff and each member of the Class to limit the scope of Sony BMG's access to the computers of Plaintiff and the members of the Class. In

particular, Sony BMG agreed to install only "a small proprietary software program" which would "reside on ... [the user's] computer until removed or deleted" and agreed to not utilize such software "to collect any personal information from you, whether stored on your computer or otherwise."

71.   Sony BMG breached the terms of the EULA by exceeding the scope of its contractually authorized access to the computers of plaintiffs and the Class, as alleged above.

72.   On information and belief, Plaintiffs and the members of the Class duly performed each of their obligations under the terms of the EULA.

73.   By virtue of the foregoing, Plaintiffs and the members of the Class suffered damages in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
### Trespass To Personal Property

74.   Plaintiff repeats and realleges each of the allegations of foregoing paragraphs as if fully set forth herein.

75.   Defendant intentionally, and without justification or proper consent, interfered with the use and enjoyment of the personal computers of Plaintiff and the members of the Class.

76.   As a result of the foregoing, Plaintiff and the members of the Class suffered damage to their computers, as alleged above, including significantly degraded

20

computer performance in the form of substantially slower internet access and increased vulnerability to computer viruses and hackers, none of which can be repaired without great expense and further damage to the computer.

77.   As a result of defendant's conduct, Plaintiff and the other class members suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests, on behalf of himself and all other members of the class against defendant Sony BMG, by reason of each of the causes set forth above, an order providing as follows:

A.   Equitable relief enjoining defendants from engaging in the conduct complained of herein; in particular, from distributing anti-piracy protected audio CDs containing the rootkit software; requiring consumers to agree to the installation of it or any other similarly damaging type of software as a condition of playing its audio CDs; prohibiting defendants from using misleading EULAs or any other type of fraudulent means for obtaining unauthorized access to protected computers.

B.   Damages under the New York Consumer Fraud Act including reasonable attorneys' fees, disbursements, and costs of this action pursuant to New York General Business Law §349 *et seq.*;

C.   Damages in an amount to be determined at trial;

D.   Punitive damages in an amount to be determined at trial; and

E.    Such other favorable relief as this Court may deem just, equitable, or

proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:      November 14, 2005

KIRBY McINERNEY & SQUIRE, LLP

By: _____
Ira M. Press (IP5313)
Mark A. Strauss (MS2288)
830 Third Avenue
New York, New York 10022
(212) 317-2000
Fax: (212) 751-2540

Counsel for Plaintiff



10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE JONES

# 05 CV 10190

```
------------------------------ x
TOM  RICCIUTI, YVONNE RICCIUTI, and   :
MARY SCHUMACHER,                      :
                                      :
                        Plaintiffs,   :
                                      :
            vs.                       :
                                      :
SONY BMG MUSIC ENTERTAINMENT,         :
SONY CORPORATION OF AMERICA, and      :
BERTELSMANN, INC.,                    :
                                      :
                        Defendants.   :
------------------------------ x
```

Civil Action No.

**CLASS ACTION COMPLAINT**

Plaintiffs Tom Ricciuti, Yvonne Ricciuti, and Mary Schumacher, by and through their

attorneys, bring this action on behalf of themselves and all others similarly situated, and allege

against Defendants as follows:

### INTRODUCTION

1.      By including a flawed and overreaching computer program in over 20 million music

CDs sold to the general public, Sony BMG created serious security, privacy and consumer protection

problems that damaged Plaintiffs and the members of the class. At issue are two software

technologies – MediaMax and Extended Copy Protection, also known as XCP – which defendant

Sony BMG claims to have placed on the music CDs for the purpose of copyright protection, but

which in truth do much more, including monitoring customer listening of the CDs and installing

undisclosed and in some cases hidden files on users' computers. These computer programs expose

users to malicious attacks by third parties and create a threat to public safety, without appropriate

- 1 -

notice and consent from purchasers. The CDs also condition use of the music on unconscionable licensing terms. These, plus other problems caused by Sony BMG's use of this software on its CDs, violate federal and New York law and public policy. After public revelations about security risks associated with the XCP software, including warnings issued by the United States Government, and demands made to address the problems by the Electronic Frontier Foundation and its co-counsel, defendant Sony BMG began to take steps to respond to the security risks created by the XCP technology. It failed, however, to address security concerns raised by the MediaMax software or the consumer privacy and consumer fairness problems created by both technologies, or to provide adequate notice to the consuming public of the XCP issues and the remedies for those problems.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1332.

3. Venue is proper in this District under 28 U.S.C. §1391(b), because Defendant Sony Corporation of America has its principal place of business in this District, Defendant Sony BMG Music Entertainment has its principal place of business in this District, and Defendant Bertelsmann, Inc. has its principal place of business in this District.

## PARTIES

4. At all times mentioned herein, Plaintiff Tom Ricciuti was and still is an individual and resident of New York, New York.

5. At all times mentioned herein, Plaintiff Yvonne Ricciuti was and still is an individual and resident of New York, New York.

6. At all times mentioned herein, Plaintiff Mary Schumacher was and still is an individual and resident of Port Orange, Florida.

7.     At all times mentioned herein, Defendant Sony BMG Music Entertainment ("Sony BMG"), is and at all relevant times was, a Delaware General Partnership, with its principal place of business in New York, New York.

8.     Defendant Sony Corporation of America ("Sony Corp.") is the U.S. subsidiary of Sony Corporation, a multinational corporation based in Japan.  At all times mentioned herein, Defendant Sony Corporation of America, is and at all relevant times was, a New York corporation, with its principal place of business in New York, New York.

9.     Defendant Bertelsmann, Inc. ("Bertelsmann, Inc.") is the U.S. subsidiary of Bertelsmann AG, a multinational corporation based in Germany.  At all times mentioned herein, Defendant Bertelsmann, Inc., is a Delaware Corporation with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

10.     In August 2004, Sony Corp. merged its Sony Music Entertainment, Inc. with Bertelsmann AG's BMG to create a joint venture, Sony BMG.  Sony Corporation of America and Bertelsmann AG are the parent companies, respectively, of Sony Music Entertainment and BMG.

11.     Sony BMG is the world's second largest music company.  Its labels include Arista Records, Columbia Records, Epic Records, J Records, Jive Records, LaFace Records, Legacy Recordings, Provident Music Group, RCA Records, RCA Victor Group, RLG – Nashville, SONY BMG Masterworks, Sony Music Nashville, Sony Urban Music, Sony Wonder, So So Def Records, and Verity Records.  Sony BMG manufactures, distributes, markets, and sells audio compact discs ("CDs").

12.     In 2003, Sony BMG began to distribute to the public CDs that contain software that Sony BMG refers to as Digital Rights Management ("DRM").  This DRM software on Sony BMG CDs includes MediaMax software created by SunnComm ("MediaMax CDs") and Extended Copy

Protection ("XCP") software created by First4Internet ("XCP CDs").  On information and belief, Sony BMG intended that most of its CDs sold in the United States would incorporate one of these technologies.

13.     Sony BMG is the first company to commercially deploy XCP.  Sony BMG has been using versions of XCP since 2002 on prerelease CDs sent to radio stations and internal employees.

14.     Sony BMG and BMG have been using versions of MediaMax on some CDs since at least 2003.  Sony BMG currently uses MediaMax 5 on its recently issued MediaMax CDs.

15.     Since March 2005, Sony BMG has distributed at least 52 music titles with XCP software.  Sony BMG has shipped at least 4.7 million CD's containing the XCP software, of which around 2 million were sold to consumers.

16.     Sony BMG also distributed many more music titles with MediaMax software – including a number one hit CD last year by Velvet Revolver, entitled Contraband.  Sony BMG distributed approximately 20 million CDs with MediaMax software.

17.     In a November 11, 2005, MSNBC.com article, by Bob Sullivan, SunnComm CEO Peter Jacobs was quoted as stating that MediaMax is "now on about 20 million Sony BMG music discs."

### THE SUNNCOMM SOFTWARE IS UNDISCLOSED SPYWARE AND COMPROMISES SECURITY

18.     The Anti-Spyware Coalition ("ASC") describes spyware as technologies deployed without appropriate user consent and/or implemented in ways that impair user control over: (1) material changes that affect a user's experience, privacy, or system security; (2) use of the user's system resources, including what programs are installed on the user's computer; and/or (3) collection, use, and distribution of a user's personal or other sensitive information.  Computer Associates defines spyware as, "Any product that employs a user's Internet connection in the

background without their knowledge, and gathers/transmits info on the user or their behavior." As discussed below, the MediaMax software used by Sony BMG on many of its CDs meets the ASC's definition of spyware.

19.     The software on a Sony BMG MediaMax CD is designed to operate only on Windows-based computers that run Windows 98SE/ME/NT/2000/XP. MediaMax requires that the user have administrator privileges on the Windows operating system in order to listen to the CD.

20.     MediaMax installs without meaningful consent or notification. When a MediaMax CD is inserted into a computer running Windows, an installer program already starts and MediaMax installs, prior to the appearance of the End User License Agreement ("EULA"), approximately eighteen files that consume approximately 15 MB on the computer's hard drive. These files remain permanently installed even if the user declines the EULA presented later. One of them, a kernel-level driver with the cryptic name "sbcphid," is loaded into the memory and ready to run at all times, even when there is no disc in the CD drive and no music is being played. A "kernel" is the core of a computer operating system, which controls and secures access to the computer's basic operations.

21.     This kernel-level driver is the heart of the MediaMax copy protection system. When it is running, it attempts to block CD ripping and copying applications from reading the audio tracks on MediaMax CDs. The software refrains from making one final change until after users accept the EULA – it does not set the driver to automatically run again every time Windows starts. Even if the EULA is declined, the code remains on the hard disk indefinitely. Further, even if the EULA is declined, the code keeps running on the computer until the computer is shut down and restarted, which rarely occurs on many computers. In addition, when a subsequent CD with MediaMax is installed in the computer, the inactive software will reactivate, even if the EULA for the subsequent CD is declined.

22.    Only after these files are installed and at least one has launched does the software display a EULA, which the user may accept or decline, making it a contract of adhesion.

23.    The MediaMax CDs' EULA states: "As soon as you have agreed to be bound by the terms and conditions of the EULA, this CD will automatically install a small proprietary software program (the "SOFTWARE") onto YOUR COMPUTER. The SOFTWARE is intended to protect the audio files embodied on the CD, and it may also facilitate your use of the DIGITAL CONTENT. Once installed, the SOFTWARE will reside on YOUR COMPUTER until removed or deleted." This statement is not true, as alleged above. Attached hereto as Exhibit A and incorporated herein by reference is a true and correct copy of the MediaMax EULA.

24.    Sony BMG's MediaMax EULA states that, "[T]he SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise."

25.    If purchasers seek more information about the software that has been installed on their computer, they are directed to the SunnComm Sony BMG customer care website, which falsely tells users that "No information is ever collected about you or your computer without you consenting" and also states: "Is any personal information collected from my computer during the digital key delivery process? No, during the digital key delivery process, no information is ever collected about you or your computer."

26.    In addition to the SunnComm Sony BMG customer care website, purchasers are also directed to the "Readme.html". The "Readme.html" file is located on the MediaMax CD. The Readme.html file falsely tells users that, "AT NO TIME DURING THESE PROCESSES WILL DATA BE COLLECTED ABOUT YOU OR YOUR COMPUTER." (emphasis in the original).

27.     Despite the representations to the contrary in the EULA and the SunnComm website, and without notification or consent of the user, the MediaMax software "phones home" to Sony BMG and/or SunnComm every time a user plays a protected CD. The software causes the computer to connect to a Sony BMG and/or SunnComm server via the internet. The MediaMax software conveys a unique code that identifies the album to which the user is listening. The request also contains standard HTTP headers which determine the operating system the computer is running and what version of Internet Explorer web browser the user has.

28.     Prior versions of the MediaMax software still used on some Sony BMG CDs contact Sony BMG and/or SunnComm to obtain "digital keys" that permitted the CDs to be copied.

29.     The SunnComm Sony BMG customer care website does not have a visible privacy policy.

30.     The Media Max software connects to an online service at http://license.sunncomm2.com/, which does not have a visible privacy policy.

31.     The MediaMax software opens a web page from a Sony BMG and/or SunnComm server and sends a 32-character identifier through an HTTP request. On information and belief, this is a unique code that tells Sony BMG and/or SunnComm to which album the user is listening. The request also contains standard HTTP headers that can be used to determine the user's operating system.

32.     The server to which the MediaMax software connects returns an HTTP response to the MediaMax software. According to SunnComm's public statements, this response is intended to facilitate the placement of dynamic, interactive advertisements that can be changed at any time by Sony BMG and/or SunnComm.

33.   · The MediaMax software also transmits the computer's Internet Protocol or "IP" address to servers controlled by Sony BMG or its agents, without receiving permission from the computer user.  No two IP addresses are alike and IP addresses provide the means to determine information about the person who used the particular IP address.  Users are assigned an IP address by their Internet service provider or system administrator.  Many users are issued frequently changing "dynamic" IP addresses that make it difficult to track them individually, but others have fixed, "static" addresses that can permit Sony BMG to ascertain their identities and associate listening habits with particular individuals across many different CDs containing the SunnComm software.

34. ·  The MediaMax software contains a program referred to as "Perfect Placement."  In a July 13, 2005, press release, SunnComm states that Perfect Placement provides "unparalleled targeted marketing opportunities . . . .  This unique feature centrally serves up dynamic promotional content controlled by the record label to reserved spaces located throughout the MediaMax interface while a user is enjoying their CD on the computer."  The press release further states: "Imagine an artist's album is coming out and the record company has the ability to announce this event to all those playing the artist's previously released album in their computer."

35.   ·  The SunnComm MediaMax support website (http://tickets.sunncomm.com/selfhelp/), also misleadingly states, "Please note that MediaMax was designed to manage and safeguard the copyrights of specified artists' CDs while giving you an enhanced visual and listening experience.  It does not interfere with or impact any of the normal operations and/or functions of your computer." (Emphasis in the original.)  As described above, this statement is false.

36.   Sony BMG fails to disclose, prior to purchase, that users running the MediaMax CDs on Windows-based computers could have files downloaded and stored on their computers without

their consent, and fails to disclose that the software would transmit information about user, including monitoring whenever users listen to the CDs, without notification to or consent of the users.

## SUNNCOMM'S MEDIAMAX'S FIRST UNINSTALLER CREATED A GREATER SECURITY RISK AND VIOLATED USER'S PRIVACY

37.     Upon request, SunnComm will provide an internet-based uninstaller for the MediaMax software.  Until approximately November 21, 2005, SunnComm provided this uninstaller only after repeated requests that require the disclosure of personally identifying information.

38.     The uninstaller provided by SunnComm until November 21, 2005, suffered from a design flaw.  When a user visited the SunnComm uninstaller web page, the user was prompted to accept a small software component – an ActiveX control called "AxWebRemoveCtrl" created by SunnComm.

39.     This ActiveX control was designed so that any web page can ask it to download and execute code from an arbitrary website location or URL.

40.     If a user visits a malicious website, the site can use the flawed ActiveX control to download, install, and run malicious or dangerous software code on the user's computer without the user's knowledge or consent.  Such code could severely damage a user's computer, including but not limited to erasing a user's hard disk.

41.     The uninstaller available until November 21, 2005, failed to remove the vulnerable ActiveX control from the user's computer following completion of the uninstallation process.

42.     On or about November 21, 2005, SunnComm issued a patch to address the security flaw in the prior uninstallation.

43.     On or about November 21, 2005, the SunnComm Sony BMG customer care website provided a link to a web page that allows a user to access an internet-based uninstaller.  The uninstaller uses an ActiveX control.

- 9 -

44.     Sony BMG fails to disclose the security risks created by the MediaMax software and the potential harm to a user's computer.

### THE XCP SOFTWARE IS UNDISCLOSED SPYWARE
### AND COMPROMISES SECURITY

45.     Sony BMG's actions and omissions with respect to the MediaMax software are part of a pattern of corporate failure to investigate, address, and disclose the security and privacy risks associated with its inclusion of so-called DRM software on music CDs.

46.     Similar and, in some respects, more serious risks have been identified in CDs loaded with another Sony BMG technology, Extended Copy Protection, or XCP.  As with the MediaMax software independent researchers and consumer advocates disclosed these risks, not Sony BMG.

47.     The software on a Sony BMG XCP CD is designed to operate only on Windows-based computers that run Windows 98SE/NT/2000/XP.

48.     When a computer user places the Sony BMG XCP CD in a Windows based computer, the software is designed such that the user is first required to agree to a EULA. According to the EULA, a user cannot utilize the audio files or the digital content of the CD on the computer unless the user agrees to the EULA, making it a contract of adhesion.  Attached hereto as Exhibit B and incorporated herein by reference is a true and correct copy of the XCP EULA.

49.     The user is told that the XCP software automatically installs player software into the user's computer that will allow the user to play, save and copy the audio files on the CD.

50.     According to the EULA, the software automatically installed by the XCP CD is intended to protect the "digital content" embodied on the XCP CD.  Digital content appears to include audio files converted into digital music files as well as unspecified other "already existing digital content."

51.·    While the user is led to believe that Sony BMG's XCP software is installing the player software into the user's computer, it is actually installing software as a "rootkit" into the user's hard drive. The Sony BMG XCP software also installs a CD drive filter driver that intercepts calls to the computer's CD drive.

52.    A rootkit is used to hide login, processes, files, and logs and may include software to intercept data from terminals, network connections, CD drives, and keyboards. A rootkit is invisible to the operating system and antivirus and security software, and is frequently used by unauthorized third-parties, after gaining access to a computer system, to hide their activities.

53.    Specifically, the Sony BMG rootkit is a system filter driver which intercepts all calls for process, directory or registry listings, and then modifies what information is visible to the operating system in order to hide every file, process, or registry key beginning with the characters "$sys$."

54.    Unbeknownst to users, once the rootkit is installed by the software on a Sony BMG CD, the rootkit degrades the performance of the user's computer.

55.    In a November 1, 2005, eweek.com article by Paul Roberts, computer security analyst Mark Russinovich states that the rootkit files interact with the Windows operating system at a very low level and fail to account for certain conditions that could cause the files to overwrite areas of memory, crashing applications that use that memory, or even crashing the entire Windows operating system. On information and belief, this article correctly illustrates some of the damage the rootkit could do.

56.    The rootkit causes significant and cumulative injury to a user's computer. Specifically, the rootkit can interfere with the computer's CD drive, file copying software, and media players. The rootkit also uses up system memory that would otherwise be available.

57.     On or around November 4, 2005, on National Public Radio's "Morning Edition" program, Thomas Hesse, President of Sony BMG's global digital business division, when asked about the XCP controversy, responded "Most people, I think, don't even know what a rootkit is, so why should they care about it?"  In the same program, Mr. Hesse also denied that Sony BMG's software communicated with Sony BMG, saying "No information ever gets gathered about the users' behavior, no information ever gets communicated back to the user, this is purely about restricting the ability to burn MP3 files in an unprotected manner."

58.     In a November 29, 2005, Business Week article, by Steve Hamm, the article states that F-Secure, a Finland-based antivirus company, notified Sony BMG on October 4, 2005, with problems associated the XCP rootkit.  The article further states that F-Secure informed Sony BMG that the rootkit "was a major security risk."

59.     Sony BMG failed to disclose that the XCP software, in the rootkit, automatically connects the user's computer via the internet to a server owned or operated by Sony BMG or its affiliates, without the user's consent.  Once a user's computer is connected to the Sony BMG website, the software sends an identification code associated with each XCP CD that is played on that computer to the Sony BMG website.  The Sony BMG server then automatically checks for updates to the album art and lyrics for that album.  This process uses the bandwidth that would otherwise be available to the user's computer for other tasks.

60.     As with the MediaMax software, this network connection provides Sony BMG with the ability to record each time a CD with XCP software is played and the IP address of the computer playing it, without receiving permission from the computer user.  As discussed above, no two IP addresses are alike and IP addresses provide the means to determine information about the person who used the particular IP address.  Sony BMG does not disclose the possibility of this use of DRM

- 12 -

software in its packaging, the installation process, or its EULA. Instead the EULA states, "the SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise."

61.   The Anti-Spyware Coalition and computer security firm Computer Associates identify Sony BMG's XCP software as "Spyware."

62.   Sony BMG's XCP software meets the ASC standards for spyware because the rootkit is placed on the computer without the user's consent and it changes the user's system security because the rootkit makes the user's computer more vulnerable to other types of malware.

63.   Computer Associates has classified the Sony BMG XCP rootkit as a form of spyware known as a "Trojan," noting that the "XCP.Sony.Rootkit modifies you[r] operating system at a low level, represents a large threat to both corporate and consumer users system integrity." Computer Associates also has noted that "[t]he Rootkit functionality hides files and enables hackers and other spyware to hide files with impunity."

64.   Computer Associates has categorized Sony BMG's "Media Player" as spyware, noting that "When launched from the CD, Music Player sends information back to Sony BMG, indicating which album is being played."

65.   Once the rootkit is on a user's computer, it creates an undisclosed risk of security breach to that computer because other malicious software, such as computer viruses, worms, and spyware that enter the computer could exploit the software concealed by the rootkit.

66.   Malicious software coders have discovered that they can effectively render their programs invisible by using names for computer files similar to ones cloaked by the Sony BMG technology.   On information and belief, several malicious programs that exploit the XCP technology's ability to avoid detection have already been distributed over the internet. Further, as

stated above, XCP software transmits information about the user's computer, IP address, and listening habits.

67.    On or around November 12, 2005, Microsoft, Inc., the maker of the Windows operating system stated that "Rootkits have a clearly negative impact on not only the security, but also the reliability and performance of their systems" and Microsoft's Anti-Malware Engineering Team informed consumers that "in order to help protect our customers we will add a detection and removal signature for the rootkit component of the XCP software."

68.    The nature of a rootkit makes it extremely difficult for a computer user to remove, often leaving reformatting the entire hard drive as the only solution. Reformatting a hard drive requires backing up all data on the hard drive, as reformatting a hard drive deletes all data on the hard drive. The user is then required to re-install the operating system and all applicable programs and drivers. This process can take many hours and is beyond the technical capabilities of many users. Sony BMG's XCP CD EULA and install process do not disclose nor does the CDs' software prompt users with information about the rootkit or the need to reformat the hard drive in order to remove it.

69.    In response to the public outcry about the deceptive nature of Sony BMG XCP CDs, Sony BMG made available a software patch. The patch was only available on the Sony BMG support site (http://cp.sonybmg.com/xcp/english/home.html). The patch does not remove the software or allow the user to remove the software. The software patch merely makes the software visible to system tools and antivirus software while installing an additional 3.5 MB of updated versions of the software into the user's computer. Additionally, the patch contains a design flaw that could cause a computer to crash as it is installed.

70.     Sony BMG failed to disclose that if a user attempts to disable the software it will likely disable the audio CD driver on the computer, rendering the user's CD drive inoperable. If the rootkit is removed manually, the Sony BMG software's changes to the user's system will render the user's CD drive non-functional.   According to computer security firm Computer Associates, "[r]econfiguring the CD-ROM driver to a functioning state will be beyond the ability of the average home user."

71.     Computer Associates categorized Sony BMG's patch as a "Trojan" and noted that the Sony BMG software, even when patched with Sony BMG's update, continues to "represent a threat to the user's control over their system . . . ."

72.     The United States Computer Emergency Readiness Team (US-CERT), part of the Department of Homeland Security that is charged with the task of "protecting the nation's Internet infrastructure" by coordinating "defense against and responses to cyber attacks across the nation" has stated that the XCP rootkit "can pose a security threat" and that "one of the uninstallation options provided by Sony BMG also introduces vulnerabilities to a system."

73.     Installation of a rootkit on a computer undermines the security of that computer.

74.     Installation of a rootkit on a computer causes impairment to the integrity or availability of data, a program, a system or information.

75.     The software installed by Sony BMG includes a set of computer instructions that are designed to modify, damage, destroy, record, and/or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information.

## SONY BMG'S FIRST XCP UNINSTALLER CREATED A GREATER SECURITY RISK AND VIOLATED USER'S PRIVACY

76.    The only known way for typical users to safely uninstall the XCP software is to obtain an uninstaller from Sony BMG.

77.    Until approximately November 15, 2005, in order to obtain an uninstaller from Sony BMG, a user was required to navigate an extensive request process and disclose personal information to Sony BMG. First, the user was required to go to the Sony BMG support website and fill out a form stating: a country where the CD was purchased; the artist's name; the album title; the store name; and the user's e-mail address. After submitting the form, the user was directed to a website which states that the user that the user will receive an e-mail with a "Case ID." Next, the user received an e-mail that directed the user to install the patch and then visit another website if the user still wanted to uninstall the DRM software.

78.    This further website, available until November 15, 2005, required the user to install ActiveX control software. The user was then required to enter the Case ID and fill in the reasons for the request. Once the user submitted this information, the user received an email that notified the user that a customer service representative would email the uninstall instructions to the user within a business day. The user then received an e-mail with a link to a confidentiality notice, which had to be accepted before software could be uninstalled.

79.    Sony BMG states that the information collected by Sony BMG before providing the uninstaller is subject to its Privacy Policy, http://www.sonybmg.com/privacypolicy.html. The Sony BMG Privacy Policy states, *inter alia*, that Sony BMG "may share the information we collect from you with our affiliates or send you e-mail promotions and special offers from reputable third parties in whose products and services we think you may have an interest. We may also share your information with reputable third-parties who may contact you directly."

80.     On information and belief, if the Sony BMG software was uninstalled using the uninstaller available until November 15, 2005, the user was no longer able to receive the full use and value of the XCP CD on his or her computer.  Therefore, Sony BMG required the user to either accept the malicious software or lose the full use and value of the XCP CD.  Sony BMG did not disclose this fact to users prior to purchase.

81.     The Sony BMG software could not be uninstalled if the user proceeded to the link from a different computer than the one on which the user installed the ActiveX control software.  If the user is not at that same computer he or she will receive an error message.  The uninstall link contains the Case ID in the address, so when the user proceeded to the uninstall link, the ActiveX control software sent a Sony BMG website an encrypted block of data.  This encrypted data was a signature that is tied to the hardware configuration of the user's computer.

82.     On information and belief, the ActiveX uninstaller left behind numerous software methods that can be exploited by others.

83.     The ActiveX uninstaller also exposed a user's computer to additional risks by enabling malicious third parties to download and install over the internet because the ActiveX uninstaller failed to restrict such access only to Sony BMG or First4Internet.  Such malicious code could severely damage a user's computer, including but not limited to erasing a user's hard disk.

84.     Sony BMG did not cause the ActiveX control to be removed from user's computers following completion of the installation process.

85.     On information and belief, the uninstallation could cause further damage to users' computers, including but not limited to, causing a user's Windows operating system to crash.

86.     On or around November 15, 2005, Sony BMG posted the following message on its website: "We currently are working on a new tool to uninstall First4Internet XCP software.  In the

- 17 -

meantime, we have temporarily suspended distribution of the existing uninstall tool for this software. We encourage you to return to this site over the next few days. Thank you for your patience and understanding." Sony BMG failed to disclose the problems associated with the old uninstaller.

87.    On or about November 28, 2005, Sony provided individuals who had requested the first uninstaller for the XCP software information on how to uninstall the first uninstaller. Yet, as of the filing of this complaint, no new uninstaller has been made available.

88.    On information and belief, the software released by Sony BMG to resolve the flaws in the XCP software can cause further damage to users' computers.

**SONY BMG HAS MADE MATERIAL
MISREPRESENTATIONS AND OMISSIONS REGARDING
THE SOFTWARE IT HAS INCLUDED ON MUSIC CDS**

89.    In addition to the material misrepresentations and omissions set forth above, Sony BMG has made numerous additional misrepresentations and omissions of material facts.

90.    On information and belief, the XCP and MediaMax CDs are disseminated to the public with identical EULAs.

91.    Sony BMG's EULAs state that the MediaMax and XCP software installed on a user's computer will not be used to collect any personal information. As set forth above, this is untrue.

92.    Sony BMG's EULAs state that the MediaMax and XCP software will remain on the user's computer until it is removed or deleted. Neither the MediaMax nor the XCP software allows a user to use the standard "add/remove program" function on the Windows operating system to remove the program. Sony BMG's MediaMax and XCP CDs and its software fail to provide information about how to remove the program or even how to contact Sony BMG to resolve any problems with the program.

93.    The EULAs disclose that the MediaMax and XCP drivers try to "protect the audio files embodied on the CD." However, the drivers also attempt to restrict access to any other CD that

- 18 -

uses MediaMax or XCP technology.  Therefore, users need only agree to installation on one album

for the software to affect users' ability to use many other titles.

94.    Sony BMG uses its website to advertise and promote the sale of its CDs to the public.

On its website, until November 15, 2005, Sony BMG falsely denied that its software is spyware and

that it posed a security risk.  Sony BMG also made the false claim that the software does not collect

any personal information nor is it designed to be intrusive to the user's computer system.

95.    On or around November 8, 2005, Sony BMG publicly and falsely stated, on the

http://cp.sonybmg.com/xcp website, that the XCP software's rootkit "component is not malicious

and does not compromise security."

96.    The above website directs users to another site, http://updates.xcp-aurora.com/, where

users can obtain a software update to remove the rootkit component of the XCP technology.  As of

the filing of this complaint, the website states that the cloaking component "is not malicious and

does not compromise security."

97.    On its support website (http://cp.sonybmg.com/xcp/english/home.html), Sony BMG

stated, until approximately November 16, 2005, that its XCP software simply acts to prevent

unlimited copying and ripping from discs featuring the technology.  Sony BMG created the false

impression that the only effect of software included on CDs would be to restrict the ability to create

copies of CDs or the quantity of CDs that a user can copy.

98.    On or around November 16, 2005, Sony BMG announced, on the

http://cp.sonybmg.com/xcp website, that it shared the security concerns of consumers regarding the

XCP discs, and offered to exchange new CDs for CDs with XCP software.  Sony BMG did not

indicate the nature or extent of the security risks associated with the XCP software.  Sony BMG also

affirmed that the XCP software was not a "monitoring technology."

99.     Sony BMG uses its website to advertise and promote the sale of its CDs to the public. On its website, until November 15, 2005, Sony BMG falsely denied that its software is spyware and that it posed a security risk.  Sony BMG also made the false claim that the software does not collect any personal information nor is it designed to be intrusive to the user's computer system.  Sony BMG has failed to make efforts to publicize the flaws in its XCP software and uninstaller, apart from statements on its websites and statements to the press.  Therefore, many XCP CD purchasers are unaware of the security and other risks caused by the software.

100.    Sony BMG has failed to publicly disclose or address the risks associated with MediaMax software and its uninstaller.  Therefore, many MediaMax CD purchasers are unaware of the security and other risks caused by the software.

101.    As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG support website misleadingly represent that the software will not be used to collect personal information about the user without his or her permission.

102.    As set forth above, the MediaMax CD EULA and the SunnComm Sony BMG support website falsely represent that MediaMax software will not be installed if the user declines the EULA.

103.    The MediaMax EULA fails to disclose other important details about what the uninstaller does, including but not limited to the security risks it poses to users' computers.

104.    According to Sony BMG, the purpose of the software is to restrict the ability to create copies of CDs or the quantity of CDs that a user can copy.  The MediaMax and XCP software goes far beyond copyright protection, however.  For example, the software makes it extremely difficult for a consumer with a PC to transfer their music to an Apple Corporation-manufactured iPod but easy to transfer to other portable digital music players, such as those sold by Sony.  Sony BMG asks

iPod owners who have XCP CDs to complain to Apple about the inability to play Sony BMG protected music on an iPod. The MediaMax support website also asks iPod owners who have MediaMax CDs to complain to Apple about the inability to play Sony BMG protected music on an iPod. To the extent that this is intended to advantage Sony BMG or its partners in the portable digital music player market, this advantage comes at the expense of consumers.

## SONY BMG'S EULAS CONTAIN NUMEROUS UNCONSCIONABLE AND UNREASONABLE PROVISIONS

105.    The XCP and MediaMax CDs are disseminated with identical EULAs.

106.    Sony BMG utilized unconscionable provisions in the EULA that accompanies the XCP and MediaMax CDs. These provisions include:

(a)    Restrictions on the user's ability to use the digital content on the CD in the event that that consumer chose to leave the United States;

(b)    Restrictions on resale and transfer of the digital content on the CDs;

(c)    Restrictions on user's ability to use the digital content on the CDs at work;

(d)    Restrictions on user's ability to use and retain lawfully-made copies of the digital content on the CDs in the event that the original CD is stolen or lost;

(e)    Restrictions on user's ability to use the digital content on the CDs following a bankruptcy;

(f)    Conditioning the user's continued use of the digital content on the CDs on acceptance of all Sony BMG software updates;

(g)    A purported $5.00 limit on Sony BMG's entire liability to the purchaser of the CDs;

(h)    Restrictions on user's ability to examine and test his or her computer to understand and attempt to prevent the damage cause by the rootkit;

(i)     A reservation of rights by Sony BMG to use technological "self-help" measures against the computers of users who desire to make use of the digital content on the CDs "at any time, without notice to [the user];" and

(j)     A disclaimer of all warranties, including implied warranties of merchantability, satisfactory quality, noninfringement, and fitness for any particular purpose.

### SONY BMG HAS CAUSED DAMAGE TO CONSUMERS AND THE PUBLIC

107.   On or around November 16, 2005, Sony BMG issued a public statement announcing that it would recall XCP CDs and allow customers to exchange the XCP CDs for CDs that would not contain any DRM.

108.   A November 30, 2005, press release by the Office of the Massachusetts Attorney General states that some of the XCP CDs are still available in stores.

109.   As of the filing of this Complaint, Sony BMG has not offered to refund the purchase price of the XCP CDs.

110.   As of the filing of this complaint, Sony BMG has not offered to recall, replace, or refund the purchase price of MediaMax CDs.

111.   As of the filing of this complaint, Sony BMG has not compensated or offered to compensate consumers for the damage it has caused to their computers.

112.   Through the actions set forth above, Sony BMG damaged its customers, including Plaintiffs and Class members, to an extent to be determined at trial, caused them actual injury, and caused them to lose money and property.

113.   Investigation into the scope and extent of the effects and damage caused by Sony BMG's software is ongoing.  Plaintiffs, on behalf of themselves and the Class, reserve the right to amend these allegations as new information is discovered.

## CLASS ACTION ALLEGATIONS

114.     Pursuant to Federal Rules of Civil Procedure 23 (a) and (b), Plaintiffs Tom Ricciuti,

Yvonne Ricciuti, and Mary Schumacher bring this action on behalf of themselves and a Class of

similarly situated persons defined as:

> All persons or entities who purchased an audio compact disc distributed by Sony
> BMG that XCP or SunnComm software and every person or entity who suffered
> damage or loss as a result of Defendants' violation of the Computer Fraud and Abuse
> Act ("CFAA").

Excluded from the Class are Defendants, any entity in which any Defendant has a controlling

interest, the officers, directors, and employees of Defendants, and the legal representatives, heirs,

successors, and assigns of Defendants.

115.     This action is brought as a class action and may properly be so maintained; pursuant

to the provisions of the Federal Rules of Civil Procedure 23.

### Numerosity

116.     Members of the Class are so numerous that their individual joinder is impracticable.

The precise numbers of members of the Class and their addresses are unknown to the Plaintiffs.

Plaintiffs estimate that the Class consists of millions of members.  The precise number of persons in

the Class and their identities and addresses may be ascertained from Defendants' records.  Members

of the Class may be notified of the pendency of this action by mail, supplemented (if deemed

necessary or appropriate by the Court) by published notice.

### Commonality

117.     Common questions of fact and law exist as to all members of the Class.  These

questions predominate over the questions affecting only individual members of the Class.  These

common legal and factual questions include:

(a)      Whether Sony BMG engaged in deceptive business practice in connection with the sale and advertising of the XCP and MediaMax CDs;

(b)      Whether some or all of the terms of the EULA are unconscionable;

(c)      Whether the MediaMax software installs on consumers' computers without authorization;

(d)      Whether the MediaMax and XCP software exceed the authorizations given by consumers;

(e)      Whether the MediaMax and XCP software are in violation of the Consumer Fraud Abuse Act, 18 U.S.C. §1030; and

(f)      Whether the communications by the MediaMax and XCP software over the internet are disclosed and necessary uses of the copy protection software.

### Typicality

118.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased a CD distributed by Defendants, and Plaintiffs were required to agree to the EULA, which did not notify Plaintiffs of the true nature of the software that the CD was to install on Plaintiffs' computers.

### Adequacy

119.    Plaintiffs are adequate representatives of the Class because of their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intends to prosecute this action vigorously.  The interests of the member of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

120.    This suit may also be maintained as a class action because Plaintiffs and the Class seek declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 23(b)(2) as

Defendants acted on grounds generally applicable to Plaintiffs and the Class, thereby making declaratory and/or injunctive relief proper.

121.    This suit may also be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member may be relatively small, especially given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Moreover, even if Class members themselves could afford such individual litigation, the court system could not. Individual litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal issue of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale and comprehensive supervision by a single court.

122.    In addition, this suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because:

(a)    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendants; or

(b)    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

- 25 -

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030)

123.    Plaintiffs incorporate by reference the allegations in all proceeding paragraphs of this complaint.

124.    As defined by 18 U.S.C. §1030, the Computer Fraud and Abuse Act ("CFAA"), the computers used by Plaintiffs and Class members are "protected computers."

125.    By engaging in the above-described acts and practices, Sony BMG (i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; and/or (iii) intentionally accesses protected computers, and as a result of such conduct, causes damage, without authorization, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(5)(A).

126.    By engaging in the above-described acts and practices, Sony BMG "intentionally accesse[d] a computer without authorization or exceeds authorized access, and thereby obtain[ed] . . . information from any protected computer if the conduct involved an interstate or foreign communication" in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(2)(C).

127.    By engaging in the above-described acts and practices, Sony BMG "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed]

- 26 -

authorized access, and by means of such conduct further[ed] the intended fraud" and obtained information "of value," in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(4).

128.     By engaging in the above-described acts and practices, Sony BMG caused and causes (i) loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value; (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; (iii) a threat to public health or safety; or (iv) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security; in violation of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(5)(B).

129.     Plaintiffs and the Class suffered and will continue to suffer damages, and there continues to be a threat to public health or safety; or damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security, as a result of Sony BMG's computer fraud and abuse.  Plaintiffs, on behalf of themselves and on behalf of the Class seek compensatory damages, injunctive relief and other equitable relief as specified below in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Violation of New York General Business Law §349, *et seq.* – Deceptive Acts and Practices)

130.     Plaintiffs incorporate by reference the allegations in all proceeding paragraphs of this complaint.

131.     Defendants' acts and practices, as described above, occurred in the conduct of business, trade, or commerce as defined in N.Y. Gen. Bus. Law § 349, et seq.

132.     Defendants' acts and practices, as described above, were and continue to be deceptive to consumers.

133.    Specifically, Sony marketed and sold to the public the XCP and MediaMax CDs in defective condition and deceptively failed to disclose their defects as described above; advertised its XCP and MediaMax CDs with intent not to sell them as advertised; represented that the purchase and/or use of its XCP and MediaMax CDs confers or involves rights, remedies, or obligations which they do not have or involve, or which are prohibited by law; inserted unconscionable provisions into the EULA that accompanies the XCP and MediaMax CDs infected with the XCP and MediaMax software; took control and modified the settings of user's computers, collected personally identifiable information about users and attempted to prevent users from blocking or disabling the XCP and MediaMax software; and failed to ensure that the XCP and MediaMax software was distributed with required copyright notices.

134.    The general public, including members of the Class, routinely rely on this type of information in making purchase decisions.  If Sony BMG disclosed this material information, Plaintiffs and other class members would not have purchased the XCP and MediaMax CDs.

135.    Sony BMG's policies and practices are unlawful, unethical, oppressive, fraudulent, and malicious.  The gravity of the harm to all consumers from Sony BMG's policies and practices far outweighs any purported utility of those policies and practices.

136.    Plaintiffs and Class members suffered injury in fact and lost money or property as a result of Defendants violations of N.Y. Gen. Bus. Law §349, *et seq*.

137.    The unlawful, unfair and deceptive business practices conducted by Defendants deceived members of the Class and the general public.

138.    Plaintiff and the Class are entitled to all applicable damages, equitable relief and attorneys' fees pursuant to N.Y. Gen. Bus. Law §349(h).

## THIRD CAUSE OF ACTION

### (Violation of New York General Business Law §350, *et seq.* – False Advertising)

139.    Plaintiff incorporates by reference the allegations in all proceeding paragraphs of this complaint.

140.    Defendants engaged in deceptive and misleading advertisements through its advertising practices, promotional materials, packaging, and public statements.

141.    Defendants' advertising practices, promotional materials, packaging, and public statements were made in the conduct of business, trade or commerce as defined by NY Gen. Bus. Law §350, *et seq.*

142.    Defendants made untrue and materially misleading statements and omitted material facts about the XCP and MediaMax CDs. Defendants' deceptive and misleading advertising practices deceived Plaintiff and members of the class along with general consumer public.

143.    Defendants' deceptive and misleading advertising practices caused harm to Plaintiff and Class members.  Defendants' continuing practice of distributing MediaMax CDs will continue to harm the Class.  Defendants' deceptive and misleading advertising practices were and are directed toward the public and such acts have caused and continue to harm the public interest.

144.    Plaintiff is entitled to all applicable damages and attorneys' fees pursuant to N.Y. Gen. Bus. Law §350-e.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

145.    Plaintiffs incorporate by reference the allegations in all proceeding paragraphs of this complaint.

146.    New York law implies a covenant of good faith and fair dealing in every contract.

147.   By engaging in the above described acts and practices, Sony BMG violated the implied covenant of good faith and fair dealing in the consumers' purchase of the XCP and MediaMax CDs.

148.   By engaging in the above described acts and practices, Sony BMG caused Plaintiff and the Class to suffer damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.   For compensatory damages in an amount to be proven at trial.

B.   For restitution and disgorgement of profits realized as a result of the unlawful conduct of defendants.

C.   For any treble and/or punitive damages to the extent permitted by law.

D.   For declaratory relief, including but not limited to, i) declaring the distribution of CDs with MediaMax and XCP software to be illegal under CFAA and ii) declaring the EULAs to be unconscionable, misleading and void.

E.   For further equitable relief, including but not limited to, requiring Sony BMG to:

(i)   Notify consumers, through widespread publicity, of the potential security and other risks associated with the XCP and MediaMax technology, to allow consumers to make informed decisions regarding their use of those CDs.  The notification process should include issuing a public statement describing the risks associated with both XCP and MediaMax software and listing every Sony BMG CD, DVD or other product that contains MediaMax software.  In addition, Sony BMG must use the banner communication system incorporated in its software to advise consumers that refunds and uninstall software is available.  The notifications must be reasonably calculated to reach all consumers who have purchased the products.

(ii)     Cooperate fully with any interested manufacturer of anti-virus, anti-spyware, or similar computer security tools, and with security researchers, to facilitate the identification and complete removal of both XCP and MediaMax software from the computers of those infected. Among other actions, Sony BMG should publicly waive any claims it may have against such vendors or researchers under the EULA, the Digital Millennium Copyright Act (DMCA), and any similar laws.

(iii)     Refund the purchase price of the CDs containing XCP technology for those consumers who prefer a refund to a replacement CD.

(iv)     Refund the purchase price of the CDs containing MediaMax technology or, at the consumer's election, provide a replacement CD that does not contain the MediaMax technology. For those consumers who choose to retain CDs containing the MediaMax technology, develop and make widely available a software update that will allow consumers to easily uninstall the technology without losing the ability to play the CD on their computers, without causing further damage to their computers, and without revealing any personally identifying information.

(v)     To avoid future abuses, prior to releasing any future product containing technology with similar functions, thoroughly test the software to determine the existence of any security risks or other possible damages the technology might cause to any user's computer and certify in a statement included in the packaging of every CD containing the technology that the product does not contain any concealed software such as the XCP rootkit, does not electronically communicate with Sony BMG or any other party nor initiate the download of any software update or other data without informed consent of the consumer immediately prior to each communication, can be uninstalled without any need to contact and/or disclose personal information to Sony BMG or its affiliates and

agents, does not present any security risks to any consumer's computer, and will not damage or reduce the functionality of the consumer's computer in any way.

     F.    For the award to Plaintiffs of their attorneys' fees and other costs of suit.

     G.    For such other and further relief as the Court deems just and equitable.

DATED:  December 2, 2005

                  LERACH COUGHLIN STOIA GELLER
                    RUDMAN & ROBBINS LLP
                  ROBERT M. ROTHMAN (RR-6090)

                        ROBERT M. ROTHMAN

                  200 Broadhollow Road, Suite 406
                  Melville, NY  11747
                  Telephone:  631/367-7100
                  631/367-1173 (fax)

                  GREEN WELLING LLP
                  ROBERT S. GREEN
                  JENELLE WELLING
                  AVIN P. SHARMA
                  595 MARKET STREET, SUITE 2750
                  San Francisco, CA  94105
                  Telephone:  (415) 477-6700
                  (415) 477-6710 (fax)

                  ELECTRONIC FRONTIER FOUNDATION
                  CINDY COHN
                  FRED VON LOHMANN
                  KURT OPSAHL
                  CORYNNE MCSHERRY
                  454 Shotwell street
                  San Francisco, CA 94110
                  Telephone: (415) 436-9333
                  (415) 436-9993 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
REED R. KATHREIN
JEFFREY FRIEDMAN
SHANNA SCARLETT
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: (415) 288-4545
(415) 288-4534 (fax)

LAWRENCE E. FELDMAN & ASSOCIATES
LAWRENCE E. FELDMAN
432 Tulpehocken Avenue
Elkins Park, PA 19027
Telephone: (215) 885-3302
(215) 885-3303 (fax)

*Attorneys for Plaintiffs*

I:\Sony\Pleadings\051202 Complaint NY FINAL.doc

- 33 -

**EXHIBIT A**

IMPORTANT-READ CAREFULLY:  This compact disc ("CD") product contains standard so-called "Red Book" compliant audio files that can be played on any standard CD player, including those contained in many personal home computer systems.  As an added feature, this compact disc ("CD") product also enables you to convert these audio files into digital music files and/or may also contain other already existing digital content (such files and content, collectively, the "DIGITAL CONTENT"), any of which may be stored on the hard drive of a personal home computer system owned by you ("YOUR COMPUTER") and accessed via YOUR COMPUTER or certain approved, compatible portable devices owned by you (each, an "APPROVED PORTABLE DEVICE").

Before you can play the audio files on YOUR COMPUTER or create and/or transfer the DIGITAL CONTENT to YOUR COMPUTER, you will need to review and agree to be bound by an end user license agreement or "EULA", the terms and conditions of which are set forth below.  Once you have read these terms and conditions, you will be asked whether or not you agree to be bound by them.  Click "AGREE" if you agree to be bound.  Click "DISAGREE" if you do not agree to be bound.  Please keep in mind, however, that if you do not agree to be bound by these terms and conditions, you will not be able to utilize the audio files or the DIGITAL CONTENT on YOUR COMPUTER.

As soon as you have agreed to be bound by the terms and conditions of the EULA, this CD will automatically install a small proprietary software program (the "SOFTWARE") onto YOUR COMPUTER.  The SOFTWARE is intended to protect the audio files embodied on the CD, and it may also facilitate your use of the DIGITAL CONTENT.  Once installed, the SOFTWARE will reside on YOUR COMPUTER until removed or deleted.  However, the SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise.

Once the SOFTWARE has been installed on YOUR COMPUTER, a menu will then appear on the screen of YOUR COMPUTER, giving you the option of playing the audio files on YOUR COMPUTER, creating a copy of the DIGITAL CONTENT directly onto the hard drive of YOUR COMPUTER, or making a limited number of back-up copies of the CD onto other, recordable CDs.  If you choose to create a copy of the DIGITAL CONTENT, the menu will then prompt you to select a file format for the DIGITAL CONTENT.  Once you have selected a file format, a copy of the DIGITAL CONTENT will automatically be created in that file format and transferred onto the hard drive of YOUR COMPUTER, where you will be able to access it using an APPROVED MEDIA PLAYE (see below) or, at you election, transfer it from YOUR COMPUTER onto an APPROVED PORTABLE DEVICE.

In order to access the DIGITAL CONTENT on YOUR COMPUTER, you will need to have a copy of an approved media player software program that is capable of playing the DIGITAL CONTENT in the file format you selected (each such approved media player, an "APPROVED MEDIA PLAYER") on YOUR COMPUTER.  You may already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER.  If you do, you will be able to play the DIGITAL CONTENT on YOUR COMPUTER without doing anything further.  This CD may also contain an APPROVED MEDIA PLAYER for the file format you selected.  If it does, the menu that appears on the screen of YOUR COMPUTER will prompt you on how to transfer a copy of that APPROVED MEDIA PLAYER onto YOUR COMPUTER.  To the extent you utilize an APPROVED MEDIA PLAYER

contained on this CD, your use of such APPROVED MEDIA PLAYER may be
subject, in each instance, to separate terms and conditions provided by
the owner of the APPROVED MEDIA PLAYER concerned.  If you do not
already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER, and
if this CD does not contain a compatible APPROVED MEDIA PLAYER, then
you will then need to secure a compatible APPROVED MEDIA PLAYER
elsewhere (e.g., on an Internet website, where you can download one).


END-USER LICENSE AGREEMENT

This End-User License Agreement ("EULA") is a legal agreement between
you and SONY BMG MUSIC ENTERTAINMENT ("SONY BMG"), a general
partnership established under Delaware law. By clicking on the "AGREE"
button below, you will indicate your acceptance of these terms and
conditions, at which point this EULA will become a legally binding
agreement between you and SONY BMG.

Article 1.  GRANT OF LICENSE
1.    Subject to your agreement to the terms and conditions set forth
in this EULA, SONY BMG grants to you a personal, non-exclusive and non-
transferable license, with no right to grant sublicenses, to:
(a)    install one (1) copy of SOFTWARE onto the hard drive of YOUR
COMPUTER, solely in machine-executable form;
(b)    install one (1) copy of any APPROVED MEDIA PLAYER(S) contained on
this CD onto the hard drive of YOUR COMPUTER, solely in machine-
executable form;
(c)    use the SOFTWARE and any APPROVED MEDIA PLAYER(S) contained on
this CD to access the DIGITAL CONTENT on YOUR COMPUTER or on an
APPROVED PORTABLE DEVICE;
in each instance, solely for your own personal and private use and not
for any other purpose(including, without limitation, any act of
electronic or physical distribution, making available, performance or
broadcast, or any act for profit or other commercial purpose) and in
accordance with the terms and conditions set forth in this EULA.
2.    The DIGITAL CONTENT and the SOFTWARE contained on this CD are
sometimes referred to herein, collectively, as the "LICENSED
MATERIALS".


Article 2.  PRODUCT FEATURES
1.    This CD contains technology that is designed to prevent users
from making certain, unauthorized uses of the DIGITAL CONTENT,
including, without limitation, the following:
(1)    making and storing more than one (1) copy of the DIGITAL CONTENT
in each available file format on the hard drive of YOUR COMPUTER;
(2)    accessing the DIGITAL CONTENT on YOUR COMPUTER (once you have
installed a copy of it on the hard drive of YOUR COMPUTER) using a
media player that is not an APPROVED MEDIA PLAYER;
(3)    transferring copies of the DIGITAL CONTENT that reside on the
hard drive of YOUR COMPUTER on to portable devices that are not
APPROVED PORTABLE DEVICES;
(4)    burning more than three (3) copies of the DIGITAL CONTENT stored
on YOUR COMPUTER (ATRAC OpenMG file format only) onto AtracCDs;
(5)    burning more than three (3) copies of the DIGITAL CONTENT onto
recordable compact discs in the so-called "Red Book"-compliant audio
file format; and
(6)    burning more than three (3) backup copies of this CD (using the

burning application provided on the CD) onto recordable CDs and burning or otherwise making additional copies from the resulting backup copies.

2.   PLEASE NOTE:  Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS may be subject to additional restrictions, under applicable copyright and other laws, that are not enforced or prescribed by any technology contained on this CD.  The absence of any such technology designed to enforce these additional restrictions should in no way be viewed or interpreted as a waiver, on the part of SONY BMG or any other person or entity owning any rights in any of the LICENSED MATERIALS, of their respective rights to enforce any such additional restrictions regarding your use of the LICENSED MATERIALS. Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS shall, at all times, remain subject to any and all applicable laws governing the use of such materials, including, without limitation, any restrictions on your use prescribed therein.

3.   All of your rights to enjoy the DIGITAL CONTENT, as described herein, shall be subject to your continued ownership of all rights in and to the physical CD on which such DIGITAL CONTENT is embodied; should you transfer your ownership rights in the physical CD on which such DIGITAL CONTENT is embodied (in whole or in part) to any other person (whether by sale, gift or otherwise), your rights in both the physical CD and such DIGITAL CONTENT shall terminate.

Article 3.  RESTRICTIONS ON USE OF LICENSED MATERIALS

1.   Except to the extent otherwise expressly permitted hereunder or otherwise by the owner of the relevant rights in or to the LICENSED MATERIALS concerned, and without limitation, the following restrictions shall apply to your use of the LICENSED MATERIALS:

(a)   You may not copy or reproduce any portion of the LICENSED MATERIALS.

(b)   You may not distribute, share through any information network, transfer, sell, lease or rent any of the LICENSED MATERIALS to any other person, in whole or in part.

(c)   You may not change, alter, modify or create derivative works, enhancements, extensions or add-ons to any of the LICENSED MATERIALS.

(d)   You may not decompile, reverse engineer or disassemble any of the LICENSED MATERIALS, in whole or in part.

(e)   You may not export the LICENSED MATERIALS outside of the country where you reside.  (This clause 1(e) of Article 3 shall not be applicable within the European Economic Area (EEA).)

(f)   You will at all times comply with, and will not circumvent or attempt to circumvent, any of the restrictions on use set forth in this Article 3 or elsewhere in this EULA.

2.   In the event that the owner of the LICENSED MATERIALS is a party other than SONY BMG (each, a "LICENSOR"), you agree that such LICENSOR shall be a third party beneficiary under this EULA and, as such, shall have the right to enforce the terms and conditions of this EULA that pertain directly to such LICENSOR'S rights in and to the LICENSED MATERIALS concerned as if such LICENSOR was a party to this EULA.  The rights granted to a Licensor under this Article shall not be revoked.

3.   SONY BMG and each LICENSOR reserve the right to use the SOFTWARE and/or any APPROVED MEDIA PLAYER to enforce their respective rights in and to the DIGITAL CONTENT, including any and all of the restrictions on use set forth in this Article 3, at any time, without notice to you.

Article 4.  INTELLECTUAL PROPERTY RIGHTS

All title to, and intellectual property rights in, the LICENSED

MATERIALS and any related documents are and shall remain owned and/or controlled solely and exclusively by SONY BMG and/or its LICENSORS. SONY BMG and/or all respective LICENSORS reserve all rights in the LICENSED MATERIALS not specifically granted to you under this EULA.

**Article 5.   EXCLUSION OF WARRANTIES**
YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT YOU ARE INSTALLING AND USING THE LICENSED MATERIALS AT YOUR OWN SOLE RISK.   THE LICENSED MATERIALS ARE PROVIDED "AS IS" AND WITHOUT WARRANTY, TERM OR CONDITION OF ANY KIND, AND SONY BMG, ITS LICENSORS AND EACH OF THEIR LICENSEES, AFFILIATES AND AUTHORIZED REPRESENTATIVES (EACH, A "SONY BMG PARTY") EXPRESSLY DISCLAIM ALL WARRANTIES, TERMS OR CONDITIONS. EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, NON-INFRINGEMENT AND FITNESS FOR A GENERAL OR PARTICULAR PURPOSE.   NO ORAL, WRITTEN OR ELECTRONIC INFORMATION OR ADVICE GIVEN BY ANY SONY BMG PARTY SHALL CREATE ANY WARRANTY, TERM OR CONDITION WITH RESPECT TO THE LICENSED MATERIALS OR OTHERWISE.   SHOULD THE LICENSED MATERIALS PROVE TO BE DEFECTIVE, YOU (AND NOT THE SONY BMG PARTY CONCERNED) AGREE TO ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIRS OR CORRECTIONS.   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, TERMS OR CONDITIONS IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY MANDATES LIABILITY, DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 6.   LIMITATION OF LIABILITY**
NO SONY BMG PARTY SHALL BE LIABLE FOR ANY LOSS OR DAMAGE, EITHER DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHERWISE, ARISING OUT OF THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, TERM OR CONDITION, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY MISREPRESENTATION, FAILURE OF ANY REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE OR ANY OTHER LEGAL THEORY ARISING OUT OF, OR RELATED TO, THIS EULA OR YOUR USE OF ANY OF THE LICENSED MATERIALS (SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF DATA, LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED EQUIPMENT, DOWN TIME AND USER'S TIME), EVEN IF THE SONY BMG PARTY CONCERNED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.   IN ANY CASE, THE ENTIRE LIABILITY OF THE SONY BMG PARTIES, COLLECTIVELY, UNDER THE PROVISIONS OF THIS EULA SHALL BE LIMITED TO FIVE US DOLLARS (US $5.00).   SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY REQUIRES LIABILITY DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 7.   DAMAGES ARISING OUT OF YOUR ACTIONS**
You shall defend and hold the SONY BMG PARTIES harmless from and against any and all liabilities, damages, costs, expenses or losses arising out of your use of the LICENSED MATERIALS, your negligent or wrongful acts, your violation of any applicable laws or regulations, and/or your breach of any provision of this EULA.

**Article 8.   UPDATES TO THE LICENSED MATERIALS**
The SONY BMG PARTIES may from time to time provide you with updates of the SOFTWARE in a manner that the SONY BMG PARTIES deem to be appropriate.   All such updates shall be deemed to be part of the

SOFTWARE for all purposes hereunder.  In the event that you fail to install an update, the SONY BMG PARTIES reserve the right to terminate the term of this EULA, along with your rights to use the LICENSED MATERIALS, immediately, without additional notice to you.  The SONY BMG PARTIES shall not be liable for any loss or damage caused by reason of your failure to install any such update or your failure to do so in the manner instructed.

**Article 9.   EXPIRATION AND TERMINATION**
1.     The rights granted to you hereunder to use the DIGITAL CONTENT are conditioned upon your continued possession of, and your continued right under a license from SONY BMG to use, the original CD product that you purchased.  In the event that you no longer possess or have the right under such license to use the original CD product, your rights hereunder to use the DIGITAL CONTENT shall expire immediately, without notice from SONY BMG.
2.     Without prejudice to any other rights SONY BMG or any SONY BMG PARTY may have hereunder, the term of this EULA shall terminate immediately, without notice from SONY BMG, and all rights you may have hereunder to use the LICENSED MATERIALS shall be immediately revoked, in the event that you: (i) fail to comply with any provision of this EULA (ii) fail to install an update of the SOFTWARE that was previously provided to you by the SONY BMG PARTIES within the time specified, or (iii) file a voluntary petition or are subject to an involuntary petition under applicable bankruptcy laws, are declared insolvent, make an assignment for the benefit of creditors, or are served with a writ of attachment, writ of execution, garnishment or other legal process pertaining to any of your assets or property.
3.     Upon the expiration or termination of this EULA, you shall immediately remove all of the LICENSED MATERIALS from your personal computer system and delete or destroy them, along with any related documentation (and any copies thereof) that you may have received or otherwise may possess.
4.     Articles 4 (Intellectual Property Rights), 6 (Limitation of Liability), 7 (Damages Arising Out Of Your Actions), 9 (Expiration and Termination), 10 (Governing Law and Waiver of Trial By Jury), and 11 (General) shall survive and remain in full force and effect following the expiration or termination of this EULA.
5.     To the extent relevant under applicable law, you and SONY BMG each agree, for the effectiveness of the termination clauses under this EULA, to waive any provisions, procedures and operation of any applicable law that might otherwise require judicial approval or a court order in order to effect the termination of this EULA.

**Article 10. GOVERNING LAW AND WAIVER OF TRIAL BY JURY**
1.     THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS EULA SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW).  THE NEW YORK COURTS (STATE AND FEDERAL), SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN NEW YORK COUNTY AND NOT ELSEWHERE.  THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS.
2.     YOU HEREBY WAIVE ALL RIGHTS AND/OR ENTITLEMENT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE THAT ARISES OUT OF OR RELATES IN ANY WAY

TO THIS EULA OR THE SOFTWARE.

Article 11. GENERAL
If any provision of this EULA is subsequently held to be invalid or
unenforceable by any court or other authority, such invalidity or
unenforceability shall in no way affect the validity or enforceability
of any other provision of this EULA.  This EULA shall be binding upon
the parties' authorized successors and assignees.  Neither party's
waiver of any breach or failure to enforce any of the provision of this
EULA at any time shall in any way affect, limit or waive such party's
right there after to enforce and compel strict compliance with every
other provision.  No modification of this EULA shall be effective
unless it is set forth in a writing signed by SONY BMG.

**EXHIBIT B**

**IMPORTANT-READ CAREFULLY:** This compact disc ("CD") product contains standard so-called "Red Book"-compliant audio files that can be played on any standard CD player, including those contained in many personal home computer systems. As an added feature, this compact disc ("CD") product also enables you to convert these audio files into digital music files and/or may also contain other already existing digital content (such files and content, collectively, the "DIGITAL CONTENT"), any of which may be stored on the hard drive of a personal home computer system owned by you ("YOUR COMPUTER") and accessed via YOUR COMPUTER or certain approved, compatible portable devices owned by you (each, an "APPROVED PORTABLE DEVICE").

Before you can play the audio files on YOUR COMPUTER or create and/or transfer the DIGITAL CONTENT to YOUR COMPUTER, you will need to review and agree to be bound by an end user license agreement or "EULA", the terms and conditions of which are set forth below. Once you have read these terms and conditions, you will be asked whether or not you agree to be bound by them. Click "AGREE" if you agree to be bound. Click "DISAGREE" if you do not agree to be bound. Please keep in mind, however, that if you do not agree to be bound by these terms and conditions, you will not be able to utilize the audio files or the DIGITAL CONTENT on YOUR COMPUTER.

**As soon as you have agreed to be bound by the terms and conditions of the EULA, this CD will automatically install** a small proprietary software program (the "SOFTWARE") onto YOUR COMPUTER. The SOFTWARE is intended to protect the audio files embodied on the CD, and it may also facilitate your use of the DIGITAL CONTENT. Once installed, the SOFTWARE will reside on YOUR COMPUTER until removed or deleted. However, the SOFTWARE will not be used at any time to collect any personal information from you, whether stored on YOUR COMPUTER or otherwise.

Once the SOFTWARE has been installed on YOUR COMPUTER, a menu will then appear on the screen of YOUR COMPUTER, giving you the option of playing the audio files on YOUR COMPUTER, creating a copy of the DIGITAL CONTENT directly onto the hard drive of YOUR COMPUTER, or making a limited number of back-up copies of the CD onto other, recordable CDs. If you choose to create a copy of the DIGITAL CONTENT, the menu will then prompt you to select a file format for the DIGITAL CONTENT. Once you have selected a file format, a copy of the DIGITAL CONTENT will automatically be created in that file format and transferred onto the hard drive of YOUR COMPUTER, where you will be able to access it using an APPROVED MEDIA PLAYER (see below) or, at you election, transfer it from YOUR COMPUTER onto an APPROVED PORTABLE DEVICE.

In order to access the DIGITAL CONTENT on YOUR COMPUTER, you will need to have a copy of an approved media player software program that is capable of playing the DIGITAL CONTENT in the file format you selected (each such approved media player, an "APPROVED MEDIA PLAYER") on YOUR COMPUTER. You may already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER. If you do, you will be able to play the DIGITAL CONTENT on YOUR COMPUTER without doing anything further. This CD may also contain an APPROVED MEDIA PLAYER for the file format you selected. If it does, the menu that appears on the screen of YOUR COMPUTER will prompt you on how to transfer a copy of that APPROVED MEDIA PLAYER onto YOUR COMPUTER. To the extent you utilize an APPROVED MEDIA PLAYER contained on this CD, your use of such APPROVED MEDIA PLAYER may be subject, in each instance, to separate terms and conditions provided by the owner of the APPROVED MEDIA PLAYER concerned. If you do not already have a copy of an APPROVED MEDIA PLAYER on YOUR COMPUTER, and if this CD does not contain a compatible APPROVED MEDIA PLAYER, then you will then need to secure a compatible APPROVED MEDIA PLAYER elsewhere (e.g., on an Internet website, where you can download one).

**END-USER LICENSE AGREEMENT**

This End-User License Agreement ("EULA") is a legal agreement between you and SONY BMG MUSIC ENTERTAINMENT ("SONY BMG"), a general partnership established under Delaware law. By clicking on the "AGREE" button below, you will indicate your acceptance of these terms and conditions, at which point this EULA will become a legally binding agreement between you and SONY BMG.

Article 1.  GRANT OF LICENSE

1.  Subject to your agreement to the terms and conditions set forth in this EULA, SONY BMG grants to you a personal, non-exclusive and non-transferable license, with no right to grant sublicenses, to:

    (a)    install one (1) copy of SOFTWARE onto the hard drive of YOUR COMPUTER, solely in machine-executable form;

    (b)    install one (1) copy of any APPROVED MEDIA PLAYER(S) contained on this CD onto the hard drive of YOUR COMPUTER, solely in machine-executable form;

    (c)    use the SOFTWARE and any APPROVED MEDIA PLAYER(S) contained on this CD to access the DIGITAL CONTENT on YOUR COMPUTER or on an APPROVED PORTABLE DEVICE;

in each instance, solely for your own personal and private use and not for any other purpose (including, without limitation, any act of electronic or physical distribution, making available, performance or broadcast, or any act for profit or other commercial purpose) and in accordance with the terms and conditions set forth in this EULA.

2. The DIGITAL CONTENT and the SOFTWARE contained on this CD are sometimes referred to herein, collectively, as the "LICENSED MATERIALS".

### Article 2.  PRODUCT FEATURES

1. This CD contains technology that is designed to prevent users from making certain, unauthorized uses of the DIGITAL CONTENT, including, without limitation, the following:

   (1) making and storing more than one (1) copy of the DIGITAL CONTENT in each available file format on the hard drive of YOUR COMPUTER;

   (2) accessing the DIGITAL CONTENT on YOUR COMPUTER (once you have installed a copy of it on the hard drive of YOUR COMPUTER) using a media player that is not an APPROVED MEDIA PLAYER;

   (3) transferring copies of the DIGITAL CONTENT that reside on the hard drive of YOUR COMPUTER on to portable devices that are not APPROVED PORTABLE DEVICES;

   (4) burning more than three (3) copies of the DIGITAL CONTENT stored on YOUR COMPUTER (ATRAC OpenMG file format only) onto AtracCDs;

   (5) burning more than three (3) copies of the DIGITAL CONTENT onto recordable compact discs in the so-called "Red Book"-compliant audio file format; and

   (6) burning more than three (3) backup copies of this CD (using the burning application provided on the CD) onto recordable CDs and burning or otherwise making additional copies from the resulting backup copies.

2. PLEASE NOTE:  Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS may be subject to additional restrictions, under applicable copyright and other laws, that are not enforced or prescribed by any technology contained on this CD.  The absence of any such technology designed to enforce these additional restrictions should in no way be viewed or interpreted as a waiver, on the part of SONY BMG or any other person or entity owning any rights in any of the LICENSED MATERIALS, of their respective rights to enforce any such additional restrictions regarding your use of the LICENSED MATERIALS.  Your use of the DIGITAL CONTENT and the other LICENSED MATERIALS shall, at all times, remain subject to any and all applicable laws governing the use of such materials, including, without limitation, any restrictions on your use prescribed therein.

3. All of your rights to enjoy the DIGITAL CONTENT, as described herein, shall be subject to your continued ownership of all rights in and to the physical CD on which such DIGITAL CONTENT is embodied; should you transfer your ownership rights in the physical CD on which such DIGITAL CONTENT is embodied (in whole or in part) to any other person (whether by sale, gift or otherwise), your rights in both the physical CD and such DIGITAL CONTENT shall terminate.

### Article 3.  RESTRICTIONS ON USE OF LICENSED MATERIALS

1. Except to the extent otherwise expressly permitted hereunder or otherwise by the owner of the relevant rights in or to the LICENSED MATERIALS concerned, and without limitation, the following restrictions shall apply to your use of the LICENSED MATERIALS:

   (a) You may not copy or reproduce any portion of the LICENSED MATERIALS.

   (b) You may not distribute, share through any information network, transfer, sell, lease or rent any of the LICENSED MATERIALS to any other person, in whole or in part.

   (c) You may not change, alter, modify or create derivative works, enhancements, extensions or add-ons to any of the LICENSED MATERIALS.

   (d) You may not decompile, reverse engineer or disassemble any of the LICENSED MATERIALS, in whole or in part.

   (e) You may not export the LICENSED MATERIALS outside of the country where you reside.  (This clause 1(e) of Article 3 shall not be applicable within the European Economic Area (EEA).)

   (f) You will at all times comply with, and will not circumvent or attempt to circumvent, any of the restrictions on use set forth in this Article 3 or elsewhere in this EULA.

2. In the event that the owner of the LICENSED MATERIALS is a party other than SONY BMG (each, a "LICENSOR"), you agree that such LICENSOR shall be a third party beneficiary under this EULA and, as such, shall have the right to enforce the terms and conditions of this EULA that pertain directly to such LICENSOR'S rights in and to the LICENSED MATERIALS concerned as if such LICENSOR was a party to this EULA.  The rights granted to a Licensor under this Article shall not be revoked.

3. SONY BMG and each LICENSOR reserve the right to use the SOFTWARE and/or any APPROVED MEDIA PLAYER to enforce their respective rights in and to the DIGITAL CONTENT, including any and all of the restrictions on use set forth in this Article 3, at any time, without notice to you.

**Article 4.  INTELLECTUAL PROPERTY RIGHTS**
All title to, and intellectual property rights in, the LICENSED MATERIALS and any related documents are and shall remain owned and/or controlled solely and exclusively by SONY BMG and/or its LICENSORS.  SONY BMG and/or all respective LICENSORS reserve all rights in the LICENSED MATERIALS not specifically granted to you under this EULA.

**Article 5.  EXCLUSION OF WARRANTIES**
YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT YOU ARE INSTALLING AND USING THE LICENSED MATERIALS AT YOUR OWN SOLE RISK.  THE LICENSED MATERIALS ARE PROVIDED "AS IS" AND WITHOUT WARRANTY, TERM OR CONDITION OF ANY KIND, AND SONY BMG, ITS LICENSORS AND EACH OF THEIR LICENSEES, AFFILIATES AND AUTHORIZED REPRESENTATIVES (EACH, A "SONY BMG PARTY") EXPRESSLY DISCLAIM ALL WARRANTIES, TERMS OR CONDITIONS. EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, NON-INFRINGEMENT AND FITNESS FOR A GENERAL OR PARTICULAR PURPOSE.  NO ORAL, WRITTEN OR ELECTRONIC INFORMATION OR ADVICE GIVEN BY ANY SONY BMG PARTY SHALL CREATE ANY WARRANTY, TERM OR CONDITION WITH RESPECT TO THE LICENSED MATERIALS OR OTHERWISE.  SHOULD THE LICENSED MATERIALS PROVE TO BE DEFECTIVE, YOU (AND NOT THE SONY BMG PARTY CONCERNED) AGREE TO ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIRS OR CORRECTIONS.  SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, TERMS OR CONDITIONS IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY MANDATES LIABILITY, DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 6.  LIMITATION OF LIABILITY**
NO SONY BMG PARTY SHALL BE LIABLE FOR ANY LOSS OR DAMAGE, EITHER DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHERWISE, ARISING OUT OF THE BREACH OF ANY EXPRESS OR IMPLIED WARRANTY, TERM OR CONDITION, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY MISREPRESENTATION, FAILURE OF ANY REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE OR ANY OTHER LEGAL THEORY ARISING OUT OF, OR RELATED TO, THIS EULA OR YOUR USE OF ANY OF THE LICENSED MATERIALS (SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF DATA, LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED EQUIPMENT, DOWN TIME AND USER'S TIME), EVEN IF THE SONY BMG PARTY CONCERNED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN ANY CASE, THE ENTIRE LIABILITY OF THE SONY BMG PARTIES, COLLECTIVELY, UNDER THE PROVISIONS OF THIS EULA SHALL BE LIMITED TO FIVE US DOLLARS (US $5.00).  SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CERTAIN INSTANCES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. THIS ARTICLE WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY REQUIRES LIABILITY DESPITE THE FOREGOING DISCLAIMER, EXCLUSION AND LIMITATION.

**Article 7.  DAMAGES ARISING OUT OF YOUR ACTIONS**
You shall defend and hold the SONY BMG PARTIES harmless from and against any and all liabilities, damages, costs, expenses or losses arising out of your use of the LICENSED MATERIALS, your negligent or wrongful acts, your violation of any applicable laws or regulations, and/or your breach of any provision of this EULA.

**Article 8.  UPDATES TO THE LICENSED MATERIALS**
The SONY BMG PARTIES may from time to time provide you with updates of the SOFTWARE in a manner that the SONY BMG PARTIES deem to be appropriate.  All such updates shall be deemed to be part of the SOFTWARE for all purposes hereunder.  In the event that you fail to install an update, the SONY BMG PARTIES reserve the right to terminate the term of this EULA, along with your rights to use the LICENSED MATERIALS, immediately, without additional notice to you.  The SONY BMG PARTIES shall not be liable for any loss or damage caused by reason of your failure to install any such update or your failure to do so in the manner instructed.

**Article 9. EXPIRATION AND TERMINATION**

1. The rights granted to you hereunder to use the DIGITAL CONTENT are conditioned upon your continued possession of, and your continued right under a license from SONY BMG to use, the original CD product that you purchased. In the event that you no longer possess or have the right under such license to use the original CD product, your rights hereunder to use the DIGITAL CONTENT shall expire immediately, without notice from SONY BMG.

2. Without prejudice to any other rights SONY BMG or any SONY BMG PARTY may have hereunder, the term of this EULA shall terminate immediately, without notice from SONY BMG, and all rights you may have hereunder to use the LICENSED MATERIALS shall be immediately revoked, in the event that you: (i) fail to comply with any provision of this EULA, (ii) fail to install an update of the SOFTWARE that was previously provided to you by the SONY BMG PARTIES within the time specified, or (iii) file a voluntary petition or are subject to an involuntary petition under applicable bankruptcy laws, are declared insolvent, make an assignment for the benefit of creditors, or are served with a writ of attachment , writ of execution, garnishment or other legal process pertaining to any of your assets or property.

3. Upon the expiration or termination of this EULA, you shall immediately remove all of the LICENSED MATERIALS from your personal computer system and delete or destroy them, along with any related documentation (and any copies thereof) that you may have received or otherwise may possess.

4. Articles 4 (Intellectual Property Rights), 6 (Limitation of Liability), 7 (Damages Arising Out Of Your Actions), 9 (Expiration and Termination), 10 (Governing Law and Waiver of Trial By Jury), and 11 (General) shall survive and remain in full force and effect following the expiration or termination of this EULA

5. To the extent relevant under applicable law, you and SONY BMG each agree, for the effectiveness of the termination clauses under this EULA, to waive any provisions, procedures and operation of any applicable law that might otherwise require judicial approval or a court order in order to effect the termination of this EULA.

**Article 10. GOVERNING LAW AND WAIVER OF TRIAL BY JURY**

1. THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS EULA SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER NEW YORK LAW). THE NEW YORK COURTS (STATE AND FEDERAL), SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN NEW YORK COUNTY AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS.

2. YOU HEREBY WAIVE ALL RIGHTS AND/OR ENTITLEMENT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE THAT ARISES OUT OF OR RELATES IN ANY WAY TO THIS EULA OR THE SOFTWARE.

**Article 11. GENERAL**

If any provision of this EULA is subsequently held to be invalid or unenforceable by any court or other authority, such invalidity or unenforceability shall in no way affect the validity or enforceability of any other provision of this EULA. This EULA shall be binding upon the parties' authorized successors and assignees. Neither party's waiver of any breach or failure to enforce any of the provision of this EULA at any time shall in any way affect, limit or waive such party's right thereafter to enforce and compel strict compliance with every other provision. No modification of this EULA shall be effective unless it is set forth in a writing signed by SONY BMG.

(ID:239675.18 -- 1/7/2005)



11

# ORIGINAL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DORA RIVAS individually and on behalf of all others similarly situated, ) | **05 CV 9598** |
| ) | |
| Plaintiff, ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| SONY BMG MUSIC ENTERTAINMENT, ) | *JUDGE KAPLAN* |
| Defendant. ) | |

## CLASS ACTION COMPLAINT

Plaintiff Dora Rivas ("Plaintiff") by and through her undersigned attorneys, hereby complains against Sony BMG Music Entertainment ("Sony" or "Defendant" ) on behalf of herself and all others similarly situated as follows. Plaintiff's allegations are based upon information and belief, except as to her own actions, which are based on knowledge. Plaintiff's information and belief are based on the investigation of her counsel, and the facts that are a matter of public record, as follows:

### NATURE OF THE CASE

1.    Starting in January 2005, Sony, the number two owner and distributor of record labels, began distributing on some of its compact discs ("CDs") a DRM (digital rights management) software program ("DRM CDs") that limits the number of copies a user can make of the CD and limits the software programs and devices that can utilize the CD to Sony and Microsoft compatible products. Users who purchase DRM CDs however, are unaware of the restriction Sony has placed on them. This is because Sony has concocted an elaborate scheme that conceals from the user that DRM CDs contain the DRM software program, the installation

of the software program, and the presence of the software program on the user's computer. As a direct result of Sony's illicit scheme, malicious software programs can use Sony's DRM Software program to access users' computers. If the user discovers Sony's DRM software program, the software program can only be uninstalled through a series of emails and software program downloads and with the assistance of a Sony Customer Assistant. Consequently, consumers who purchase DRM CDs are left with CDs that do not have the functionality they expected and with a computer vulnerable to viruses and spyware running a software program that they did not knowingly install and that cannot be reasonably removed.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to under 28 U.S.C. § 1332. The aggregate claims of Plaintiff and the Proposed Class members exceed the sum or value of $5,000,000 and are citizens of different states. Additionally, this Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1030(g) and 28 U.S.C. §§ 1331.

3.      Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c). A substantial part of the events and conduct giving rise to the violations of law complained of herein occurred in this District, Sony is headquartered in this district, and Sony conducts business with consumers in this District.

## PARTIES

4.      Plaintiff Dora Rivas is a resident of San Francisco, located in the County of San Francisco.

5.      Defendant Sony is a Delaware corporation with its principal place of business located in New York, New York.

2

## FACTUAL ALLEGATIONS

6.    Sony BMG Music Entertainment, is a 50-50 joint venture between Sony Corporation of America and Bertelsmann AG. Sony BMG is the number two record label in the world, owns and distributes recording labels such as Arista Records, Columbia Records, Epic Records, J Records, RCA Victor, RCA Records, Sonic Wave America, and boasts an artist roster that includes Aerosmith, Jennifer Lopez, Avril Lavigne, Alicia Keys, OutKast, Jessica Simpson, and Britney Spears.

7.    Starting in January 2005, Sony BMG began bundling a DRM software program with the audio files on some of its CDs, with the purported purpose of limiting the number of copies a user can make of the CD. In addition to limiting the number of copies a user can make however, Sony's DRM software program also imposes a number of compatibility and portability restraints that limit the use of the DRM CDs on computers to Sony or Microsoft compatible products and software. For example, DRM CDs can only be played and copied on a computer using Sony's DRM software program. Similarly, if the user wants to compress the audio file to save space or for use on a mobile media player, the user is forced to use Sony's DRM software program. Even more restricting, Sony's DRM software program does not allow audio file compression in the dominant non-proprietary MP3 format. Instead, Sony's DRM software program forces the user to utilize either Microsoft's and Sony's proprietary audio file compression formats. Thus, for example, users of Apple Inc.'s iPod or iTunes Media Player, which are not compatible with Microsoft or Sony products and are the dominant portable media player and computer media player, have no way of transferring tracks from DRM CDs to their iPod or playing them in iTunes Media Player.

8.    Users who purchase DRM CDs are unaware however of the restrictions Sony has placed on the use of DRM CDs. This is because Sony has concocted an elaborate scheme to

3

conceal that its DRM CDs contain its DRM software program and the limitations it imposes on consumers' use of DRM CDs.

9.    Sony's illicit scheme begins at the point of sale where it fails to properly disclose and conceals that its DRM CDs contain copyright protection technology and that such copyright protection technology will be installed and run on the user's computer materially restricting the consumer's use of the DRM CD.

10.    Sony's illicit scheme continues with the deceptive installation of its DRM software program onto the user's computer. Upon first use of a DRM CD in a computer, the user is presented with a software program that appears to be a computer media player to play and copy the CD. Unknown to the computer user however, the computer media player is actually a software program that surreptitiously installs Sony's DRM software program. In short, users do not knowingly install Sony's DRM software program, are not aware that it is running on their computer, and do not know that it imposes restrictions on their use of the audio files contained on the DRM CD.

11.    Once installed, the DRM software program utilizes a variety of software techniques, typically used by spyware and viruses software programs, to continue to conceal its existence from the user. Sony's DRM technology prevents detection by integrating  itself deep in the architecture of the operating system and by forcing the computer's operating system to hide from the user any file, directory, or process that begins with "$sys$". Sony's DRM software program however, has no mechanism in place to ensure that other software programs cannot employ the "$sys$" cloaking mechanism. In other words, any application can make itself virtually invisible to the user by renaming its files so that they begin with "$sys$."

4

Consequently, malicious software could leverage Sony's DRM cloaking mechanism to conceal its existence and circumvent most antivirus software programs on the market today.

12.     Sony also prevents its DRM software program from being listed in the commonly accessed "Add/Remove Software programs" utility in the Microsoft Windows operating system, making removal all the more difficult. Microsoft's "Add/Remove programs" utility is the most common mechanism by which users uninstall software programs from their computers. Sony even fails to provide its own uninstall utility, a function that is common in the software industry, particularly when a given software program cannot be uninstalled by Microsoft's "Add/Remove programs" utility. In fact, the only way to uninstall Sony's DRM software program is for the user to visit Sony's website, fill out a form that requires users to disclose their email address, and then wait for an email from Sony, download additional software, wait for a phone call from a technical support specialist, and then download and install yet another software program that removes the files. Additionally, because Sony's DRM software program integrates itself deep within the architecture of the operating system, if a user attempts to manually uninstall the software program the user will cripple the computer on which the software program is installed.

13.     In late October 2005, Mark Russinovich, a computer security research specialist, inadvertently discovered, while testing a software program that he was developing to reveal hidden software programs, that he had a hidden software program running on his system. Upon further investigation, Mr. Russinovich traced the installation of the hidden software program to a Sony DRM CD he had purchased and used on his computer. Mr. Russinovich published his findings on the Internet bringing to the public's attention that Sony was selling DRM CDs and the invasive and deceptive nature of Sony's DRM software program. In response to the criticism sparked by Mr. Russinovich's findings, Sony issued a patch that removes the DRM software

5

program's cloaking mechanism and that can be down loaded from Sony's website. The patch fails to remove the DRM software program, fails to add an uninstallation tool, and fails to give the software program additional functionality. Further, the patch is not included in the DRM CDs Sony currently sells, and Sony fails to disclose this on the CD, the materials accompanying the CD, or through the DRM software program's installation process.

14.     In May 2005, Plaintiff purchased a CD containing Sony's DRM software program. Shortly thereafter Plaintiff copied the CD to the computer at her parents' house. At the time of purchase and during installation Plaintiff was unaware the CD contained DRM software, that Sony's DRM software installed itself on the computer, and the limitations it imposed on her use.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action on behalf of himself and all other similarly situated people as members of a Class as defined as follows:

> All people who purchased a compact disc after January 1, 2005 containing Sony BMG Music Entertainment's digital management technology. ("the Class").

Excluded from the Class are Sony; any affiliate, parent, or subsidiary of Sony; any entity in which Sony has a controlling interest; any officer, director, or employee of Sony; any successor or assign of Sony; anyone employed by counsel for Plaintiff in this action; and any Judge to whom this case is assigned as well as his or her immediate family.

16.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

17.     **Numerosity.** Members of the Class are so numerous that their individual joinder herein is impracticable. It is estimated that Sony has sold over 15 million DRM CDs, with a substantial portion of those sales occurring in California. Although the exact number of Class

6

members and their addresses are unknown to Plaintiff, they are readily ascertainable from Sony's

records. Class member may be notified of the pendency of this action by mail, supplemented (if

deemed necessary or appropriate by the Court) by published notice.

      18.    **Existence and predominance of common questions.**  Common questions of law

and fact exist as to all members of the Class and predominate over questions affecting only

individual Class members.  These common questions include whether:

> a.    Sony fails to disclose, inadequately discloses, and conceals at the point of
> sale and through the software installation process that DRM CDs contain
> digital rights management technology;

> b.    Sony fails to disclose, inadequately discloses, and conceals at the point of
> sale and through the software installation process that Sony's DRM
> software program restricts the user's use of the audio files contained on
> DRM CDs;

> c.    Sony fails to disclose, inadequately discloses, and conceals at the point of
> sale and through the software installation process that Sony's DRM
> software is installed and runs on the user's computer;

> d.    Sony fails to disclose, inadequately discloses, and conceals at the point of
> sale and through the software installation process that Sony's DRM
> software does not have an uninstall feature and that if users attempts to
> manually uninstall the software program they will damage the computer
> on which it is installed;

> e.    Sony's DRM software and the DRM software patch damages the
> computers upon which it is installed;

    f.    Sony has a duty to disclose (a)-(e) above;

    g.    Sony has engaged in deceptive acts and practices violating the New York

        Deceptive Act and Practices Act;

    h.    Sony has violated the Computer Fraud and Abuse Act, as alleged;

    i.    Sony has violated New York trespass to chattels common law, as alleged;

        and

    j.    Plaintiff and the other Class members are entitled to damages and other

        monetary relief and, if so, in what amount.

19.    **Typicality.**  Plaintiff's claims are typical of the claims of the Class because, among other things, Plaintiff purchased a DRM CD.

20.    **Adequacy.**  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

21.    In the alternative, the Class may be certified because:

    a.    the prosecution of separate actions by the individual members of the Class

        would create a risk of inconsistent or varying adjudication with respect to

        individual Class members which would establish incompatible standards

        of conduct for Sony;

    b.    the prosecution of separate actions by individual Class members would

        create a risk of adjudications with respect to them which would, as a

        practical matter, be dispositive of the interests of other Class members not

8

parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.   Sony has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION

### (For violation of New York Deceptive Act and Practices Act, GBL § 349)

22.   Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiff and Class members against Sony.

23.   By its conduct, including the non-disclosure of material facts as alleged above, and the continued sale of DRM CDs, Sony has engaged and continues to engage in deceptive acts and practices in the conduct of business, trade and commerce, and in the furnishing of services within New York State, all in violation of New York General Business Law ("GBL") § 349.

24.   GBL § 349(h) provides in relevant part that:

> . . . any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, [and] an action to recover his actual damages . . .

25.   Plaintiff and Class members are "person[s] who have been injured" by reason of the Sony's violation of GBL § 349.

26.   Sony's acts and practices described above have directly and proximately and forseeably resulted in damages to Plaintiff and Class members, resulting in Plaintiff and Class members' costs of purchasing DRM CDs, incurring costs and damages through the DRM software program's illicit use of Plaintiff's and Class members' computers; incurring costs in

9

repairing damage cause by Sony's DRM software program, and in incurring costs in removing and attempting to remove Sony's DRM software program.

## SECOND CAUSE OF ACTION

### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

27.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein. This claim is brought on behalf of Plaintiff and Class members against Sony.

28.    This claim is brought under Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* (the "Act"). The Act applies to protect Plaintiff's and Class members' computers, as they are used in interstate or foreign commerce or communication. *See* 18 U.S.C. § 1030(e)(2)(B). By virtue of Sony's conduct set forth above, Sony violated Section 1030(a)(5) of the Act which specifically applies to anyone who:

      a.    Knowingly causes the transmission of a software program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

      b.    Intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damages; or

      c.    Intentionally accesses a protected computer without authorization, and as a result   of such conduct, causes damage.

29.    Sony has knowingly caused, and continues to cause, the transmission of its DRM software program to millions of consumers through sales at its stores and sales at major retailers of its DRM CDs. During installation, Sony intentionally accessed Class members' computers without authorization and thereby caused damage within the meaning of the Act.

30.    During the installation process, which is controlled by Sony's DRM software program, Sony accesses, installs, and reconfigures essential operating components of users'

10

Microsoft Windows operating system. Sony's transmission of injurious software code to Plaintiff's and Class members' computers was unauthorized.

31. Sony is liable under the Act, because its actions *either*: (1) intentionally caused damage, (Section 1030(a)(5)(i)); (2) recklessly caused damage (Section 1030(a)(5)(ii)); *or* (3) simply caused damage (Section 1030(a)(5)(iii)). Under the Act, "damage" is defined to include "any impairment to the integrity of availability of data, a program, a system, or information," that causes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5000 in value . . . ." 18 U.S.C. § 1030(e)(8), (a)(5)(B)(i).

32. As set out above, Sony's DRM software program makes sweeping and potentially dangerous changes to the operating system, which it does not disclose.

33. As a result of the injurious changes Sony's DRM software program makes to Class members' operating systems Class members will have to expend time and labor repairing their computers. Additionally, Sony's DRM software program has caused Plaintiff's and Class members' computers to consume computer resources, consume electricity, incur wear, and hindered computer performance. Class members have also lost personal and business opportunities and goodwill, as well as irreplaceable data. By even the most conservative calculation of damages, the damage caused by the approximately 15 million DRM CDs in circulation would produce aggregate damages far exceeding $5,000.

34. The computers used by Plaintiff and Class members are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B), as through accessing the Internet, the computers are used in interstate commerce and communication.

35. As a direct result of the installation of Sony's DRM software program, and intentional access by Sony to Plaintiff's and Class members' computers, Sony caused damage to

11

Plaintiff's and class members' computers including, but not limited to, the following: (1) the software unnecessarily modifies and reconfigures operating system files on the computer; (2) the software could result in software conflicts, system crashes, and complete Microsoft Windows operating system failure; (3) the software could result in the installation and cloaking of malicious software programs such as viruses and spyware; and (4) it is virtually impossible to remove the product from their computers without jeopardizing the operating system itself.

36.    Plaintiff and Class members suffered damages as defined in 18 U.S.C. § 1030(e), in that as a direct result of Sony's conduct, Plaintiff's and Class members' computers have suffered an impairment to the integrity or availability of data software programs including the operating system.  Such impairment has and will cause loss aggregating to at least $5000 in value in any one year period to Plaintiff and the Proposed Class.

37.    Because of Sony's violation of the Computer Fraud and Abuse Act and pursuant to 18 U.S.C. § 1030(g), Plaintiff seeks recovery of compensatory damages and injunctive relief.

### THIRD CAUSE OF ACTION

### (Trespass to Chattels)

38.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.  This claim is brought on behalf of Plaintiff and Class members against Sony.

39.    New York common law prohibits the intentional intermeddling with a chattel, including a computer, in possession of another that results in the deprivation of the use of the chattel or impairment of the condition, quality, or usefulness of the chattel.

40.    By repeatedly and persistently engaging in the act and practices described above, Sony has repeatedly and persistently engaged in trespass to chattels in violation of New York common law.

WHEREFORE, Plaintiff prays that the Court enter judgment and orders in her favor and against Sony as follows:

A.      An order certifying the Class, directing that this case proceed as a class action, and appointing Plaintiff and her counsel to represent both;

B.      Judgment in favor of Plaintiff and Class members in an amount of actual damages or restitution to be determined at trial;

C.      An order enjoining Sony from the further sale of the DRM CDs;

D.      An order granting reasonable attorneys' fees and costs, as well as pre- and post-judgment interest at the maximum legal rate; and

E.      Such other and further relief as this Court may deem appropriate.

## DEMAND FOR TRIAL BY JURY

The Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated:  November 14, 2005
        New York, New York

Respectfully submitted,

**MILBERG WEISS BERSHAD &**
**  SCHULMAN LLP**

By: _____
       Sanford P. Dumain (SD-8712)
Peter Safirstein (PS-6176)
One Pennsylvania Avenue
New York, New York  10119-0165
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

**GIRARD GIBBS &**
**  De BARTOLOMEO LLP**
Jonathan K. Levine
Eric H. Gibbs
Dylan Hughes
601 California Street, Suite 1400
San Francisco, California 94104

13

Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

**NESTER & CONSTANCE, P.C.**
David Nester
123 West Washington Street
Belleville, Illinois  62220-2021
Telephone:  (618) 234-4440
Facsimile:  (618) 234-6193

**ROBERT I. LAX & ASSOCIATES**
Robert I. Lax (RL-8413)
535 Fifth Avenue, 21st Floor
New York, NY  10017
Telephone:  (212) 818-9150
Facsimile:  (212) 818-1266

*Attorneys for Individual and Representative*
*Plaintiff Dora Rivas*

14



**12**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/1/05
```

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

JAMES MICHAELSON and ORI
EDELSTEIN, on behalf of themselves
and all others similarly situated,

              Plaintiffs,

    vs.

SONY BMG MUSIC, INC. and FIRST 4
INTERNET,

              Defendants.

Case No. :1:05-cv-09575-NRB

**STIPULATION AND ~~[PROPOSED]~~ CASE MANAGEMENT ORDER NUMBER 1**

IT IS HEREBY STIPULATED, AGREED AND ORDERED as follows:

WHEREAS, the related actions *Rivas, et al., v. Sony BMG Music Entertainment*, 1:05-cv-09598-LAK (S.D.N.Y. filed November 14, 2005); *Potter, et al., v. Sony BMG Music Entertainment*, 1:05-cv-09607-GBD (S.D.N.Y. filed November 14, 2005); and *Klewan and Springer, et al., v. Arista Holdings Inc. d/b/a Sony BMG Music Entertainment*, 1:05-cv-09609-UA (S.D.N.Y. filed November 14, 2005) (collectively, "Actions") are pending before this Court; and,

WHEREAS, counsel for the plaintiffs have each concluded that it in the best interests of the respective parties and absent putative class members that the above captioned actions be consolidated for all purposes and proceed as contemplated herein; and,

WHEREAS, all served parties, through their respective counsel, have stipulated to the terms provided herein;

WHEREAS, it is anticipated that additional related actions may be transferred to, removed to or filed in this Court; and,

WHEREAS, the existence of common questions of law and fact in the Actions now pending before this Court, the interests of fair and efficient administration of the Actions and the avoidance of unnecessary duplicative efforts, warrants the consolidation of the Actions, establishment of an organizational structure for plaintiffs' counsel, and the setting of a status conference to discuss, among other things, schedules for the filing of pleadings, motion practice and discovery, and good cause appearing therefor;

**IT IS HEREBY ORDERED AS FOLLOWS:**

   **I.   CONSOLIDATION AND TREATMENT OF SUBSEQUENT ACTIONS**

   1.   The Court finds that *Rivas, et al., v. Sony BMG Music Entertainment*, 1:05-cv-09598-LAK; *Potter, et al., v. Sony BMG Music Entertainment*, 1:05-cv-09607-GBD; and *Klewan and Springer, et al., v. Arista Holdings Inc. d/b/a Sony BMG Music Entertainment*, 1:05-cv-09609-UA are related actions and such cases are hereby consolidated into *Michaelson, et al., v. Sony BMG Music, Inc., et al.*, 1:05-cv-09575-NRB, and are referred to herein as the Consolidated Action. Each document filed by a party to this litigation shall bear the following caption:

--------------------------------------------------
In Re Sony BMG CD Technologies Litigation         No. 1:05-cv-09575-NRB
--------------------------------------------------

   2.   The terms of this Order shall apply to actions later instituted in, removed to, or

2

transferred to this Court that involve the same or substantially similar issues of law and fact, subject to the following procedures:

    i.    When such a case is filed in, removed to, or transferred to this Court, the Clerk of the Court shall:

        (1)    place a copy of this Order in the separate file for such action;

        (2)    provide a copy of this Order by mail or electronically pursuant to the local rules to counsel for plaintiff(s) in the newly filed or transferred action and to any defendant(s) in the newly filed or transferred action; and

        (3)    make an appropriate entry on the docket for the Consolidated Action.

    ii.    Each new case that arises out of the subject matter of the Consolidated Action which is filed in this Court or transferred to this Court, shall be consolidated with the Consolidated Action and this Order shall apply thereto, unless a party in such newly-filed or transferred action objects to consolidation, as provided for herein, or any provision of this Order, within ten (10) days after the date upon which a copy of this Order is served on counsel for such party, by filing an application for relief and this Court deems it appropriate to grant such application.

3.    Counsel shall call to the attention of the Court and the Clerk the filing or transfer of any case which might properly be consolidated with the Consolidated Action. Mailing or other delivery of a copy of this Order by Defendants' counsel or Plaintiffs' Co-Lead Counsel (see II., below), as appropriate, to the counsel in any newly filed or transferred actions shall

constitute valid notice thereof for purposes of establishing its applicability to such action in accordance herewith.

4.    A status conference is set for *December 22* at *3:30* p.m. The agenda for the status conference shall include a schedule for the filings of pleadings or other motion practice, a discovery plan, a schedule for class certification, the potential for settlement mediation, and such other matters as the parties or the Court deem appropriate.

## II. ORGANIZATION OF PLAINTIFFS' COUNSEL

1.    Under Federal Rule of Civil Procedure 23(g)(2), *inter alia*, Interim Class Counsel and Plaintiffs' Co-Lead Counsel shall be Kamber & Associates, LLC and Girard Gibbs & De Bartolomeo LLP ( collectively, "Co-Lead Counsel"). Co-Lead Counsel, acting on behalf of plaintiffs, shall have the following duties:

a.    To coordinate all proceedings, including preparing, structuring, and presenting pretrial and other management-related orders;

b.    To encourage full cooperation and efficiency among all counsel;

c.    To create any necessary committees and appoint committee chairs and otherwise delegate responsibilities for specific tasks in a manner to assure that pretrial and trial preparation is conducted effectively, efficiently, and economically;

d.    To delegate work responsibilities and monitor the activities of counsel to assure that schedules are met and unnecessary expenditures of time and expense are avoided;

e.    To act as spokespersons at all court conferences;

f.    To call meetings of themselves and/or other counsel as appropriate or necessary from time to time;

4

      g.      To initiate and conduct settlement negotiations with counsel for the
Defendant;

      h.      To determine Plaintiffs' position on all matters arising during this
litigation (after such consultation with other counsel as they deem appropriate) and present such
position orally and/or in writing to the Court and opposing parties;

      i.      To consult with and employ experts, as necessary;

      j.      To initiate, coordinate and conduct discovery;

      k.      To represent Plaintiffs at trial and on any appeal of this matter;

      l.      To negotiate and execute agreements with local counsel or other
cooperating attorneys;

      m.      To determine the fee that local counsel and liaison counsel are entitled
to; and

      n.      To perform such other duties as are necessary in connection with the
prosecution of this litigation.

    2.      Plaintiffs' Executive Committee shall be Milberg Weiss Bershad & Schulman
LLP; Kirby McInerney & Squire, LLP; and Giskan & Solotaroff, LLP. Co-Lead Counsel shall
convene and consult with the Executive Committee members as is necessary to ensure the
efficient coordination and prosecution of this litigation.

    3.      Co-Lead Counsel shall be the contact between plaintiffs' counsel and defendants'
counsel as well as the spokespersons for plaintiffs' counsel. All agreements reached with the
Co-Lead Counsel shall be binding on all other plaintiffs' counsel in the Consolidated Action.

    4.      Co-Lead Counsel are hereby designated as the counsel for plaintiffs in the
Consolidated Action upon whom all notices, orders, pleadings, motions, discovery, and
memoranda relating to the Consolidated Action shall be served, and defendants shall effect

5

service of papers on plaintiffs in the consolidated Action by serving each of the Co-Lead

Counsel.

      5.      No motion or request for discovery shall be served or filed by plaintiffs, or other

pretrial proceedings initiated by plaintiffs, except by or with the authorization of Co-Lead

Counsel.

      6.      The organization structure set forth in this section applies to all plaintiffs' counsel

in the Consolidated Action, including any action subsequently governed by this Order.

      7.      No communications among plaintiffs' counsel shall be taken as a waiver of any

privilege or protection to which they would otherwise be entitled.

### MODIFICATION OF THIS ORDER

      This Order may be modified, supplemented or superseded by order of the Court or upon

any party for good cause shown.

6

| | |
|---|---|
| **DEBEVOISE & PLIMPTON LLP** | **KAMBER & ASSOCIATES, LLC** |
| **Electronically filed with consent**<br>By:_____<br>    Jeffrey S. Jacobson | **Electronically filed by signatory**<br>By:_____<br>    Scott A. Kamber (SK-5794) |
| 919 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 909-6479<br>Facsimile: (212) 521-7479 | 19 Fulton Street, Suite 400<br>New York, New York 10038<br>Telephone: (212) 571-2000<br>Facsimile: (212) 202-6364 |
| *Counsel for Defendant Sony BMG Music*<br>*Entertainment, Inc.* | *Attorneys for Plaintiffs James Michaelson*<br> *& Ori Edelstein* |

**GIRARD GIBBS & De BARTOLOMEO LLP**

**Electronically filed with consent**
By:_____
      Jonathan K. Levine (JL-8390)

Daniel C. Girard
Eric H. Gibbs
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Sanford P. Dumain (SD-8712)
Peter Safirstein (PS-6176)
**MILBERG WEISS BERSHAD &**
**SCHULMAN LLP**
One Pennsylvania Avenue
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

David Nester
**NESTER & CONSTANCE, P.C.**
123 West Washington Street
Belleville, Illinois 62220
Telephone: (618) 234-4440
Facsimile: (618) 234-6193

Robert I. Lax (RL-8413)
**ROBERT I. LAX & ASSOCIATES**
535 Fifth Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 818-9150
Facsimile: (212) 818-1266

*Attorneys for Plaintiff Dora Rivas*

|  | **KIRBY McINERNEY & SQUIRE, LLP** |
|  | **Electronically filed with consent** |
|  | By:_____ |
|  |     Ira M. Press (IP-5313) |
|  | Mark A. Strauss (MS-2288) |
|  | 830 Third Avenue |
|  | New York, New York  10022 |
|  | Telephone:  (212) 317-2000 |
|  | Facsimile:  (212) 751-2540 |
|  | *Attorneys for Plaintiff Jeffrey Potter* |
|  | **GISKAN & SOLOTAROFF, LLP** |
|  | **Electronically filed with consent** |
|  | By:_____ |
|  |     Jason L. Solotaroff (JS-5739) |
|  | 207 West 25th Street |
|  | New York, New York  10001 |
|  | Telephone:  (212) 847-8315 |
|  | Facsimile:  (212) 473-8096 |
|  | Daniel Lynch |
|  | **CIRIGNANI HELLER HARMAN & LYNCH** |
|  | 150 S. Wacker Drive, #2600 |
|  | Chicago, IL  60606 |
|  | Telephone:  (312) 346-8700 |
|  | Facsimile:  (312) 896-5883 |
|  | Ethan Preston |
|  | 150 S. Wacker Drive, #2600 |
|  | Chicago, IL  60606 |
|  | Telephone:  (312) 346-8700 |
|  | Facsimile:  (312) 896-5883 |
|  | *Attorneys for Plaintiff Andrew Klewan and James Springer* |

/continued

SO ORDERED, this __ day of November 2005.

HON. NAOMI REICE BUCHWALD
UNITED STATES DISTRICT COURT JUDGE
SOUTHERN DISTRICT OF NEW YORK



**13**

Jennifer Sarnelli, Esq.
WILENTZ, GOLDMAN & SPITZER
A Professional Corporation
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Tel: (732) 636-8000
Attorneys for Plaintiff

Jeffrey S. Jacobson, Esq.
Marissa M. Grimes, Esq.
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000
Attorneys for Defendant
SONY BMG Music Entertainment

**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF NEW JERSEY**

-------------------------------------------------------X

| | | |
|---|---|---|
| Darren DeMarco, on behalf of himself and all others similarly situated | : | |
| | : | |
| | : | |
| Plaintiffs, | : | 05-5485 (WHW) |
| | : | |
| v. | : | |
| Sony BMG Music, | : | |
| and SunnComm Technologies, Inc., and | : | JOINT STIPULATION |
| Does 1 – 300. | : | FOR CHANGE OF VENUE |
| | : | |
| Defendants. | : | |

-------------------------------------------------------X

It is stipulated that the interests of justice, with due regard to the convenience of the defendant and the witnesses and to the prompt administration of justice as a formal case management structure is presently in place before Judge Buchwald in the transferring District, will be served by transferring this proceeding to the United States District Court for the Southern District of New York.

DEBEVOISE & PLIMPTON LLP          WILENTZ, GOLDMAN & SPITZER
Attorneys for Defendant            Attorneys for Plaintiffs
SONY BMG Music Entertainment

By: _____      _____
    JEFFREY S. JACOBSON            JENNIFER SARNELLI
Jennifer Sarnelli, Esq.



**14**

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT

NO. CV-2005-09329

ENDORSED
FILED IN MY OFFICE THIS

DEC 1 9 2005

*Juanita M. Duran*
CLERK DISTRICT COURT

LORENZO D. FREEMAN

CHAD BLACK, on behalf of himself and all
Other similarly situated, ·

     Plaintiff,

vs.

SONY BMG MUSIC ENTERTAINMENT and
DOES I through 100,

     Defendants.

## NOTICE OF FILING NOTICE OF REMOVAL

Defendant Sony BMG Music Entertainment gives notice that, on December __19th__, 2005,

a Notice of Removal of the above-captioned action was filed in the United States District Court

for the District of New Mexico. A true and correct copy of the Notice of Removal (exhibits

omitted) is attached as Exhibit 1.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _____
     Andrew G. Schultz
P.O. Box 1888
210 Third St. NW, #2200
Albuquerque, NM 87103-1888
Telephone:   (505) 765-5900
Facsimile:   (505) 768-7395

     -and-

Bruce P. Keller
Jeffrey S. Jacobson
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
Telephone:      (212) 909-6000
Facsimile:      (212) 909-6836

*Attorneys for Defendant Sony BMG Music Entertainment*

We hereby certify that a true copy of
the foregoing pleading was hand-
delivered to the following counsel of
record at the following address:

     Nicholas Koluncich III
     Law Offices of Nicholas Koluncich III
     6804 Fourth Street, NW
     Albuquerque, NM  87107

this **19th** day of December, 2005.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _____
     Andrew G. Schultz

2

FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE. NEW MEXICO

DEC 1 9 2005

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHAD BLACK, on behalf of himself and all
Other similarly situated,

       Plaintiff,

vs.

SONY BMG MUSIC ENTERTAINMENT and
DOES I through 100,

       Defendants.

CIV NO. 0 5 - 1 3 1 5    WDS RLP

### NOTICE OF REMOVAL

Petitioner-Defendant Sony BMG Music Entertainment ("Petitioner"), pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446, and 1453, respectfully submits this Notice of Removal. As grounds for removal, Petitioner states as follows:

**I.    Procedural Background**

    1.    On December 7, 2005, Plaintiff commenced an action in the Second Judicial District Court, State of New Mexico, case number CV-2005-09329 (the "State Court Action").

    2.    On December 12, 2005, Petitioner received the following documents: (a) the summons and complaint (the latter, the "Complaint") in the State Court Action, attached as Exhibit A; (b) Plaintiff's Notice of Motion and Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion for TRO") and supporting memorandum, attached as Exhibit B; and (c) a copy of the temporary restraining order (the "TRO") granted *ex parte* on the same date by the Honorable Judge Clay Campbell, Second Judicial District Court, State of New Mexico, Bernalillo County.

3. The TRO enjoined Petitioner

> [f]rom consolidating, releasing or dismissing any claims for damages or equitable relief in this action purportedly on behalf of New Mexico consumers in any way related to Defendant's dissemination of audio discs containing any form of "copy-protection" technology, or publishing or disseminating any proposed settlement notice purporting to do so.

Judge Campbell set a hearing date of December 22, 2005 for the preliminary injunction sought by the Motion for TRO.

4. Petitioner has not yet filed an answer to the Complaint or an opposition to the Motion for TRO filed in the State Court Action.

5. This Notice of Removal is timely filed under 28 U.S.C. § 1446(b), which provides that a defendant may file a notice of removal

> within thirty days after the receipt ... of a copy of the initial pleading setting forth the claim for relief. ...
>
> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

*Id.* The filing deadline is met here. Petitioner received both the Complaint and the Motion for TRO on December 12, 2005, and is filing this petition on December 19, 2005, well before thirty days will have elapsed.

## II. Removal is Proper on the Basis of Diversity Jurisdiction.

6. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, Pub.L. No. 109-2, 119 Stat. 4 (2005) ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). Removal is authorized, therefore, by 28 U.S.C. § 1441.

7. This action is a "class action" within the meaning of the jurisdictional and removal provisions of the CAFA because it was filed under a State statute or rule of judicial

2

procedure – Rule 1-023 NMRA – that is similar to Fed. R. Civ. P. 23 in that it authorizes an action to be brought by one or more representative persons as a class action. 28 U.S.C. § 1332(d)(1). *See* Compl. ¶¶ 17-27.

    A.    The Amount in Controversy Threshold is Met

    8.    A federal district court has jurisdiction over a class action under CAFA where the matter in controversy exceeds $5,000,000. 28 U.S.C. § 1332(d)(2).

    9.    The Complaint alleges that Petitioner sold "millions of copies" of purportedly defective audio discs (the "audio discs") and that "the Class will number in excess of tens of thousands individuals [sic]." Compl. ¶¶ 18.

    10.    Although the Complaint does not specify the precise dollar value of the purported claims, it does allege that each member of the putative class is entitled to several forms of monetary recovery. For instance, Plaintiff seeks restitution, including disgorgement from Petitioner of "all of its ill-gotten gains" and "all monies wrongfully acquired by defendant by means of the wrongful conduct alleged herein." Compl., Prayer for Relief, ¶ 2.

    11.    Plaintiff also alleges damage to the computer hardware of "tens of thousands" of class members, constituting, at a minimum, "trespass to chattel."

    12.    On its face, therefore, the Complaint is removable under CAFA.

    13.    Additionally, a defendant may seek removal upon receipt of a "motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b). *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68-69 (1996); *Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1078 (10th Cir. 1999).

    14.    Plaintiff's Motion for TRO and accompanying filings clearly establish that the amount in controversy exceeds the jurisdictional minimum. The memorandum of law in support

of the TRO ("Mem. Supp. TRO") alleges that the claims asserted "on behalf of New Mexico consumers are worth millions of dollars." Mem. Supp. TRO, at 8.

15.     The TRO papers also make clear that Plaintiff is seeking recovery for purported violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.* (the "DMCA"), and the Audio Home Recording Act, 17 U.S.C. § 1001 *et seq.* (the "AHRA"). Plaintiff "seeks disgorgement of...improper profits" gained from royalties and fees specified by those statutes. Mem. Supp. TRO at 4. These amounts allegedly range from a percentage of the sales price of audio discs and all digital audio recording devices and mediums, to approximately $1.00 per audio disc equipped with the copy protection software. *See id.*; Compl. ¶¶ 30, 37, and Prayer for Relief, at 14-15.

16.     The DMCA and AHRA further allow private litigants to seek statutory rather than actual damages. *See* 17 U.S.C. §§ 1009(d)(1), 1203(c)(1). For DMCA claims, statutory damages can range from $200 to $2,500 "per act" in violation of the statute. *See* 17 U.S.C. § 1203(c)(3). Plaintiff asserts that these damages are available to each of the "tens of thousands" of consumers based on each of the "millions" of offending audio discs, and his affidavit in support of his Motion for TRO valued these alleged claims in the "tens or hundreds of millions of dollars." Memo Supp. TRO, Ex. D., ¶ 8. These sums are well in excess of the $5 million CAFA minimum.

17.     Based on the allegations in Plaintiff's complaint regarding the size of the class, the types of remedies sought in the complaint, the claims asserted in Plaintiff's Motion for TRO and the potential damages available to Plaintiff under the DMCA and AHRA, the amount in controversy in this litigation exceed $5,000,000.

4

B.    Diversity of Citizenship is Present

18.    Diversity of citizenship exists in class actions where "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). (CAFA alters this standard under circumstances not present in this case. *See* 28 U.S.C. § 1332(d)(3), (d)(4), (d)(5), (d)(9).) This minimal threshold is easily met in this action.

19.    Petitioner Sony BMG Music Entertainment is a Delaware General Partnership with its headquarters and principal place of business in New York, NY. Compl. ¶ 7. Plaintiff alleges that he is "presently domiciled" in New Mexico, *id.* ¶ 6, and is thus a citizen of New Mexico for purposes of diversity jurisdiction. *See Crowley v. Glaze*, 710 F.2d 676, 678 (10th Cir. 1983). Because Plaintiff has brought this case as a purported class action, *see* 28 U.S.C. § 1332(d)(8), because diversity exists between the defendant and at least one member of the class (indeed, between the defendant and the *entire* purported class), and because the CAFA jurisdictional minimum is met, the State Court Action may be removed to this Court under the CAFA removal provisions, which permit removal to the district court "without regard to whether any defendant is a citizen of the State in which the action is brought" and "by any defendant without the consent of all defendants." 28 U.S.C. § 1453(b). No exception to removal under the CAFA applies. *See* 28 U.S.C. § 1453(d). The identities of the "Doe" defendants (if any) do not matter for purposes of removal under 28 U.S.C. § 1441.

III.    **Removal Also is Proper on the Basis of Federal Question Jurisdiction**

20.    Even if diversity jurisdiction were absent, removal would be available on the independent basis that this action raises a federal question. *See* 28 U.S.C. § 1441(b), 1331.

21.    Plaintiff's Complaint and TRO application make clear that he alleges violations of and seeks relief under the DMCA and the AHRA. The action thus asserts "claim[s] or right[s] arising under the . . . laws of the United States" and as such can be removed "without regard to

5

the citizenship or residence of the parties." 28 U.S.C. § 1441(b). Moreover, both the DMCA and the AHRA vest federal courts with original jurisdiction over private lawsuits alleging violations of their terms. *See* 17 U.S.C. §§ 1009(a) (AHRA) and 1203(a) (DMCA).

22.     The Complaint alleges that, pursuant to the DMCA, "approximately $1.00 is added to the price of each audio disc to defray the alleged 'costs' of unauthorized reproduction," and that Petitioner did not disclose this fact to consumers. Compl. ¶ 30. The Complaint includes a demand that Petitioner "disgorge all of its ill-gotten gains" and an award of "full restitution of all monies wrongfully acquired ... by means of the wrongful conduct alleged herein." Compl., Prayer for Relief, ¶ 2(b)-(c).

23.     The Complaint itself thus demonstrates the presence of a federal question. Plaintiff's Motion for TRO makes this fact even plainer.

24.     As noted above in ¶ 13, a defendant may seek removal based on allegations in the "initial pleading" or, where that pleading does not state a case, in a "motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. 1446(b). *See Caterpillar Inc.*, 519 U.S. at 68-69; *Huffman*, 194 F.3d at 1078 (§ 1446(b) ensures that "a defendant has an opportunity to assert the congressionally bestowed right to remove upon being given notice in the course of the case that the right exists") (internal quotation marks and citations omitted); *Chavez v. Kincaid*, 15 F. Supp. 2d 1118, 1123 (D.N.M. 1998) ("'Other paper' is a broad term, and includes any relevant information received by Defendants"); *Butts v. Hansen*, 650 F. Supp. 996 (D. Minn. 1987) (denying motion to remand where basis for removal appeared in filings supporting a temporary restraining order).

25.     Plaintiff's filings in support of the Motion for TRO explain in clear terms that this case presents a federal question and is removable under 28 U.S.C. § 1441(b). By its terms, that

6

motion seeks "only to separate [Plaintiff's] *claims for violations of the [DMCA] and [AHRA]* . . . from the extant claims from the New York and California actions." Mem. Supp. TRO, at 7. The motion papers, like the Complaint, also state that Plaintiff is seeking disgorgement of "improper profits" from fees and royalties allegedly imposed by Petitioner on audio discs and digital audio recording devices pursuant to the DMCA and AHRA. *Id.* at 4.

26.     Federal courts have original jurisdiction over private rights of action asserting violations of the DMCA and AHRA. *See* 17 U.S.C. §§ 1009, 1203. Because Plaintiff unambiguously asserts claims and seeks relief under these statutes, removal is appropriate pursuant to 28 U.S.C. § 1441(a)-(b).

## IV.     This Court Has Supplemental Jurisdiction Over Plaintiff's State-Law Claims.

27.     To the extent that any of the claims in the State Court Action do not arise under the DMCA or AHRA, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a) or 1441(c).

28.     Moreover, the claims asserted under New Mexico statutory and common law do not raise novel or complex issues of state law, they do not predominate over the federal question claims over which this Court has original jurisdiction, and there are no exceptional circumstances or other compelling reasons for this Court to decline jurisdiction over these questions.

## V.     Filing with State Court; Right to Amend

29.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Second Judicial District Court, State of New Mexico, Bernalillo County, and is being served on Plaintiff.

30.     Petitioner reserves the right to amend or supplement this Notice of Removal.

WHEREFORE, Petitioner respectfully requests that the State Court Action now pending in the Second Judicial District Court, State of New Mexico, bearing case number CV-2005-

09329, be removed to this Court, and asks that this Court make and enter such further orders as may be necessary and proper.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _____
Andrew G. Schultz
P.O. Box 1888
210 Third St. NW, #2200
Albuquerque, NM 87103-1888
Telephone:    (505) 765-5900
Facsimile:    (505) 768-7395

-and-

Bruce P. Keller
Jeffrey S. Jacobson
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone:    (212) 909-6000
Facsimile:    (212) 909-6836

*Attorneys for Defendant Sony BMG Music Entertainment*

We hereby certify that a true copy of
the foregoing pleading was hand-
delivered to the following counsel of
record at the following address:

    Nicholas Koluncich III
    Law Offices of Nicholas Koluncich III
    6804 Fourth Street, NW
    Albuquerque, NM 87107

this **19th** day of December, 2005.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _____
Andrew G. Schultz

8